**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :

**In re**                            :        **Chapter 11**
                                          :

**NORTHERN BERKSHIRE**      :       **Case No. 11-_____ (    )**
**HEALTHCARE, INC.,** *et al.,*[1]   :
                                          :       **(Jointly Administered)**
               **Debtors.**           :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF CHRISTOPHER L. HICKEY
IN SUPPORT OF CHAPTER 11 PETITIONS
AND FIRST DAY MOTIONS AND APPLICATIONS**

I, Christopher L. Hickey, hereby declare as follows:

1.      I am the Chief Financial Officer of Northern Berkshire Healthcare, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). In this capacity, I am familiar with the Debtors' day-to-day operations, business, and financial affairs.

2.      On June 13, 2011 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

3.      I submit this declaration (the "Declaration") in support of the Debtors' chapter 11 petitions and certain motions and applications filed on the Petition Date.

4.      Except as otherwise indicated, all statements set forth in this Declaration are based upon (i) my knowledge as Chief Financial Officer, (ii) information supplied to me by

---

[1] The Debtors in these cases are Northern Berkshire Healthcare, Inc., North Adams Regional Hospital, Inc., Visiting Nurse Association & Hospice of Northern Berkshire, Inc., Northern Berkshire Realty, Inc., and Northern Berkshire Healthcare Physicians Group, Inc.

other members of the Debtors' management or Debtors' professionals, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs. If called upon to testify, I could and would testify to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration.

5.      Part I of this Declaration describes the Debtors' business, financial information, and organizational structure, Part II describes the Debtors' capital structure, Part III describes the circumstances giving rise to the commencement of these chapter 11 cases, and Part IV sets forth certain facts in support of the individual first day motions and applications (the "First Day Motions").

## I.

### Overview of the Debtors' Business Operations, Financials, and Organizational Structure

A.      The Debtors

6.      Northern Berkshire Healthcare, Inc. ("NBH") is a non-profit healthcare corporation in northern Berkshire County, Massachusetts. NBH, originally named Northern Berkshire Health System Inc., was founded in 1984 with the mission to provide healthcare to the local community. NBH has 25 employees, and the Debtors are, together with NBHPG (defined below) the second largest employer in Berkshire County, with 600 employees in full and part-time positions. NBH serves a population of approximately 43,000.

7.      NBH operates through several affiliates, each of which is a non-profit corporation. Northern Adams Regional Hospital, Inc. ("NARH") operates North Adams Regional Hospital, a full-service community hospital with 109 beds and 12 bassinets located in North Adams, Massachusetts. The hospital was founded in 1884 and has provided healthcare to the surrounding community for over 125 years. The hospital provides a full range of adult and pediatric in-patient and out-patient medical care, including both general and specialized surgery

2

services, and runs an emergency department open 24 hours a day, 365 days a year. NARH is the

largest employer in North Adams, with 483 full and part-time employees.

8.      The hospital is the only major medical facility and emergency care facility

in the region. The next nearest hospitals are located in Pittsfield, Massachusetts and Bennington,

Vermont, over 21 and 18 miles away, respectively. Due to a lack of major roads connecting these

communities and the region's mountainous terrain, these facilities are typically more than a 35

minute drive from North Adams.

9.      The Visiting Nurse Association & Hospice of Northern Berkshire, Inc.

(the "VNA") is a provider of professional home health care. Founded in 1911, the VNA provides

nursing and hospice care services in the homes of patients, allowing them to recuperate from

illness, injury, or childbirth or manage a medical condition while staying in their own home. The

VNA has 63 full and part-time employees. In fiscal year 2010,[2] the VNA served approximately

1,313 patients.

10.     Northern Berkshire Realty, Inc. ("NBR") was formed to hold certain real

estate assets of the Debtors and does not have employees.

11.     Northern Berkshire Healthcare Physicians Group, Inc. ("NBHPG") was

established in February 2008 to provide an organizational structure for NBH-related physicians

and physician practices, and has 29 employees. NBHPG includes Northern Berkshire Obstetrics

and Gynecology, Northern Berkshire Family Medicine, Northern Berkshire ENT, and Northern

Berkshire General Surgery. NBHPG requires periodic financial support from NBH to cover

operational losses. NBHPG is not a co-obligor for the Debtors' substantial secured bond debt,

which is described in detail below in Part II.

---

[2] The Debtors' fiscal year runs from October 1 to September 30.

B.      The Sweets

12.     Northern Berkshire Community Services, Inc. ("NBCS"), which is not a Debtor, is the former owner of Sweet Brook Transitional Care & Living Centers ("Sweet Brook"), a 184-bed skilled nursing facility, and Sweetwood Continuing Care Retirement Community ("Sweetwood", and together with Sweet Brook, the "Sweets"), a 70-unit continuing care retirement community. Both of the Sweets are located in Williamstown, Massachusetts. The Debtors acquired the Sweets in 1999 and sold them on August 15, 2010. Following the sale, NBCS has few remaining assets. The Sweets and their impact on the Debtors' operations are discussed in further detail in Part III.

C.      General Financial Information

13.     As of September 2010, the Debtors books showed, on a consolidated basis, approximately $63 million in assets, including approximately $35 million in property, plant, and equipment.

14.     For fiscal year 2010, the Debtors recorded, on a consolidated basis, revenues of approximately $68.5 million versus operating expenses of approximately $74.8 million. The Debtors recorded a net loss of approximately $14.2 million in fiscal year 2010 and $15.1 million in fiscal year 2009, and net gains of $1.7 million and $767,000 in fiscal years 2008 and 2007 respectively.

15.     NARH received operating grants from the Commonwealth of Massachusetts of $1 million in 2009 and $2 million in 2008. In fiscal year 2010, NBH received $500,000 for development of an electronic medical records system. The Commonwealth did not provide an operating grant in 2010, and no operating grants are anticipated in 2011.

4

16.     NARH has been designated a Medicare Dependent Hospital by the Centers for Medicare and Medicare Services since December 20, 2006. In fiscal year 2010, approximately 49% of the Debtors' net patient service revenue came from Medicare and state-sponsored Medicaid programs. This is a higher proportion than the national or Massachusetts hospital average.

D.     Organizational Structure

17.     The Debtors are non-profit corporations formed under chapter 180 of the Massachusetts General Laws. NBH is the sole member of, and has substantial authority and control over, the other Debtors.

18.     The executive offices for the Debtors are located at 71 Hospital Avenue, North Adams, Massachusetts 01247.

## II.

## Capital Structure

19.     Tax-Advantaged Bonds. The Debtors have approximately $43 million in secured bond debt. As described below, the bonds were issued by various agencies of the Commonwealth of Massachusetts, which essentially served as a pass-through for the Debtors' obligations to the bondholders. The bonds were structured in this manner so that the interest income on the bonds would qualify as tax-exempt under various taxation laws.

A.     MDFA Bonds

20.     In 1999, NBH financed the acquisition of the Sweets with the proceeds from $18,130,000 in Massachusetts Development Finance Agency ("MDFA") Revenue Bonds, Northern Berkshire Community Services, Inc. Issue, 1999 Series A (the "MDFA Bonds"). MDFA issued the MDFA Bonds pursuant to a Loan and Trust Agreement, dated as of September 1, 1999 (as amended, the "MDFA Loan Agreement"), by and among MDFA, NBCS,

5

and the Bank of New York, as Trustee ("<u>BONY</u>"). The MDFA then lent the proceeds, less

certain amounts deposited in accounts created pursuant to the MDFA Loan Agreement (the

"<u>MDFA Bond Accounts</u>"), to NBCS.[3] The MDFA Bonds bear interest at 5.75% and 6.25% with

payments due on an annual basis in varying amounts through 2029. As of May 31, 2011,

$13,585,000 in principal and $280,802.65 in interest was outstanding under the MDFA Bonds.

21.     As explained above, the structure is a pass-through with respect to MDFA.

MDFA issued the bonds, but the only recourse of the bondholders against MDFA is to MDFA's

interest in the loan to NBCS. NBCS, however, is obligated under the MDFA Loan Agreement to

make payments to BONY in the amounts and at the times necessary to make payments to holders

of the MDFA Bonds.

22.     NBCS's obligations under the MDFA Loan Agreement are secured

pursuant to the Amended and Restated Master Trust Indenture, dated as of September 1, 1999

and amended and restated as of October 1, 2004 (the "<u>Master Indenture</u>") among NBH, NARH,

NBCS, VNA, Reach Community Health Foundation, Inc.,[4] NBR, and the Bank of New York, as

Master Trustee (Wells Fargo & Co., as successor to the Bank of New York as master trustee for

the Master Indenture, the "<u>Master Trustee</u>"). Pursuant to the Master Indenture, the Debtors

issued Master Note No. 1 to BONY to secure the MDFA Bonds.

23.     In the Master Indenture, the Debtors pledge their "Gross Revenues" (as

defined in the Master Indenture) to the Master Trustee to secure any notes issued under the

Master Indenture. NARH and NBCS have also pledged substantially all of their personal

---

[3] The amounts held in MDFA Bond Accounts as of May 31, 2011 were: (a) $0 in the Debt Service Fund,
(b) $1,112,844.88 in the Debt Service Reserve Fund, (c) $0 in the Expense Fund, (d) $0 in the Project Fund, (e) $0
in the Redemption Fund, and (f) $0 in the Rebate Fund, for a total of $1,112,844.88.

[4] Reach Community Health Foundation, Inc. was dissolved prior to the Petition Date.

property and various parcels of real estate in separate Mortgage and Security Agreements. For a

further discussion of these pledges, please refer to the Cash Collateral Motion (as defined

below).

24.     The MDFA Bonds are insured by ACA Financial Guaranty Corporation

("ACA"), pursuant to that certain Bond Insurance Policy, dated as of October 14, 1999 (as

amended, the "MDFA Bond Insurance Policy").

25.     Following the sale of the Sweets (as described below), approximately

$2.8 million of the sale proceeds was applied to redeem MDFA Bonds and pay accrued interest.

B.     MHEFA Bonds

26.     In 1996, NARH financed certain equipment purchases and additions and

renovations to the hospital, including to maternity, medical, surgical, and pediatric units, with the

proceeds from $12,790,000 in Massachusetts Health and Educational Facilities Authority

("MHEFA")[5] Revenue Bonds, North Adams Regional Hospital Issue, 1996 Series C (the "1996

Bonds"). MHEFA issued the 1996 Bonds pursuant to the Second Supplemental Agreement to the

Mortgage and Trust Agreement, dated December 6, 1986, between NARH, MHEFA, and State

Street Bank & Trust Co., as initial trustee (the "Mortgage and Trust Agreement"). MHEFA then

lent the proceeds, less certain amounts deposited in accounts created pursuant to the Mortgage

and Trust Agreement, to NARH. The 1996 Bonds bear interest at rates that range from 6.25% to

6.75% annually. As of May 31, 2011, $2,955,000 in principal and $81,660.13 in interest was

outstanding under the 1996 Bonds.

