## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### WESTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| : | |
| In re : | **Chapter 11** |
| : | |
| **NORTHERN BERKSHIRE** : | **Case No. 11-_____ (          )** |
| **HEALTHCARE, INC.,** *et al.,*[1] : | |
| : | **(Jointly Administered)** |
| **Debtors.** : | |
| : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MOTION FOR AUTHORITY TO PAY WAGES, COMPENSATION, EMPLOYEE BENEFITS, AND OTHER RELATED OBLIGATIONS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE

Northern Berkshire Healthcare, Inc., on behalf of itself and its affiliated debtors and debtors in possession (collectively, the "Debtors"), hereby submits this motion (the "Motion") for an order (the "Order") authorizing, but not directing, the Debtors, in their good faith business judgment, to pay wages, employee benefits, and other related obligations. In support of the Motion, the Debtors submit the Declaration of Christopher L. Hickey in Support of Chapter 11 Petitions and First Day Motions and Applications, sworn to on June 13, 2011 (the "Hickey Declaration"), and respectfully represent and set forth as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested

---

[1] The Debtors in these cases are Northern Berkshire Healthcare, Inc., North Adams Regional Hospital, Inc., Visiting Nurse Association & Hospice of Northern Berkshire, Inc., Northern Berkshire Realty, Inc., and Northern Berkshire Healthcare Physicians Group, Inc.

herein are sections 105(a), 362(d), 363(b), and 1107(a) of title 11 of the United States Code,

11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

**Background**

2.        On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  Sections

1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their

businesses and manage their properties as debtors in possession.  No trustee, examiner, or

creditors' committee has been appointed in the Debtors' chapter 11 cases.

3.        Northern Berkshire Healthcare, Inc. is a non-profit healthcare corporation

in northern Berkshire County, Massachusetts and is the sole member of the other Debtors, all of

which are also non-profit corporations.  The Debtors operate the North Adams Regional Hospital

and a visiting nurse association and hospice in North Adams, Massachusetts.  The Debtors are

one of the largest employers in Berkshire County and are the largest employer in the city of

North Adams, Massachusetts.  The Debtors serve a population of approximately 43,000 located

in and around North Adams.

4.        The Debtors have initiated these chapter 11 cases to address their over-

leveraged balance sheet and effect a reorganization of their operations.  The Debtors expect to

continue all hospital and other operations during these chapter 11 cases and to continue in their

mission of providing high-quality medical care to the North Adams community.

5.        Further details regarding the Debtors, their capital structure, and the events

leading to these chapter 11 cases can be found in the Hickey Declaration filed

contemporaneously herewith.

**Relief Requested**

6.      To prevent the disruption the Debtors would suffer if prepetition employment-related obligations are not paid when due or as expected, as well as to maintain the morale of the Debtors' employees during this critical time, the Debtors request entry of an order authorizing, but not directing, the Debtors to pay the prepetition Employee Wages and Benefits (as defined below) and to continue to honor the Employee Wages and Benefits in the ordinary course of business.

7.      To assist in the implementation of the relief requested, the Debtors further request that their banks be authorized to honor (i) prepetition payroll checks or wires and (ii) all other checks or wires issued for payments approved by the Motion, regardless of whether such checks or wires were drawn prior to or after the Petition Date.  The Debtors also seek authorization to reissue prepetition checks or wires for payments approved by the Motion that are dishonored notwithstanding the foregoing authorizations.

8.      Although the Debtors seek authority to make the requested payments, they do not believe the Court should direct them to pay any specific claim.  Additionally, notwithstanding anything in the Motion to the contrary, the payment of any claims pursuant to the Order (if entered by this Court) shall neither (i) make such obligations administrative expenses of the estates entitled to priority status under sections 503 and 507 of the Bankruptcy Code, nor (ii) constitute approval by this Court of any employee plan or program, including any bonus plans subject to section 503(c) or any other section of the Bankruptcy Code.

9.      Eighty-two of the Debtors' 613 employees are salaried employees (the "Salaried Employees"), and the rest are paid by the hour (the "Hourly Employees," and, together with the Salaried Employees, the "Employees").  291 of the Employees are members of unions (the "Union Employees") and the rest are not members of unions (the "Non-Union Employees").

3

The Union Employees consist of the Debtors' nursing staff of 109 Employees, which is

represented by the MNA, and 182 technical employees who are represented by the Service

Employees International Union (the "SEIU").  As of the Petition Date, collective bargaining

agreements are in place with both the MNA and the SEIU.[2]  The Debtors are required to comply

with these collective bargaining agreements pursuant to 11 U.S.C. § 1113 and intend to do so.

