**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**WESTERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re : Chapter 11
:
NORTHERN BERKSHIRE : Case No. 11-_____ (         )
HEALTHCARE, INC., *et al.*,[1] :
: (Jointly Administered)
Debtors. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION FOR ORDER PURSUANT TO SECTIONS 105, 361, 362, AND 363 OF THE BANKRUPTCY CODE (A) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION, AND (C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE

Northern Berkshire Healthcare, Inc. ("NBH"), on behalf of itself and NARH, VNA, and NBR (collectively, the "Debtors"), hereby submits this motion (the "Motion") for an order (the "Interim Order") pursuant to sections 105, 361, 362, and 363 of the Bankruptcy Code (as defined below) (i) authorizing the Debtors' use of cash collateral, (ii) granting adequate protection, and (iii) scheduling a final hearing. In support of the Motion, the Debtors submit the Declaration of Christopher L. Hickey in Support of Chapter 11 Petitions and First Day Motions and Applications, sworn to on June 13, 2011 (the "Hickey Declaration"), and respectfully represent and set forth as follows:

**Summary of the Relief Requested**

1. By the Motion, the Debtors request, pursuant to sections 105, 361, 362, and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002,

---

[1] The Debtors in these cases are Northern Berkshire Healthcare, Inc., North Adams Regional Hospital, Inc. ("NARH"), Visiting Nurse Association & Hospice of Northern Berkshire, Inc. ("VNA"), Northern Berkshire Realty, Inc. ("NBR"), and Northern Berkshire Healthcare Physicians Group, Inc.

25204465_15

4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and MLBR 4001-2 (a) authority to use "cash collateral" as defined in section 363(a) of the Bankruptcy Code, (b) the granting of adequate protection, and (c) the scheduling of a further hearing (the "Further Hearing") thereon.  A proposed Interim Order is attached hereto as Exhibit A.

2. In accordance with Bankruptcy Rule 4001 and MLBR 4001-2, below is a summary of the terms of the proposed Interim Order.[2]

(a) Parties with an Interest in the Cash Collateral.  The party with an interest in the Cash Collateral (as defined below) is Wells Fargo & Company, in its capacity as Master Trustee (the "Master Trustee") under the Amended and Restated Master Trust Indenture, dated as of September 1, 1999 and amended and restated as of October 1, 2004 (as amended and supplemented, the "Master Indenture").  A copy of the Master Indenture is attached to this Motion as Exhibit B.

(b) Cash Collateral.  By this Motion, the Debtors seek authorization to use "cash collateral" as defined in section 363(a) of the Bankruptcy Code; provided, that the Debtors are not at this time seeking authorization to use the funds in the Bond Accounts (as defined below) (the "Cash Collateral").[3]

(c) Authorization to Use Cash Collateral.

(i) Subject to the terms and conditions of the Interim Order, and in accordance with the budget attached as Exhibit A thereto (the "Budget"), the Interim Order will authorize the Debtors to use Cash Collateral for the period (the "Specified Period") from the Petition Date through the date which is the earliest to occur of (i) 5:00 p.m. (ET) on the date that is two business days after the date of the Further Hearing; and (ii) the expiration of the Cure Period (as defined herein) following the delivery of a Default Notice by the Trustee.

(ii) Except as otherwise expressly provided in the Interim Order, Cash Collateral may be used during the Specified Period, at the times and for the purposes identified in the Budget; provided, that the Debtors will be authorized to use Cash Collateral to pay all fees and expenses of

---

[2] Unless stated otherwise, all capitalized terms not defined in this summary will have the meaning ascribed to such term in the proposed Interim Order.

[3] For purposes of this Motion, Cash Collateral is assumed to consist of all of the assets of the Debtors which would constitute "cash collateral" for purposes of section 363 of the Bankruptcy Code if the Prepetition Liens (as defined below) were valid, binding, enforceable, non-avoidable, and perfected; provided, that the Debtors reserve all rights with respect to this issue.