27.     In 2004, NARH refinanced a portion of the 1996 Bonds and financed

additional equipment purchases and renovations and expansions to the hospital with the proceeds

---

[5] MHEFA was subsequently merged into MDFA in July 2010.

from $7,055,000 in MHEFA Revenue Bonds, North Adams Regional Hospital Issue, 2004 Series

A (the "2004A Bonds") and $19,670,000 in MHEFA Revenue Bonds, North Adams Regional

Hospital Issue, 2004 Series B (the "2004B Bonds" and, together with the 1996 Bonds and the

2004A Bonds, the "MHEFA Bonds" and together with the MDFA Bonds, the "Bonds").

MHEFA issued the 2004A Bonds and 2004B Bonds pursuant to a Third Supplemental

Agreement to the Mortgage and Trust Agreement. As part of the transaction, NARH and

MHEFA also amended and restated the Mortgage and Trust Agreement as the Amended and

Restated Loan and Trust Agreement (the "MHEFA Loan Agreement"), dated as of June 8, 2004,

among MHEFA, NARH, and U.S. Bank N.A., as Trustee ("U.S. Bank").

        28.     MHEFA lent the proceeds of the 2004A Bonds and 2004B Bonds, less

certain amounts deposited in accounts created pursuant to the MHEFA Loan Agreement

(together with the accounts previously created under the Mortgage and Trust Agreement for the

1996 Bonds, the "MHEFA Bond Accounts", and together with the MDFA Bond Accounts, the

"Bond Fund Accounts"),[6] to NARH. The 2004A Bonds bear interest at 6.375% annually. The

2004B Bonds bear interest at 6.25% annually on a $5,765,000 original principal amount

component and 6.375% annually on a $13,905,000 original principal amount component. As of

May 31, 2011, $7,055,000 in principal and $187,605.40 in interest was outstanding under the

2004A Bonds, and $19,670,000 in principal and $520,055.67 in interest was outstanding under

the 2004B Bonds.

---

[6] The amounts held in the MHEFA Bond Accounts as of May 31, 2011 were: (a) $5.77 in the Debt Service Fund,
(b) $3,122,501.11 in the Debt Service Reserve Fund, (c) $0 in the Expense Fund, (d) $6,095.12 in the Redemption
Fund, and (e) $51,005.35 in the Rebate Fund, for a total of $3,174,172.30.

29.    NARH's obligations under the MHEFA Loan Agreement are secured pursuant to the Master Indenture, pursuant to which the Debtors issued Master Note No. 3 to U.S. Bank to secure the MHEFA Bonds.

30.    The Debtors are advised that Nuveen Investments and certain of its affiliates ("Nuveen") holds the vast majority of the MHEFA Bonds as well as some of the MDFA Bonds.

31.    The chart below sets forth amounts outstanding in connection with the MDFA and MHEFA bonds as of May 31, 2011:

| Bond Issuance | Principal Outstanding | Interest Outstanding | Obligor | Collateral |
|---|---|---|---|---|
| 1996 Bonds | $ 2,955,000 | $ 81,660.13 | NARH | Master Note No. 3 |
| MDFA Bonds | 13,585,000 | 280,802.65 | NBCS | Master Note No. 1 |
| 2004A Bonds | 7,055,000 | 187,605.40 | NARH | Master Note No. 3 |
| 2004B Bonds | 19,670,000 | 520,055.67 | NARH | Master Note No. 3 |

C.    Other Obligations

32.    The Debtors are also parties to various promissory notes, mortgages, capital leases, and other obligations. Their principal other obligations are summarized in the chart below as of May 31, 2011:

| Obligation | Principal Outstanding | Interest Outstanding | Obligor | Collateral |
|---|---|---|---|---|
| Commercial Promissory Note issued to North Adams Hoosac Savings Bank (Hoosac Bank, as successor), September 3, 1997 | $571,295.60 | $707.20 | VNA | Real estate owned by VNA |

25275569_13

| Obligation | Principal Outstanding | Interest Outstanding | Obligor | Collateral |
|---|---|---|---|---|
| Commercial Promissory Note issued to North Adams Hoosac Savings Bank (Hoosac Bank, as successor), September 3, 1997 | $645.49 | $2.02 | NBR | Real estate owned by NBR |
| Loan and Security Agreement with South Adams Savings Bank, December 3, 2008 | $465,490.93 | $2,884.71 | NBR | All of NBR's personal property and a parcel of real estate owned by NBR |
| Promissory Note issued to Williamstown Medical Associates, Inc., December 8, 2002 | $266,130.00 | $4,225 | NARH | N/A |
| Accrued liability on Berkshire Medical Center Promissory note | $1,855,832.28 | $5,155 | NARH | N/A |

33.     As of the Petition Date, the Debtors owe approximately $4,584,355 in

unsecured obligations to vendors, suppliers, service providers, and other trade creditors.

**III.**

**Events Leading to these Chapter 11 Cases**

34.     The Debtors have been under increasing financial distress for many years.

The primary factors causing this distress are the Debtors' over-leveraged balance sheet,

combined with losses associated with the Sweets prior to their sale, and the decline in the

Debtors' revenues due to national and local economic factors beyond their control. These

financial pressures have resulted in operational losses which have, over time, significantly

eroded the Debtors' available working capital.

35.     The Debtors currently have approximately $4,592,364.83 in cash and

investments, excluding the funds in the Bond Fund Accounts and donor-restricted accounts.

Including the investments, this represents approximately 16 days cash on hand, a critical level for an operating hospital. The majority of the Debtors' assets are subject to liens, many of which are under-secured, and the Debtors do not anticipate they will be able to secure debtor in possession financing.

A.   2004 Bond Issuance and National and Local
     Economic Pressures on the Debtors' Revenues

36.   The 2004A Bonds and 2004B Bonds went into default in the first reporting period for violations of certain financial covenants. Recognizing that significant operational changes would be necessary to service the Debtors' substantially increased long-term debt obligations, the Debtors brought in a new senior management team and retained Cambio Health Solutions (now FTI Cambio, LLC) as consultants to review the Debtors' operations and recommend changes to improve the Debtors' cash flow. The Debtors subsequently implemented significant measures to reduce expenses and turned a profit in fiscal years 2007 and 2008.

37.   A number of national and local economic factors have placed pressure on the Debtors' revenues over the past few years. The population of North Adams and the surrounding region has been steadily declining for many years, eroding the Debtors' base of potential patients. The recent recession and continued high unemployment have further impacted the Debtors' patient base and reduced the demand for medical care. These economic pressures have resulted in more patients choosing to defer non-critical medical care and an increased number of uninsured patients, for which the Debtors receive either no compensation or only partial compensation from the Commonwealth. Admissions to the hospital declined by almost 10.1% in fiscal year 2009, approximately 3.1% in fiscal year 2010, and have continued to decrease in fiscal year 2011 by another 4.5%.

38.     The recently enacted national healthcare reform law is expected to put further pressure on the Debtors and similarly-sized non-profit hospitals. Over the next ten years, healthcare reform is expected to reduce Medicare reimbursements to hospitals by approximately $155 billion. For hospitals like NARH that have a disproportionately high number of patients covered by Medicare, this means a steady and significant reduction in Medicare reimbursements commencing in the next few years. According to a report of the Massachusetts Hospital Association, national healthcare reform will likely reduce NARH's reimbursements by $15 million over a 10 year period.

39.     Healthcare reform is expected to impose significant new capital expenditures on hospitals to meet new federal information system requirements. The Debtors also must increase their future capital expenditures to address aging plant and equipment assets, and to make up for capital investments the Debtors have deferred over the past few years to conserve liquidity.

40.     Healthcare reform also creates certain incentives and efficiencies that only benefit larger healthcare institutions. The Debtors are too small to benefit from these programs and policies and will need to merge or form a partnership with another healthcare institution in the next few years to access these incentives and remain viable. Accordingly, it is not sufficient for the Debtors to reorganize their operations to a break-even level on a current basis. Instead, the Debtors must put themselves in a strong position to weather the roll-out of healthcare reform and to be an attractive partner for a business combination.

B.     <u>Pension Obligations</u>

41.     NARH has a defined benefit pension plan, the North Adams Regional Hospital Retirement Income Plan, which the Debtors estimate is underfunded by approximately

12

$20.1 million as of September 30, 2010 (the "Defined Benefit Plan"). This substantial

underfunding resulted in part from the recent recession and instability in the public equity

markets – as of September 30, 2008, the Defined Benefit Plan was underfunded by only

approximately $5.4 million.

42.    The Defined Benefit Plan had 696 participants as of May 31, 2011.

Recognizing the increasing cost of maintaining the Defined Benefit Plan, the Debtors have, over

the past few years, frozen the accrual of benefits under the Defined Benefit Plan for all union and

non-union employees. As a replacement, the Debtors have created a defined contribution pension

plan (the "Defined Contribution Plan") for such employees.

43.    The Debtors failed to make minimum funding contributions to the Defined

Benefit Plan of $309,892 in January 2011 and $364,022 in April 2011. Even taking advantage of

certain deferral elections available under recently-enacted statutes, based on the current funding

deficit, the Debtors will owe contributions of approximately $1.3 million to the Defined Benefit

Plan for the remainder of 2011 and approximately $1.8 million in 2012 if the Defined Benefit

Plan is not terminated.

44.    The Debtors have determined that a distressed termination of the Defined

Benefit Plan is necessary, along with a significant reduction in the Debtors' long-term secured

debt obligations, for the Debtors to reorganize successfully. Contemporaneously with the filing

of their chapter 11 petitions, the Debtors have provided the required notices to begin the process

of terminating the Defined Benefit Plan to the PBGC and the plan participants. The Debtors have

been in discussions with the PBGC and anticipate filing a motion to terminate the Defined

Benefit Plan, preferably on a consensual basis, once those discussions conclude.

45.     The Debtors anticipate that the termination of the Defined Benefit Plan will have no impact on the employees and former employees who are plan participants, as their benefits are guaranteed by the PBGC. The termination will, however, have a significant impact on claims against the Debtors' estates and the Debtors' reorganization. The Debtors expect the PBGC to assert unsecured claims of more than $20 million against each Debtor for termination liabilities and missed contributions, some of which may be asserted as priority claims. Further, pursuant to a change in the law in 2005, the Debtors will owe three penalty payments of more than $900,000 each to the PBGC after emerging from chapter 11 (the "Post-Bankruptcy Pension Payments"), with the first payment coming due almost immediately after emerging from bankruptcy, unless a settlement can be reached with the PBGC to compromise these amounts. While the Debtors intend, and have already begun, to negotiate with the PBGC regarding its claims against the Debtors' estates and the Post-Bankruptcy Pension Payments, no agreement has been reached and there can be no assurances that any agreement will be reached on these issues.

C.     The Sweets

46.     Prior to their sale in August 2010, the primary drain on the Debtors' finances was the Sweets. As noted above, NBCS acquired the Sweets in 1999 with the proceeds from the MDFA Bonds. The Debtors' acquisition of the Sweets was driven by a desire to keep the Sweets in local hands and an expectation that, in the long-term, the Sweets would be able to support themselves. This expectation proved incorrect; in recent years the Sweets became a significant cash drain for the Debtors. The Debtors provided $2,287,606 and $3,639,718 to NBCS to fund the Sweets' operations in fiscal years 2008 and 2009, respectively, and another $2,321,685 in fiscal year 2010.