### Prepetition Employee Obligations

**A.      Wages, Salaries, and Compensation**

10.     The Debtors' average aggregate monthly compensation to employees for

wages and salaries is approximately $1,597,806, exclusive of the deductions and exclusions

detailed below.  Employees of Debtors other than VNA are paid with direct deposits or by check

every Wednesday and are paid in arrears through Saturday of the prior week.  VNA Employees

are paid every other week on Friday and are paid in arrears through Friday of two weeks before.

11.     The Debtors estimate that the aggregate amount of accrued prepetition

wages and salaries that remain unpaid to the employees as of the Petition Date is approximately

$559,227 exclusive of deductions and exclusions (the "Unpaid Wages and Salaries").[3]  To the

best of the Debtors' knowledge, none of the Employees are individually owed more than $11,725

on account of wages earned prior to the Petition Date.

---

[2] The MNA collective bargaining agreement is temporary pending completion of a final collective bargaining agreement, the terms of which are still being negotiated.

[3]      The calculation of Unpaid Wages and Salaries incorporates payments owing on account of wages and salaries.  The calculation does not attempt to incorporate amounts for other benefits, including post-retirement benefits or health and dental benefits.  Further, the calculation does not include expense reimbursement amounts, which the Debtors do not consider compensation.

**B.**     **Reimbursable Expenses**

12.     In the ordinary course of business, the Debtors reimburse employees and members of their Boards of Trustees for certain expenses incurred while performing their duties on the Debtors' behalf (the "Reimbursable Expenses").

13.     In the normal course of business, employees submit expense reports to their supervisors, who approve proper expense reports and submit them to the Debtors' accounting personnel.  The Debtors reimburse expenses on a bi-weekly basis, through either a paper check or direct deposit.  Reimbursable Expenses include expenses for business-related travel (including meals, tickets, lodging, and automobile mileage), business supplies, and related expenses.

14.     The Debtors estimate that, as of the Petition Date, approximately $10,000 of Reimbursable Expenses remain unpaid.

**C.**     **Prepetition Deductions and Withholdings**

15.     For each applicable pay period, the Debtors deduct certain amounts from paychecks (collectively, the "Deductions"), including, without limitation: (i) garnishments for child support and similar deductions; (ii) pre-tax contributions to health and dependent care flexible spending accounts, as described in detail below; and (iii) other pre-tax and after-tax deductions payable pursuant to certain of the employee benefit plans discussed below and other miscellaneous deductions.  The Debtors withhold on average approximately $296,039.00 per month in Deductions from employees' paychecks.

16.     The Debtors are also required by law to (i) withhold from an employee's wages amounts related to, among other things, federal, state, and local income taxes, Social Security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state, or local taxing authorities and (ii) make matching payments for Social

5

Security and Medicare taxes and pay additional amounts, based upon a percentage of gross

payroll, for state and federal unemployment insurance (the "Employer Payroll Taxes," together

with the Withheld Amounts, the "Payroll Taxes", and collectively with the Unpaid Wages and

Salaries, the Reimbursable Expenses, and the Deductions, the "Unpaid Compensation").  The

Debtors estimate that they will withhold approximately $603,767.00 per month in Payroll Taxes

from employees' paychecks.

### D.  Employee Benefit Plans

17.  The Debtors also offer or provide employees (and their dependents) with a

variety of benefits.  These employee benefits (collectively, the "Employee Benefits") include,

but are not limited to:  (i) paid time-off benefits; (ii) health and dental care insurance; (iii) life

and accidental death & dismemberment insurance; (iv) disability income insurance; (v) flexible

spending plans; (vi) 403(b) plans; and (vii) COBRA medical coverage.  The Debtors estimate

that, as of the Petition Date, the total amount owed or accrued in connection with the Employee

Benefits due to employees is approximately $359,517.[4]

### (i)  Paid Time-Off Benefits

18.  The Debtors provide both Union and Non-Union Employees with paid

time-off benefits, depending upon the employee's length of employment.  The Debtors provide

some form of paid leave in connection with vacation time, sick days, holidays, personal days,

jury duty, and bereavement leave (collectively the "PTO Benefits").  Certain earned and unused

vacation time (or, at VNA and NBHPG, paid time-off)[5] may be carried over year-to-year, up to a

maximum that varies depending on position and length of employment but does not exceed 300

---

[4]  This estimate excludes any accrued but unused vacation time, sick days, or personal days, but includes approximately $302,000 payable to employees for medical and dental care expenses under the Debtors' self-insurance program.

[5]  There is no distinction between vacation time, sick days, or holidays for Employees of VNA and NBHPG.