2

25204465_15

      Professionals authorized to be paid by orders of the Court and applicable law, subject to the limitations in paragraph 3 of the Interim Order, and such payments will be deemed to be consistent with and in accordance with the Budget; provided, further, that the actual amount for each line item for expenses in the Budget may exceed the budgeted amount by up to twenty percent (20%) so long as, (i) for each week, the aggregate actual amount of all such line items does not exceed the aggregate budgeted amount by more than twenty percent (20%), measured on the close of business on each Saturday for the preceding one-week period ending on such Saturday and (ii) for each month, the aggregate actual amount of all such line items does not exceed the aggregate budgeted amount by more than fifteen percent (15%), measured on the close of business on the last business day of each month; provided, further, that the Master Trustee may, on five business days' notice to the Debtors, deliver a written Notice of Default upon the occurrence and during the continuation of an Event of Default, which includes, among other things, the Debtors' use of any Cash Collateral in a manner materially inconsistent with the Budget and the Interim Order; provided, further, however, that during this five day period (the "Cure Period"), the Debtors may continue to use Cash Collateral subject to the limitations in paragraph 3 of the Interim Order and, if the Debtors timely cure the Event of Default, the Debtors shall be permitted to continue to use Cash Collateral thereafter in accordance with the Budget.

(d) Adequate Protection. The Interim Order provides that, as adequate protection, the Master Trustee will receive the following (collectively, the "Proposed Adequate Protection"):

    (i) Adequate Protection Liens.

        1. The Master Trustee will be granted liens (the "Adequate Protection Liens") on any asset of the Debtors acquired after the Petition Date that would constitute Gross Revenues (as defined in the Master Indenture)[4] or be subject to a security interest under the Mortgage and

---

[4] The Master Indenture defines Gross Revenues as follows: "'Gross Revenues' of any Person means all receipts, revenues, rentals, income and other moneys received or receivable by or on behalf of such Person from any source, whether or not in connection with the ownership or the operation of all or any part of the Mortgaged Property, including without limitation, all fees paid or payable by or on behalf of patients or residents and all other operating and non-operating revenues (to the extent the same may lawfully be assigned or a security interest therein may lawfully be granted), and all rights to receive the same whether in the form of accounts, Accounts Receivable, contract rights (to the extent the same may lawfully be assigned or a security interest therein may lawfully be granted), chattel paper, instruments, general intangibles or investment property and the proceeds thereof, the proceeds of insurance coverages on and condemnation awards in respect of the Mortgaged Property or any gain on the sale or other disposition of property; all of the foregoing, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired; and including all gifts, grants, bequests, donations and contributions, except those heretofore or hereafter made which are designated at the time of making by the donor or maker as being for certain specified purposes inconsistent with the application thereof to the payments due from such Person under this Master Indenture and except any income derived therefrom to the extent required by such designation or restriction."

3

25204465_15

Security Agreement from NARH to Bank of New York dated as of October 1, 2004 (the "Mortgage and Security Agreement") and on which the Master Trustee would have a valid, binding, enforceable, non-avoidable, and perfected security interest, but for the application of section 552 of the Bankruptcy Code (the "Postpetition Collateral," and together with the Prepetition Collateral (as defined below), the "Collateral"), but only to the extent of any diminution in value of the Master Trustee's interest in the Debtors' interest in the Prepetition Collateral resulting from the Debtors' use of Prepetition Collateral pursuant to sections 361 and 363 of the Bankruptcy Code ("Diminution in Value"); provided, that in no circumstances shall causes of action under chapter 5 of the Bankruptcy Code or the proceeds thereof (collectively, "Avoidance Actions") be subject to the Adequate Protection Liens.

2. The Adequate Protection Liens will be junior only to (a) the Prepetition Liens (as defined below), (b) Permitted Encumbrances as defined in the Master Indenture, and (c) any other security interests and liens (solely to the extent that such interests are valid, binding, enforceable, non-avoidable, and perfected) in the Debtors' interests in the Prepetition Collateral existing as of the Petition Date, and will be otherwise senior to all other security interests in, liens on, or claims against any of the Collateral.

3. "Prepetition Collateral" means assets of the Debtors as of the Petition Date that constitute Gross Revenues under the Master Indenture or are subject to a security interest under the Mortgage and Security Agreement, to the extent the Master Trustee has valid, binding, enforceable, non-avoidable, and perfected liens thereon (such liens, the "Prepetition Liens").

(ii) Superpriority Claim.