47.     The national recession starting in 2007 had a significant negative impact on the growth of the Sweets' business (and indeed on the Debtors as a whole). In particular, the collapse of the residential housing market strongly impacted Sweetwood, as potential customers for continuing care retirement centers typically fund the large up-front payments required to join through the sale of their home. As a result, Sweetwood's occupancy rate remained well below the level necessary to break even on its operations. Sweet Brook's business was similarly depressed by the recession and its impact on customers' ability to afford staying at a skilled nursing facility.

48.     To address the continuing cash drain from the Sweets, the Debtors, with the encouragement of the bondholders, began a process to sell the Sweets in June 2009. Originally intended to take only a few months, the sale process was not ultimately concluded until over a year later, on August 15, 2010, when the Debtors closed on a sale of the Sweets to Green Field – DES, LLC ("Green Field"). The Debtors conducted an exhaustive search for potential buyers but ultimately only received serious interest from Green Field. The gross purchase price was $7 million in cash, plus certain assumed liabilities.

49.     Nuveen and ACA pressed the Debtors to sell the Sweets for over a year before an agreement was finally reached with Greenfield. Despite this, as a condition to Nuveen's and ACA's consent to the sale of the Sweets, Nuveen and ACA required the Debtors to retain Navigant Capital Advisors, LLC ("Navigant") as a consultant to review the Debtors' business and operations to determine (a) steps that the Debtors could take to improve their cash flow and operational profitability and (b) proposals for restructuring the Debtors' long-term debt. Nuveen and ACA required the Debtors to retain Navigant to perform this work.

15

50.    Total fees paid by the Debtors to date for the retention of Navigant equal $1,014,316, of which $400,000 came out of the proceeds from the sale of the Sweets. ACA also required that a portion of the sale proceeds ($2.8 million) be used to redeem MDFA Bonds. Of the remaining proceeds of the sale of the Sweets, after paying costs associated with the sale, only $1.2 million remained, which by agreement was entrusted to the Master Trustee for application to critical capital expenditures by the Debtors, to the extent such expenditures were approved by Navigant. Of the approximately $8.2 million the Debtors put into the Sweets to maintain their operations from 2008 through 2010, the Debtors were repaid only $1.2 million out of the proceeds of the sale.

D.    Operational Improvements

51.    In late 2010, the Debtors began instituting several operational measures suggested by Navigant to reduce costs and increase revenues. Most notably, the Debtors eliminated and consolidated several management functions, reducing their annual payroll cost. The Debtors also began implementing measures to increase the productivity of their clinical staff and reduce their expenses for supplies.

52.    The Debtors also began a process to have the hospital certified as a Medicare Critical Access Hospital ("MCAH"). MCAH certification is determined by the Centers for Medicare & Medicaid Services ("CMS"), a unit of the Department of Housing & Human Services ("DHS") which generally regulates Medicare and Medicaid. Hospitals that have been designated MCAH receive cost-based reimbursement from Medicare, which is intended to make such hospitals more profitable and thereby prevent their closure. MCAH designation is only available to hospitals in remote areas that satisfy a number of criteria, as determined by CMS.

16

53.     MCAH certification would result in a significant improvement in the hospital's profitability. While the Debtors believe the hospital meets all the criteria for MCAH certification, CMS recently informed the Debtors that their application for MCAH certification would be denied. The Debtors intend to appeal the CMS determination.

54.     Even if the Debtors achieve maximal profitability and the Hospital receives MCAH certification, the Debtors revenues will be insufficient to support their current debt and pension obligations.

E.     Organizational Deterioration and Unproductive Negotiations with Nuveen and ACA

55.     The Debtors have been engaged in discussions with Nuveen and ACA regarding a restructuring of the Debtors' balance sheet for well over a year. These discussions first centered on facilitating a sale of the Sweets, which were a continuing cash drain on the Debtors.  Following the sale of the Sweets in August 2010, discussions turned to a global restructuring of the Debtors' operations and debt.

56.     As discussed above, in the months leading up to the August 2010 sale of the Sweets, Nuveen and ACA pressed the Debtors to retain Navigant as a consultant to review the Debtors' business and operations, and the Debtors acquiesced as part of a deal to complete the Sweets sale. The Debtors also agreed to provide financial updates to Nuveen and ACA on a weekly basis, to provide access to Navigant and its findings, and to have a weekly call to discuss the various updates and answer other questions. The Debtors have diligently provided these updates, access to Navigant, and weekly calls for the past 9 months. The parties have also held a number of in-person meetings in attempts to reach a consensual agreement on a restructuring.

57.     Navigant proceeded to review the Debtors' operations and financial situation as requested by Nuveen and ACA. In November 2010, Navigant provided a report to

17

the Debtors regarding the results of Navigant's review (the "November Report"). The November

Report is flawed in many respects, including a substantial over-valuation of the Debtors'

business, and was not adopted by the Debtors. Nevertheless, the November Report concluded,

even with its inflated value for the Debtors, that the Debtors could not support the full

$43 million of Bond debt and that significant debt reduction would be necessary for a successful

reorganization, even if the Debtors received MCAH certification.

58.    After reviewing the November Report, Nuveen and ACA informed the

Debtors that they were unwilling to agree to a restructuring which reduced the principal amount

of the Bonds. Nuveen and ACA thereby rejected the main conclusion of the November Report

that significant debt reduction was necessary in any restructuring.

59.    Instead of a balance sheet restructuring, Nuveen suggested an alternate

approach under which the entire $43 million in Bond debt would remain outstanding but the

Debtors would be provided with debt-service payment relief for up to five years. The Debtors did

not believe a restructuring along this lines was feasible because it would not address the Debtors'

over-leveraged balance sheet. It was unclear how Nuveen's approach would address the Debtors'

liabilities for the underfunded Defined Benefit Plan or would provide payment to unsecured

creditors. Nevertheless, the Debtors invited Nuveen and ACA to make a restructuring proposal to

start a negotiating process.

60.    Nuveen and ACA informed the Debtors that they needed time to work out

the details of a proposal between themselves, and that they would thereafter provide a term sheet

to the Debtors. This would become a common refrain for the next 6 months. Nuveen and ACA

also requested access to Navigant to model various alternatives, which the Debtors agreed to

provide.

61.    In January 2011, Navigant, working on its own, developed a term sheet based on the debt-relief approach suggested by Nuveen along with financial projections to show projected results from such a reorganization. The term sheet provided for a reorganization in chapter 11, in which the Defined Benefit Plan would be terminated and the Bonds would be modified to remove all financial covenants and to decrease debt service to a lower fixed rate, plus a variable rate based on the Debtors' performance. Navigant's projections showed that Nuveen and ACA would have to provide debtor-in-possession financing of at least $3 million for the proposed restructuring, plus an additional $2 million in financing if the Defined Benefit Plan were not terminated. The term sheet did not, however, explain how this financing would be repaid.

62.    The Debtors did not adopt the January term sheet. The Debtors did, however, authorize Navigant to provide the January term sheet and the related financial projections to Nuveen and ACA in the hopes of moving Nuveen and ACA to make a proposal that would allow the parties to begin productive negotiations. Navigant provided the term sheet and financial projections to Nuveen and ACA on January 7, 2011.

63.    Nuveen and ACA informed the Debtors that they would respond with a term sheet of their own once they reached agreement between themselves. No such proposal was provided, however, until June (as discussed below).

64.    In the meantime, the Debtors' operations and liquidity position continued to erode. Despite implementing the efforts discussed in Section D above to reduce costs and increase revenue, the Debtors remained cash-flow negative through February 2011. Critical vendors began to push back more forcefully against stretched accounts payable, further pressuring the Debtors' limited cash resources. In addition, the Debtors also began to experience

19

serious operational problems due to their prolonged financial distress, most notably increasing

difficulty in retaining critical physicians and other staff and in filling vacant positions.

65.     Concerned with the apparent lack of progress by Nuveen and ACA and the

Debtors' worsening condition, the Debtors developed a term sheet for a consensual restructuring

in chapter 11 in February 2011. The Debtors' proposal provided for the Bond debt to be

substantially reduced to $12 million in new tax-exempt secured bonds, the Defined Benefit Plan

to be terminated, and for unsecured creditors to receive interests in a trust funded with a pool of

cash and the Debtors' avoidance actions. The proposal provided for Nuveen and ACA to provide

$3 million in debtor-in-possession financing, which would be converted into another $3 million

in new secured bonds on the effective date.

66.     The Debtors proposal also provided for the parallel exploration of the

opportunities for a sale of substantially all of the Debtors' assets in bankruptcy. Nuveen and

ACA indicated interest in exploring sale options at various stages of the negotiations but never

moved beyond the discussion stage. The Debtors proposed that they solicit bids for a 363 sale, at

which Nuveen and ACA would be permitted to credit bid and/or serve as a stalking horse bidder,

at their election. The Debtors also proposed to permit Nuveen and ACA to designate a third party

consultant, including Navigant, to perform the solicitation subject to a requirement that Nuveen

and ACA pay for this expense.

67.     The Debtors presented this proposal to Nuveen and ACA at a meeting on

February 14, 2011. The Debtors stressed that a long-term solution to the over-leveraged balance

sheet was needed for the Debtors to move forward as an institution, and that the Debtors could

not indefinitely sustain the operational and financial pressures they were experiencing.

25275569_13

68.     Nuveen rejected the Debtors' proposal, restating Nuveen's opposition to any reduction of Bond debt. Nuveen and ACA again stated that they needed further time to attempt to negotiate an agreement between themselves, with assistance from Navigant regarding financial modeling.

69.     Nuveen also provided a term sheet, shortly after the February meeting, which Nuveen disclaimed as a proposal and instead provided as an example of the general structure it was considering. Consistent with Nuveen's position throughout this process, the Nuveen term sheet did not provide for any reduction of the Bond debt. Instead, it provided for debt service relief and the appointment of a CRO with direct control over all significant decisions in the chapter 11 case. Notably, the disavowed Nuveen term sheet left many important issues for further consideration, including the treatment of unsecured trade vendors claims and claims of the PBGC.

70.     A few days later, Nuveen provided a comment to the Debtors' term sheet indicating that Nuveen and ACA were discussing a possible buy-out by ACA of its insurance obligations for the MDFA Bonds. The language, which did not include the price ACA would pay in such a buy-out, provided for an optional process whereby holders of MDFA Bonds could elect to receive a cash out of the MDFA Bonds consisting of their share of the debt service reserve funds for the MDFA Bonds and cash provided by ACA. In exchange, such holders' claims against the Debtors and ACA would terminate.

71.     The Debtors responded to the comments of Nuveen and ACA with a revised term sheet on February 18, 2011, that incorporated the ACA insurance buy-out concept and revised the manner in which the Bond debt would be restructured. Like the Debtors' February 14 proposal, the revised term sheet provided for the bondholders to receive $12 million

in tax-exempt secured bonds. The new proposal also provided for the bondholders to receive a new taxable bond (the "B Bond"), which would provide the bondholders with a significant interest in the Debtors' future free cash flow. The B Bond would have no financial covenants and be payable solely out of the Debtors' free cash flow, after repayment of $1.5 million in debtor-in-possession financing (to be provided by ACA) and $1.5 million in debt service reserve funds to be used as cash collateral (with the authorization of Nuveen). The February 18 term sheet also provided for the appointment of a CRO, who would have authority to certify the feasibility of the Debtors' projections and oversee any sale process.