6

hours of paid time-off per eligible employee.  Each year, MNA and SEIU members may cash out

one or two weeks, respectively, of accrued and unused vacation time or paid time-off, as

applicable.[6]  All Employees are entitled to a cash payout for accrued and unused vacation days

upon termination of employment with the Debtors.  The PTO Benefits are obligations ultimately

satisfied in the ordinary course of business through salary and payroll continuation, other than

accrued PTO Benefit payouts for terminated or union-member Employees.  As of May 28, 2011,

the Debtors estimate that they owe approximately $2,299,187 of accrued but unpaid PTO

Benefits that are convertible to cash payment obligations.

**(ii)    Medical, Dental, and Other Health Plans**

19.    The Debtors offer coverage to eligible employees (and their dependents)

for medical, dental, vision, prescription drug, emergency health services, outpatient surgery,

hospice care, rehabilitation services, mental health, and other related benefits (collectively, the

"Health Care Benefits").

20.    The Debtors offer a self-insured medical plan that is administered by Blue

Cross/Blue Shield of Massachusetts ("BCBS") under the Blue Choice New England, Network

Blue New England, and Blue Care Elect PPO Plans (the "Medical Plans").  On a monthly basis,

the Debtors fund an account of the Debtors from which claims are paid.  The Debtors' current

monthly transfers to this account are approximately $423,600.  Under the Medical Plans, the full

cost of the employees' claims, less any deductibles or co-pays, is paid from the account.  There

are currently 371 employees enrolled in the Medical Plans.  As of the Petition Date, the Debtors

estimate that they owe approximately $302,000 for incurred but not reported claims and reported

but unpaid claims under the Medical Plans.

---

[6]        In the past year, NBH has paid an aggregate of $22,039.54 in cash-out time to MNA and SEIU employees.

21.    The Debtors' employee dental plan (the "Dental Plan") is also self-insured and administered by BCBS.  The Debtors' current monthly payments to the self-insurance account for dental coverage are approximately $30,800.  Under the Dental Plan, the full cost of the employee claims, less any deductibles or co-pays, is paid from the account, up to an annual maximum benefit of $1,000 per individual.  There are currently 418 employees enrolled in the Dental Plan.  As of the Petition Date, the Debtors estimate that they owe no amounts for the Dental Plan.

22.    For both the Medical Plans and the Dental Plan, the Debtors also pay BCBS monthly fees of approximately $50,000 in aggregate for administration costs and to reinsure employees whose cost of care exceeds specified limits.[7]

23.    Generally, for employees and their enrolled family members, the Debtors pay approximately (i) 75% of their cost of care under the Medical Plans (with a smaller percentage paid for part-time employees) and (ii) 64% of their cost of care under the Dental Plan for individual enrollees, 45% for family enrollees, and 75% for members of SEIU, whether individual or family.  The balance of the cost is contributed by the employees through payroll withholding.  On a weekly basis, the Debtors withhold from employees' wages amounts related to the Medical and Dental Plans totaling approximately $33,000 and remit the same to the health care plan administrators or providers (the "Health Plan Withholdings").

**(iii)    Life and Accidental Death & Dismemberment Insurance**

24.    The Debtors provide basic life insurance and accidental death and dismemberment coverage (collectively, "Life Insurance") through The Hartford Life Insurance Company ("The Hartford").  The Debtors currently pay approximately $4,128 per month in

---

[7] Generally, when an individual's annual claims exceed $110,000.

8

premiums and administrative costs in connection with the Life Insurance.  There are currently

525 employees and retirees enrolled in the Life Insurance program.  As of the Petition Date, the

Debtors estimate that approximately $1,373 is owed to The Hartford.

      25.    Certain employees may supplement their Life Insurance coverage with

additional personal life insurance and accidental death & dismemberment coverage

("Supplemental Insurance" and, collectively with the Life Insurance, the "Insurance Benefits").

Participating employees pay all premiums in connection with the Supplemental Insurance (the

"Supplemental Insurance Premiums") through payroll withholding, which the Debtors remit to

The Hartford on a monthly basis.  There are 172 employees enrolled in the Supplemental

Insurance program.  As of the Petition Date, the Debtors estimate that $1,928 is owed to The

Hartford on account of the Supplemental Insurance Premiums.

**(iv)**    **Disability Plans**

      26.    NBH provides managers, senior management, and employed physicians

with long-term disability coverage (the "Subsidized Disability Coverage") at no cost to such

employees.  The Subsidized Disability Coverage is provided through a policy with The Hartford,

under which the average monthly premiums are $10,510.  As of the Petition Date, the Debtors

estimate they owe approximately $1,645 in unpaid amounts related to Subsidized Disability

Coverage.

      27.    Other employees can purchase both short-term and long-term disability

coverage (collectively, the "Unsubsidized Disability Coverage" and, together with the

Subsidized Disability Coverage, the "Disability Coverage") through the Debtors by electing to

have additional amounts withheld from their pay on an after-tax basis.  The Unsubsidized

Disability Coverage is provided through a policy with The Hartford, under which the average

monthly withholdings are $3,871.  As of the Petition Date, the Debtors estimate they hold

9

approximately $3,586.66 in withheld but unpaid amounts related to Unsubsidized Disability Coverage.