1. The Interim Order will grant the Master Trustee, pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim, but only to the extent (a) of any Diminution in Value and (b) that the Adequate Protection Liens are insufficient to provide the Master Trustee adequate protection (the "Adequate Protection Superpriority Claim"); provided, that the Master Trustee shall not be entitled to receive distributions on account of Avoidance Actions by reason of its Adequate Protection Superpriority Claim.

2. The Adequate Protection Superpriority Claim will be senior to all other unsecured claims.

4

25204465_15

(e) <u>Events of Default</u>.

 (i) The Interim Order provides that, except as otherwise authorized by further order of the Court, the occurrence of any of the following events, unless waived by the Master Trustee in writing, will constitute an event of default (collectively, the "<u>Events of Default</u>"):

1. the Debtors' use of any Cash Collateral in a manner materially inconsistent with the Budget and the Interim Order;

2. the Debtors' failure to perform, in any material respect, any of its obligations under the Interim Order;

3. the appointment of a chapter 11 trustee or examiner with expanded powers in the Debtors' chapter 11 cases; or

4. any stay, reversal, vacatur, or rescission of the terms of the Interim Order (other than in accordance with a Further Order).

(f) <u>Rights and Remedies Upon Event of Default</u>.

 (i) The Interim Order provides that, immediately upon the occurrence and during the continuation of an Event of Default, the Master Trustee may deliver a written notice of an Event of Default to the Debtors (a "<u>Default Notice</u>"), which Default Notice will be given by email, facsimile, or other electronic means to (i) counsel for the Debtors, (ii) the United States Trustee, and (iii) counsel for any Creditors' Committee.

 (ii) The Debtors will have until the date (the "<u>Default Termination Date</u>") that is five business days after the date of delivery of such Default Notice to cure such Event of Default (the "<u>Cure Period</u>").

 (iii) The Debtors' right to use Cash Collateral will continue during the cure period and will thereafter cease as of the Default Termination Date; <u>provided</u>, <u>however</u>, that if the Debtors timely cure the Event of Default, the Debtors will be permitted to continue to use Cash Collateral thereafter in accordance with the Budget.

## **Jurisdiction and Venue**

3. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, 362, and 363 of the Bankruptcy Code.

**Background**

4. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code. Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and manage their properties as debtors in possession. No trustee, examiner, or creditors' committee has been appointed in the Debtors' chapter 11 cases.

5. The Debtors' capital structure and the facts and circumstances surrounding the Debtors' chapter 11 cases are set forth in the Hickey Declaration filed contemporaneously herewith.

**The Bonds**

6. The Master Trustee's interest in the Cash Collateral arises from the collateral pledges made by the Debtors under the Master Indenture for the benefit of certain tax-advantaged bonds. One series of bonds was issued by the Massachusetts Development Finance Agency ("MDFA") in 1999 (the "MDFA Bonds," and The Bank of New York as the bond trustee therefor, "BONY"). As of May 31, 2011, $13,585,000 in principal and $280,802.65 in interest was outstanding under the MDFA Bonds. The other three series of bonds were issued by the Massachusetts Health and Educational Facilities Authority ("MHEFA") in 1996 and 2004 (the "MHEFA Bonds," and U.S. Bank National Association as the bond trustee therefor, "U.S. Bank"). As of May 31, 2011, $29,680,000 in principal and $789,321.20 in interest was outstanding under the MHEFA Bonds.

6

25204465_15

7.    As security under the Loan Agreements, BONY holds Master Note No. 1 issued under the Master Indenture, and U.S. Bank holds Master Note No. 3 (together with Master Note No. 1, the "Master Notes") issued under the Master Indenture.  The Master Notes are secured by the Gross Revenues (as defined in the Master Indenture) of the Debtors.  The Master Notes are also secured by a pledge pursuant to the Mortgage and Security Agreement to the Master Trustee that purports to cover substantially all of NARH's personal property and two parcels of real estate.[5]  The Mortgage and Security Agreement is attached to this Motion as Exhibit C.

8.    The MDFA Bonds are insured by ACA Financial Guaranty Corporation ("ACA"), pursuant that certain Bond Insurance Policy, dated as of October 14, 1999 (as amended, the "MDFA Bond Insurance Policy").