72.    Principals of the Debtors, Nuveen, and ACA met in person on March 1, 2011, in a further attempt to reach agreement on a restructuring. No agreements were reached at the meeting, which concluded with Nuveen and ACA once again indicating they needed further time to work out a proposal between themselves.

73.    On March 25, 2011, Nuveen provided the Debtors with a proposed scope of services for Navigant to serve as a CRO in a restructuring. The scope of services provided for Navigant to have control over essentially every aspect of a restructuring, including all aspects related to a plan of reorganization, negotiations and agreements with creditors, and any pleadings filed in the cases, as well as control over all major decisions with respect to the Debtors' business.

74.    The Debtors oppose implementing a CRO to run their business because it would provide no benefit to the Debtors and yet come at a very substantial cost. The Debtors did not, however, reject the CRO proposal outright. Instead, the Debtors informed Nuveen and ACA that they would evaluate the CRO proposal only in the context of a restructuring proposal from the bondholders, and that such proposal would need to include the fees Navigant would charge

22

for the proposed representation. Although Navigant assured the Debtors it would be able to

quickly provide a fee schedule for the representation, no such schedule was ever provided.

75.     On April 21, 2011, Navigant circulated a draft sensitivity analysis

regarding the financial implications of Nuveen's suggested approach of reinstating the Bond debt

in full. Navigant performed this sensitivity analysis at the bondholders request. The report began

by noting that the Debtors had to date achieved most of their expected performance

improvements. The report then restated Navigant's position from November that the Debtors,

even with MCAH certification and taking into account Navigant's over-valuation of the Debtors'

business, could not support the current amount of Bond debt and that significant debt reduction

was necessary. Navigant's sensitivity analysis showed that, assuming a chapter 11 reorganization

along the lines of the bondholders' proposal, the reorganization would require over $2 million of

debtor-in-possession financing (to pay for approximately $2 million in fees for Navigant and

bondholder counsel during the cases) and that the Debtors would be able to service less than half

of the reinstated Bond debt.

76.     Despite this, Nuveen and ACA continued to press an approach under

which the full amount of the Bond debt would be reinstated and to negotiate the terms of such a

restructuring between themselves, never reaching any agreement until the week prior to these

chapter 11 cases (as discussed below). In the meantime, the Debtors' financial performance

improved somewhat in March, April, and May, but the operational stresses on the Debtors

continued to mount.

77.     The Debtors continued to press Nuveen and ACA for a restructuring

proposal to commence productive negotiations during this period, but also began to prepare for a

chapter 11 reorganization without bondholder consent. The Debtors also began a process to

terminate the Defined Benefit Plan and conversations with the PBGC and continued to press

their application for MCAH certification with CMS. In May 2011, the Debtors retained Carl

Marks Advisory Group ("CMAG") as financial consultants to advise them in this process.

78.     The Debtors have been in negotiations with Nuveen and ACA for

approximately 9 months, since the Sweets sale in August 2010. During this period, despite great

efforts and patience by the Debtors, these negotiations have accomplished nothing.

79.     On May 26, 2011, the Board of Trustees for NBH authorized a chapter 11

filing on a non-consensual basis to reorganize the Debtors. Prior to the filing, the Debtors

reached out to Nuveen and ACA one final time with terms for a consensual reorganization

similar to the terms provided in previous restructuring proposals by the Debtors, as set forth

above. The Debtors also sought consent to use cash collateral from the Master Trustee, which

negotiations remain ongoing.

80.     On June 9, 2011, the Debtors for the first time received a formal term

sheet proposal for a restructuring from Nuveen and ACA, represented a more formal statement

of an approach the Debtors had previously determined was not workable (as discussed above).

The term sheet provided for a reorganization in bankruptcy through a plan process. Once again,

the term sheet pressed an approach in which the full amount of the Bonds would be reinstated

(subject to the retirement of 1999 Bonds pursuant to an optional insurance settlement), with debt

service forgiveness being provided for a period of time. The term sheet also provided for a CRO

that would have full authority over the chapter 11 plan and budgeting and expenditure issues.

The term sheet also provided for unsecured creditors to receive a five year note in an amount to

be negotiated.

24

81.     Following provision of the term sheet, Nuveen and ACA also requested that the Debtors postpone commencing these chapter 11 cases to attempt to reach agreement on a consensual plan prior to filing for chapter 11. After reviewing the term sheet and determining the approach therein was not workable and did not reflect any movement by Nuveen and ACA from their prior stated positions, the Debtors informed Nuveen and ACA that the Debtors intended to commence these chapter 11 cases to start the process of moving forward to a resolution (whether consensual or not) and to involve other necessary parties in the discussion, such as the PBGC. The Debtors also stated that they stood ready to promptly continue negotiations for a consensual restructuring post-filing.

## IV.

## Facts in Support of First Day Motions[7]

A.      **Motion for Authority to (a) Continue Using Debtors' Bank Accounts, Business Forms, and Cash Management System; and (b) Waive or Suspend the Requirements of 11 U.S.C. Section 345(b) (the "Cash Management Motion")**

82.     By the Cash Management Motion, the Debtors request, among other things, a waiver of certain operating guidelines established by the United States Trustee that otherwise would require that the Debtors close all prepetition bank accounts, open new "debtor in possession" accounts, and order new business forms and stationery.

83.     The Debtors use a centralized cash management system (the "Cash Management System") to collect and transfer funds from and for, and to pay expenses incurred by, the Debtors.

---

[7] Capitalized terms not defined within this Section IV shall have the meaning ascribed to such terms in the respective First Day Motion.

84.   The Cash Management System comprises 24 bank accounts (the "Bank Accounts"). The Bank Accounts are maintained at the following banks (the "Banks"):

| Bank | Number of Accounts |
|---|---|
| TD Bank, N.A. ("TD Bank") | 9 |
| Bank of Bennington | 1 |
| Sovereign Bank | 1 |
| Hoosac Bank | 7 |
| Berkshire Bank | 1 |
| Adams Co-operative Bank | 3 |
| Williamstown Savings Bank | 1 |
| South Adams Savings Bank | 1 |

85.   Operating Accounts. Each of the Debtors maintains operating accounts with TD Bank, except for VNA, which maintains its operating account at Hoosac Bank (collectively, the "Operating Accounts"). The Debtors use the Operating Accounts to deposit and disburse funds taken in and paid out in the ordinary course of the Debtors' operations, with the exception of payroll disbursements to employees of NARH and VNA as discussed below. NARH, VNA, and NBR each maintain one Operating Account. NBH maintains one Operating Account for its operations and one Operating Account for the operations of a consignment shop whose proceeds help to fund the Debtors' operations.

86.   Payroll Accounts. NARH and VNA each maintain a separate payroll account with TD Bank (the "Payroll Accounts") to fund payroll.[8] VNA manually funds its Payroll Account from the VNA Operating Account. The NARH Payroll Account is a zero balance account; it maintains a zero balance with any debits covered by a transfer of funds from the respective Debtor's Operating Account. Thus, as checks, debits, and wires issued under the

---

[8] The other Debtors make payroll disbursements out of their Operating Accounts

26

NARH Payroll Account are presented for payment, funds are automatically transferred from NARH's Operating Account to its Payroll Account.

87.    <u>Special Purpose Accounts</u>. The Debtors maintain two accounts to serve functions specific to the healthcare field. First, NARH maintains one account with Sovereign Bank (the "<u>HSN Account</u>") to receive and disburse funds related to the Commonwealth of Massachusetts uncompensated care pool, now known as the Health Safety Net. The Debtors provide uncompensated medical services to Massachusetts residents who are ineligible for health insurance or can't afford to buy health insurance. The Commonwealth makes regular disbursements to the Debtors into the HSN Account in partial compensation. When the Commonwealth disburses funds to the HSN Account, the Debtors promptly transfer funds to the respective Operating Account(s) of the Debtor(s) that provided uncompensated care. If the Commonwealth determines a hospital provides a greater or lesser share of uncompensated care relative to their liability to the Health Safety Net, the HSN Account is credited or debited respectively on a monthly basis.

88.    Second, NARH maintains an account with TD Bank (the "<u>EFT Account</u>") to receive electronic fund transfers from Medicare, Medicaid, and private health insurers. When the Debtors invoice a public or private health insurer, invoiced payments are generally made to the EFT Account. The EFT Account was established to comply with insurer payment policy, as the account reduces insurers' costs of wire transfers and paper checks.

89.    NARH also maintains a savings account with Bank of Bennington.

90.    <u>Reserve Accounts</u>. The Debtors maintain four deposit accounts (the "<u>Reserve Accounts</u>"). There is one Reserve Account maintained at each of Williamstown Savings Bank, Adams Co-operative Bank, South Adams Savings Bank, and Hoosac Bank. The

25275569_13

Debtors established the Reserve Accounts separate from the Debtors' Operating Accounts to hold reserves, grants, and fundraising amounts, such as reserves designated for capital expenses, outside of the Debtors' system for receiving and disbursing funds in the ordinary course of business.[9] As of June 1, 2011, the Reserve Accounts held approximately $395,121.39.

91.    Temporarily and Permanently Restricted Accounts. The Debtors maintain eight deposit accounts that hold donated or granted funds (the "Restricted Accounts"); the use of funds in these accounts is temporarily or permanently limited by donor or grantor restriction. For instance, the Debtors may use one Restricted Account to fund a recreation association for the Debtors' employees. The Debtors maintain one Restricted Account at Berkshire Bank, five at Hoosac Bank, one at Adams Co-operative bank, and one at TD Bank.  As of June 1, 2011, the Restricted Accounts held approximately $622,829.97.

92.    SEI Investments Company ("SEI"), Cramer Rosenthal McGlynn, LLC, and Berkshire Capital Investors (the "Investment Firms") hold securities on behalf of the Debtors (the "Investments").

93.    The Debtors may draw on certain of the Investments held with SEI to fund the Debtors' operations.  Internal policy allows the Debtors to fund operations with certain Investments (the "Limited Investments") only when other funding methods would violate regulations, result in substantial disruption of patient services, or result in failure to meet payroll requirements.  Use of Limited Investments must be approved by the Chief Financial Officer and the Chief Executive Officer, who must also notify the chairs of both the Debtors' board of trustees and finance committee of such use.  The remaining Investments held by the Investment

---

[9] For example, one of the Reserve Accounts holds certain funds granted to the Debtors by the Commonwealth of Massachusetts that are intended to be used by the Debtors for electronic medical records. If the Debtors do not deliver an appropriate electronic medical records system, the Debtors must return the funds to the Commonwealth.

Firms are donated or granted funds or investments, the use of which is temporarily or permanently limited by donor or grantor restriction, similar to the restrictions on the Restricted Accounts described above.

94.     A detailed listing of the Bank Accounts and the Investment Accounts is attached to the Cash Management Motion as <u>Exhibit A</u>.