**(v)**     **Flexible Spending Programs for Medical and Dependent Care**

28.    The Debtors offer health care and child care flexible spending accounts (the "Flexible Spending Programs").  There are currently 62 employees and former employees of the Debtors (the "Former Employees") enrolled in the Flexible Spending Programs.  The Flexible Spending Accounts allow employees, through pre-tax payroll Deductions, to contribute up to (i) $5,000 per year for eligible out-of-pocket medical, dental, or vision expenses, (ii) $5,000 per year for eligible child care expenses.  The Debtors hold funds contributed by employees and Former Employees under the Flexible Spending Programs in trust for the benefit of the employees (the "FSA Contributed Funds").

29.    Former Employees who made contributions in 2011 prior to their termination are covered by the Flexible Spending Programs, despite no longer being employed by the Debtors.  This continued coverage is required by law.  See 26 C.F.R. § 54.4980B-2. Former Employees who made contributions in 2011 may submit for reimbursement for appropriate expenses incurred in 2011 prior to their termination.  These Former Employees are permitted by law to receive reimbursements for the total amount they would have contributed during 2011 had they remained employed by the Debtors.  Accordingly, it is possible that Former Employees could receive reimbursements under the Flexible Spending Plans in excess of their actual 2011 contributions.  In this event, the Debtors would be required to fund the difference.

30.    By this Motion, the Debtors seek authority to continue the Flexible Spending Programs and perform all prepetition obligations thereunder with regard to both employees and Former Employees.

10

(vi)     **Defined Contribution and Executive Retirement Plans**

31.     The Debtors maintain a 403(b) plan for Employees and Former Employees of NBH and NARH (the "403(b) Plan"), and a 401(a) plan for Employees and Former Employees of VNA (the "401(a) Plan" and, together the 403(b) Plan, the "Defined Contribution Plans") for the benefit of certain eligible Employees and Former Employees.  The 403(b) Plan allows employees to make automatic pre-tax salary deductions subject to the limits set by the Internal Revenue Code (the "Withholding Contributions").  Under for the 401(a) Plan, VNA contributes 5% of each Employee's base earnings (the "Employer Contributions") to an investment account directed by such Employee that are not taxable when the Employer Contributions are made.  Former Employees may continue to maintain accounts through the Defined Contribution Plans, but may not make new contributions.  As of the Petition Date, approximately 289 Employees and Former Employees participate in the Defined Contribution Plans, and there are approximately $12,718,949 in assets held in the Defined Contribution Plans.

32.     The 403(b) Plan is held in custody by Wilmington Trust FSB ("Wilmington Trust") and administered by Lincoln Financial Corporation ("Lincoln Financial") on behalf of the Debtors.  The 401(a) Plan is held in custody by Mutual of America. Withholding Contributions for the 403(b) Plan are transferred by wire to Wilmington Trust on a weekly basis to be credited to individual employee 403(b) accounts.  Employer Contributions to the 401(a) Plan are made monthly.  The Debtors estimate that monthly Withholding Contributions to the 403(b) Plan are approximately $120,000.  The Debtors match all Employee contributions (other than contributions of SEIU members) to the 403(b) Plan, at a rate determined by the age of the employee and amount of contributions, ranging from 1.5% to 6%. The Debtors also make monthly contributions to a retirement plan sponsored and administered by SEIU, under which the Debtors contribute 8.71% of the salaries of SEIU members.  As of the

11

Petition Date, the Debtors estimate that they owe approximately $21,369.23 in unpaid matching

payments to the 403(b) Plan and approximately $16,334 in unpaid Employer Contributions to the

401(a) Plan and the SEIU plan.

33.     The Debtors also offer two deferred compensation plans for senior

executives (the "Deferred Compensation Plans").  Under these plans, a portion of the Chief

Executive Officer and Chief Financial Officer's compensation is deferred and is paid and taxed

to the employees at a later date.  The Debtors do not seek authority at this time to pay prepetition

amounts owed under the Deferred Compensation Plans.  The Debtors merely request authority to

continue to allow these employees to defer or deduct compensation earned on and after the

Petition Date under the Deferred Compensation Plans.