9.    In addition, U.S. Bank holds certain accounts, established for the benefit of the MHEFA Bonds, which accounts hold various debt service, reserve, and other funds (the "Bond Accounts").  NARH has a residual interest in the funds held by U.S. Bank.  The amounts held in each of these funds as of May 31, 2011 was: (i) $5.77 in the Debt Service Fund, (ii) $3,122,501.11 in the Debt Service Reserve Fund, (iii) $0 in the Expense Fund, (iv) $6,095.12 in the Redemption Fund, and (v) $51,005.35 in the Rebate Fund, for a total of $3,174,172.30.

---

[5]    All the personal property and four parcels of real estate of Northern Berkshire Community Services, Inc. ("NBCS"), one of NBH's non-profit corporate affiliates, were also purported to be pledged to the Master Trustee pursuant to a Mortgage and Security Agreement from NBCS to Bank of New York, dated as of October 1, 2004 (the "NBCS Mortgage and Security Agreement").  On the Petition Date, NBCS commenced a voluntary petition with this Court under chapter 7 of the Bankruptcy Code.  Following the sale of substantially all of NBCS's assets in August 2010, NBCS now owns no assets other than cash and accounts receivable.

7

25204465_15

**Relief Requested**

10. By this Motion, the Debtors seek authorization to use the Cash Collateral.[6] The Debtors also request that the Court (a) authorize the Debtors' grant of adequate protection to the Master Trustee and (b) schedule the Further Hearing pursuant to Bankruptcy Rule 4001.

**Basis for Relief**

I. **The Use of Cash Collateral is Warranted and Should Be Approved**

11. Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use "cash collateral" unless:

> (A) each entity that has an interest in such collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [section 363].

11 U.S.C. § 363(c)(2). The Master Trustee has already consented to the use of cash collateral in a bankruptcy under the conditions set forth in the Master Indenture. In addition, use of cash collateral may be authorized if the holders of interests in such cash collateral are provided adequate protection for such interests. 11 U.S.C. § 363(e). Here, as set forth in detail below, the Debtors have provided adequate protection for the Master Trustee.

12. The Debtors require the immediate use of Cash Collateral to maintain their medical operations. Absent the use of Cash Collateral, the Debtors will be forced to cease operations, destroying the Debtors' going-concern value to the detriment of the Debtors, their estates, and their creditors. Further, because the Debtors' businesses include a hospital, hospice, and home health service, closure would have a devastating impact on the Debtors' current patients and the surrounding community, eliminating crucial medical services and putting at risk the health of current in-patients that would need to be transferred to other facilities. Use of the

---

[6] As noted above, the Debtors are not at this time seeking authorization to use the funds in the Bond Accounts. The Debtors reserve all rights with respect to these funds, including, without limitation, the right to seek to use these funds as cash collateral at a later date.

8

25204465_15

Cash Collateral is therefore critical to preserve and maintain the Debtors' estates, the possibility for a successful reorganization in these chapter 11 cases, and the safety of the Debtors' patients and the community they serve.

## II. The Master Trustee Has Consented to the Use of Cash Collateral

13. The Bankruptcy Code prevents the Debtors from using cash collateral unless "each entity that has an interest in such collateral consents." 11 U.S.C. § 363(c)(1)(A). In the Master Indenture, the Master Trustee granted this consent. The Master Indenture provides that the Debtors may continue to use cash collateral after a bankruptcy filing, provided that the Debtors comply with certain "lockbox" restrictions in the Master Indenture.

14. During a Lockbox Period,[7] which includes the period following the filing of a voluntary bankruptcy petition, the Debtors may, without restriction, use Gross Revenues[8] equal to 5% of the current month's expenses as set forth in the current Operating Budget.[9] The Master Indenture requires the Debtors to deposit all Gross Revenues into a "Revenue Fund" established under the Master Indenture. The Master Trustee, however, is required by the Master Indenture to use this cash collateral to pay the Debtors' expenses as directed by the Debtors. Indeed, the Master Indenture requires the Master Trustee to make transfers from the Revenue Fund to the Obligated Group each month, in an amount adequate to meet the Debtors' estimated

---

[7] "Lockbox Period," in the Master Indenture, means "the period between a Lockbox Event and a Lockbox Termination Event." A "Lockbox Event" is "the occurrence of an Event of Default under the Master Indenture." One of these Events of Default is "if bankruptcy, reorganization, arrangement, insolvency or liquidation or other proceedings for relief under any bankruptcy or similar law for the relief of debtors are instituted by or against any [Debtor] … ." Master Indenture § 701(f). A "Lockbox Termination Event" means "the curing or waiving of all Events of Default previously in existence under the Master Indenture."