95.     The Debtors routinely transfer funds between various Debtors.  The Debtors account for each such transfer with intercompany debts that are recorded as bookkeeping entries.  Intercompany transfers are necessary for certain of the Debtors, as the only Debtors that generate revenues are NARH, VNA, and NBHPG.  NBH has certain employee benefit liabilities (including employee health benefits) on behalf of both its own employees and the employees of the other Debtors, and NBR has liabilities under various leases and mortgages for certain of the Debtors' real estate assets.  Further, while NBHPG generates revenues from its physician practices, NBHPG is still in a start-up mode and does not generate sufficient revenue to cover its expenses. NBH, NBR, and NBHPG rely on periodic intercompany transfers from other Debtors (principally NARH) to meet their obligations.  Absent intercompany transfers, NBH, NBR, and NBHPG would be unable to meet their obligations as they come due, to the detriment of all of the Debtors.

96.     Compelling the Debtors to adopt a new, segmented cash management system would be expensive and would create unnecessary administrative problems.  Further disruption of the Cash Management System could have a severe and adverse effect upon the Debtors' ability to reorganize.  Consequently, maintenance of the Cash Management System is essential and is in the best interests of all creditors and other parties-in-interest.

97.      Continuing the Debtors' practice for intercompany transfers is also critical to the Debtors' reorganization.  As discussed above, the Debtors that require intercompany transfers for working capital are subject to current liabilities that benefit all of the Debtors.

98.      The Debtors seek a waiver of the requirements that they immediately close all of their Bank Accounts and open new postpetition bank accounts. Enforcing this requirement would cause significant disruption to the Debtors' operations, result in delays in payments to administrative creditors and others, and impair the Debtors' efforts to maximize the value of their estates. As described above, the Bank Accounts are central to an established Cash Management System that the Debtors maintain to ensure smooth deposits and disbursements in the ordinary course of business.

99.      The Debtors propose that each Debtor will open a new Operating Account as a debtor in possession account and maintain its funds primarily in such account (the "DIP Accounts"). The Debtors request that the other Bank Accounts be deemed debtor in possession accounts and that the Debtors be authorized to continue to use them with the same account numbers, styles, and document forms as the Debtors used prior to the Petition Date. In particular, it is critical that the Operating Accounts and EFT Account remain open, as they receive deposits on the vast majority of the Debtors' accounts receivable directly, often by electronic transfer, and switching this function to new accounts would be extremely time consuming and result in lost or delayed funds. Accordingly, the Debtors propose to leave the prepetition Operating Accounts and EFT Account open solely to receive deposits and collections and to sweep them daily to the DIP Accounts. The Debtors also request authorization to open new accounts whenever needed, provided that the Debtors give the U.S. Trustee notice of such newly-opened accounts.

Case 11-31114   Doc 3   Filed 06/13/11   Entered 06/13/11 13:51:10   Desc Main
Document   Page 31 of 56

100.     In connection with continuing the use of the prepetition Bank Accounts, the Debtors also request the authority to pay prepetition Bank fees and charges to the extent of the amount of the Debtors' cash held by such Bank. Each Bank likely has setoff rights with respect to any of the Debtors' cash it holds and could request that this Court lift the automatic stay to exercise those setoff rights. The Debtors seek authority to pay these amounts to the extent the Debtors determine, in their good faith business judgment, that the Banks have valid setoff claims pursuant to 11 U.S.C. § 553 (but only to the extent of such claims). This will save the Debtors the time and expense of defending lift stay requests and/or negotiating stipulated orders to allow setoff. The debtors submit that the relief requested with regard to the prepetition Bank fees and charges would not prejudice the interests of any creditors or other parties-in-interest.

101.     To minimize expenses to their estates, the Debtors also request authorization to continue to use all correspondence and business forms (including, but not limited to, letterheads, purchase orders, multi-copy checks, envelopes, promotional materials, and other business forms (collectively, the "Business Forms")) existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession. Once the Debtors' existing stock is exhausted, the Debtors will imprint the legend "DIP" or "Debtor in Possession" and the case number for the Debtors' consolidated chapter 11 cases on any new stock of correspondence and business forms acquired.

102.     Changing correspondence and business forms would be needlessly expensive and burdensome to the Debtors' estates and disruptive to the Debtors' operations. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession due to the Debtors' provision of notice of the commencement of these chapter 11 cases, the press releases issued by the Debtors, and information circulating within the

31

healthcare field and the North Adams community. Accordingly, adding a "Debtor in Possession" legend would have little practical effect.

103.     The cash management procedures employed by the Debtors constitute ordinary, usual, and essential business practices and are similar to those used by other major healthcare enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to control health system funds centrally and to ensure the availability of funds when necessary.

104.     For each Debtor, their Bank Accounts at each Bank are collectively insured for up to $250,000 by the Federal Deposit Insurance Corporation ("FDIC"), a department, agency, or instrumentality of the United States.  As of June 1, 2011, only NARH's Bank Accounts held at TD Bank, Hoosac Bank, and Bank of Bennington collectively held more than $250,000 deposited with a single Bank.  No other Debtor's Bank Accounts, and none of NARH's other Bank Accounts, held more than $250,000 in the aggregate at any one Bank as of June 1, 2011.  Therefore, with the exception of NARH's three Bank Accounts with TD Bank (the "NARH TD Bank Accounts") the Bank Accounts with Hoosac Bank, and the Bank of Bennington Bank Account, all of the Debtors' Bank Accounts are well within the deposit insurance limits established by the FDIC.  These accounts consequently comply with Section 345.

105.     In addition, Hoosac Bank is a member of the Massachusetts Depositors Insurance Fund ("DIF"), which is a privately-administered fund regulated by the FDIC and the Massachusetts Division of Banks and supported by fees of and assessments on Massachusetts member banks.  The DIF provides unlimited insurance of deposit accounts in excess of the FDIC limit.  Because of the unlimited insurance of DIF-insured deposits, the Debtors request that the

Court waive Section 345's bonding requirements with respect to the Debtors' Bank Accounts held at Hoosac Bank.

106.    With respect the NARH TD Bank Accounts and the Bank of Bennington Bank Account, the Debtors request an extension of 30 days after the Petition Date to come into compliance with the requirements of Section 345(b), without prejudice to their right to seek further extensions or waivers, for cause shown.  The Debtors further request an extension of 120 days after the Petition Date to come into compliance with the requirements of Section 345(b) with respect to the Investments, without prejudice to their right to seek further extensions or waivers, for cause shown.  The Investments are equity securities of varying liquidity.  The Debtors intend to liquidate these securities as soon as possible.  Market conditions at any given time, however, may make the immediate liquidation of all of the securities financially detrimental to the Debtors.  The Debtors therefore seek a waiver of compliance with the requirements of Section 345(b) with respect to the Investments to enable the Debtors' investment manager to liquidate the Debtors' investments as appropriate over a 120 day period.

**B.      Motion for Authority to Pay Wages, Compensation, Employee Benefits, and Other Related Obligations (the "Wage Motion").**

107.    By the Wage Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to pay the prepetition Employee Wages and Benefits (as defined below) and to continue to honor the Employee Wages and Benefits in the ordinary course of business.

108.    Eighty-two of the Debtors' 613 employees are salaried employees (the "Salaried Employees"), and the rest are paid by the hour (the "Hourly Employees," and, together with the Salaried Employees, the "Employees").  291 of the Employees are members of unions (the "Union Employees") and the rest are not members of unions (the "Non-Union Employees").

The Union Employees consist of the Debtors' nursing staff of 109 Employees, which is represented by the MNA, and 182 technical employees who are represented by the Service Employees International Union (the "SEIU").  As of the Petition Date, collective bargaining agreements are in place with both the MNA and the SEIU.[10]

109.    The Debtors' average aggregate monthly compensation to employees for wages and salaries is approximately $1,597,806, exclusive of the deductions and exclusions detailed below.  Employees of Debtors other than VNA are paid with direct deposits or by check every Wednesday and are paid in arrears through Saturday of the prior week.  VNA Employees are paid every other week on Friday and are paid in arrears through Friday of two weeks before.

110.    The Debtors estimate that the aggregate amount of accrued prepetition wages and salaries that remain unpaid to the employees as of the Petition Date is approximately $559,227 exclusive of deductions and exclusions (the "Unpaid Wages and Salaries").[11]  To the best of the Debtors' knowledge, none of the Employees are individually owed more than $11,725 on account of wages earned prior to the Petition Date.

111.    In the ordinary course of business, the Debtors reimburse employees and members of their Boards of Trustees for certain expenses incurred while performing their duties on the Debtors' behalf (the "Reimbursable Expenses").

112.    In the normal course of business, employees submit expense reports to their supervisors, who approve proper expense reports and submit them to the Debtors' accounting personnel.  The Debtors reimburse expenses on a bi-weekly basis, through either a

---

[10] The MNA collective bargaining agreement is temporary pending completion of a final collective bargaining agreement, the terms of which are still being negotiated.

[11]    The calculation of Unpaid Wages and Salaries incorporates payments owing on account of wages and salaries.  The calculation does not attempt to incorporate amounts for other benefits, including post-retirement benefits or health and dental benefits.  Further, the calculation does not include expense reimbursement amounts, which the Debtors do not consider compensation.

paper check or direct deposit.  Reimbursable Expenses include expenses for business-related travel (including meals, tickets, lodging, and automobile mileage), business supplies, and related expenses.

113.    The Debtors estimate that, as of the Petition Date, approximately $10,000 of Reimbursable Expenses remain unpaid.

114.    For each applicable pay period, the Debtors deduct certain amounts from paychecks (collectively, the "Deductions"), including, without limitation: (i) garnishments for child support and similar deductions; (ii) pre-tax contributions to health and dependent care flexible spending accounts, as described in detail below; and (iii) other pre-tax and after-tax deductions payable pursuant to certain of the employee benefit plans discussed below and other miscellaneous deductions.  The Debtors withhold on average approximately $296,039.00 per month in Deductions from employees' paychecks.

115.    The Debtors are also required by law to (i) withhold from an employee's wages amounts related to, among other things, federal, state, and local income taxes, Social Security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state, or local taxing authorities and (ii) make matching payments for Social Security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (the "Employer Payroll Taxes," together with the Withheld Amounts, the "Payroll Taxes", and collectively with the Unpaid Wages and Salaries, the Reimbursable Expenses, and the Deductions, the "Unpaid Compensation").  The Debtors estimate that they will withhold approximately $603,767.00 per month in Payroll Taxes from employees' paychecks.

116.    The Debtors also offer or provide employees (and their dependents) with a variety of benefits.  These employee benefits (collectively, the "Employee Benefits") include, but are not limited to:  (i) paid time-off benefits; (ii) health and dental care insurance; (iii) life and accidental death & dismemberment insurance; (iv) disability income insurance; (v) flexible spending plans; (vi) 403(b) plans; and (vii) COBRA medical coverage.  The Debtors estimate that, as of the Petition Date, the total amount owed or accrued in connection with the Employee Benefits due to employees is approximately $359,517.[12]

117.    The Debtors provide both Union and Non-Union Employees with paid time-off benefits, depending upon the employee's length of employment.  The Debtors provide some form of paid leave in connection with vacation time, sick days, holidays, personal days, jury duty, and bereavement leave (collectively the "PTO Benefits").  Certain earned and unused vacation time (or, at VNA and NBHPG, paid time-off)[13] may be carried over year-to-year, up to a maximum that varies depending on position and length of employment but does not exceed 300 hours of paid time-off per eligible employee.  Each year, MNA and SEIU members may cash out one or two weeks, respectively, of accrued and unused vacation time or paid time-off, as applicable.[14]  All Employees are entitled to a cash payout for accrued and unused vacation days upon termination of employment with the Debtors.  The PTO Benefits are obligations ultimately satisfied in the ordinary course of business through salary and payroll continuation, other than accrued PTO Benefit payouts for terminated or union-member Employees.  As of May 28, 2011,

---

[12]    This estimate excludes any accrued but unused vacation time, sick days, or personal days, but includes approximately $302,000 payable to employees for medical and dental care expenses under the Debtors' self-insurance program.