**(vii)     COBRA Medical and Dental Coverage**

34.     Former Employees are entitled to continue to participate in the Debtors'

Medical Plan coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of

1986 (as amended, "COBRA") for up to 18 months (such coverage, the "COBRA Medical

Coverage").  As of the Petition Date, the Debtors estimate that approximately 23 Former

Employees are either currently on or eligible to elect COBRA Medical Coverage.  Former

Employees who elect to exercise their rights under COBRA must pay up to 102% of the

premiums for COBRA Medical Coverage, and, pursuant to the American Recovery and

Reinvestment Act of 2009, for Former Employees terminated through May 31, 2010, the Debtors

must advance 65% of these premiums (which are eventually recouped through quarterly tax

credits).

35.     Failure to comply with the requirements of COBRA can subject the

Debtors to penalties of up to $110 per day per qualified beneficiary (with a minimum penalty of

$15,000 for more than *de minimis* violations), actions by the Department of Labor, and civil

lawsuits by the Former Employees to recover their benefits.  See, e.g., 29 C.F.R. § 2575.502c-6.

Accordingly, the Debtors request authority in this Motion to continue to offer COBRA Medical

Coverage to eligible Former Employees on a postpetition basis.

**(viii)**   **Third-Party Administrative Costs**

36.     In the ordinary course of business, the Debtors use the services of several

third-party administrators to whom the Debtors outsource tasks associated with the payment of

compensation or benefits to employees (some of which are described above) (the costs

associated therewith, the "Third-Party Administrative Costs" and, collectively with the Unpaid

Compensation and the Employee Benefits, the "Employee Wages and Benefits").  The ordinary

course services provided by these third-parties ensure that the Debtors' obligations with respect

to employees continue to be administered in the most cost-efficient manner and comply with all

applicable laws.

**Basis for Relief**

37.     It is essential that the Debtors continue to honor their Employee Wages

and Benefits obligations to ensure the continued operation of the Debtors' business and to

maintain the morale of the employees.  Absent the requested relief, employees may be unable to

meet personal obligations, may be left without medical insurance, or may seek alternative

employment opportunities.

**A.**      **The Court May Rely on the "Necessity of Payment"**
**Doctrine and its General Equitable Powers to Grant the Motion**

38.     Section 105(a) of the Bankruptcy Code empowers the court to "issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title."  11 U.S.C. § 105(a).  Section 105(a) operates "to facilitate the implementation of other

Bankruptcy Code provisions," and in so doing it provides a "bankruptcy court with broad

13

authority to exercise its equitable powers." <u>Ameriquest Mortgage Co. v. Nosek (In re Nosek)</u>,

544 F.3d 34, 43 (1st Cir. 2008) (internal citations omitted).  These equitable powers are granted

to effectuate the policies and goals of chapter 11 reorganization, which are to rehabilitate the

debtor, <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174, 176-77 (Bankr. S.D.N.Y. 1989), and to "create

a flexible mechanism that will permit the greatest likelihood of survival of the debtor and

payment of creditors in full or at least proportionately." <u>Mich. Bureau of Workers' Disability</u>

<u>Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)</u>, 80 B.R. 279, 287 (S.D.N.Y. 1987). <u>See</u>

<u>also</u> <u>In re Structurlite Plastics Corp.</u>, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) (rejecting a

bright line rule prohibiting payment of prepetition debts because it "may well be too inflexible to

permit the effectuation of the rehabilitative purposes of the Code").

       39.    Under the "doctrine of necessity" or "necessity of payment" rule, first

articulated in <u>Miltenberger v. Logansport C. & S.W. R. Co.</u>, 106 U.S. 286 (1882), bankruptcy

courts can exercise these equitable powers "to authorize a debtor in a reorganization case to pay

pre-petition claims where such payment is essential to the continued operation of the debtor."

<u>Ionosphere Clubs</u>, 98 B.R. at 176.  <u>See, e.g.</u>, <u>In re Lehigh & N.E. Ry. Co.</u>, 657 F.2d 570, 581 (3d

Cir. 1981) (stating that payment of a claim arising before reorganization is authorized if it is

"essential to the continued operation of the [debtor]"); <u>In re Tusa-Expo Holdings, Inc.</u>, 2008 WL

4857954, *4 (Bankr. N.D. Tex. 2008) (authorizing the debtor to pay prepetition employee wages,

health insurance, workers' compensation benefits, and vacation time because the payment of

these amounts was necessary to retain the debtor's workforce and maintain the debtor's going

concern value); <u>In re Tropical Sportswear Int'l Corp.</u>, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005)

(authorizing the debtor to pay certain critical vendors because the continued provision of the

critical vendors goods and services was "absolutely critical to the maintenance of the Debtors'

14

estates."); In re Wehrenberg, Inc., 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) (authorizing the

debtor to pay the prepetition claims of certain critical vendors because the payment of those

claims was "necessary to realize the possibility of a successful reorganization"); In re Payless

Cashways, Inc., 268 B.R. 543, 547 (Bankr. W.D. Mo. 2001) (authorizing the debtor to pay

critical vendors' prepetition claims because the payments were necessary to induce the vendors

to continue supplying goods that were "critical to the survival of the debtor"); In re Equalnet

Commc'ns Corp., 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) (authorizing the debtor to pay

certain prepetition creditors because failure to pay these amounts "would be devastating to a

proposed reorganization."); In re Synteen Techs., Inc., 2000 WL 33709667, *2 (Bankr. D.S.C.