[8] See fn.3.

[9] "Operating Budget," in the Master Indenture, means "the annual budget prepared for the [Debtors' facilities] for each Fiscal Year by the Obligated Group Representative, which budget, during any Lockbox Period, shall be delivered by the Obligated Group Representative to the Master Trustee and shall contain a month-by-month estimate of the Operating Expenses for such Fiscal Year." A copy of the Debtors Operating Budget for fiscal year 2011 is attached as Exhibit D.

9

25204465_15

Operating Expenses[10] for the following month, after reserving certain payments to comply with tax exemption rules and for taxes and insurance. The only limit on this requirement is that the Master Trustee need not transfer more than 115% of the amount previously estimated for expenses that month in the Operating Budget.[11]

15. The Debtors are currently within a Lockbox Period, since they have filed voluntary bankruptcy petitions. In the Master Indenture, the Master Trustee agreed (and is required) to let the Debtors use cash collateral (1) in an amount equal to 5% of the current month's expenses for any purpose and (2) for monthly operating expenses up to 115% of the amount set forth for such month's expenses in the Operating Budget.

16. The Debtors are, at a minimum, entitled to the use of Cash Collateral the Master Trustee consented to in the Master Indenture. The agreement to allow the use of cash collateral under lockbox conditions constitutes consent under section 363(c)(1)(A) of the Bankruptcy Code, because the agreement was made with the explicit understanding that the lockbox provisions would operate after a bankruptcy filing. Compare In re TS Industries, Inc., 117 B.R. 682, 688-89 (Bankr. D. Utah 1990) (holding that where creditor expressly consents to

---

[10] "Operating Expenses" means "all operating expenses of the [Debtors], determined in conformity with GAAP consistently applied … ."

[11] Specifically, section 601(a) of the Master Indenture provides that "the moneys in the Revenue Fund shall be transferred by the Master Trustee, ... in the following manner, at the times and in the order of priority indicated:

(1) first, on any date on which the Obligated Group is required to pay any Rebate Amount to the United States Treasury, a transfer to the trustee for the applicable Related Bonds equal to the amount necessary to be paid to the United States Treasury;

(2) second, by each Transfer Date [the fourth business day before the end of the month], (a) a transfer to the Taxes and Insurance Account of the Revenue Fund in an amount which is equal to 1/12 of the annual taxes and insurance payable by the [Debtors] with respect to the [Debtors' facilities], and (b) a transfer to the Obligated Group Representative in an amount which, together with all other transfers in such month, is equal to the amount estimated by Obligated Group Representative to be required to pay all Operating Expenses (excluding depreciation, amortization and bad debt expense and payments to be made under other subsections of [Section 602(a) of the Master Indenture] whether or not such payments or debt service shall constitute Operating Expenses) for the next succeeding month, as reflected in an Officer's Certificate (which Certificate shall include a comparison of such Operating Expenses against the then current Operating Budget provided to the Master Trustee and an explanation of any deviations exceeding 5% for such month therefrom); provided such amount shall not exceed 115% of the amount estimated in the current Operating Budget ... ."

10

25204465_15

lend in contemplation of a bankruptcy, the debtor can assume that contract and the lender must fund even though the Bankruptcy Code prohibits assumption of contracts to lend, because of contemplation of bankruptcy) with <u>Hartigan v. Pine Lake Village Apartment Co. (In re Pine Lake Village Apartment Co.)</u>, 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) (prepetition consent to use cash in the ordinary course insufficient to provide consent to use of cash collateral in bankruptcy because it was "given before the expectation of a bankruptcy case").