[13]    There is no distinction between vacation time, sick days, or holidays for Employees of VNA and NBHPG.

[14]    In the past year, NBH has paid an aggregate of $22,039.54 in cash-out time to MNA and SEIU employees.

36

the Debtors estimate that they owe approximately $2,299,187 of accrued but unpaid PTO

Benefits that are convertible to cash payment obligations.

118.     The Debtors offer coverage to eligible employees (and their dependents)

for medical, dental, vision, prescription drug, emergency health services, outpatient surgery,

hospice care, rehabilitation services, mental health, and other related benefits (collectively, the

"Health Care Benefits").

119.     The Debtors offer a self-insured medical plan that is administered by Blue

Cross/Blue Shield of Massachusetts ("BCBS") under the Blue Choice New England, Network

Blue New England, and Blue Care Elect PPO Plans (the "Medical Plans").  On a monthly basis,

the Debtors fund an account of the Debtors from which claims are paid.  The Debtors' current

monthly transfers to this account are approximately $423,600.  Under the Medical Plans, the full

cost of the employees' claims, less any deductibles or co-pays, is paid from the account.  There

are currently 371 employees enrolled in the Medical Plans.  As of the Petition Date, the Debtors

estimate that they owe approximately $302,000 for incurred but not reported claims and reported

but unpaid claims under the Medical Plans.

120.     The Debtors' employee dental plan (the "Dental Plan") is also self-insured

and administered by BCBS.  The Debtors' current monthly payments to the self-insurance

account for dental coverage are approximately $30,800.  Under the Dental Plan, the full cost of

the employee claims, less any deductibles or co-pays, is paid from the account, up to an annual

maximum benefit of $1,000 per individual.  There are currently 418 employees enrolled in the

Dental Plan.  As of the Petition Date, the Debtors estimate that they owe no amounts for the

Dental Plan.

121.    For both the Medical Plans and the Dental Plan, the Debtors also pay

BCBS monthly fees of approximately $50,000 in aggregate for administration costs and to

reinsure employees whose cost of care exceeds specified limits.[15]

122.    Generally, for employees and their enrolled family members, the Debtors

pay approximately (i) 75% of their cost of care under the Medical Plans (with a smaller

percentage paid for part-time employees) and (ii) 64% of their cost of care under the Dental Plan

for individual enrollees, 45% for family enrollees, and 75% for members of SEIU, whether

individual or family.  The balance of the cost is contributed by the employees through payroll

withholding.  On a weekly basis, the Debtors withhold from employees' wages amounts related

to the Medical and Dental Plans totaling approximately $33,000 and remit the same to the health

care plan administrators or providers (the "Health Plan Withholdings").

123.    The Debtors provide basic life insurance and accidental death and

dismemberment coverage (collectively, "Life Insurance") through The Hartford Life Insurance

Company ("The Hartford").  The Debtors currently pay approximately $4,128 per month in

premiums and administrative costs in connection with the Life Insurance.  There are currently

525 employees and retirees enrolled in the Life Insurance program.  As of the Petition Date, the

Debtors estimate that approximately $1,373 is owed to The Hartford.

124.    Certain employees may supplement their Life Insurance coverage with

additional personal life insurance and accidental death & dismemberment coverage

("Supplemental Insurance" and, collectively with the Life Insurance, the "Insurance Benefits").

Participating employees pay all premiums in connection with the Supplemental Insurance (the

"Supplemental Insurance Premiums") through payroll withholding, which the Debtors remit to

---

[15] Generally, when an individual's annual claims exceed $110,000.

38

The Hartford on a monthly basis.  There are 172 employees enrolled in the Supplemental

Insurance program.  As of the Petition Date, the Debtors estimate that $1,928 is owed to The

Hartford on account of the Supplemental Insurance Premiums.

125.    NBH provides managers, senior management, and employed physicians

with long-term disability coverage (the "Subsidized Disability Coverage") at no cost to such

employees.  The Subsidized Disability Coverage is provided through a policy with The Hartford,

under which the average monthly premiums are $10,510.  As of the Petition Date, the Debtors

estimate they owe approximately $1,645 in unpaid amounts related to Subsidized Disability

Coverage.

126.    Other employees can purchase both short-term and long-term disability

coverage (collectively, the "Unsubsidized Disability Coverage" and, together with the

Subsidized Disability Coverage, the "Disability Coverage") through the Debtors by electing to

have additional amounts withheld from their pay on an after-tax basis.  The Unsubsidized

Disability Coverage is provided through a policy with The Hartford, under which the average

monthly withholdings are $3,871.  As of the Petition Date, the Debtors estimate they hold

approximately $3,586.66 in withheld but unpaid amounts related to Unsubsidized Disability

Coverage.

127.    The Debtors offer health care and child care flexible spending accounts

(the "Flexible Spending Programs").  There are currently 62 employees and former employees of

the Debtors (the "Former Employees") enrolled in the Flexible Spending Programs.  The

Flexible Spending Accounts allow employees, through pre-tax payroll Deductions, to contribute

up to (i) $5,000 per year for eligible out-of-pocket medical, dental, or vision expenses,

(ii) $5,000 per year for eligible child care expenses.  The Debtors hold funds contributed by

employees and Former Employees under the Flexible Spending Programs in trust for the benefit

of the employees (the "FSA Contributed Funds").

128.    Former Employees who made contributions in 2011 prior to their

termination are covered by the Flexible Spending Programs, despite no longer being employed

by the Debtors.  Former Employees who made contributions in 2011 may submit for

reimbursement for appropriate expenses incurred in 2011 prior to their termination.  These

Former Employees are permitted by law to receive reimbursements for the total amount they

would have contributed during 2011 had they remained employed by the Debtors.  Accordingly,

it is possible that Former Employees could receive reimbursements under the Flexible Spending

Plans in excess of their actual 2011 contributions.  In this event, the Debtors would be required

to fund the difference.

129.    The Debtors maintain a 403(b) plan for Employees and Former Employees

of NBH and NARH (the "403(b) Plan"), and a 401(a) plan for Employees and Former

Employees of VNA (the "401(a) Plan" and, together the 403(b) Plan, the "Defined Contribution

Plans") for the benefit of certain eligible Employees and Former Employees.  The 403(b) Plan

allows employees to make automatic pre-tax salary deductions subject to the limits set by the

Internal Revenue Code (the "Withholding Contributions").  Under for the 401(a) Plan, VNA

contributes 5% of each Employee's base earnings (the "Employer Contributions") to an

investment account directed by such Employee that are not taxable when the Employer

Contributions are made.  Former Employees may continue to maintain accounts through the

Defined Contribution Plans, but may not make new contributions.  As of the Petition Date,

approximately 289 Employees and Former Employees participate in the Defined Contribution

Plans, and there are approximately $12,718,949 in assets held in the Defined Contribution Plans.

40

130.    The 403(b) Plan is held in custody by Wilmington Trust FSB

("Wilmington Trust") and administered by Lincoln Financial Corporation ("Lincoln Financial")

on behalf of the Debtors.  The 401(a) Plan is held in custody by Mutual of America.

Withholding Contributions for the 403(b) Plan are transferred by wire to Wilmington Trust on a

weekly basis to be credited to individual employee 403(b) accounts.  Employer Contributions to

the 401(a) Plan are made monthly.  The Debtors estimate that monthly Withholding

Contributions to the 403(b) Plan are approximately $120,000.  The Debtors match all Employee

contributions (other than contributions of SEIU members) to the 403(b) Plan, at a rate

determined by the age of the employee and amount of contributions, ranging from 1.5% to 6%.

The Debtors also make monthly contributions to a retirement plan sponsored and administered

by SEIU, under which the Debtors contribute 8.71% of the salaries of SEIU members.  As of the

Petition Date, the Debtors estimate that they owe approximately $21,369.23  in unpaid matching

payments to the 403(b) Plan and approximately $16,334 in unpaid Employer Contributions to the

401(a) Plan and the SEIU plan.

131.    The Debtors also offer two deferred compensation plans for senior

executives (the "Deferred Compensation Plans").  Under these plans, a portion of the Chief

Executive Officer and Chief Financial Officer's compensation is deferred and is paid and taxed

to the employees at a later date.  The Debtors do not seek authority at this time to pay prepetition

amounts owed under the Deferred Compensation Plans.  The Debtors merely request authority to

continue to allow these employees to defer or deduct compensation earned on and after the

Petition Date under the Deferred Compensation Plans.

132.    Former Employees are entitled to continue to participate in the Debtors'

Medical Plan coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of

41

1986 (as amended, "COBRA") for up to 18 months (such coverage, the "COBRA Medical

Coverage").  As of the Petition Date, the Debtors estimate that approximately 23 Former

Employees are either currently on or eligible to elect COBRA Medical Coverage.  Former

Employees who elect to exercise their rights under COBRA must pay up to 102% of the

premiums for COBRA Medical Coverage, and, pursuant to the American Recovery and

Reinvestment Act of 2009, for Former Employees terminated through May 31, 2010, the Debtors

must advance 65% of these premiums (which are eventually recouped through quarterly tax

credits).

133.    In the ordinary course of business, the Debtors use the services of several

third-party administrators to whom the Debtors outsource tasks associated with the payment of

compensation or benefits to employees (some of which are described above) (the costs

associated therewith, the "Third-Party Administrative Costs" and, collectively with the Unpaid

Compensation and the Employee Benefits, the "Employee Wages and Benefits").  The ordinary

course services provided by these third-parties ensure that the Debtors' obligations with respect

to employees continue to be administered in the most cost-efficient manner and comply with all

applicable laws.

134.    It is essential that the Debtors continue to honor their Employee Wages

and Benefits obligations to ensure the continued operation of the Debtors' business and to

maintain the morale of the employees.  Absent the requested relief, employees may be unable to

meet personal obligations, may be left without medical insurance, or may seek alternative

employment opportunities.

135.    The Employee Wages and Benefits represent a competitive but reasonably

limited set of policies targeted towards retaining the skilled and motivated workforce necessary

25275569_13

to continue the Debtors' healthcare operations.  Accordingly, based on the foregoing, the Debtors

submit that the requested relief is necessary and appropriate, is in the best interests of their

estates and creditors, and should be granted in all respects.

136.    The Debtors pay the Employee Wages and Benefits with funds drawn by

checks (the "Checks") or by means of electronic fund transfers (the "Electronic Transfers").

Before the Petition Date, the Debtors sent certain parties Checks or Electronic Transfers on

account of Employee Wages and Benefits that may not have cleared as of the Petition Date.