2000) (stating that a court may "authorize the payment of a pre-petition claim" where the debtor

meets the "rule of necessity," which requires the debtor to show "a 'compelling business

justification' that is in the best interest of both the debtor and other creditors.") (citations

omitted); In re Columbus Gas Sys., Inc., 171 B.R. 189, 192 (Bankr. D. Del. 1994) (noting that a

debtor may pay prepetition creditors "in advance of a confirmed plan" where such payments are

"essential to the continued operation of the [debtor's] business"); see also In re Fin. News

Network Inc., 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991) (stating that the "'doctrine of

necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of

prepetition obligations where such payments are critical to the debtor's reorganization"); cf. In re

Boston and Maine Corp., 634 F.2d 1359, 1382 (1st Cir. 1980) (discussing the history of

Miltenberger and the necessity of payment rule in railroad reorganizations under the Bankruptcy

Act of 1898.  The doctrine of necessity permits a deviation from the equal treatment of creditors

because "otherwise there will be no reorganization and no creditor will have an opportunity to

recoup any part of its prepetition claim."  In re United Am., Inc., 327 B.R. 776, 781 (Bankr. E.D.

Va. 2005).  See also In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (stating that the necessity of payment exception is "well-established in bankruptcy common law").

40.     Many courts have applied section 105(a) in conjunction with sections 1107(a) and 362(d) to allow payment of prepetition claims under the doctrine of necessity.  See, e.g., In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (holding that there are occasions when the debtor-in-possession's fiduciary duty to protect and preserve the estate "can only be fulfilled by the preplan satisfaction of a prepetition claim"); In re CEI Roofing, Inc., 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (opining that the debtor-in-possession and its "critical vendors" could request relief under section 362(d) for cause, such cause "being the urgency and necessity of paying the prepetition claims, such payment being the only means of protecting the going concern value of the operating business in Chapter 11").

41.     Many courts have also authorized debtors to pay critical prepetition claims pursuant to the doctrine of necessity, including claims that are not accorded priority in section 507 of the Bankruptcy Code.  For example, in Chateaugay, the Southern District of New York opined that the bankruptcy court had the power to pay prepetition workers' compensation claims characterized as general unsecured claims prior to confirmation of the plan, stating that "[a] rigid application of the priorities of [section 507 of the Bankruptcy Code] would be inconsistent with the fundamental purpose of reorganization and of the [Bankruptcy Code's] grant of equity powers to bankruptcy courts."  80 B.R. at 287.  See also In re Crafts Precision Indus., Inc., 244 B.R. 178, 183 (1st Cir. BAP 2000) (noting that the bankruptcy court had authorized the debtor to pay certain prepetition vacation benefits as they came due, even though such claims were not entitled to priority under former 11 U.S.C. § 507(a)(3), to "preserve[] [the debtor's] potential for rehabilitation"); In re Mirant Corp., 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (setting

procedural rules to authorize the debtor to pay "critical" creditors outside of a confirmed plan without advance court approval); In re Just for Feet, Inc., 242 B.R. 821, 825-26 (D. Del. 1999) (allowing the debtor to pay prepetition claims of certain trade vendors because they were "essential to the survival of the debtor during the chapter 11 reorganization"); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (authorizing the debtor, an automobile part supplier, to pay prepetition obligations to its toolmakers because the payments were "necessary to avert a serious threat to the Chapter 11 process").  Because flexibility is most needed during the immediate postpetition period to safeguard the debtor from the loss of essential goods and services and the collapse of the reorganization, it is both an appropriate and vital use of bankruptcy courts' equitable powers to permit debtors to pay critical creditors during that time.

42.     Courts are also empowered to authorize debtors to pay prepetition claims under section 363(b)(1), which provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  This section gives the court "broad flexibility in tailoring its orders to meet a wide variety of circumstances."  Ionosphere Clubs, Inc., 98 B.R. at 175.  Before the court can apply section 363(b) in its favor, the debtor must "articulate some business justification, other than mere appeasements of major creditors."  Id. (finding that the debtor gave "sound business reasons for its decision to pay pre-petition wages," those reasons being that it was necessary to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale"); see also Synteen Techs, 2000 WL 33709667, *3 (authorizing the debtor under sections 363(b) and 105(a) to pay a prepetition vendor's claim because the debtor had a "genuine need for [the vendor's] product" and the

product was "essential to [the debtor's] business."); <u>Tropical Sportswear</u>, 320 B.R. at 17 (authorizing payment of critical vendors pursuant to sections 363 and 105).