### III.    **The Proposed Adequate Protection**

#### A.    The Adequate Protection

17.    The Master Trustee is entitled to receive adequate protection to the extent of any Diminution in Value of the Prepetition Collateral. Pursuant to the proposed Interim Order, as adequate protection for any such Diminution in Value, the Master Trustee will receive the adequate protection described above, which consists in summary form of:

(a) Liens on any asset of the Debtors acquired after the Petition Date (a) that would constitute Gross Revenues under the Master Indenture or be subject to a security interest under the Mortgage and Security Agreement and (b) on which the Master Trustee would have valid, binding, enforceable, non-avoidable, and perfected liens but for the application of section 552 of the Bankruptcy Code, but only to the extent of any diminution in value of the Master Trustee's interest in the Debtors' interest in the Prepetition Collateral resulting from the Debtors' use of Prepetition Collateral pursuant to sections 361 and 363 of the Bankruptcy Code; <u>provided</u>, that in no circumstances shall Avoidance Actions be subject to the Adequate Protection Liens; and

(b) Superpriority administrative expense claims pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, but only to the extent (a) of any Diminution in Value and (b) that the Adequate Protection Liens are insufficient; <u>provided</u>, that the Adequate Protection Superpriority Claim shall not be entitled to receive distributions on account of Avoidance Actions.

11

25204465_15

As set forth in detail below, if use of Cash Collateral is granted, the Master Trustee is also protected by the enhanced value of the Debtors' assets as a going concern over their value in liquidation.

B.   Assets Excluded from Prepetition Collateral

18.   Although the pledges of collateral in the Master Indenture and the Mortgage and Security Agreement appear broad, significant assets are excluded. Among these excluded assets are the Investment Property (as defined and described in detail below), and there are further irregularities in the pledges that are not necessary to address here. To the extent these assets do not constitute Prepetition Collateral, the Master Trustee is not entitled to any adequate protection for the diminution in value thereof. While the Debtors have brought these issues to the Court's attention in this Motion, it is not necessary that Court resolve these issues to grant the interim relief requested in this Motion, and the Debtors suggest that these issues be reserved for the Further Hearing.

19.   Investment Property held by the Debtors other than NARH (the "Gross Revenue Pledgors") is excluded from the Prepetition Collateral because any security interest the Master Trustee may have in the Investment Property is unperfected and therefore avoidable pursuant to section 544 of the Bankruptcy Code.

20.   The Debtors' assets include investments purchased more than 20 days prior to the petition date. These investments are shares of entities that are registered as investment companies under the federal investment company laws, which constitute "investment property" under M.G.L. ch. 106, § 8-103(b), and partnership interests in private funds held in a securities account, which constitute "financial assets" under M.G.L. ch. 106 § 8-103(c) (collectively, the "Investment Property"). The value of the Investment Property held by the

12

25204465_15

Gross Revenue Pledgors as of May 31, 2011, outside of Investment Property held in endowment funds and similar restricted accounts, was approximately $746,910.84.

21.     Under M.G.L. ch. 106, § 9-315(a), a security interest "attaches to any identifiable proceeds of collateral." Thus, to the extent the Investment Property was purchased with cash in which the Master Trustee held a security interest, such security interest attached to the Investment Property when first purchased. Pursuant to M.G.L. ch. 106, § 9-315(d), the Master Trustee was also automatically perfected in any such Investment Property, but only for 20 days.[12] After 20 days, M.G.L. ch. 106, § 9-315(d) requires the Master Trustee to be otherwise perfected in such Investment Property under applicable law, or else the Master Trustee's security interest becomes unperfected. The UCC filing statement for the Master Trustee does not extend to the Investment Property – it only covers "Gross Revenues" as defined in the Master Indenture. All the Investment Property was purchased more than 20 days prior to the Petition Date. Accordingly, the Master Trustee's security interest in the Investment Property, if any, is unperfected and avoidable under section 544 of the Bankruptcy Code.

22.     Investment Property held by NARH may also be excluded from the Prepetition Collateral. Investment Property is excluded from NARH's pledge of Gross Revenues for the reasons stated above. It may also be excluded from the pledge of all assets in the Mortgage and Security Agreement. The collateral description in that agreement is insufficient under M.G.L. ch. 106, § 9-108(d) to describe the Investment Property. That statute provides that

---

[12]     M.G.L. ch. 106, § 9-315(d) provides:

> a perfected security interest in proceeds becomes unperfected on the twenty-first day after the security interest attaches to the proceeds unless: (1) the following conditions are satisfied: (A) a filed financing statement covers the original collateral; (B) the proceeds are collateral in which a security interest may be perfected by filing in the office in which the financing statement has been filed; and (C) the proceeds are not acquired with cash proceeds; (2) the proceeds are identifiable cash proceeds; or (3) the security interest in the proceeds is perfected other than under subsection (c) when the security interest attaches to the proceeds or within 20 days thereafter.