137.    To the extent any Check or Electronic Transfer has not cleared as of the

Petition Date, the Debtors request the Court authorize the banks, in the Debtors' sole discretion,

to receive, process, honor, and pay the Checks or Electronic Transfers.  If any party has not

received payment for amounts owed on account of any Employee Wages and Benefits, the

Debtors seek authority to issue replacement Checks, re-issue Electronic Transfers, or otherwise

make payments on account of Employee Wages and Benefits.  The Debtors represent that each

of the Checks and Electronic Transfers can be readily identified as relating directly to the

authorized payment of amounts owed on account of Employee Wages and Benefits.

Accordingly, if the relief requested is granted, Checks and Electronic Transfers other than those

relating to authorized payments will not be honored inadvertently.

**C.     Motion for Order Pursuant to Sections 105, 361, 362, and 363 of the
Bankruptcy Code (A) Authorizing the Debtors' Use of Cash Collateral,
(B) Granting Adequate Protection, and (C) Scheduling a Final Hearing
Pursuant to Bankruptcy Rule 4001 (the "Cash Collateral Motion")**

138.    By the Cash Collateral Motion, the Debtors seek authorization to use the

Cash Collateral. The Debtors also request that the Court (a) authorize the Debtors' grant of

adequate protection to the Master Trustee and (b) schedule the Further Hearing pursuant to Bankruptcy Rule 4001.

139.    The Master Trustee's interest in the Cash Collateral arises from the collateral pledges made by the Debtors under the Master Indenture for the benefit of certain tax-advantaged bonds. The MDFA Bonds were issued by MDFA in 1999. As of May 31, 2011, $13,585,000 in principal and $280,802.65 in interest was outstanding under the MDFA Bonds. The other three series of bonds were issued by MHEFA in 1996 and 2004.  As of May 31, 2011, $29,680,000 in principal and $789,321.20 in interest was outstanding under the MHEFA Bonds.

140.    As security under the Loan Agreements, BONY holds Master Note No. 1 issued under the Master Indenture, and U.S. Bank holds Master Note No. 3 (together with Master Note No. 1, the "Master Notes") issued under the Master Indenture. The Master Notes are secured by the Gross Revenues (as defined in the Master Indenture)[16] of the Debtors. The Master Notes are also secured by a pledge pursuant to the Mortgage and Security Agreement to the Master Trustee that purports to cover substantially all of NARH's personal property and two

---

[16] The Master Indenture defines Gross Revenues as follows: "'Gross Revenues' of any Person means all receipts, revenues, rentals, income and other moneys received or receivable by or on behalf of such Person from any source, whether or not in connection with the ownership or the operation of all or any part of the Mortgaged Property, including without limitation, all fees paid or payable by or on behalf of patients or residents and all other operating and non-operating revenues (to the extent the same may lawfully be assigned or a security interest therein may lawfully be granted), and all rights to receive the same whether in the form of accounts, Accounts Receivable, contract rights (to the extent the same may lawfully be assigned or a security interest therein may lawfully be granted), chattel paper, instruments, general intangibles or investment property and the proceeds thereof, the proceeds of insurance coverages on and condemnation awards in respect of the Mortgaged Property or any gain on the sale or other disposition of property; all of the foregoing, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired; and including all gifts, grants, bequests, donations and contributions, except those heretofore or hereafter made which are designated at the time of making by the donor or maker as being for certain specified purposes inconsistent with the application thereof to the payments due from such Person under this Master Indenture and except any income derived therefrom to the extent required by such designation or restriction."

44

parcels of real estate.[17] The Mortgage and Security Agreement is attached to the Cash Collateral

Motion as Exhibit C and incorporated therein by reference.

141.    The MDFA Bonds are insured by ACA, pursuant that certain Bond

Insurance Policy, dated as of October 14, 1999 (as amended, the "MDFA Bond Insurance

Policy").

142.    In addition, U.S. Bank holds certain accounts, established for the benefit

of the MHEFA Bonds, which accounts hold various debt service, reserve, and other funds (the

"Bond Accounts").  NARH has a residual interest in the funds held by U.S. Bank.  The amounts

held in each of these funds as of May 31, 2011 was: (i) $5.77 in the Debt Service Fund,

(ii) $3,122,501.11 in the Debt Service Reserve Fund, (iii) $0 in the Expense Fund, (iv) $6,095.12

in the Redemption Fund, and (v) $51,005.35 in the Rebate Fund, for a total of $3,174,172.30.

143.    The Master Trustee also holds certain cash proceeds of NBCS's sale of the

Sweets (the "Sale Proceeds," and the accounts in which the Sale Proceeds are held, together with

the Bond Fund Accounts, the "Bond Accounts").  NBCS has an interest in the Sale Proceeds

pursuant to an agreement with the Master Trustee related to the sale of the Sweets.

144.    The Debtors' assets that are excluded from prepetition collateral include,

among other things, investments purchased with the proceeds of Gross Revenues more than 20

days prior to the petition date. These investments are shares of entities that are registered as

investment companies under the federal investment company laws and partnership interests in

private funds held in a securities account (collectively, the "Investment Property"). The value of

---

[17] All the personal property and four parcels of real estate of Northern Berkshire Community Services, Inc.
("NBCS"), one of NBH's non-profit corporate affiliates, were also purported to be pledged to the Master Trustee
pursuant to a Mortgage and Security Agreement from NBCS to Bank of New York, dated as of October 1, 2004 (the
"NBCS Mortgage and Security Agreement"). On the Petition Date, NBCS commenced a voluntary petition with this
Court under chapter 7 of the Bankruptcy Code. Following the sale of substantially all of NBCS's assets in August
2010, NBCS now owns no assets other than cash and accounts receivable.

the Investment Property held by NARH and VNA as of May 31, 2011, outside of Investment

Property held in endowment funds and similar restricted accounts, was approximately

$746,910.84.  As of May 31, 2011, NARH held approximately $185,000 in Investment Property.

The UCC filing statement for the Master Trustee does not extend to the Investment Property – it

only covers "Gross Revenues" as defined in the Master Indenture.

145.    The Debtors require the immediate use of Cash Collateral to maintain their

medical operations. Absent the use of Cash Collateral, the Debtors will be forced to cease

operations, destroying the Debtors' going-concern value to the detriment of the Debtors, their

estates, and their creditors. Further, because the enterprise is a hospital, hospice, and home health

service, closure would have a devastating impact on the Debtors' current patients and the

surrounding community, reducing crucial medical services and putting at risk the health of

current in-patients that would need to be transferred to other facilities. Use of the Cash Collateral

is therefore critical to preserve and maintain the Debtors' estates, the possibility for a successful

reorganization in these chapter 11 cases, and the safety of the Debtors' patients and the

community they serve.

146.    Terminating the medical operations of the Debtors would have devastating

effects on the Debtors' going concern value and the interests of their current patients and the

surrounding community at large.  Denying the use of cash collateral would force the closure of

the hospital and eliminate crucial emergency and in-patient services.  The current patients in the

hospital would have to be transferred to other locations, a process that is not without risk,

assuming space at suitable other medical facilities could even be found.  Additionally, due to the

relative remoteness of the North Adams community from other major hospitals, many residents

25275569_13

of northern Berkshire County would find themselves too far from a hospital to receive timely

emergency care.

      **D.**      **Motion for Order Authorizing Joint Administration of Chapter 11 Cases**
               **Pursuant to Federal Rule of Bankruptcy Procedure 1015 and MLBR 1015-1**
               **(the "Joint Administration Motion")**

      147.      By the Joint Administration Motion, the Debtors request entry of an order

directing the joint administration of the Debtors' chapter 11 cases and the consolidation thereof

for procedural purposes only. Many of the motions, applications, hearings, and orders that will

arise in these chapter 11 cases will affect all Debtors. For that reason, the Debtors respectfully

submit that their interests, as well as the interests of their creditors and other parties in interest,

would be best served by the joint administration of these chapter 11 cases, for procedural

purposes only.

      148.      The Debtors submit that the joint administration of their cases should be

maintained under the case name and number assigned to NBH, the sole member of NARH,

VNA, NBR, and NBHPG, and request that the Clerk of the Court maintain one file and one

docket for each of the Debtors' chapter 11 cases under that case name and number. In addition,

the Debtors seek the Court's direction that a separate docket entry be made on the chapter 11

case dockets of NARH, VNA, NBR, and NBHPG substantially as follows:

> An order has been entered in this case directing the procedural consolidation and
> joint administration of the chapter 11 cases of Northern Berkshire Healthcare,
> Inc., North Adams Regional Hospital, Inc., Visiting Nurse Association & Hospice
> of Northern Berkshire, Inc., Northern Berkshire Realty, Inc., and Northern
> Berkshire Healthcare Physicians Group, Inc., which have concurrently
> commenced chapter 11 cases. The docket in the chapter 11 case of Northern
> Berkshire Healthcare, Inc., Case No. 11-_____ (____), should be consulted
> for all matters affecting this case.

      149.      The Debtors further request that the caption of these chapter 11 cases be

modified as follows to reflect their joint administration under the lead chapter 11 case of NBH:

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### WESTERN DIVISION

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re                                         :      Chapter 11
                                              :
NORTHERN BERKSHIRE                            :      Case No. 11-_____ (    )
HEALTHCARE, INC., et al.,                     :
                                              :      (Jointly Administered)
            Debtors.                          :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

150.    Finally, the Debtors seek authority to file the Debtors' monthly operating reports on a consolidated basis if the Debtors determine, after consultation with the United States Trustee, that consolidated reports would further administrative economy and efficiency without prejudice to any party in interest and that the reports would accurately reflect the Debtors' consolidated business operations and financial affairs.

151.    Joint administration of the Debtors' respective estates will ease the administrative burden on this Court and all parties in interest in these chapter 11 cases. Joint administration of these chapter 11 cases also will permit the Clerk of this Court to use a single docket for all the cases and to combine notices to creditors and other parties in interest in the Debtors' respective cases. As there likely will be numerous motions, applications, and other pleadings filed in these chapter 11 cases that will affect all the Debtors, joint administration will (a) significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, (b) render the completion of various administrative tasks less costly, and (c) minimize unnecessary delays. Joint administration also will permit counsel for the various parties in interest to include each Debtor's chapter 11 case in a single caption for the documents that are likely to be filed and served in these chapter 11 cases and will enable parties-in-interest

48

(including the United States Trustee) in each of the chapter 11 cases to stay apprised of all the

various related matters before this Court.

**E.      Motion for Order (i) Authorizing the Debtors to Prepare (a) a Consolidated Creditor Matrix and (b) a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (ii) Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required By Privacy Rules, and (iii) Approving the Form and Manner of the Notice of Commencement (the "Notice Procedures Motion")**

152.    By the Notice Procedures Motion, the Debtors seek entry of an order

(i) authorizing the Debtors to prepare (a) a consolidated creditor matrix and (b) a consolidated

list of the Debtors' 30 largest unsecured creditors; (ii) authorizing certain procedures to maintain

the confidentiality of patient information as required by the Health Insurance Portability and

Accountability Act of 1996 ("HIPAA") and M.G.L. ch. 111, § 70; and (iii) approving the form

and manner of notice of the commencement of these chapter 11 cases and of the meeting of

creditors to be held pursuant to section 341 of the Bankruptcy Code (the "Section 341 Meeting"),

substantially in the form attached as Exhibit 1 to the proposed order attached to the Notice

Procedures Motion (the "Commencement Notice").