43.     Further, Rule 6003 of the Federal Rules of Bankruptcy Procedure makes clear that the bankruptcy court, if "necessary to avoid immediate and irreparable harm," may grant relief early in a bankruptcy case to "use, sell, lease, or otherwise incur an obligation regarding property of the estate, *including a motion to pay all or part of a claim that arose before the filing of the petition . . . ."* Fed. R. Bankr. P. 6003 (emphasis added).  Thus, Rule 6003 specifically contemplates granting relief to honor prepetition claims where necessary to preserve the estate and the debtor's prospects for reorganization and provides guidance on whether such authority should be granted immediately or delayed.  And as set forth herein and in the Hickey Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors' business – accordingly, immediate approval is appropriate.

## B.     Payment of Priority Claims Will Not Materially Prejudice Other Creditors

44.     Prepetition Employee Wages and Benefits would be entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Pursuant to section 507(a)(4) of the Bankruptcy Code, each employee may be granted a priority claim for:

> allowed unsecured claims, but only to the extent of $11,725 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for –
>
> (A)     wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual . . . .

11 U.S.C. § 507(a)(4).[8]

45.     Section 507(a)(5) of the Bankruptcy Code accords priority in payment for:

---

[8]     The dollar amounts referenced in section 507(a) of the Bankruptcy Code were automatically adjusted, pursuant to section 104(b) of the Bankruptcy Code, as of April 1, 2010.

allowed unsecured claims for contributions to an employee benefit plan –

(A)     arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B)     for each such plan, to the extent of –

    (i)     the number of employees covered by each such plan multiplied by $11,725; less

    (ii)    the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan . . . .

11 U.S.C. § 507(a)(5).[9]

46.     Claims for Unpaid Employee Compensation below the $11,725 section 507(a)(4) cap are entitled to priority treatment at the conclusion of these cases, and as noted above the Debtors expect all employees to have Unpaid Employee Compensation claims below $11,725.  Similarly, to the extent other Employee Benefits are entitled to priority status under section 507(a)(5) of the Bankruptcy Code, the relief requested in the Motion will only change the timing, and not the amount, of the payment of such claims.

## C.     Applicable Bankruptcy and Non-Bankruptcy Law Requires Payment and Continuation of Certain of the Employee Wages and Benefits

47.     The Deductions, Payroll Taxes, and Withholding Contributions principally represent employee earnings that governments (in the case of taxes), employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of any involuntarily withheld amounts) have designated for deduction from employees' paychecks.  If the Debtors do not remit

---

[9]     The costs of administering employee benefits programs also are entitled to priority under section 507(a)(5) of the Bankruptcy Code.  See Allegheny Int'l, Inc. v. Metro. Life Ins. Co., 145 B.R. 820, 822 (W.D. Pa 1992).  In Allegheny, the court found that prepetition fees of a plan administrator were entitled to priority under former section 507(a)(4) of the Bankruptcy Code.  Id.  The court stated "[i]t would be useless to prioritize expenses for contributions to an employee benefit plan and not prioritize the expenses necessary to administer those plans."  Id. at 822-23.

19

those amounts, the employees may face legal action and the Debtors may be burdened by inquiries and disputes concerning their failure to submit legally required payments.

48.      Further, most, if not all, of the unremitted Deductions, Payroll Taxes, and Withholding Contributions constitute monies held in trust and are not property of the Debtors' bankruptcy estates.  With respect to any such amounts held in trust, the Debtors believe that they are both entitled and required to continue directing such funds to the appropriate parties.  See In re Energy Res. Co., Inc., 871 F.2d 223, 225 (1st Cir. 1989) (observing that federal law requires employers to hold withheld funds in trust for the United States); DuCharmes & Co. v. Mich. (In re DuCharmes & Co.), 852 F.2d 194, 195-96 (6th Cir. 1988) (noting that "individual officials of an employer who fail to pay over [federal withholding] taxes that have been withheld are subject to personal liability").