13

25204465_15

a security agreement's description of a "security entitlement, securities account, or commodity account" is sufficient if it describes (a) the collateral "by those terms or as investment property" or (b) "the underlying financial asset or commodity contract." See In re Flanagan, 293 B.R. 102, 110 (Bankr. D. Conn. 2003) (denying judgment lien on securities where filing lacked description required by Uniform Commercial Code § 9-108(d)). The Mortgage and Security Agreement fails to describe (a) any security entitlement, securities account, commodity account, or investment property or (b) the underlying Investment Property.

23. The lien under the Mortgage and Security Agreement does attach, however, to "proceeds" of the collateral otherwise covered thereby, and the Master Trustee therefore has a lien in the Investment Property held by NARH to the extent acquired with cash collateral. On the other hand, to the extent Investment Property held by NARH was not purchased with cash collateral, such property is not subject to a lien of the Master Trustee. It is unknown at this time how much of the Investment Property was acquired with cash collateral and is therefore subject to the Master Trustee's lien. As of May 31, 2011, NARH held approximately $185,000 in Investment Property.

### IV.  **The Proposed Adequate Protection Should Be Approved**

24. Section 363(e) of the Bankruptcy Code provides that:

> on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e). Although the Bankruptcy Code does not define "adequate protection," section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection, including cash payments, additional liens, replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361; See In re

14

25204465_15

Dairy Mart Convenience Stores, Inc., 351 F3d 86, 89 (2d Cir. 2003). The indubitable equivalent alternative "is regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party." Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 12 F.3d 552, 564 (3d Cir. 1994).

25. Courts determine adequate protection for purposes of the Bankruptcy Code "on a case-by-case basis." Id. The purpose of adequate protection "is to ensure that the creditor receives the value for which he bargained prebankruptcy." Id. (quoting MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987)); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest").

26. The Master Trustee's principal protection is the Debtors' continuing operations, which will generate further Cash Collateral. The Debtors will present evidence at the hearing that the Debtors' operations are viable on a going concern basis and will be cash flow positive during the period until the Further Hearing. This alone is sufficient to adequately protect the Master Trustee's interest in the Cash Collateral.

27. The Master Trustee is also protected by the Adequate Protection Liens and the Adequate Protection Superpriority Claim. Due to the Adequate Protection Liens, every dollar of the Debtors' incoming Gross Revenues and all property of NARH acquired after the Petition Date that would have been subject to a lien in favor of the Master Trustee but for section 552 of the Bankruptcy Code will serve to satisfy any Diminution in Value of the Prepetition Collateral. The Master Trustee will also receive the Adequate Protection Superpriority Claim to satisfy any Diminution in Value not satisfied by the Adequate Protection Liens. These two protections alone are sufficient to protect the Master Trustee from any Diminution in Value.

15

    28.  Furthermore, courts have found secured creditors to be adequately protected if the use of cash collateral is necessary to maintain a debtor's value as a going concern or enhances the value of the debtor's assets, even when no equity cushion is present. <u>See, e.g.</u>, <u>In re Hubbard Power & Light</u>, 202 B.R. 680, 684-85 (Bankr. E.D.N.Y. 1996) (holding a secured creditor to be adequately protected for a priming loan by the anticipated increase in value of the debtor's property due to use of loans proceeds); <u>495 Cent. Park Ave.</u>, 136 B.R. at 631-32 (same); <u>In re Aqua Assocs.</u>, 123 B.R. 192, 198-199 (Bankr. E.D. Pa. 1991) (holding a secured creditor to be adequately protected for a priming loan based on small equity cushion and increase in going concern value versus liquidation value).