153.    The Debtors request authority to file a consolidated creditor matrix in lieu

of separate creditor matrices for each Debtor as required by Bankruptcy Rule 1007(a) and MLBR

1007-1. There would be no significant benefit to offset the burden of compiling separate

matrices. The five matrices would largely repeat the same information and, since these cases are

already in joint administration, all such creditors will receive all the same notices, hearing dates,

and so forth, regardless of the creditor matrix on which they would appear.

154.    The Debtors submit that a single consolidated list of their combined 30

largest unsecured creditors in these cases would be more reflective of the body of unsecured

creditors that have the greatest stake in these cases than separate Top 20 Lists for each of the

Debtors. The Debtors believe that such relief is not only appropriate under the circumstances, but

necessary for the efficient and orderly administration of these cases.

155.    Lastly, the Debtors request authority to implement procedures regarding

disclosure of patient information, because certain current and past patients of the Debtors may

assert claims against the Debtors and, without procedures covering such disclosure, the Debtors

would otherwise have to list information about these patients in the creditor matrix, the

Schedules and Statements, and elsewhere.

     **F.**     **Motion for Order Establishing Case Management Procedures (the "Case Management Motion")**

156.    By the Case Management Motion, the Debtors seek entry of an order

establishing the case management procedures listed in the Case Management Motion.

157.    The Debtors submit that the Case Management Procedures are proper and

sufficient under the existing circumstances. Adopting the Case Management Procedures will

promote the Debtors' reorganization efforts by organizing the hearings and motion practice in

these cases and, by allowing service by email, preserve assets that otherwise would be consumed

by unnecessary copying, postage, and related expenses.

     **G.**     **Motion for Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals (the "Interim Compensation Motion")**

158.    By the Interim Compensation Motion, the Debtors request entry of an

order establishing a process for the monthly allowance and payment of compensation and

reimbursement of expenses for professionals whose services are authorized by the Court and who

will be required to file applications for allowance of such compensation and expenses pursuant to

sections 330 and 331 of the Bankruptcy Code. In addition, the Debtors seek approval of a

procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any

statutory committees appointed in these cases.

159.    The Debtors intend to seek authority to employ Ropes & Gray LLP as

their bankruptcy attorneys and Carl Marks Advisory Group LLC as their financial advisors.  Any

statutory committee appointed in these cases may also need to retain professionals.

160.    The Debtors propose that the procedures set forth in the Interim

Compensation Motion be established such that all professionals retained in these cases pursuant

to 11 U.S.C. §§ 327 and 1103 (each, a "Professional") may seek postpetition interim

compensation as provided therein.

161.    The Debtors also request that, in lieu of serving full copies of any Interim

Fee Application and/or final fee applications (collectively, the "Applications"), the Court limit

service of Applications to the Notice Parties. The Debtors further request that all other parties

who have filed a notice of appearance with the Clerk of the Court and requested notice of

pleadings in these chapter 11 cases shall be entitled to receive only notice of hearings on the

Applications (the "Hearing Notices"). Serving the Applications and the Hearing Notices in this

manner will permit the parties most active in these chapter 11 cases to review and object to the

Professionals' fees and will save unnecessary duplications and mailing expenses.

162.    Entry of the Administrative Fee Order would permit the Court and all

other parties to monitor more effectively the fees and expenses incurred by the Professionals

retained in these cases. The Debtors submit that the efficient administration of the chapter 11

cases will be significantly aided by establishing the foregoing compensation procedures.

**H.**   **Motion for Order Pursuant to Sections 105(A) and 366 Of The Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (B) Deeming Utility Providers Adequately Assured of**

**Future Performance, and (C) Establishing Procedures for Determining
Adequate Assurance of Payment (the "Utilities Motion")**

163.     By the Utilities Motion, the Debtors seek entry of an interim and a final
order: (i) prohibiting the Utility Providers from altering, refusing, or discontinuing service to the
Debtors except as set forth in the Utilities Motion; (ii) determining that the Utility Providers have
been provided with adequate assurance of payment on the basis of the provision of Two Weeks
Deposits and the establishment of a Utility Deposit Account; and (iii) approving the Debtors'
proposed procedures for Utility Providers to request additional assurance of payment. Though
the Debtors seek the continued provision of utility services from the Utility Providers, the
Debtors are not seeking authority or direction to pay any specific claim.

164.     In the normal course of their business, the Debtors incur utility expenses
for water, electricity, gas, sewer, waste management, oxygen, cable, and telecommunications
services. These utility services are provided by utility providers (the "Utility Providers"), a non-
exhaustive list of which is attached to the Utilities Motion as Exhibit A.[18] Prior to the Petition
Date, the Debtors' average monthly payments to their Utility Providers aggregated
approximately $112,368 per month. The Debtors anticipate that the average postpetition monthly
cost for utility services during the Debtors' chapter 11 cases will be approximately the same.

165.     Uninterrupted utility services is essential to the Debtors' ongoing
operations and, therefore, to the success of their chapter 11 cases. Should one or more of the
Utility Providers refuse or discontinue service, even for a brief period, it would severely disrupt
the Debtors' operations, jeopardizing patient health and resulting in significant losses. Such an

---

[18] The listing of any entity on Exhibit A to the Utilities Motion is not an admission that such entity is a utility within the
meaning of section 366 of the Bankruptcy Code. The Debtors reserve the right to assert at any time that any entity listed on
Exhibit A to the Utilities Motion is not entitled to adequate assurance pursuant to section 366 of the Bankruptcy Code. The
Debtors further reserve the right to terminate the services of any Utility Provider at any time. The relief requested in to the
Utilities Motion is with respect to all Utility Providers and is not limited only to those identified in Exhibit A to the Utilities
Motion.

interruption would damage the Debtors' business to the detriment of their estates, creditors, and

employees. It is critical that the Debtors' utility services continue uninterrupted.

166.    To provide adequate assurance of payment for future services to the Utility

Providers, the Debtors propose to provide each such Utility Provider with a deposit (a "Two

Weeks Deposit") against the Debtors' postpetition utility service charges equal to approximately

two weeks' worth of the estimated cost of the Debtors' average annual consumption of such

Utility Provider's utility services. The Two Weeks Deposits, which equal $56,184 in the

aggregate, will be placed, collectively, into an interest-bearing, newly-created, segregated account

(the "Utility Deposit Account") within twenty days after the Petition Date, with the funds in such

Utility Deposit Account to be held in escrow pending further order of this Court. Absent further

order of this Court, the Debtors will maintain the Utility Deposit Account with a minimum balance

of $56,184 until the conclusion of these chapter 11 cases.

167.    If the Debtors identify an Added Utility Provider, the Debtors will

increase the amount held in the Utility Deposit Account by an amount equal to the estimated cost

of two weeks of utility services used by the Debtors, based on a yearly average, from such

Added Utility Provider. Any amount by which the amount in the Utility Deposit Account is

increased with respect to the Added Utility Provider shall also increase the minimum balance to

be maintained in the Utility Deposit Account.

168.    In addition, the Debtors seek to reasonable procedures (the "Procedures")

by which a Utility Provider may request additional assurance of future payment if such Utility

Provider believes that the provision of the applicable Two Weeks Deposit and the establishment

of the Utility Deposit Account does not provide it with satisfactory adequate assurance, as set

forth in the Utilities Motion.

169.     The Debtors submit that the Court should grant the relief requested in this

Motion because such relief is necessary to continue the Debtors' normal business operations and

to preserve the Debtors' ability to restructure their businesses in an orderly manner. The Debtors

could face a severe cash drain if the Utility Providers condition the provision of postpetition

services to the Debtors upon the payment of exorbitantly burdensome and/or unreasonable

deposits or other forms of adequate assurance.

170.     If the Utility Providers are permitted to terminate utility services on the

thirty-first day after the Petition Date, a substantial disruption to the Debtors' operations will

occur, and the Debtors and their patients will be irreparably harmed. If faced with imminent

termination of utility services, the Debtors would be forced to pay whatever amounts are

demanded by the Utility Providers to avoid the cessation of essential utility services and a severe

disruption of Debtors' operations, which would seriously jeopardize patients' health and safety.

171.     The Debtors submit that providing the Two Weeks Deposits in the Utility

Deposit Account, a substantial cash reserve relative to the Debtors' estimated monthly

consumption of utility services, provides adequate assurance to their Utility Providers under

section 366(c) of the Bankruptcy Code. In addition, the Debtors submit that the Procedures set

forth in the Motion, whereby any Utility Provider can request additional adequate assurance if it

believes there are facts and circumstances that would merit greater protection, provide an orderly

process for giving adequate assurance of payment to the Utility Providers without risking

irreparable harm to the estates.

## I.     Application to Retain GCG, Inc. as Claims, Noticing, and Balloting Agent for the Debtors (the "Application")

172.     By the Application, the Debtors seek to retain GCG, Inc. ("GCG") as the

Debtors' claims, noticing, and balloting agent pursuant to the Bankruptcy Administration

Agreement (the "Agreement") between GCG and the Debtors, attached to the Application as

Exhibit A.  The Debtors propose to retain GCG on the terms and conditions set forth in the

Agreement, with the cost of such services to be paid from the Debtors' estates as contemplated

by Section 156(c) of the Judicial Code.  The Debtors submit that if GCG is not engaged, the

Debtors will be required to divert substantial manpower from their efforts to manage their

operations and maximize the value of their estates.

>        173.    The Debtors propose to retain GCG at the rates set forth in the Agreement

and to pay GCG for its services from the Debtors' estates in accordance with section 156(c) of

the Judicial Code and section 503(b)(1)(A) of the Bankruptcy Code.  The Debtors and GCG have

agreed (subject to the Court's authorization hereof) that GCG shall invoice the Debtors monthly

for services rendered to the Debtors during the preceding month.  The Debtors believe that the

proposed rates to be charged by GCG for the services to be performed are fair and reasonable

and appropriate for services of this nature.  GCG received a $40,000 retainer from the Debtors

prior to the Petition Date, which GCG will apply first against all prepetition fees and expenses

and then against bills for fees and expenses that GCG will render in these cases.

>        174.    The services GCG will provide and the proposed terms of GCG's

retention are set forth in full in the Application and the attachments thereto.

25275569_13

## Declaration

Pursuant to section 1746 of title 28 of the United States Code, I declare under

penalty of perjury that the foregoing is true and correct.

## Relief Requested

I respectfully request that the Court grant all relief requested in the First Day

Motions and such other and further relief as may be just and proper.

NORTHERN BERKSHIRE HEALTHCARE, INC.
NORTH ADAMS REGIONAL HOSPITAL, INC.
VISITING NURSE ASSOCIATION & HOSPICE
OF NORTHERN BERKSHIRE, INC.
NORTHERN BERKSHIRE REALTY, INC.
NORTHERN BERKSHIRE HEALTHCARE
PHYSICIANS GROUP, INC.

By: _____
    Christopher L. Hickey
    Chief Financial Officer

Executed on:    6/13/11