49.      Courts in this district have approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those described herein in other large chapter 11 cases.  See, e.g., In re The Rugged Bear Co., Case No. 11-10577 (HJB) (Bankr. D. Mass Jan. 28, 2011) [Docket No. 34]; In re Oscient Pharm. Corp., Case No. 09-16576 (HJB) (Bankr. D. Mass. July 15, 2009) [Docket No. 53]; In re Lexington Jewelers Exchange, Inc., Case No. 08-10042 (WHC) (Bankr. D. Mass. Jan. 4, 2008) [Docket No. 48]; In re Iron Age Corp., Case No. 07-40217 (JBR) (Bankr. D. Mass. Jan. 23, 2007) [Docket No. 30]; In re Plymouth Rubber Co., Case No. 05-16088 (JNF) (Bankr. D. Mass. July 7, 2005) [Docket No. 37]; In re Syratech Corp., Case No. 05-11062 (RS) (Bankr. D. Mass. Feb. 18, 2005) [Docket No. 117]; In re High Voltage Eng'g Corp., Case No. 04-11586 (JNF) (Bankr. D. Mass. Mar. 2, 2004) [Docket No. 38]; In re Rowecom, Inc., Case No. 03-10668 (WHC) (Bankr. D. Mass. Jan. 29, 2003) [Docket No. 34]; In re ACT Mfg., Inc., Case No. 01-47641 (JBR) (Bankr. D. Mass. Dec. 21,

2001) [Docket No. 13]; In re Arch Wireless, Inc., Case No. 01-47330 (HJB) (Bankr. D. Mass. Dec. 6, 2001) [Docket No. 36].

50.     Nothing in the Motion should be construed as a request for authorization to assume or reject any executory contract between the Debtors and any party with respect to the Employee Wages and Benefits.  The Debtors are in the process of reviewing these matters and reserve all of their rights with respect to the assumption or rejection of any executory contracts. Furthermore, the Motion shall not be construed to limit, or in any way affect, the Debtors' right to contest on any grounds the amount claimed to be due as Employee Wages and Benefits.

51.     The Employee Wages and Benefits represent a competitive but reasonably limited set of policies targeted towards retaining the skilled and motivated workforce necessary to continue the Debtors' healthcare operations.  Accordingly, based on the foregoing, the Debtors submit that the requested relief is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

### Payment of Checks Issued and Other
### Transfers Made in Respect of the Employee Wages and Benefits

52.     The Debtors pay the Employee Wages and Benefits with funds drawn by checks (the "Checks") or by means of electronic fund transfers (the "Electronic Transfers"). Before the Petition Date, the Debtors sent certain parties Checks or Electronic Transfers on account of Employee Wages and Benefits that may not have cleared as of the Petition Date.

53.     To the extent any Check or Electronic Transfer has not cleared as of the Petition Date, the Debtors request the Court authorize the banks, in the Debtors' sole discretion, to receive, process, honor, and pay the Checks or Electronic Transfers.  If any party has not received payment for amounts owed on account of any Employee Wages and Benefits, the Debtors seek authority to issue replacement Checks, re-issue Electronic Transfers, or otherwise

21

make payments on account of Employee Wages and Benefits.  The Debtors represent that each of the Checks and Electronic Transfers can be readily identified as relating directly to the authorized payment of amounts owed on account of Employee Wages and Benefits. Accordingly, if the relief requested is granted, Checks and Electronic Transfers other than those relating to authorized payments will not be honored inadvertently.

### Waivers

54.    Because the relief requested herein is necessary to avoid immediate and irreparable harm, to the extent required for the immediate implementation of the relief requested herein, the Debtors seek a waiver of (i) the notice requirements under Rule 6004(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (ii) the requirements of Bankruptcy Rule 6003(b), and (iii) the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice[10]

55.    No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.  The Debtors served notice of the Motion on: (i) the Office of the United States Trustee for the District of Massachusetts; (ii) the creditors holding the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (iii) MDFA; (iv) BONY; (v) counsel to Wells Fargo; (vi) counsel to U.S. Bank; (vii) counsel to Nuveen; and (vii) counsel to ACA.  In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

---

[10] Capitalized terms used but not defined in this Notice section shall have the meanings given in the Hickey Declaration.

25208108_14

## **No Prior Request**

56.      No prior request for the relief sought herein has been made by the Debtors

to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter an order, in substantially the form attached to the Motion as Exhibit A: (i) authorizing, but not directing, the Debtors to pay the prepetition Employee Wages and Benefits and to continue to honor the Employee Wages and Benefits in the ordinary course of business; (ii) authorizing, but not directing, the Debtors to make payments as requested in the Motion and to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for such payments where such method of payment has been dishonored postpetition; and (iii) granting such other and further relief as is just and proper.

Dated: Boston, Massachusetts
      June 13, 2011

Respectfully submitted,

*/s/ Steven T. Hoort*
Steven T. Hoort (BBO No. 239380)
James A. Wright III (BBO No. 671822)
Jonathan B. Lackow (BBO No. 670060)
Matthew F. Burrows (BBO No. 677016)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050

E-mail:
      steven.hoort@ropesgray.com
      james.wright@ropesgray.com
      jonathan.lackow@ropesgray.com
      matthew.burrows@ropesgray.com

PROPOSED COUNSEL TO THE DEBTORS