    29.  This inquiry is performed by comparing (a) the value of the debtor's assets as a going concern, after factoring in the risk of the debtor failing to achieve this value, versus (b) the debtor's value in liquidation. <u>See, e.g.</u>, <u>Hubbard Power</u>, 202 B.R. at 685 (comparing value of debtor's primary asset prior to use of loan proceeds for clean up versus value following clean up and resumption of debtor's business operations); <u>495 Cent. Park Ave.</u>, 136 B.R. at 631 ("[T]o determine whether [the secured creditor] is adequately protected, the court must consider whether the value of the debtor's property will increase as a result of the renovations funded by the proposed financing."); <u>Aqua Assocs.</u>, 123 B.R. at 198 (holding that the "most important questions" to be answered in determining whether the proposed adequate protection was sufficient to grant a priming lien under section 364(d) are "(1) Is the Debtor's Plan . . . feasible? and (2) Is the consummation of the loan likely to increase the value of the Debtor's estate and thereby enhance the value of the Mortgagee's security?").

    30.  Ensuring that the Debtors remain a going concern protects the Master Trustee from the drastic decline in the enterprise's value – and the concordant decline in the

value of the Prepetition Collateral – that would occur in liquidation. Terminating the medical operations of the Debtors would have devastating effects on the Debtors' going concern value and the interests of their current patients and the surrounding community at large. Denying the use of cash collateral would force the closure of the hospital and eliminate crucial emergency and in-patient services. The current patients in the hospital would have to be transferred to other locations, a process that is not without risk, assuming space at suitable other medical facilities could even be found. Additionally, due to the relative remoteness of the North Adams community from other major hospitals, many residents of northern Berkshire County would find themselves too far from a hospital to receive timely emergency care.

31. The adequate protection provided in the Interim Order and the Debtors' value as a going concern will thus adequately protect the Master Trustee from any diminution in the value of the Cash Collateral. Granting the relief requested in the Motion will significantly enhance the value of the Debtors' assets by preserving the Debtors' going concern value over their value in liquidation. Further, the Interim Order protects the Master Trustee by providing superpriority claims and liens on the Collateral.

32. For the foregoing reasons, and based on the evidence the Debtors will present at the hearing, the proposed adequate protection is fair and reasonable and satisfies the requirements of section 363(c)(2) of the Bankruptcy Code.

## V. The Interim Approval Should Be Granted

33. Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after the service of such motion. Fed. R. Bankr. P. 4001(b). Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent

17

necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Id.

34. Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court (a) conduct an expedited preliminary hearing on the Motion, (b) authorize the Debtors to use the Cash Collateral in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (c) schedule a Further Hearing on the relief requested herein.

### Notice

35. No trustee, examiner, or creditors' committee has been appointed in the Debtors' chapter 11 cases. The Debtors served notice of the Motion on: (i) the Office of the United States Trustee for the District of Massachusetts; (ii) the creditors holding the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (iii) MDFA; (iv) counsel to the Master Trustee; (v) counsel to U.S. Bank; (vi) BONY; (vii) counsel to Nuveen; and (viii) counsel to ACA. In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

### Notice of Further Hearing

36. The Debtors further respectfully request that the Court schedule a Further Hearing and authorize the Debtors to serve notice of the entry of the Interim Order and of the Further Hearing, together with a copy of the signed Interim Order (and to the extent not previously served on such party, the Motion), on (a) the parties given notice of this Motion; (b) any party which has filed prior to the date of entry of the Interim Order a request for notices with the Court; and (c) counsel for any committee appointed pursuant to section 1102 of the

18

25204465_15

Bankruptcy Code. The Debtors request that the Court approve such notice of the Further Hearing as sufficient notice under Bankruptcy Rule 4001.

## No Prior Request

37. No prior request for the relief sought herein has been made by the Debtors to this or any other court.

25204465_15

WHEREFORE, the Debtors respectfully request that this Court enter an order, in substantially the form attached to the Motion as <u>Exhibit A</u>: (i) authorizing use of cash collateral on an interim basis, (ii) granting adequate protection, (iii) scheduling a further hearing, and (iv) granting such other and further relief as is just and proper.

Dated: Boston, Massachusetts
June 13, 2011

Respectfully submitted,

<u>/s/ Steven T. Hoort</u>
Steven T. Hoort (BBO No. 239380)
James A. Wright III (BBO No. 671822)
Jonathan B. Lackow (BBO No. 670060)
Matthew F. Burrows (BBO No. 677016)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050

E-mail:
steven.hoort@ropesgray.com
james.wright@ropesgray.com
jonathan.lackow@ropesgray.com
matthew.burrows@ropesgray.com

PROPOSED COUNSEL TO THE DEBTORS

25204465_15