UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

-------------------------------------------------------------x
                                                             :
In re                                                        :
                                                             :   Chapter 11
NORTHERN BERKSHIRE                                           :
HEALTHCARE, INC., *et al.*,[1]                               :   Case No. 11 – 31114 (HJB)
                                                             :
                    Debtors.                                 :   (Jointly Administered)
                                                             :
-------------------------------------------------------------x

**MODIFIED SECOND AMENDED PLAN OF REORGANIZATION OF NORTHERN BERKSHIRE HEALTHCARE, INC., NORTH ADAMS REGIONAL HOSPITAL, INC., VISITING NURSE ASSOCIATION & HOSPICE OF NORTHERN BERKSHIRE, INC., AND NORTHERN BERKSHIRE HEALTHCARE PHYSICIANS GROUP, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Attn: Steven T. Hoort
Attn: James A. Wright III
Attn: Jonathan B. Lackow
Attn: Matthew F. Burrows

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

Dated: January 5, 2012

---

[1] The Debtors in these cases are Northern Berkshire Healthcare, Inc., North Adams Regional Hospital, Inc., Visiting Nurse Association & Hospice of Northern Berkshire, Inc., Northern Berkshire Realty, Inc., and Northern Berkshire Healthcare Physicians Group, Inc.

# TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME ..................................................................1

    Section 1.1.   *Defined Terms.* ...................................................1

    Section 1.2.   *Rules of Interpretation and Computation of Time.*................23

ARTICLE II UNCLASSIFIED CLAIMS ...................................................24

    Section 2.1.   *Administrative Claims.* ..............................24

    Section 2.2.   *Priority Tax Claims.* ................................24

    Section 2.3.   *Professional Fees.* .................................25

    Section 2.4.   *Certain Master Trustee and Bond Trustee Fees and Expenses.*................................................26

ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING RIGHTS OF CLAIMS ............................................................26

    Section 3.1.   *Classification.* ....................................26

    Section 3.2.   *Treatment of Claims.* ..............................27

    Section 3.3.   *Voting Rights of Claims.*...........................32

    Section 3.4.   *No Effect on Claims Against Northern Berkshire Realty, Inc..* ................................................32

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN....................32

    Section 4.1.   *Compromise of Controversies; Waiver of Intercompany Claims.* ..............................................32

    Section 4.2.   *Vesting and Distribution of Assets.* .......................33

    Section 4.3.   *Continued Corporate Existence; Sale.* .....................34

    Section 4.4.   *Cancellation of Notes and Instruments.* ...................34

    Section 4.5.   *Cancellation of Liens.*.............................35

    Section 4.6.   *New Constituent Documents*.........................35

    Section 4.7.   *New Officers.* ...................................36

    Section 4.8.   *Trustees of the Reorganized Debtors.* ....................36

    Section 4.9.   *Corporate Action.* ................................36

    Section 4.10.   *Post-Effective Trust.* ..............................36

    Section 4.11.   *ECF Notes.* ....................................39

    Section 4.12.   *1111(b) Elections.*................................40

    Section 4.13.   *[Reserved].* ....................................41

# TABLE OF CONTENTS
(continued)

Page

Section 4.14.   *Establishment of Administrative Bar Date.* ..........................................41

Section 4.15.   *Disposition of VNA Real Estate* ...........................................................42

Section 4.16.   *Insurance Mitigation.* .........................................................................42

Section 4.17.   *New Bond Documents; Tax-Exempt Notes; New Note Covenants* ...................................................................................43

Section 4.18.   *Affiliation.* ...........................................................................................44

Section 4.19.   *Treatment of Claims of PBGC.* .............................................................46

Section 4.20.   *Search Committee.* ...............................................................................47

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........................................................................47

Section 5.1.   *Assumption of Executory Contracts and Unexpired Leases.* ..............................................................................................47

Section 5.2.   *Claims Based on Rejection of Executory Contracts or Unexpired Leases.* ...................................................................48

Section 5.3.   *Insurance Policies.* ...............................................................................48

Section 5.4.   *Modifications, Amendments, Supplements, Restatements, or Other Agreements* ......................................................................49

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ...........................................49

Section 6.1.   *Date of Distributions; Distribution Record Date.* ..............................49

Section 6.2.   *Disbursing Agent.* ...............................................................................49

Section 6.3.   *Delivery of Distributions and Undeliverable or Unclaimed Distributions.* ....................................................................50

Section 6.4.   *Setoff.* ...................................................................................................50

Section 6.5.   *Surrender of Cancelled Notes, Instruments, or Securities.* .................51

Section 6.6.   *Lost, Stolen, Mutilated, or Destroyed Documentation.* ........................51

Section 6.7.   *Fractional and Minimum Distributions.* .................................................51

Section 6.8.   *Manner of Payment Under Plan of Reorganization.* ............................52

Section 6.9.   *Withholding and Reporting Requirements.* ...........................................52

Section 6.10.   *ACA Commutation Distributions.* .........................................................52

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS .............................52

Section 7.1.   *Prosecution of Objections to Claims.* ...................................................52

Section 7.2.   *Estimation of Claims.* ...........................................................................53

Section 7.3.   *Payments and Distributions on Disputed Claims* ................................53

29105896_1

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| Section 7.4. | *Debtors' Rights and Defenses Preserved.* | 53 |
| Section 7.5. | *Disputed Claims Reserves.* | 54 |

**ARTICLE VIII CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE** ... 55

| | | |
|---|---|---|
| Section 8.1. | *Conditions Precedent to Confirmation.* | 55 |
| Section 8.2. | *Conditions Precedent to the Effective Date* | 55 |
| Section 8.3. | *Waiver of Conditions.* | 55 |
| Section 8.4. | *Modification of Plan.* | 56 |
| Section 8.5. | *Effect of Withdrawal or Revocation.* | 56 |
| Section 8.6. | *Reservation of Rights.* | 56 |
| Section 8.7. | *Substantial Consummation of Plan.* | 56 |

**ARTICLE IX EFFECT OF PLAN CONFIRMATION** ... 56

| | | |
|---|---|---|
| Section 9.1. | *Binding Effect.* | 56 |
| Section 9.2. | *Discharge of Claims.* | 57 |
| Section 9.3. | ***Releases.*** | 57 |
| Section 9.4. | ***Exculpation and Limitation of Liability.*** | 58 |
| Section 9.5. | ***Injunction.*** | 58 |
| Section 9.6. | *Term of Bankruptcy Injunction or Stays.* | 59 |
| Section 9.7. | *Termination of Subordination Rights and Settlement of Related Claims.* | 59 |
| Section 9.8. | *Preservation of Rights of Action.* | 59 |

**ARTICLE X RETENTION OF JURISDICTION** ... 60

**ARTICLE XI MISCELLANEOUS PROVISIONS** ... 62

| | | |
|---|---|---|
| Section 11.1. | *Payment of Statutory Fees.* | 62 |
| Section 11.2. | *Governing Law.* | 62 |
| Section 11.3. | *Severability of Terms or Provisions.* | 62 |
| Section 11.4. | *Severability of Debtors.* | 62 |
| Section 11.5. | *Inconsistency.* | 63 |
| Section 11.6. | *Filing of Additional Documents.* | 63 |
| Section 11.7. | *Service of Documents.* | 63 |
| Section 11.8. | *Section 1125(e) of the Bankruptcy Code.* | 63 |

## TABLE OF CONTENTS
(continued)

Section 11.9.    *Exemption from Certain Transfer Taxes.* ............................................64

Section 11.10.    *Tax Reporting and Compliance.* ...........................................64

Section 11.11.    *Schedules and Exhibits.* .........................................64

Section 11.12.    *No Prejudice.* ........................................64

Section 11.13.    *Allocation of Payments.* ........................................65

Section 11.14.    *Dissolution of Statutory Committees.* ..................................................65

EXHIBITS

Exhibit A        Capital Lease Claims List
Exhibit B        Capital Expenditure Budget

**DEBTORS' MODIFIED SECOND AMENDED PLAN
OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Northern Berkshire Healthcare, Inc., North Adams Regional Hospital, Inc., Visiting Nurse Association & Hospice of Northern Berkshire, Inc., and Northern Berkshire Healthcare Physicians Group, Inc., as debtors and debtors in possession in the above-captioned cases, hereby respectfully propose the following plan of reorganization under chapter 11 of the Bankruptcy Code.

Prior to voting to accept or reject the Plan, Holders are encouraged to read the Plan, the accompanying Disclosure Statement, and their respective exhibits and schedules in their entirety. No materials other than the Plan, the Disclosure Statement, and their respective exhibits and schedules have been authorized by the Debtors for use in soliciting acceptances or rejections of the Plan.

**ARTICLE I**

**DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME**

Section 1.1.    *Defined Terms*.

The following terms shall have the meanings provided below when used in capitalized form in the Plan:

"***1111(b) Election***" shall have the meaning given in Section 4.12.

"***1111(b) Election Date***" means the date by which MDFA Bondholders and MHEFA Bondholders must return Ballots to the Balloting and Noticing agent.

"***1111(b) Form***" means a form for making an 1111(b) Election to be distributed with the Ballots.

"***1111(b) Notes***" means the New MDFA 1111(b) Note and the New MHEFA 1111(b) Note.

"***ACA***" means ACA Financial Guaranty Corporation.

"***ACA Insurance Commutation***" shall have the meaning given in Section 4.16.

"***ACA Parties***" means ACA and its affiliates, directors, officers, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or any of their successors or assigns.

"***Administrative 503(b)(9) Claims***" means all Claims against any Debtor under section 503(b)(9) of the Bankruptcy Code, which provides priority status to claims for the value of goods received by the Debtors within 20 days before the Petition Date and sold to a Debtor in the ordinary course of such Debtor's business.

"*Administrative Bar Date*" means the date that is 45 days after the Confirmation Date.

"*Administrative Claims*" means all Claims against any Debtor constituting a cost or expense of administration (incurred after the Petition Date and prior to the Effective Date) described in sections 330, 331, or 503(b) and entitled to priority under section 507(a)(2) or 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases in connection with the conduct of their businesses; (c) any administrative claims allowed by Final Order of the Bankruptcy Court in connection with the assumption of executory contracts or otherwise; and (d) any compensation for professional services rendered and reimbursement of expenses incurred.  Any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code shall be excluded from the definition of Administrative Claims and paid in accordance with Section 11.1.

"*Administrative Claim Request*" has the meaning given to such term in Section 4.14.

"*Affiliation*" means if:

(a)      NARH or NBH (so long as NBH is the managing member of NARH) shall consolidate with or merge into any other healthcare institution (other than one another);

(b)      NARH shall transfer all or substantially all of its assets to any other healthcare institution;

(c)      any healthcare institution other than NBH shall become the managing member of NARH; or

(d)      so long as NBH is the managing member of NARH, any healthcare institution shall become the managing member of NBH.

"*Affiliation Notes*" means the MDFA Affiliation Note and the MHEFA Affiliation Note.

"*Affiliation Notes Original Principal Amount*" has the meaning given to such term in Section 4.18.

"*Allowed*" means, with respect to any Claim:

(a)      any Claim against any Debtor that remains unpaid and that has been listed by such Debtor in the Schedules as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed;

(b)      any Claim that is allowed pursuant to the terms of an agreement by and among the Holder of such Claim and the Debtors (or the Post-Effective Trustee or Reorganized Debtors, as the case may be);

(c)      any Claim for which a proof of claim has been timely filed or deemed timely filed pursuant to a Final Order of the Bankruptcy Court and as to which (x) no

2

objection to allowance has been filed by the Claims Objection Deadline or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (y) any objection has been determined by a Final Order in favor of the respective Holder; or

(d)     any Claim that is otherwise allowed by Final Order or under the terms of the Plan.

"*Assets*" means, with respect to any Debtor, all such Debtor's right, title, and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

"*Avoidance Actions*" means any and all actual or potential Causes of Action to avoid a transfer of property or an obligation incurred by a Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

"*Ballot*" means a ballot for voting to accept or reject the Plan prepared and distributed by the Debtors to Holders of Impaired Claims entitled to vote on this Plan and, for the purposes of voting procedures, includes an 1111(b) Form.

"*Balloting and Noticing Agent*" means GCG, Inc., the Debtors' balloting and noticing agent.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Petition Date, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Massachusetts or such other court having jurisdiction over the Chapter 11 Cases or any proceeding within, or appeal of an order entered in, the Chapter 11 Cases.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, and Massachusetts Local Bankruptcy Rules, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases.

"*Bar Date*" means a date established by a Final Order of the Bankruptcy Court by which certain Claims must be filed to be entitled to vote on and receive a distribution under a chapter 11 plan in the Chapter 11 Cases, including, without limitation, the Bar Dates established pursuant to the Bar Date Order.

"*Bar Date Order*" means an order of the Bankruptcy Court establishing the Bar Date.

"*Baseline Budget*" means the EBIDA projections of the Chief Financial Officer of NBH attached to the Disclosure Statement as Exhibit B, together with balance sheets, statements of income and sources and uses of cash, and a detailed capital expenditure budget for fiscal years

2012, 2013, 2014, 2015, and 2016, which shall be prepared in summary form and shall include an explanation of the principal assumptions of such budget.

"***Bondholder***" means an MDFA Bondholder or a MHEFA Bondholder.

"***Business Day***" means any day, other than a Saturday, Sunday, or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

"***CalFirst***" means California First Leasing Corporation.

"***CalFirst Capital Lease 1***" means Schedule No. 1, dated as of September 27, 2007, to that certain Lease Agreement, dated as of September 9, 2007, between NARH and CalFirst.

"***CalFirst Capital Lease 1 Claim***" means the Claim held by CalFirst against NARH under the CalFirst Capital Lease 1.

"***CalFirst Capital Lease 1 Secured Note***" means the new note of NARH substantially in the form included in the Plan Supplement, secured by the same collateral securing the CalFirst Capital Lease 1 or other collateral of like value, which shall have as its material terms, at the election of NARH in its sole discretion:

      (a)     a maturity date of the last day of the term of the CalFirst Capital Lease 1, an interest rate of the lesser of 6% and the interest rate under the CalFirst Capital Lease 1 payable on an amortization schedule set forth in the Plan Supplement, and a principal amount equal to the Allowed outstanding amount of the CalFirst Capital Lease 1 Claim as of the Effective Date;

      (b)     such other terms as determined by the Bankruptcy Court to be necessary to satisfy the requirements of section 1129(b)(2)(A)(i) of the Bankruptcy Code; or

      (c)     such other terms as otherwise agreed by and among NARH and the Holder of the CalFirst Capital Lease 1 Claim.

"***CalFirst Capital Lease 2***" means Schedule No. 2, dated as of October 30, 2009, to that certain Lease Agreement, dated as of September 27, 2007, between NARH and CalFirst.

"***CalFirst Capital Lease 2 Claim***" means the Claim held by CalFirst against NARH under the CalFirst Capital Lease 2.

"***CalFirst Capital Lease 2 Secured Note***" means the new note of NARH substantially in the form included in the Plan Supplement, secured by the same collateral securing the CalFirst Capital Lease 2 or other collateral of like value, which shall have as its material terms, at the election of NARH in its sole discretion:

      (a)     a maturity date of the last day of the term of the CalFirst Capital Lease 2, an interest rate of the lesser of 6% and the interest rate under the CalFirst Capital Lease 2 payable on an amortization schedule set forth in the Plan Supplement, and a principal

4

amount equal to the Allowed outstanding amount of the CalFirst Capital Lease 2 Claim as of the Effective Date;

> (b)      such other terms as determined by the Bankruptcy Court to be necessary to satisfy the requirements of section 1129(b)(2)(A)(i) of the Bankruptcy Code; or

> (c)      such other terms as otherwise agreed by and among NARH and the Holder of the CalFirst Capital Lease 2 Claim.

"***Capital Lease***" means any leasing or similar arrangement that, in accordance with GAAP, is classified as a capital lease.

"***Capital Lease Claims List***" means the list attached to the Plan as <u>Exhibit A</u>.

"***Cash***" means legal tender of the United States of America.

"***Causes of Action***" means all actions, causes of action, Avoidance Actions, suits, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment and claims, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, and trespasses of, or belonging to, the Estates, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly, indirectly, or derivatively, in law, equity, or otherwise.

"***Chapter 11 Cases***" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

"***Chapter 11 Parties***" means, collectively, (a) all Persons engaged or retained by the Debtors in connection with the Chapter 11 Cases and (b) any and all managers, trustees, partners, representatives, employees, attorneys, advisors, and agents of any of the foregoing.

"***Charging Lien***" means any Lien or other priority in payment arising prior to the Effective Date to which:

> (a)      the Master Trustee is entitled, pursuant to the Master Indenture, against distributions to be made in accordance with the Master Indenture;

> (b)      MHEFA Trustee is entitled, pursuant to the MHEFA Loan and Trust Agreement, against distributions to be made in accordance with the MHEFA Loan and Trust Agreement; and/or

> (c)      MDFA Trustee is entitled, pursuant to the MDFA Loan and Trust Agreement, against distributions to be made in accordance with the MDFA Loan and Trust Agreement.

"***Claim***" means a claim as defined in section 101(5), as supplemented by section 102(2) of the Bankruptcy Code, against any Debtor, whether or not asserted.

5

"***Claims Objection Deadline***" means 120 days after the Effective Date.

"***Class***" means a class of Claims as set forth in ARTICLE III.

"***Commutation Consideration***" shall mean the product of $5,000,000 multiplied by the Commutation Percentage.

"***Commutation Percentage***" shall mean and refer to a fraction, the numerator of which is the face amount of MDFA Bonds held by Commuting Bondholders and the denominator of which is the face amount of all outstanding MDFA Bonds as of the Effective Date.

"***Commuted Insurance Policy***" shall mean and refer to that certain Bond Insurance Policy No. NI1099-51 dated as of October 14, 1999, and issued by ACA on October 14, 1999 with respect to the MDFA Bonds.

"***Commuting Bondholders***" shall mean and refer to all holders of the MDFA Bonds that do not affirmatively elect to opt-out of the ACA Insurance Commutation in accordance with Section 4.16, or that voluntarily accept any portion of the Commutation Consideration.

"***Confirmation Date***" means the date upon which the Confirmation Order is entered on the docket for the Chapter 11 Cases.

"***Confirmation Hearing***" means the hearing(s) to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1129 of the Bankruptcy Code.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"***Creditors' Committee***" means any Official Committee of Unsecured Creditors of the Debtors formed in the Chapter 11 Cases.

"***Days' Cash on Hand***" means, for any period of time (which shall be, for the purposes of calculating such number on the first ECF Calculation Date, the period between the Effective Date and the first ECF Calculation Date, and for each ECF Calculation Date thereafter, the period between such ECF Calculation Date and the prior ECF Calculation Date), a number determined by (A) multiplying (i) the number of days in such period, by (ii) the amount of Unrestricted Cash held on the last day of such period plus Restricted Pension Payments made since the Effective Date, and (B) dividing the amount determined in clause (A) by an amount equal to the total Operating Expenses of the Obligated Group for such period less depreciation, amortization, contingent interest expense with respect to the Debtors' obligations under the MBL, Restricted Pension Payments made since the Effective Date, and provision for bad debt expense for such period, all of which shall be determined in accordance with U.S. GAAP.

"***Debtor Parties***" means the Debtors, each of their respective bankruptcy estates, and their respective affiliates, trustees, officers, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or any of their successors or assigns.

"*Debtors*" means, collectively, Northern Berkshire Healthcare, Inc., North Adams Regional Hospital, Inc., Visiting Nurse Association & Hospice of Northern Berkshire, Inc., and Northern Berkshire Healthcare Physicians Group, Inc., as debtors and debtors in possession in the Chapter 11 Cases.

"*Disallowed*" means, with respect to any Claim:

(a)    any Claim that has been disallowed or expunged by a Final Order;

(b)    any Claim against any Debtor that has been listed by such Debtor in the Schedules in the amount of "$0" or as unliquidated in amount, disputed, or contingent and for which a Bar Date has been established but no proof of claim has been timely filed or, pursuant to a Final Order of the Bankruptcy Court, deemed timely filed; or

(c)    any Claim that is not listed on the Schedules for the subject Debtor and for which a Bar Date has been established but no proof of claim has been timely filed or, pursuant to a Final Order of the Bankruptcy Court, deemed timely filed.

"*Disbursing Agent*" means, before and on the Effective Date, the Debtors, the Reorganized Debtors, or any other Person designated by the Debtors or the Reorganized Debtors, in its or their capacity as disbursing agent under the Plan, and, after the Effective Date, the Post-Effective Trustee with respect to distributions by the Post-Effective Trust, and otherwise the Reorganized Debtors or any other Person designated by the Reorganized Debtors.

"*Disclosure Statement*" means the disclosure statement relating to the Plan (including any exhibits and schedules thereto), as such disclosure statement may be amended, supplemented, or modified from time to time.

"*Disputed*" means, with respect to any Claim, all or the portion of any Claim against any Debtor that is neither Allowed nor Disallowed, including any Claim as to which the Debtors or the Reorganized Debtors have filed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or that otherwise is disputed by the Debtors or the Reorganized Debtors in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order.

"*Disputed Claims Reserves*" means the reserves to hold the Post-Effective Trust Interests to be distributed, as applicable, to Holders of Allowed PET Claims pending the resolution of Disputed PET Claims in accordance with the terms of ARTICLE VII, as established and maintained by the Post-Effective Trustee.

"*Distribution Record Date*" means, with respect to the MDFA Bonds and the MHEFA Bonds, the Confirmation Date or such other date as shall be established by the Bankruptcy Court in the Confirmation Order.

"*Doctors Building*" means the parcel of real property commonly known as 99 Hospital Avenue, North Adams, Massachusetts.

7

"*Earnings*" means the excess of revenues (inclusive of all revenue increases or decreases from government rate changes) over expenses, excluding (to the extent not already excluded from revenues and expenses) the sum of all (a) revenues from restricted grants (other than grants under the Health Information Technology for Economic and Clinical Health (HITECH) Act), pledges, or donations of any kind, (b) unrealized gains and losses, (c) gains and losses from real estate or other asset dispositions, (d) management bonuses and incentive compensation in excess of $100,000, and (e) all third-party management fees, unless otherwise agreed to by the New Trustee, all of which shall be determined in accordance with U.S. GAAP.

"*EBIDA*" means Earnings before interest, depreciation, and amortization calculated in accordance with GAAP as of the last day of the Obligated Group's fiscal year.

"*ECF Calculation Date*" means the last day of the Obligated Group's fiscal year.

"*ECF Credits*" has the meaning given to such term in Section 4.18.

"*ECF Notes*" means the MDFA ECF Note and the MHEFA ECF Note.

"*ECF Note Payment Date*" means 100 days after the last day of the Obligated Group's fiscal year.

"*Effective Date*" means the date that is 10 calendar days after the Confirmation Date, or if such date is not a Business Day, the next succeeding Business Day; underlined, however, that if, on or prior to such date, all conditions to the Effective Date set forth in ARTICLE VIII of this Plan have not been satisfied or waived, then the Effective Date shall be the first Business Day following the day that is 10 calendar days after the first date on which all such conditions to the Effective Date have been so satisfied or waived.

"*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"*Estates*" means the estates of the Debtors created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"*Excess Cash Flow*" means EBIDA for a given period, plus any proceeds from real estate or other asset dispositions outside the ordinary course of business and Restricted Pension Payments made during such period, less the following amounts to the extent paid or payable in such period on or prior to the next subsequent ECF Note Payment Date and not already included in the calculation of EBIDA (to avoid double deductions): (a) restructuring expenses related to the Chapter 11 Cases, including Trustee Fees and Expenses, cure payments under assumed executory contracts, and payments to Holders of Administrative 503(b)(9) Claims, (b) capital expenditures, (c) minimum required payments under capital leases entered into before the Petition Date, (d) minimum required mortgage payments, and (e) all other amounts payable under the New Notes (other than the excess of payments of Excess Cash Flow under the ECF Notes over the Fixed ECF Note Payments) or otherwise payable to Holders of Allowed Claims (excluding the excess of the final payment under the PBGC Post-Effective Note over $1.7 million).

8

"***File***," "***Filed***," or "***Filing***" means file, filed, or filing with the Bankruptcy Court (or agent thereof) in connection with the Chapter 11 Cases.

"***Final Decree***" means the final decree entered by the Bankruptcy Court after the Effective Date, pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

"***Final Order***" means an order or judgment entered by the Bankruptcy Court or other court of competent jurisdiction:

(a)     that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek certiorari, review, reargument, stay, or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay, or rehearing is pending; or

(b)     as to which an appeal has been taken or petition for certiorari, review, reargument, stay, or rehearing has been Filed and:

(i)     such appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay, or rehearing was sought; and

(ii)     the time to appeal further or seek certiorari, further review, reargument, stay, or rehearing has expired and no such further appeal or petition for certiorari, further review, reargument, stay, or rehearing is pending;

*provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code, Rule 59 or 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rules 9023 or 9024 may be Filed with respect to such order or judgment.

"***Financial and Reporting Covenants***" means the following obligations of the Obligated Group:

(a)     the Obligated Group shall provide the Baseline Budget to the New Trustee, which the Obligated Group may subsequently revise for fiscal years starting with the Obligated Group's 2013 fiscal year, subject to the approval of the New Trustee;

(b)     unless the Obligated Group's EBIDA is equal to or greater than the EBIDA projected in the original Baseline Budget for the current fiscal year, the Obligated Group shall provide an Operating Budget annually to the New Trustee, which shall be subject to the approval of the New Trustee and which provides for payment when due of all Fixed ECF Note Payments (if any) and all scheduled payments under the New MDFA Note, the New MHEFA Note, and the Affiliation Notes (if any); provided, that an Operating Budget for a fiscal year shall not be subject to New Trustee's approval if (i) the Obligated Group is in compliance with the covenants and requirements of the New Notes, (ii) the Operating Budget projects that the Obligated Group will remain in compliance

9

with all terms of the New Notes and can make full payment of all obligations under the New Notes, (iii) EBIDA for the current fiscal year is not less than EBIDA for the prior fiscal year (including, for the Obligated Group's 2017 fiscal year, not less than EBIDA for the Obligated Group's 2016 fiscal year as listed in the Baseline Budget), and (iv) the amount budgeted in the Operating Budget for capital expenditures does not exceed $2,625,000; provided, further, that if in any fiscal year the Company is not in compliance with the covenants and requirements of the New Notes, or if any future Operating Budget demonstrates an inability to remain in compliance, the Operating Budget for the next fiscal year shall again be subject to the approval of the New Trustee;

(c)     the Obligated Group shall provide quarterly reports of the Obligated Group's actual performance in comparison to the Baseline Budget or Operating Budget, as the case may be;

(d)     if actual EBIDA in any fiscal year is less than the EBIDA projected in the Baseline Budget for such year by greater than 5%, the Obligated Group's management shall submit a report of causes and corrective action to the New Trustee and present this report at a meeting with the New Trustee and, at the New Trustee's request, NBH's Board of Trustees shall retain a third party consultant acceptable to the New Trustee to review the Operating Budget for the following fiscal year;

(e)     it shall be an event of default if:

(i)     actual EBIDA is less than the EBIDA projected in the Baseline Budget for such year by greater than (w) 10% of projected EBIDA in a given fiscal year or (x) $800,000 cumulatively over any five-year period (inclusive of positive or negative variances from EBIDA in prior years) or, starting with the Obligated Group's 2017 fiscal year, actual EBIDA is less than the EBIDA projected in the Operating Budget by greater than (y) 10% of projected EBIDA in a given fiscal year or (z) $800,000 cumulatively over a five-year period (inclusive of positive or negative variances from EBIDA in prior years);

(ii)     the amount of Unrestricted Cash as of the Annual Evaluation Date (as such terms are defined in the Master Indenture) falls below $2.5 million through the Debtors' 2014 fiscal year; $3.0 million thereafter through the Obligated Group's 2018 fiscal year; or $3.5 million for any fiscal year thereafter; or

(iii)     with respect to debt service of the New MDFA Note, New MHEFA Note, and any Affiliation Notes, the Debt Service Coverage Ratio falls below 1.1 as of any Annual Evaluation Date (as such terms are defined in the Master Indenture); and

(f)     the Obligated Group shall not make capital expenditures (including incurring obligations under a capital lease entered into after the Effective Date) in excess, on a rolling cumulative basis, of 110% of amounts provided in Baseline Budget as set forth in Exhibit B or, starting with the Obligated Group's 2017 fiscal year, any Operating

10

Budget; provided, however, that any capital expenditures in excess of the approved budgeted amounts made under this provision shall reduce the next year's approved budgeted capital expenditures on a cumulative dollar-for-dollar basis, and that if capital expenditures are less than the approved budgeted amount for the fiscal year, such amounts may be carried forward to increase the approved capital expenditure budget in any of the three subsequent years.

"*Fixed ECF Note Payment*" means:

       (a)    for each fiscal year ending in 2012, 2013, 2014, or 2015, a payment on the MDFA ECF Note and the MHEFA ECF Note equal to the product of $350,000 times the MDFA Note Share and the MHEFA Note Share, respectively; and

       (b)    for each fiscal year ending in 2016, 2017, or 2018, a payment on the MDFA ECF Note and the MHEFA ECF Note equal to the product of $175,000 times the MDFA Note Share and the MHEFA Note Share, respectively.

"*GAAP*" shall mean generally accepted accounting principles in the United States consistently applied.

"*General Bar Date*" means the Bar Date established in the Bar Date Order for all Claims other than Administrative Claims and Claims of governmental entities.

"*General Unsecured Claims*" means all Claims that are not Administrative Claims, Priority Tax Claims, Other Priority Claims, Secured Claims, PBGC Prepetition Claims, or the VNA Hoosac Bank Deficiency Claim.

"*Holder*" means (i) with respect to the holders of Claims under the MHEFA Note or the MDFA Note, the MHEFA Bondholders and the MDFA Bondholders, and (ii) in all other cases, the beneficial holder of any Claim or New Note.

"*Impaired*" means, with respect to a Claim, such Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code on or against any of the Debtors' property or the Estates.

"*Loan and Trust Agreements*" means, collectively, the MDFA Loan and Trust Agreement and the MHEFA Loan and Trust Agreement.

"*Master Indenture*" means the Amended and Restated Master Trust Indenture, dated as of September 1, 1999, and amended and restated as of October 1, 2004, by and among NBH, NARH, NBCS, VNA, Reach Community Health Foundation, Inc., NBR, and the Master Trustee.

"*Master Trustee*" means Wells Fargo Bank, National Association, in its capacity as Master Trustee under the Master Indenture, and its successors in interest in such capacity.

"***MBL***" means the Master Building Lease between Columbia NAH Group, LLC and NARH dated October 17, 2001.

"***MDFA***" means the Massachusetts Development Finance Agency.

"***MDFA Affiliation Note***" means a new note of the Obligated Group substantially in the form included in the Plan Supplement.  The MDFA Affiliation Note (a) (i) shall be subject to the New Note Terms, secured by the New Collateral, and subordinated to the New MDFA Note, New MHEFA Note, and ECF Notes, and (ii) shall have an interest rate of 6% (non-compounding), the same maturity date as the New MDFA Note, an original principal amount equal to the product of the Affiliation Notes Original Principal Amount times the MDFA Note Share, and annual amortization payments that amortize the outstanding principal amount on a straight-line basis or (b) shall have such other terms as otherwise agreed by and among the Obligated Group and the Holders of the MDFA Note Claims.

"***MDFA Bonds***" means the Massachusetts Development Finance Agency Revenue Bonds, Northern Berkshire Community Services, Inc. Issue, 1999 Series A.

"***MDFA Bondholders***" shall mean and refer to the Holders of the MDFA Bonds.

"***MDFA ECF Note***" means a new secured note to be issued by the Obligated Group to the Holders of the MDFA Note Claims against the Debtors.  The MDFA ECF Note shall have a 30 year term, shall be subject to the New Note Terms, shall be secured by the New Collateral, shall have the same maturity date as the New MDFA Note, shall bear no interest, and shall have an original principal amount equal to the Allowed amount of the MDFA Note Claims minus the principal amount of the New MDFA Note.  Further terms of the MDFA ECF Note are set forth in Section 4.11.  A form of the MDFA ECF Note will be included in the Plan Supplement.

"***MDFA Loan and Trust Agreement***" means the Loan and Trust Agreement among MDFA, NBCS, and BONY dated as of September 1, 1999.

"***MDFA Note***" means Master Note No. 1 in the original principal amount of $18,130,000 issued under the Master Indenture for the outstanding principal amount of the MDFA Bonds.

"***MDFA Note Claim***" means any Claim under the MDFA Note.

"***MDFA Note Reserve Fund Amount***" means the sum of the amounts of all transfers made or to be made to BONY after the Petition Date (if any) from the Debt Service Fund, Debt Service Reserve Fund, Expense Fund, Redemption Fund, Project Fund, or Rebate Fund under the MDFA Loan and Trust Agreement.

"***MDFA Note Share***" shall mean and refer to a fraction, the numerator of which is the Allowed amount of the MDFA Note Claims and the denominator of which is the sum of the Allowed amounts of (i) the MDFA Note Claims and (ii) the MHEFA Note Claims.

12

"***MDFA Trustee***" means Bank of New York Mellon, as successor to The Bank of New York, acting solely in its capacity as trustee under the MDFA Loan and Trust Agreement and not individually, together with its successors in interest in such capacity.

"***MHEFA***" means the Massachusetts Health and Educational Facilities Authority.

"***MHEFA Affiliation Note***" means a new secured note of the Obligated Group substantially in the form included in the Plan Supplement.  The MHEFA Affiliation Note (a) (i) shall be subject to the New Note Terms, secured by the New Collateral, and subordinated to the New MDFA Note, New MHEFA Note, and ECF Notes, and (ii) shall have an interest rate of 6% (non-compounding), the same maturity date as the New MHEFA Note, an original principal amount equal to the product of the Affiliation Notes Original Principal Amount times the MHEFA Note Share, and annual amortization payments that amortize the outstanding principal amount on a straight-line basis or (b) shall have such other terms as otherwise agreed by and among the Obligated Group and the Holders of the MHEFA Note Claims.

"***MHEFA Bonds***" means the (a) MHEFA Revenue Bonds, North Adams Regional Hospital, Inc. Issue, 1996 Series C, dated May 14, 1996, (b) MHEFA Revenue Bonds, North Adams Regional Hospital, Inc. Issue, 2004 Series A, dated June 8, 2004, and (c) MHEFA Revenue Bonds, North Adams Regional Hospital, Inc. Issue, 2004 Series B, dated June 8, 2004.

"***MHEFA Bondholders***" shall mean and refer to the Holders of the MHEFA Bonds.

"***MHEFA ECF Note***" means a new secured note to be issued by the Obligated Group to the Holders of the MHEFA Note Claims against the Debtors.  The MHEFA ECF Note shall have a 30 year term, shall be subject to the New Note Terms, shall be secured by the New Collateral, shall have the same maturity date as the New MHEFA Note, shall bear no interest, and shall have an original principal amount equal to the Allowed amount of the MHEFA Note Claims minus the principal amount of the New MDFA Note.  Further terms of the MHEFA ECF Note are set forth in Section 4.11.  A form of the MHEFA ECF Note will be included in the Plan Supplement.

"***MHEFA Loan and Trust Agreement***" means that certain Amended and Restated Loan and Trust Agreement, dated as of June 8, 2004, among MHEFA, NARH, and MHEFA Trustee.

"***MHEFA Note***" means that certain Master Note No. 3, dated as of June 8, 2004, from certain members of the Obligated Group made payable to MHEFA Trustee in the original principal amount of $30,245,000, which was issued pursuant to the provisions of the Master Indenture.

"***MHEFA Note Claim***" means any Claim under the MHEFA Note.

"***MHEFA Note Reserve Fund Amount***" means the sum of the amounts of all transfers made or to be made to MHEFA Trustee after the Petition Date (if any) from the Debt Service Fund, Debt Service Reserve Fund, Expense Fund, Redemption Fund, or Rebate Fund under the MHEFA Loan and Trust Agreement.

13

"*MHEFA Note Share*" shall mean and refer to a fraction equal to one minus the MDFA Note Share.

"*MHEFA Trustee*" means U.S. Bank National Association, acting solely in its capacity as trustee under the MHEFA Loan and Trust Agreement and not individually, together with its successors in interest in such capacity.

"*MNA*" means Massachusetts Nurses Association.

"*NARH*" means North Adams Regional Hospital, Inc., a Massachusetts nonprofit corporation and a debtor and debtor in possession in the Chapter 11 Cases.

"*NARH General Unsecured Claims*" means General Unsecured Claims against NARH.

"*NARH PET Claim*" means any Claim in Class 2F or Class 2G, the Holder of which is entitled to a distribution of Post-Effective Trust Interests on account of such Claim.

"*NARH Post-Effective Trust Account*" means a subaccount of the Post-Effective Trust for the benefit of Holders of NARH PET Claims, as provided in Section 4.10.

"*NARH Post-Effective Trust Account Interests*" means the Post-Effective Trust Interests in the NARH Post-Effective Trust Account.

"*NBCS*" means Northern Berkshire Community Services, Inc., a Massachusetts nonprofit corporation.

"*NBH*" means Northern Berkshire Healthcare, Inc., a Massachusetts nonprofit corporation and a debtor and debtor in possession in the Chapter 11 Cases.

"*NBH General Unsecured Claims*" means General Unsecured Claims against NBH.

"*NBH PET Claim*" means any Claim in Class 1C or Class 1D, the Holder of which is entitled to a distribution of Post-Effective Trust Interests on account of such Claim.

"*NBHPG*" means Northern Berkshire Healthcare Physicians Group, Inc., a Massachusetts nonprofit corporation and a debtor and debtor in possession in the Chapter 11 Cases.

"*NBHPG PET Claim*" means any Claim in Class 4A or Class 4B, the Holder of which is entitled to a distribution of Post-Effective Trust Interests on account of such Claim.

"*NBHPG Post-Effective Trust Account*" means a subaccount of the Post-Effective Trust for the benefit of Holders of NBHPG PET Claims, as provided in Section 4.10.

"*NBHPG Post-Effective Trust Account Interests*" means the Post-Effective Trust Interests in the NBHPG Post-Effective Trust Account.

"*NBH Post-Effective Trust Account*" means a subaccount of the Post-Effective Trust for the benefit of Holders of NBH PET Claims, as provided in Section 4.10.

14

"***NBH Post-Effective Trust Account Interests***" means the Post-Effective Trust Interests in the NBH Post-Effective Trust Account.

"***NBR***" means Northern Berkshire Realty, Inc., a Massachusetts nonprofit corporation and a debtor and debtor in possession in the Chapter 11 Cases.

"***New Articles of Organization***" means, collectively, the amended and restated articles of organization of each of the Reorganized Debtors, if any, copies of which shall be included in the Plan Supplement, which shall be filed with the Massachusetts Secretary of the Commonwealth on or about the Effective Date.

"***New Boards of Trustees***" means, collectively, the boards of trustees of each of the Reorganized Debtors.

"***New Bonds***" has the meaning given to such term in Section 4.17.

"***New By-Laws***" means, collectively, the amended and restated by-laws of each of the Reorganized Debtors, if any, in substantially the form set forth in the Plan Supplement, which shall become effective on the Effective Date.

"***New Collateral***" means all real and personal property of NARH and all receipts, revenues, rentals, income, and other moneys received or receivable by or on behalf of any member of the Obligated Group from any source, including all collateral subject to any liens currently disputed by the Debtors, except for, in each case, gifts, grants, bequests, donations and contributions heretofore or hereafter made which are designated at the time of making by the donor or maker as being for certain specified purposes inconsistent with the application thereof to the payments due under the New MDFA Note, the New MHEFA Note, the ECF Notes, or the Affiliation Notes, and any income derived therefrom to the extent required by such designation or restriction.

"***New Constituent Documents***" means, collectively, the New By-Laws and the New Articles of Organization, copies of which shall be included in the Plan Supplement.

"***New Indenture***" has the meaning given to such term in Section 4.17.

"***New Loan Agreement***" has the meaning given to such term in Section 4.17.

"***New MDFA 1111(b) Note***" means a new note of the Obligated Group secured by the same collateral of the Obligated Group securing the MDFA Note Claims.  The New MDFA 1111(b) Note shall accrue no interest and shall have a principal amount equal to the Allowed amount of the MDFA Note Claims, a 30 year term, an amortization schedule set forth in the Plan Supplement, and a present value equal to the principal amount of the New MDFA Note or such other amount as the Court finds necessary to comply with the provisions of the Bankruptcy Code.

"***New MDFA Bonds***" means the New Bonds issued to the Holders of MDFA Bonds.

"*New MDFA Note*" means a new note of the Obligated Group substantially in the form included in the Plan Supplement, secured by the New Collateral.  The New MDFA Note shall be subject to the New Note Terms and shall have, at the election of the Obligated Group in their sole discretion:

> (a)    a principal amount equal to the product of $12 million times the MDFA Note Share, a 30 year term, an interest rate of 6% (non-compounding), and equal annual amortization payments;

> (b)    such other terms as determined by the Bankruptcy Court to be necessary to satisfy the requirements of section 1129(b)(2)(A)(i) of the Bankruptcy Code; or

> (c)    such other terms as otherwise agreed by and among the Obligated Group and the Holders of the MDFA Note Claims.

"*New MHEFA 1111(b) Note*" means a new note of the Obligated Group secured by the same collateral of the Obligated Group securing the MHEFA Note Claims.  The New MHEFA 1111(b) Note shall accrue no interest and shall have a principal amount equal to the sum of the Allowed amount of the MHEFA Note Claims, a 30 year term, an amortization schedule set forth in the Plan Supplement, and a present value equal to the principal amount of the New MHEFA Note or such other amount as the Court finds necessary to comply with the provisions of the Bankruptcy Code.

"*New MHEFA Bonds*" means the New Bonds issued to the Holders of MHEFA Bonds.

"*New MHEFA Note*" means a new note of the Obligated Group substantially in the form included in the Plan Supplement, secured by the New Collateral.  The New MHEFA Note shall be subject to the New Note Terms and shall have at the election of the Obligated Group in their sole discretion:

> (a)    a principal amount equal to the product of $12 million times the MHEFA Note Share, a 30 year term, an interest rate of 6% (non-compounding), and equal annual amortization payments;

> (b)    such other terms as determined by the Bankruptcy Court to be necessary to satisfy the requirements of section 1129(b)(2)(A)(i) of the Bankruptcy Code; or

> (c)    such other terms as otherwise agreed by and among the Obligated Group and the Holder of the MHEFA Note Claims.

"*New Mortgage*" means a new mortgage under which the Obligated Group will pledge to the New Trustee the real property collateral securing the following, if any: the New MDFA Note, New MDFA 1111(b) Note, the New MHEFA Note, the New MHEFA 1111(b) Note, each ECF Note, and each Affiliation Note, a form of which will be included in the Plan Supplement.

"*New Notes*" means the New Secured Notes and the New Unsecured Note.

16

"*New Note Terms*" means the Financial and Reporting Covenants, the Other Covenants, and the Voting Provisions.

"*New Officers*" means the officers of the Reorganized Debtors immediately following the Effective Date, the names of which shall be provided in the Plan Supplement.

"*New PET Unsecured Note*" means a new non-interest bearing unsecured note jointly issued by NARH, NBH, and NBHPG with a principal amount of $352,000, a four year term, and equal monthly amortization payments.  A form of the New PET Unsecured Note will be included in the Plan Supplement.

"*New Secured Notes*" means the following, to the extent applicable as the case may be: the ECF Notes, the Affiliation Notes, the New MDFA Note, New MHEFA Note, New MDFA 1111(b) Note, New MHEFA 1111(b) Note, the CalFirst Capital Lease 1 Secured Note, the CalFirst Capital Lease 2 Secured Note, and the Other Capital Lease Secured Notes.

"*New Security Agreement*" means a new security agreement under which the Obligated Group will pledge to the New Trustee the personal property collateral securing the following, if any: the New MDFA Note, New MDFA 1111(b) Note, the New MHEFA Note, the New MHEFA 1111(b) Note, each ECF Note, and each Affiliation Note, a form of which will be included in the Plan Supplement.

"*New Trustee*" has the meaning given to such term in Section 4.17.

"*New Unsecured Notes*" means the PBGC Post-Effective Note and the New PET Unsecured Note.

"*Non-Commuting Bondholders*" shall mean and refer to any holder of the MDFA Bonds that affirmatively elects to opt out of the ACA Insurance Commutation in accordance with Section 4.16.

"*Nuveen*" means, collectively, Nuveen Massachusetts Municipal Bond Fund, Inc., Nuveen Municipal Value Fund, Inc., Nuveen High Yield Municipal Bond Fund, Inc., Nuveen Municipal Value Fund, Inc., Nuveen Municipal High Income Opportunity Fund, Inc., and Nuveen Massachusetts Dividend Advantage Municipal Fund, Inc., and any affiliate thereof.

"*Nuveen Parties*" means Nuveen and its affiliates, directors, officers, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or any of their successors or assigns.

"*Obligated Group*" means Reorganized NARH, Reorganized NBH, and Reorganized VNA.

"*Operating Budget*" means the annual budget for each fiscal year prepared for the members of the Obligated Group that will include balance sheets, statements of income, and sources and uses of cash for each fiscal year, which shall be prepared in summary form and shall include an explanation of the principal assumptions of such budget in addition to actual performance against the prior year's budget with analysis and discussion of material variances.

17

29105896_1

"***Operating Expenses***" means all operating expenses of the Obligated Group, determined in conformity with GAAP consistently applied; including, without limitation, fees of any third-party manager.

"***Other Capital Leases***" means the Capital Leases listed on the Capital Lease Claims List other than the CalFirst Capital Lease 1, and the CalFirst Capital Lease 2

"***Other Capital Lease Claims***" means all Claims held by Other Capital Lessors against NARH under the Other Capital Leases, the entire Allowed amount of which as of the Petition Date shall be treated as a Secured Claim for purposes of the Plan.

"***Other Capital Lease Secured Notes***" means each new note of NARH substantially in the form included in the Plan Supplement, secured by the same collateral securing the respective Other NARH Capital Lease or other collateral of like value, which shall have as its material terms, at the election of NARH in its sole discretion:

       (a)     a maturity date of the last day of the term of such Other Capital Lease Claim, an interest rate of the lesser of 6% and the interest rate under such Other Capital Lease payable on an amortization schedule set forth in the Plan Supplement, and a principal amount equal to the Allowed outstanding amount of the respective Other Capital Lease Claim as of the Effective Date;

       (b)     such other terms as determined by the Bankruptcy Court to be necessary to satisfy the requirements of section 1129(b)(2)(A)(i) of the Bankruptcy Code; or

       (c)     such other terms as otherwise agreed by and among NARH and the Holder of the respective Other NARH Capital Lease Claim.

"***Other Capital Lessors***" means the lessors listed on the Capital Lease Claims List other than CalFirst.

"***Other Covenants***" means the following obligations of the Obligated Group:

       (a)     payments and obligations under capital leases that members of the Obligated Group enter into after the Effective Date shall not exceed $1.5 million in aggregate at any time;

       (b)     the Obligated Group shall use commercially reasonable efforts to use donor-restricted cash and endowment funds (consistent with applicable restrictions placed on those funds) to fund operations prior to using Unrestricted Cash to fund operations;

       (c)     the Obligated Group shall not pay management bonuses or incentive compensation for work performed during a fiscal year in excess of $100,000 unless EBIDA of the Obligated Group meets or exceeds the EBIDA projected in the Baseline Budget and each subsequent Operating Budget (inclusive of the management bonuses and incentive compensation being incorporated as an expense in the calculation of EBIDA) and the Obligated Group is otherwise in compliance with all covenants;

18

(d)     the Obligated Group shall not make Restricted Pension Payments without the consent of the New Trustee unless the Obligated Group submits a twelve-month forward-looking projection to the New Trustee that demonstrates that the Obligated Group can pay all future required payments under the New Notes for such period and that the Obligated Group will be in compliance with the Financial and Reporting Covenants and the Other Covenants;

(e)     if the Obligated Group makes any Restricted Pension Payments, the Obligated Group shall prepay the New MDFA Note and the New MHEFA Note on the next payment date for such New Notes in an aggregate amount equal to such Restricted Pension Payments (with such prepayment allocated based on the outstanding principal amounts of the New MDFA Note and New MHEFA Note); and

(f)     other covenants that are the same as covenants under the Master Indenture and the Loan and Trust Agreements in all material respects, including negative covenants prohibiting the pledge of assets that are the same as such covenants under the Master Indenture and the Loan and Trust Agreements in all material respects.

"*Other Priority Claims*" means all Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims or Priority Tax Claims.

"*Other Secured Claims*" means all Secured Claims against any Debtor that are not MDFA Note Claims, MHEFA Note Claims, the CalFirst Capital Lease 1 Claim, the CalFirst Capital Lease 2 Claim, or Other Capital Lease Claims.

"*PBGC*" means the Pension Benefit Guaranty Corporation.

"*PBGC Post-Effective Claim*" has the meaning given in Section 4.16(a).

"*PBGC Post-Effective Note*" means a new unsecured note issued by Reorganized NBH, Reorganized NARH, and Reorganized VNA on a joint and several basis with a principal amount equal to the PBGC Post-Effective Claim, a ten year term, and interest of 2%. One third of the principal amount of the PBGC Post-Effective Note will amortize on a straight-line basis, with the remainder of the principal due at maturity. The Reorganized Debtors will be permitted to prepay all or any portion of the PBGC Post-Effective Note at any time, *provided*, that principal due at maturity must be prepaid in full prior to prepayment of principal subject to amortization. For each dollar of the principal due at maturity that the Reorganized Debtors prepay prior to the end of the Obligated Group's 2015 fiscal year, PBGC will forgive 2 dollars of the principal due at maturity. For each dollar of the principal due at maturity that the Reorganized Debtors prepay after the end of the Obligated Group's 2014 fiscal year but prior to the end of the Obligated Group's 2018 fiscal year, PBGC will forgive 1.5 dollars of the principal due at maturity. A form of the PBGC Post-Effective Note, which will conform to the terms described herein and otherwise be in form and substance reasonably satisfactory to the PBGC, will be included in the Plan Supplement.

"*PBGC Prepetition Claim*" means the Claim of PBGC for unfunded benefit liabilities under 29 U.S.C. § 1362(b), minimum funding contributions under 29 U.S.C. § 1362(c), and for

19

insurance premiums due (if any) under 29 U.S.C. §§ 1306 and 1307, in each case as of the Petition Date, which shall be Allowed in the amount set forth in Section 3.2.

"***Person***" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"***PET Claim***" means any NARH PET Claim, NBH PET Claim, NBHPG PET Claim, or VNA PET Claim.

"***Petition Date***" means June 13, 2011, the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

"***Plan***" means this plan of reorganization under chapter 11 of the Bankruptcy Code, as amended, supplemented, or modified from time to time in accordance with the terms hereof and in accordance with the terms of the Bankruptcy Code and the Bankruptcy Rules.

"***Plan Documents***" means the agreements, documents, and instruments to be entered into as of the Effective Date as contemplated by, and in furtherance of, the Plan.

"***Plan Supplement***" means, collectively, the compilation of documents and exhibits to be Filed not later than 10 calendar days prior to the date by which the Balloting and Noticing Agent must receive all Ballots, as such documents and exhibits may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms of this Plan, and which shall include forms of the New Indenture, the New Loan Agreement, the New Mortgage, and the New Security Agreement.

"***Post-Effective Trust***" means the trust to be formed on the Effective Date and governed by the Post-Effective Trust Agreement, as discussed in Section 4.10.

"***Post-Effective Trust Accounts***" means the NARH Post-Effective Trust Account, the NBH Post-Effective Trust Account, the NBHPG Post-Effective Trust Account, and the VNA Post-Effective Trust Account.

"***Post-Effective Trust Agreement***" means the agreement establishing and delineating the terms and conditions of the Post-Effective Trust, substantially in the form set forth in the Plan Supplement.

"***Post-Effective Trust Interests***" means the beneficial interests of the Holders of Allowed PET Claims in the Post-Effective Trust, the treatment of which is described in Section 4.10.

"***Post-Effective Trust Supervisors***" has the meaning given in Section 4.10(c).

"***Post-Effective Trustee***" has the meaning given in Section 4.10(c).

"***Postpetition Interest***" means unpaid postpetition interest at the non-default contract rate as provided under the CalFirst Capital Lease 1, the CalFirst Capital Lease 2, or each Other Capital Lease, as applicable, through the Effective Date.

20

"*Priority Tax Claims*" means all Claims against any Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro-Rata Share*" means, with respect to any distribution of Post-Effective Trust Interests in a Post-Effective Trust on account of an Allowed Claim, a proportion equal to the amount of such Allowed Claim to the aggregate amount of all PET Claims against the respective Reorganized Debtor, other than Disallowed PET Claims, the Holders of which are entitled to Post-Effective Trust Interests in such Post-Effective Trust.

"*Professionals*" means (a) all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) all professionals or other entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

"*Professional Fee Claims*" means all Administrative Expense Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals (to the extent allowed under sections 328, 330, 331, 363, or 503 of the Bankruptcy Code) through the Effective Date.

"*Professional Fee Order*" means an order of the Bankruptcy Court establishing procedures for interim compensation and reimbursement of expenses of professionals.

"*Reorganized Debtor*" means any Debtor and any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

"*Restricted Pension Payments*" means payments under the PBGC Post-Effective Note (or otherwise in connection with obligations to PBGC or other pension and retirement funding contractual obligations) in excess of minimum amounts due thereunder; provided, that any 403(b) plan matches consistent with the Debtors' ordinary practices shall constitute minimum amounts due thereunder.

"*Schedules*" means the schedules of assets and liabilities and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as amended, modified, or supplemented from time to time.

"*Search Committee*" has the meaning given in Section 4.20.

"*Secured Claim*" means any Claim against any Debtor that is secured by a Lien on, or security interest in, property of such Debtor, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, but only to the extent of the value of the Holder's interest in such Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code; provided, that if a Holder of such Claim makes an 1111(b) Election on or before the 1111(b) Election Date, the entire Allowed amount of such Claim as of the Petition Date shall be treated as a Secured Claim; provided, further, that the entire Allowed amount of each of the CalFirst Capital Lease 1 Claim, the CalFirst Capital Lease 2 Claim, the Other Capital Lease Claims, and the VNA Hoosac Bank Secured Claim as of the Petition Date shall be treated as a Secured Claim for purposes of the Plan.

"***Secured Notes***" means, collectively, the MDFA Note, the MHEFA Note, and all notes, bonds, certificates, or other instruments or documents evidencing or creating the VNA Hoosac Bank Claim.

"***SEIU***" means 1199SEIU United Health Care Workers East.

"***Statutory Committees***" means all official committees appointed by the Office of the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, including the Creditors' Committee.

"***Term Sheet***" means a term sheet setting forth additional terms of the New Bonds and New Secured Notes that will be included with the Plan Supplement; provided, that any such term sheet approved by the Debtors, Nuveen, and ACA shall be the form of term sheet included with the Plan Supplement.

"***Trust Supervisors***" has the meaning given in Section 4.10.

"***Trustee Fees and Expenses***" has the meaning given in Section 2.4.

"***Unimpaired***" means, with respect to any Claim, a Claim that is not Impaired.

"***Unrestricted Cash***" means cash, cash-equivalents and marketable or liquid securities or investments less donor-restricted funds and other endowment funds and less reserves derived from or for the payment of debt, including debt service and debt service reserve funds.

"***U.S. Trustee***" means the Office of the United States Trustee for the District of Massachusetts.

"***VNA***" means Visiting Nurse Association & Hospice of Northern Berkshire, Inc., a Massachusetts nonprofit corporation and a debtor and debtor in possession in the Chapter 11 Cases.

"***VNA Building Real Property***" means the parcel of real property occupied by VNA and commonly known as 535 Curran Memorial Highway, North Adams, Massachusetts.

"***VNA Building Sale Proceeds***" has the meaning given in Section 4.15.

"***VNA General Unsecured Claims***" means General Unsecured Claims against VNA.

"***VNA Hoosac Bank Deficiency Claim***" means any Claim under the VNA Hoosac Bank Mortgage in excess of the VNA Hoosac Bank Secured Claim, which shall be Allowed in the amount set forth in Section 3.2.

"***VNA Hoosac Bank Mortgage***" means that certain North Adams Hoosac Savings Bank Massachusetts Commercial Mortgage, dated as of September 3, 1997, between VNA and Hoosac Bank.

"***VNA Hoosac Bank Secured Claim***" means that certain Secured Claim of Hoosac Bank relating to the VNA Building Real Property in connection with the VNA Hoosac Bank Mortgage, which shall be Allowed in the amount set forth in Section 3.2.

"***VNA PET Claim***" means any Claim in Class 3A (solely for the Allowed amount in excess of the sum of the principal amount of the New MDFA Note plus the aggregate amount of Fixed ECF Note Payments on the MDFA ECF Note), Class 3B (solely for the Allowed amount in excess of the sum of the principal amount of the New MHEFA Note plus the aggregate amount of Fixed ECF Note Payments on the MHEFA ECF Note), Class 3D, Class 3E, or Class 3F, the Holder of which is entitled to a distribution of Post-Effective Trust Interests on account of such Claim.

"***VNA Post-Effective Trust Account***" means the trust to be formed on the Effective Date for the benefit of Holders of VNA PET Claims, as provided in Section 4.10.

"***VNA Post-Effective Trust Account Interests***" means the Post-Effective Trust Interests in the VNA Post-Effective Trust Account.

"***VNA Post-Effective Trustee***" means the Post-Effective Trustee of the VNA Post-Effective Trust.

"***Voting Provisions***" means provisions of the New MDFA Note, the New MHEFA Note, each ECF Note, and each Affiliation Note providing that Bondholders may exercise certain rights and remedies on behalf of all Bondholders under such Notes, including to consent to (i) prepayment of obligations; (ii) change in maturity; (iii) reduction of obligations; and (iv) release of liens (provided, however, that any such exercise of rights and remedies shall treat all of the Bondholders in an equal and ratable manner) as set forth in the Term Sheet.

"***Women's Exchange Real Property***" means the parcel of real property commonly known as 279/283 Cole Avenue, Williamstown, Massachusetts.

Section 1.2.    *Rules of Interpretation and Computation of Time.*

(a)    For purposes of the Plan:

(i)    whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(ii)    any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document substantially shall be in such form or substantially on such terms and conditions;

(iii)    any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified, or supplemented;

23

(iv)    unless otherwise specified, all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan;

(v)    the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(vi)    captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

(vii)    the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

(viii)    any reference in the Plan to a "Deficiency Claim" means a reference to such "Deficiency Claim, if any"; and

(ix)    any term used in capitalized form in the Plan that is not defined in the Plan but is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

(b)    In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## UNCLASSIFIED CLAIMS

Section 2.1.   *Administrative Claims.*

Each Holder of an Allowed Administrative Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Administrative Claim (except to the extent that such Holder agrees to less favorable treatment thereof) on or as soon as practicable after the latest of (a) the Effective Date, (b) the date on which such Administrative Claim becomes Allowed, (c) the date on which such Administrative Claim becomes due and payable, and (d) such other date as mutually may be agreed to by such Holder and the Debtors. Notwithstanding the foregoing, any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto. Allowed Administrative Claims shall be paid in Cash from the Reorganized Debtors' cash on hand or generated by the Reorganized Debtors' ordinary business operations.

Section 2.2.   *Priority Tax Claims.*

Each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) on or as soon as

practicable after the latest of (a) the Effective Date, (b) the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable, and (d) such other date as mutually may be agreed to by and among such Holder and the Debtors; *provided*, *however*, that the Debtors may, at their option and in lieu of payment in full in Cash of an Allowed Priority Tax Claim as provided in clauses (a) through (d) hereof, make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.  Allowed Priority Tax Claims shall be paid in Cash from the Reorganized Debtors' cash on hand or generated by the Reorganized Debtors' ordinary business operations.

Section 2.3.    *Professional Fees.*

(a)    *Final Fee Applications*

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court and served on the Reorganized Debtors no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims and the apportionment of such Professional Fee Claims among the Debtors after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases.  The Disbursing Agent shall make all distributions on account of Allowed Claims for Professional compensation and reimbursement of expenses as soon as reasonably practicable after such Claims become Allowed.  Such distributions shall be paid in Cash from the Reorganized Debtors' cash on hand or generated by the Reorganized Debtors' ordinary business operations.

(b)    *Payment of Interim Amounts*

Professionals shall be paid pursuant to the "Monthly Statement" process set forth in the Professional Fee Order with respect to all calendar months ending prior to the Effective Date.

(c)    *Post-Effective Date Fees and Expenses*

On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date shall terminate and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(d)    *Fee Applications for Substantial Contribution Claims*

All Persons seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred during the Chapter 11 Cases under section 503(b)(3)(D) shall File their respective applications and serve them on the Reorganized Debtors no later than 45 days after the Effective Date.  Each such application shall be in the form of an application for payment of Professional Fee Claims under section 330 of the Bankruptcy Code and shall comply with all provisions of the Bankruptcy Code, the Bankruptcy Rules, and the MLBR applicable thereto and guidelines promulgated by the U.S. Trustee.

Section 2.4.    *Certain Master Trustee and Bond Trustee Fees and Expenses.*

As part of the settlement described in Section 4.1, on the condition that each of Classes 1A, 1B, 2A, 2B, 3A, and 3C has voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and has not made any 1111(b) Election, the Obligated Group has agreed as follows with respect to the fees and expenses incurred by the Master Trustee, MDFA Trustee, and MHEFA Trustee prior to the Effective Date, including the fees and expenses incurred by such trustee's professionals, required to be reimbursed under the Master Indenture or the respective Loan and Trust Agreement (collectively, "***Trustee Fees and Expenses***"):

(a)    On the Effective Date, the Obligated Group shall pay $500,000 into escrow for distribution on account of Trustee Fees and Expenses to the Master Trustee, MDFA Trustee, and MHEFA Trustee.

(b)    The principal amount of the MDFA ECF Note shall be deemed increased by (x) the sum of the amounts of (i) the Trustee Fees and Expenses owing with respect to the MDFA Loan and Trust Agreement and (ii) the Trustee Fees and Expenses owing with respect to the Master Indenture times the MDFA Note Share, less (y) $900,000 times the MDFA Note Share.

(c)    The principal amount of the MHEFA ECF Note shall be deemed increased by (x) the sum of the amounts of (i) the Trustee Fees and Expenses owing with respect to the MHEFA Loan and Trust Agreement and (ii) the Trustee Fees and Expenses owing with respect to the Master Indenture times the MHEFA Note Share, less (y) $900,000 times the MHEFA Note Share.

(d)    On or before September 15, 2012, the Obligated Group shall pay to the New Trustee for allocation among the Bondholders an amount not to exceed the lesser of (x) $400,000 in aggregate or (y) the amount of the Trustee Fees and Expenses less $500,000.

Within 10 days after the Effective Date, invoices for all Trustee Fees and Expenses through the Effective Date, including fees and expenses of professionals setting forth full time and expense records (redacted as necessary to preserve client confidentiality), shall be served upon counsel to the Obligated Group, the U.S. Trustee, and the Creditors' Committee.

For the avoidance of doubt, no payments related to Trustee Fees and Expenses shall be subject to ECF Credits.

For avoidance of doubt, nothing contained in this Plan shall prohibit, prevent, restrict or limit in any way the rights of the Master Trustee, MDFA Trustee, or MHEFA Trustee to exercise their respective Charging Liens in order to pay any and all unpaid Trustee Fees and Expenses that may be due and owing to the Master Trustee, MDFA Trustee, and/or MHEFA Trustee.

# ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING RIGHTS OF CLAIMS

Section 3.1.    *Classification.*

The categories of Claims listed below classify Claims for all purposes, including for purposes of voting, confirmation, and distribution pursuant to this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim shall be deemed classified in a particular Class only to the extent that such Claim qualifies within the description of such Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such different Class.  A Claim is in a particular Class only to the extent that such Claim has not been paid or otherwise settled prior to the Effective Date.

Claims (except for Administrative Claims, Professional Fee Claims, and Priority Tax Claims, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) are classified as follows:

| **Class** | **Designation** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1A | NBH MDFA Note Claims | Impaired | Yes |
| Class 1B | NBH MHEFA Note Claims | Impaired | Yes |
| Class 1C | NBH PBGC Prepetition Claim | Impaired | Yes |
| Class 1D | NBH General Unsecured Claims | Impaired | Yes |
| Class 2A | NARH MDFA Note Claims | Impaired | Yes |
| Class 2B | NARH MHEFA Note Claims | Impaired | Yes |
| Class 2C | CalFirst Capital Lease 1 Claim | Impaired | Yes |
| Class 2D | CalFirst Capital Lease 2 Claim | Impaired | Yes |
| Class 2E | Other Capital Lease Claims | Impaired | Yes |
| Class 2F | NARH PBGC Prepetition Claim | Impaired | Yes |
| Class 2G | NARH General Unsecured Claims | Impaired | Yes |
| Class 3A | VNA MDFA Note Claims | Impaired | Yes |
| Class 3B | VNA MHEFA Note Claims | Impaired | Yes |
| Class 3C | VNA Hoosac Bank Secured Claim | Impaired | Yes |
| Class 3D | VNA PBGC Prepetition Claim | Impaired | Yes |
| Class 3E | VNA General Unsecured Claims | Impaired | Yes |
| Class 3F | VNA Hoosac Bank Deficiency Claim | Impaired | Yes |
| Class 4A | NBHPG PBGC Prepetition Claim | Impaired | Yes |
| Class 4B | NBHPG General Unsecured Claims | Impaired | Yes |
| Class 5 | Other Priority Claims | Unimpaired | No |
| Class 6 | Other Secured Claims | Unimpaired | No |

Section 3.2.    *Treatment of Claims.*

Except as set forth in Section 4.12, Claims shall receive the following treatment:

(a)    *Class 1A— NBH MDFA Note Claims.*

    (i)    *Treatment*:  On behalf of the Holders of the MDFA Notes, in full satisfaction and discharge of the Allowed MDFA Note Claims, the New

27

Trustee shall receive, under the settlement described in Section 4.1, (x) the New MDFA Note and the MDFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12.

(ii)     *Allowance*:  The MDFA Note Claims against NBH (together with the MDFA Note Claims against NARH and VNA) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MDFA Note minus the sum of (A) the MDFA Note Reserve Fund Amount and (B) the Commutation Consideration.

(b)     *Class 1B— NBH MHEFA Note Claims.*

(i)     *Treatment*:  On behalf of the Holders of the MHEFA Notes, in full satisfaction and discharge of the Allowed MHEFA Note Claims, the New Trustee shall receive, under the settlement described in Section 4.1, (x) the New MHEFA Note and the MHEFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12.

(ii)     *Allowance*:  The MHEFA Note Claims against NBH (together with the MHEFA Note Claims against NARH and VNA) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MHEFA Note minus the MHEFA Note Reserve Fund Amount.

(c)     *Class 1C—NBH PBGC Prepetition Claim.*

(i)     *Treatment*:  If Class 1C votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, the Holder of the Allowed PBGC Prepetition Claim against NBH shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NBH Post-Effective Trust Account Interests.

(ii)     *Allowance*:  The PBGC Prepetition Claim against NBH shall be deemed Allowed in an aggregate amount equal to $27,251,912.

(d)     *Class 1D—NBH General Unsecured Claims.*  If PBGC and Class 1D vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim against NBH shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NBH Post-Effective Trust Account Interests.

(e)     *Class 2A— NARH MDFA Note Claims.*

(i)     *Treatment*:  On behalf of the Holders of the MDFA Notes, in full satisfaction and discharge of the Allowed MDFA Note Claims, the New Trustee shall receive, under the settlement described in Section 4.1, (x) the New MDFA Note and the MDFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12.

(ii)     *Allowance*:  The MDFA Note Claims against NARH (together with the

28

MDFA Note Claims against NBH and VNA) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MDFA Note minus the sum of (A) the MDFA Note Reserve Fund Amount and (B) the Commutation Consideration.

(f)    *Class 2B— NARH MHEFA Note Claims.*

    (i)    *Treatment*:  On behalf of the Holders of the MHEFA Notes, in full satisfaction and discharge of the Allowed MHEFA Note Claims, the New Trustee shall receive, under the settlement described in Section 4.1, (x) the New MHEFA Note and the MHEFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12.

    (ii)    *Allowance*:  The MHEFA Note Claims against NARH (together with the MHEFA Note Claims against NBH and VNA) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MHEFA Note minus the MHEFA Note Reserve Fund Amount.

(g)    *Class 2C— CalFirst Capital Lease 1 Claim.*

    (i)    *Treatment*:  The Holder of the Allowed CalFirst Capital Lease 1 Claim shall receive, in full satisfaction and discharge thereof, the CalFirst Capital Lease 1 Secured Note.

    (ii)    *Allowance*:  For purposes of the Plan, the entire Allowed outstanding amount of the CalFirst Capital Lease 1 Claim as of the Effective Date shall be treated as an Allowed Secured Claim.

(h)    *Class 2D— CalFirst Capital Lease 2 Claim.*

    (i)    *Treatment*:  The Holder of the Allowed CalFirst Capital Lease 2 Claim shall receive, in full satisfaction and discharge thereof, the CalFirst Capital Lease 2 Secured Note.

    (ii)    *Allowance*:  For purposes of the Plan, the entire Allowed outstanding amount of the CalFirst Capital Lease 2 Claim as of the Effective Date shall be treated as an Allowed Secured Claim.

(i)    *Class 2E— Other Capital Lease Claims.*

    (i)    *Treatment*:  Each Holder of an Allowed Other Capital Lease Claim shall receive, in full satisfaction and discharge thereof, its respective Other Capital Lease Secured Note.

    (ii)    *Allowance*:  For purposes of the Plan, the entire Allowed outstanding amount of each Other Capital Lease Claim as of the Effective Date shall be treated as an Allowed Secured Claim.

29

(j)     *Class 2F— NARH PBGC Prepetition Claim.*

(i)     *Treatment*: If Class 2F votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, the Holder of the Allowed PBGC Prepetition Claim against NARH shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NARH Post-Effective Trust Account Interests.

(ii)    *Allowance*: The PBGC Prepetition Claim against NARH shall be deemed Allowed in an aggregate amount equal to $27,251,912.

(k)     *Class 2G— NARH General Unsecured Claims.*  If PBGC and Class 2G vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim against NARH shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NARH Post-Effective Trust Account Interests.

(l)     *Class 3A— VNA MDFA Note Claims.*

(i)     *Treatment*:  On behalf of the Holders of the MDFA Notes, in full satisfaction and discharge of the Allowed MDFA Note Claims, the New Trustee shall receive, under the settlement described in Section 4.1, (x) the New MDFA Note and the MDFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12.

(ii)    *Allowance*:  The MDFA Note Claims against VNA (together with the MDFA Note Claims against NARH and NBH) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MDFA Note minus the sum of (A) the MDFA Note Reserve Fund Amount and (B) the Commutation Consideration.

(m)     *Class 3B— VNA MHEFA Note Claims.*

(i)     *Treatment*:  On behalf of the Holders of the MHEFA Notes, in full satisfaction and discharge of the Allowed MHEFA Note Claims, the New Trustee shall receive, under the settlement described in Section 4.1, (x) the New MHEFA Note and the MHEFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12.

(ii)    *Allowance*:  The MHEFA Note Claims against VNA (together with the MHEFA Note Claims against NARH and NBH) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MHEFA Note minus the MHEFA Note Reserve Fund Amount.

(n)     *Class 3C— VNA Hoosac Bank Secured Claim.*

(i)     *Treatment*: The Holder of the Allowed VNA Hoosac Bank Secured Claim shall receive, in full satisfaction and discharge thereof, the VNA Building Sale Proceeds (up to the Allowed amount of such Secured Claim) as set

30

forth in Section 4.15.

 (ii) *Allowance*:  Upon consummation of the sale of the VNA Building Real Property, the VNA Hoosac Bank Secured Claim shall be deemed Allowed in an amount equal to the lesser of (A) $599,261.41 and (B) the amount of the VNA Building Sale Proceeds.

(o) *Class 3D— VNA PBGC Prepetition Claim.*

 (i) *Treatment*:  The Holder of the Allowed PBGC Prepetition Claim against VNA shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the VNA Post-Effective Trust Account Interests.

 (ii) *Allowance*:  The PBGC Prepetition Claim against VNA shall be deemed Allowed in an aggregate amount equal to $27,251,912.

(p) *Class 3E— VNA General Unsecured Claims.*  Each Holder of an Allowed General Unsecured Claim against VNA shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the VNA Post-Effective Trust Account Interests.

(q) *Class 3F— VNA Hoosac Bank Deficiency Claim.*

 (i) *Treatment*: The Holder of the Allowed VNA Hoosac Bank Deficiency Claim, if any, shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the VNA Post-Effective Trust Account Interests.

 (ii) *Allowance*:  The VNA Hoosac Bank Deficiency Claim, if any, shall be deemed Allowed in an amount equal to the excess, if any, of (A) $599,261.41 over (B) the amount of the VNA Building Sale Proceeds.

(r) *Class 4A— NBHPG PBGC Prepetition Claim.*

 (i) *Treatment*:  If Class 4A votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, the Holder of the Allowed PBGC Prepetition Claim against NBHPG shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NBHPG Post-Effective Trust Account Interests.

 (ii) *Allowance*:  The PBGC Prepetition Claim against NBHPG shall be deemed Allowed in an aggregate amount equal to $27,251,912.

(s) *Class 4B—NBHPG General Unsecured Claims*. If Class 4B votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim against NBHPG shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NBHPG Post-Effective Trust Account Interests.

(t) *Class 5—Other Priority Claims.*  Each Holder of an Allowed Other Priority Claim shall receive from the Disbursing Agent, in full satisfaction and discharge thereof, Cash equal to

31

the unpaid amount of such Allowed Other Priority Claim (except to the extent such Holder agrees to less favorable treatment thereof) on or as soon as practicable after the latest of (x) the Effective Date, (y) the date on which such Other Priority Claim becomes Allowed, and (z) such other date as mutually may be agreed to by and among such Holder and the Debtors.

(u)     *Class 6—Other Secured Claims.*  Each Holder of an Allowed Other Secured Claim shall have its agreement with the respective Debtor reinstated under section 1124(2) of the Bankruptcy Code or shall receive from the Disbursing Agent, in full satisfaction and discharge thereof, the collateral securing its Other Secured Claim.

Section 3.3.     *Voting Rights of Claims.*

(a)     *Impaired Classes*: The following Classes are Impaired: Class 1A, Class 1B, Class 1C, Class 1D, Class 2A, Class 2B, Class 2C, Class 2D, Class 2E, Class 2F, Class 2G, Class 3A, Class 3B, Class 3C, Class 3D, Class 3E, Class 3F, Class 4A, and Class 4B.  The following Holders are entitled to vote the following Claims to accept or reject the Plan: each Holder of an NBH MDFA Note Claim, NBH MHEFA Note Claim, NBH PBGC Prepetition Claim, NBH General Unsecured Claim, NARH MDFA Note Claim, NARH MHEFA Note Claim, CalFirst Capital Lease 1 Claim, CalFirst Capital Lease 2 Claim, Other Capital Lease Claim, NARH PBGC Prepetition Claim, NARH General Unsecured Claim, VNA MDFA Note Claim, VNA MHEFA Note Claim, VNA Hoosac Bank Secured Claim, VNA PBGC Prepetition Claim, VNA General Unsecured Claim, VNA Hoosac Bank Deficiency Claim, NBHPG PBGC Prepetition Claim, and NBHPG General Unsecured Claim.

(b)     *Unimpaired Classes*: Class 5 and Class 6 are Unimpaired.  Holders of Allowed Other Priority Claims and Allowed Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

Section 3.4.     *No Effect on Claims Against Northern Berkshire Realty, Inc.*

For the avoidance of doubt, this Plan is not, and shall not be deemed to be, a plan of reorganization for NBR.  This Plan has no effect of any Claims against NBR, including any Claims of PBGC, MDFA Trustee, MHEFA Trustee, the MDFA Bondholders, or the MHEFA Bondholders against NBR, all of whose rights against NBR shall be reserved.  For the avoidance of doubt, this Plan will discharge all Claims of NBR against any of the Debtors, which shall be Allowed solely as a $207,628.97 General Unsecured Claim against NBHPG.

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

Section 4.1.     *Compromise of Controversies; Waiver of Intercompany Claims.*

(a)     The provisions of the Plan constitute a good faith compromise and settlement, in consideration for the distributions and other benefits provided under the Plan, of all Claims and controversies resolved under the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

(b)      The provisions of the Plan, and in particular Sections 2.4, 3.2, 4.2, 4.10, 4.11, 4.12, 4.16, 4.17, 4.18. 8.2, 9.3, and 9.4, represent a settlement between the Debtors, Nuveen, and ACA following extensive arm's-length and good faith negotiations and, pursuant to Section 4.1(a), the Bankruptcy Court's entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such settlement under Bankruptcy Rule 9019.  An MDFA Bondholder may accept this settlement by voting all of his, her, or its Claims in Classes 1A, 2A, and 3A to accept the Plan, and a MHEFA Bondholder may accept this settlement by voting all of his, her, or its Claims in Classes 1B, 2B, and 3B to accept the Plan.  Any split vote by a Bondholder, or any vote by a Bondholder to accept the Plan with respect to Claims against one Debtor but not another Debtor, shall be deemed a vote to reject the Plan with respect to all Debtors.

(c)      The provisions of the Plan, and in particular Sections 3.2 and 4.19, represent a settlement between the Debtors and PBGC following extensive arm's-length and good faith negotiations and, pursuant to Section 4.1(a), the Bankruptcy Court's entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such settlement under Bankruptcy Rule 9019.

(d)      The entry of the Confirmation Order shall further constitute the Bankruptcy Court's approval of each Debtor's agreement to waive any and all intercompany claims against each and every one of the other Debtors.

Section 4.2.      *Vesting and Distribution of Assets*.

On the Effective Date, except as provided in Section 4.10 or Section 4.19, (a) the Reorganized Debtors shall issue the PBGC Post-Effective Note to the Holder of the PBGC Post-Effective Claims and the New PET Unsecured Note to the Post-Effective Trust Accounts of NBH, NARH, and NBHPG, (b) VNA shall transfer the VNA Building Real Property (subject to the VNA Hoosac Bank Secured Claim) and the Women's Exchange Real Property to the VNA Post-Effective Trust Account, (c) the Debtors will release the MDFA Note Reserve Fund Amount to MDFA Trustee (to the extent not previously released) to be applied to reduce the principal amount of the MDFA Note Claim, subject to the rights of the Master Trustee and MDFA Trustee, if any, to assert their respective Charging Liens against such funds to pay any Trustee Fees and Expenses which may be due and owing to the Master Trustee and MDFA Trustee; provided, however, that all amounts so released to MDFA Trustee shall be deemed applied to reduce the principal amount of the MDFA Note Claim, (d) the Debtors will release the MHEFA Note Reserve Fund Amount to MHEFA Trustee (to the extent not previously released) to be applied to reduce the principal amount of the MHEFA Note Claim, subject to the rights of the Master Trustee and MHEFA Trustee, if any, to assert its Charging Lien against such funds under the MHEFA Loan and Trust Agreement to pay any Trustee Fees and Expenses which may be due and owing to the Master Trustee and MHEFA Trustee; provided, however, that all amounts so released to MHEFA Trustee shall be deemed applied to reduce the principal amount of the MHEFA Note Claim, (e) with respect to each Debtor, the Avoidance Actions in each Debtor's Estate, and each Debtor's right to file, settle, compromise, withdraw, or litigate to judgment objections to any PET Claim, shall vest exclusively in the Post-Effective Trust Account of such Debtor, (f) the Reorganized Debtors shall transfer $25,000 to the Post-Effective Trust, and (g) title to all other Assets of any Debtor shall vest in the respective Reorganized Debtor, free and clear of all Claims, liens, encumbrances, and other interests.

Section 4.3.    *Continued Corporate Existence.*

Each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal entity, with all the powers available to such legal entity under applicable law and pursuant to the applicable New Constituent Documents, and without prejudice to any right to alter or terminate such existence (whether by merger, sale, or otherwise) in accordance with such applicable law.  On and after the Effective Date, the Reorganized Debtors may operate their respective businesses and use, acquire, lease, sell, or dispose of their assets without supervision or approval by the Bankruptcy Court and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

Section 4.4.    *Cancellation of Notes and Instruments.*

(a)    *Cancellation of Secured Notes.*

On the Effective Date, the Loan and Trust Agreements, the Master Indenture, the MDFA Bonds, the MHEFA Bonds, and the Secured Notes and any other notes, bonds, certificates, or other instruments or documents evidencing or creating the Secured Notes shall be cancelled and deemed terminated, satisfied, and discharged, and MDFA Trustee, MHEFA Trustee, the MDFA Bondholders, the MHEFA Bondholders, the Holder of the VNA Hoosac Bank Secured Claim, and the Master Trustee shall have no further rights or entitlements in respect thereof against the Debtors; provided, however, notwithstanding any provision contained herein to the contrary:

(i)    the MHEFA Loan and Trust Agreement and the MHEFA Bonds shall continue in effect solely for the purposes of permitting MHEFA Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to MHEFA Trustee;

(ii)    the MDFA Loan and Trust Agreement and the MDFA Bonds shall continue in effect solely for the purposes of permitting MDFA Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to MDFA Trustee; and

(iii)    the Master Trust Agreement and the Secured Notes shall continue in effect solely for the purposes of permitting Master Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to the Master Trustee.

(b)    *Cancellation of Other Instruments.*

(i)    On the Effective Date, and except as otherwise provided in clauses (ii), (iii) and (iv) of this Section 4.4(b), any notes, bonds, certificates, or other instruments or documents evidencing or creating any Claims that are Impaired by the Plan shall be automatically cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and deemed terminated, satisfied, and discharged.  Any Holder of an Impaired Claim shall have no further rights or entitlements in respect thereof against the Debtors except the right to receive the distributions, if any, to which the Holder is entitled under the Plan.

34

(ii)     Upon the Effective Date, MDFA Trustee (solely in its capacity as trustee under the MDFA Loan and Trust Agreement), shall be discharged from its duties and obligations arising the MDFA Loan and Trust Agreement, the MDFA Bonds and any agreements, instruments and documents related thereto; provided, however, notwithstanding any provision contained herein to the contrary, the MDFA Loan and Trust Agreement and the MDFA Bonds shall continue in effect solely for the purposes of permitting MDFA Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to MDFA Trustee.

(iii)    Upon the Effective Date, MHEFA Trustee shall be discharged from its duties and obligations arising under the MHEFA Loan and Trust Agreement, the MHEFA Bonds and any agreements, instruments and documents related thereto, provided, however, notwithstanding any provision contained herein to the contrary, the MHEFA Loan and Trust Agreement and the MHEFA Bonds shall continue in effect solely for the purposes of permitting MHEFA Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to MHEFA Trustee.

(iv)    Upon the Effective Date, the Master Trustee shall be discharged from its duties and obligations arising the Master Trust Agreement, the Secured Notes and any agreements, instruments and documents related thereto; provided, however, notwithstanding any provision contained herein to the contrary, the Master Trust Agreement and the Secured Notes shall continue in effect solely for the purposes of permitting the Master Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to the Master Trustee.

Section 4.5.    *Cancellation of Liens*.

On the Effective Date, any Lien securing any Secured Claim shall be deemed released and the Holder of such Secured Claim shall release any collateral (including any cash collateral) or other property of any Debtor held by such Holder and shall take such actions the Debtors or the Reorganized Debtors may request to evidence the release of such Lien, including, as the Debtors or the Reorganized Debtors may request, to execute, deliver, file, or record such releases, and the Debtors or the Reorganized Debtors may take such actions on behalf of such Holders; provided, however, that notwithstanding any provision contained herein to the contrary: (i) any Charging Lien that MHEFA Trustee has shall continue to remain in full force and effect; (ii) any Charging Lien that MDFA Trustee has shall continue to remain in full force and effect; and (iii) any Charging Lien that the Master Trustee has shall continue to remain in full force and effect.

Section 4.6.    *New Constituent Documents*.

On or as soon as practicable after the Effective Date, the Reorganized Debtors shall (a) make any and all filings that may be required in connection with the New Constituent Documents with the appropriate governmental offices or agencies and (b) take any and all other actions that may be required to render the New Constituent Documents effective.

35

Section 4.7.    *New Officers*.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each of the New Officers (and, if such Person is an insider, the nature of any compensation for such Person) will be provided in the Plan Supplement.

Section 4.8.    *Trustees of the Reorganized Debtors*.

The New Board of Trustees for each Reorganized Debtor will be the same as the current board of trustees for the respective Debtor, except to the extent otherwise provided in the Plan Supplement.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of each of the initial New Boards of Trustees (and, if such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement.  Each member of each of the initial New Boards of Trustees shall assume the position of trustee on the day immediately following the Effective Date.  Any subsequent New Board of Trustees shall be elected, classified, and composed in a manner consistent with the applicable New Constituent Documents and applicable nonbankruptcy law.

Section 4.9.    *Corporate Action*.

On the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) adopting the New Constituent Documents, (b) selecting the Reorganized Debtors' trustees and officers, (c) issuing the New Notes, and (d) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All such actions shall be deemed to have occurred and shall be in effect, without any requirement of further action by the trustees or officers of the Debtors or the Reorganized Debtors.  On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the boards of trustees of the Reorganized Debtors shall issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated in this Section 4.9 shall be effective notwithstanding any requirements under any applicable nonbankruptcy law.

Section 4.10.    *Post-Effective Trust*.

(a)    *Conditions to Treatment*.  The following treatment (solely with respect to Holders of General Unsecured Claims against NBH, NARH, and NBHPG) is conditioned upon the PBGC and the Holders of General Unsecured Claims against NBH, NARH, and/or NBHPG voting to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.  Unless the PBGC and the Holders of a Class of General Unsecured Claims against NBH, NARH, and/or NBHPG vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, notwithstanding any other provision of this Plan:

(i)    no Post-Effective Trust Account will be established with respect to such Debtor, and no Holder of General Unsecured Claims against such Debtor will receive any distribution of Post-Effective Trust Interests or any other recovery, from the Post-Effective Trust or otherwise;

36

(ii)    such Debtor shall retain all Avoidance Actions in such Debtor's Estate and all right to file, settle, compromise, withdraw, or litigate to judgment objections to any PET Claim; and

(iii)    all payments under the New PET Unsecured Note or from the respective Post-Effective Trust Account that would otherwise be made to or for the benefit of such Holders will instead be made to the Holders of the MDFA ECF Note and the MHEFA ECF Note (in accordance with the MDFA Note Share and the MHEFA Note Share) to permanently reduce the principal amounts of such ECF Notes.

(b)    *In General.*

(i)    The Post-Effective Trust will distribute to the holders of the Post-Effective Trust Interests in such trust the net proceeds of the Post-Effective Trust's assets as provided in the Post-Effective Trust Agreement.

(ii)    *Holders.*  As provided in Section 3.2:

(A)    the holders of Post-Effective Trust Interests in the Post-Effective Trust Accounts of NARH, NBH, and NBHPG shall be the Holders of Allowed PBGC Prepetition Claims and Allowed General Unsecured Claims against the respective Debtor; and

(B)    the holders of VNA Post-Effective Trust Account Interests shall be the Holders of the following Claims against VNA: the Allowed MDFA Note Claims, the Allowed MHEFA Note Claims, the Allowed VNA Hoosac Bank Deficiency Claim, the Allowed PBGC Prepetition Claim against VNA, and Allowed General Unsecured Claims against VNA.

(iii)    *Assets.*  Pursuant to Section 4.1(a):

(A)    the Post-Effective Trust Accounts of NARH, NBH, and NBHPG shall receive shares of the New PET Unsecured Note in the following proportions: 92% to the NARH Post-Effective Trust Account, 3% to the NBH Post-Effective Trust Account, and 5% to the NBHPG Post-Effective Trust Account;

(B)    the VNA Post-Effective Trust Account shall receive the Women's Exchange Real Property and the VNA Building Real Property (subject to the VNA Hoosac Bank Secured Claim); and

(C)    each Post-Effective Trust Account shall receive the Avoidance Actions in such Debtor's Estate.

(iv)    *Litigation, Objection, and Settlement Power.*  The Post-Effective Trust, on behalf of each Post-Effective Trust Account, may:

37

(A)    pursue Avoidance Actions vested in such Post-Effective Trust Account;

(B)    file, withdraw, or litigate to judgment objections to PET Claims against its respective Debtor and settle or compromise such Disputed PET Claims without approval of the Bankruptcy Court; and

(C)    resolve such Disputed PET Claims outside the Bankruptcy Court and under applicable governing law.

(v)    The Post-Effective Trust will be formed on the Effective Date and is expected to be formed as a Massachusetts trust.

(vi)    The Post-Effective Trust will continue in existence until the fourth anniversary of the Effective Date or until the distribution of all its property, whichever occurs first, except that if the Trust Supervisors determine that it is necessary to extend the duration of the Post-Effective Trust to accomplish the Post-Effective Trust's purposes, the Trust Supervisors may, prior to the fourth anniversary of the Effective Date, apply to the Bankruptcy Court to extend the duration of the trust.

(c)    *Management of the Post-Effective Trust.*

The Post-Effective Trust will be managed by a managing trustee (the "***Post-Effective Trustee***") and three supervisors (the "***Post-Effective Trust Supervisors***"), each of which shall be selected by the Creditors' Committee. The Post-Effective Trustee will have the authority to manage and dispose of the assets of the Post-Effective Trust, but will be required to obtain the consent of the Post-Effective Trust Supervisors to take certain actions, as provided in the Post-Effective Trust Agreement.

(d)    *Ownership of the Post-Effective Trust.*

Post-Effective Trust Interests will be evidenced solely by book entries. The Post-Effective Trust Interests will be non-voting and will not confer any rights as shareholders. The Post-Effective Trust Interests will not be transferable by a holder except: (i) to any relative, spouse, or relative of the spouse of such holder, (ii) to any trust or estate in which such holder has more than a 50% interest of the beneficial interest (excluding contingent interests), (iii) to any corporation, partnership, or other organization in which such holder is the beneficial owner of more than 50% of the equity securities (excluding directors' qualifying shares) so long as the transferor and transferee certify that there is no current intention of changing the direct and indirect ownership of the transferee, (iv) to any person or entity that holds, directly or indirectly, more than 50% of the voting securities of such holder, or (v) upon the death of such holder in accordance with the operation of law. Each Post-Effective Trustee will take reasonable actions to prohibit the formation of an active trading market in the Post-Effective Trust Interests.

Section 4.11.  *ECF Notes.*

(a)      As provided in Section 3.2, unless an 1111(b) Election is made with respect to the MDFA Note Claims, Holders of Claims in Class 1A, Class 2A, and Class 3A shall receive the MDFA ECF Note and, unless an 1111(b) Election is made with respect to the MHEFA Note Claims, Holders of Claims in Class 1B, Class 2B, and Class 3B shall receive the MHEFA ECF Note.

(b)      The Obligated Group will pay to the Holders of the ECF Notes (x) through and until the first ECF Note Payment Date after the Obligated Group's 2017 fiscal year end, (1) the applicable Fixed ECF Note Payment, payable on or before September 15 of the applicable fiscal year, and (2) (A) the amount of the portion of Excess Cash Flow, if any, calculated as set forth below as of the respective ECF Calculation Date, less (B) the applicable Fixed ECF Note Payment, with such excess payable on or before the ECF Note Payment Date, and, (y) thereafter, a portion of Excess Cash Flow, if any, calculated as set forth below as of the respective ECF Calculation Date, payable on or before the ECF Note Payment Date:

(i)      if the Obligated Group's Days' Cash on Hand on the respective ECF Calculation Date is less than 25.0 days, the product of 35% of the Obligated Group's Excess Cash Flow times the MDFA Note Share to the New Trustee on behalf of Holders of the New MDFA Bonds and the product of 35% of the Obligated Group's Excess Cash Flow times the MHEFA Note Share to the New Trustee on behalf of Holders of the New MHEFA Bonds;

(ii)      if Obligated Group's Days' Cash on Hand on the respective ECF Calculation Date is greater than or equal to 25.0 days but less than 30.0 days, the product of 50% of the Obligated Group's Excess Cash Flow times the MDFA Note Share to the New Trustee on behalf of Holders of the New MDFA Bonds and the product of 50% of the Obligated Group's Excess Cash Flow times the MHEFA Note Share to the New Trustee on behalf of Holders of the New MHEFA Bonds; and

(iii)      if Obligated Group's Days' Cash on Hand on the respective ECF Calculation Date is greater than or equal to 30.0 days, the product of 75% of the Obligated Group's Excess Cash Flow times the MDFA Note Share to the New Trustee on behalf of Holders of the New MDFA Bonds and the product of 75% of the Obligated Group's Excess Cash Flow times the MHEFA Note Share to the New Trustee on behalf of Holders of the New MDFA Bonds.

(c)      *Application of Payments*.

(i)      All interest payments on the New MDFA Note will be applied to permanently reduce the outstanding principal amount of the MDFA ECF Note, and all interest payments on the New MHEFA Note will be applied

to permanently reduce the outstanding principal amount of the MHEFA ECF Note.

(ii)    All Fixed ECF Note Payments and all payments of Excess Cash Flow referenced in clause (b) above will be applied to permanently reduce the outstanding principal amount of the respective ECF Note.

(iii)    Any distributions received by the New Trustee or the MDFA Bondholders from the New PET Unsecured Note, the VNA Post-Effective Trust Account, or NBR will be applied to permanently reduce the outstanding principal amount of the MDFA ECF Note.

(iv)    Any distributions received by the New Trustee or the MHEFA Bondholders from the New PET Unsecured Note, the VNA Post-Effective Trust Account, or NBR will be applied to permanently reduce the outstanding principal amount of the MHEFA ECF Note.

(d)    If NARH or NBH (so long as NBH is the managing member of NARH) enters into an Affiliation, the ECF Notes will be modified as provided in Section 4.18.

(e)    Unless the ECF Notes are modified in the event of an Affiliation as provided in Section 4.18, any remaining principal amounts under the ECF Notes shall be due at maturity.

Section 4.12.    *1111(b) Elections.*

(a)    *Procedure for Making 1111(b) Election.*

(i)    The only Holders of Claims eligible to make an election under section 1111(b) of the Bankruptcy Code (the "***1111(b) Election***") are the MDFA Bondholders, as the Holders of the MDFA Note Claims, and the MHEFA Bondholders, as the Holders of the MHEFA Note Claims.

(ii)    To make an 1111(b) Election with respect to any member of the Obligated Group, the Holders of the respective Claims must mark a box on their 1111(b) Forms indicating that such Holders intend to make an 1111(b) Election with respect to all members of the Obligated Group.  The Balloting and Noticing Agent will file an 1111(b) balloting report on the docket within three Business Days of the 1111(b) Election Date.

(iii)    If the 1111(b) Forms returned to the Balloting and Noticing Agent on or before the 1111(b) Election Date indicate that each Class of Holders of MDFA Note Claims has made an 1111(b) Election against all of the members of the Obligated Group by at least two-thirds in principal amount of the MDFA Bonds and more than half in number of the MDFA Bondholders, an 1111(b) Election shall be deemed to have been made as of the 1111(b) Election Date with respect to the MDFA Note Claims against all the members of the Obligated Group.

40

(iv)    If the 1111(b) Forms returned to the Balloting and Noticing Agent on or before the 1111(b) Election Date indicate that each Class of Holders of MHEFA Note Claims has made an 1111(b) Election against all of the members of the Obligated Group by at least two-thirds in principal amount of the MHEFA Bonds and more than half in number of the MHEFA Bondholders, an 1111(b) Election shall be deemed to have been made as of the 1111(b) Election Date with respect to the MHEFA Note Claims against all the members of the Obligated Group.

(v)     Unless an 1111(b) Election is made in accordance with this Section 4.12, the right to make the 1111(b) Election for a Class of Holders of MDFA Note Claims or MHEFA Note Claims shall be deemed waived with respect to the Plan, including any amendments or modifications to the Plan that do not result in a material adverse change to the treatment of the respective Claim.

(vi)    Once an 1111(b) Election has been made, it may not be revoked without the consent of the Debtors in their sole discretion.

(vii)   An 1111(b) Election cannot be made with respect to one member of the Obligated Group but not another member, and any 1111(b) Election with respect to less than all members of the Obligated Group will be deemed ineffective against all members of the Obligated Group.

(viii)  An 1111(b) Election with respect to a Debtor constitutes a waiver of any unsecured claim against such Debtor, and a Class of Holders that has made an 1111(b) Election shall not be entitled to the New MDFA Note, the New MHEFA Note, any ECF Note, or any Affiliation Note.

(b)     *1111(b) Elections by the MDFA Bondholders*.  If the MDFA Bondholders make an 1111(b) Election with respect to each member of the Obligated Group, the MDFA Bondholders shall receive, in lieu of beneficial interests in the New MDFA Note and the MDFA ECF Note provided for in Section 3.2, beneficial interests in the New 1111(b) MDFA Note, and shall not receive beneficial interests in any Affiliation Note.

(c)     *1111(b) Elections by the MHEFA Bondholders*.  If the MHEFA Bondholders make an 1111(b) Election with respect to each member of the Obligated Group, the MHEFA Bondholders shall receive, in lieu of beneficial interests in the New MHEFA Note and the MDFA ECF Note provided for in Section 3.2, beneficial interests in the New 1111(b) MHEFA Note, and shall not receive beneficial interests in any Affiliation Note.

Section 4.13.  *[Reserved]*.

Section 4.14.  *Establishment of Administrative Bar Date*.

Except as otherwise provided in Section 2.3 with respect to Professional Fee Claims, each Holder of an Administrative Claim (other than an Administrative 503(b)(9) Claim) shall file with the Bankruptcy Court and serve on counsel to the Debtors, at the addresses set forth in

41

Section 11.7, a request to pay such Administrative Claim ("***Administrative Claim Request***"), so as to be actually received on or before 5:00 p.m. (prevailing Eastern time) on the Administrative Bar Date.  Any Holder of an Administrative Claim (other than an Administrative 503(b)(9) Claim) that fails to timely file and serve an Administrative Claim Request by the applicable deadline set forth in this Section 4.14 shall be forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtors, the Estates, or any Entity formed pursuant to this Plan, including the Post-Effective Trust, and such Administrative Claim will be deemed discharged as of the Effective Date in accordance with Section 9.2.  Notwithstanding anything in this Section 4.14 to the contrary, the Bar Date for Administrative 503(b)(9) Claims shall be the Bar Date established by the Bar Date Order and not by this Section 4.14.

Section 4.15.  *Disposition of VNA Real Estate*.

(a)    *Women's Exchange Building*.  The Post-Effective Trustee shall endeavor to sell the Women's Exchange Real Property and distribute the proceeds of such sale, net of carrying costs and costs of disposition, to the VNA Post-Effective Trust Account.

(b)    *VNA Building*.

(i)    *Lease*.  The Post-Effective Trustee shall lease the VNA Building Real Property to VNA for a term ending no later than four months after the Effective Date, in exchange for lease payments equal to the regular monthly payments under the VNA Hoosac Bank Mortgage. VNA may terminate this lease earlier by giving the Post-Effective Trustee 30 days prior written notice.

(ii)    *Sale*.  Upon the termination of the lease with VNA, the Post-Effective Trustee shall endeavor to sell the VNA Building Real Property.  The Post-Effective Trustee shall distribute the proceeds of such sale, net of carrying costs and costs of disposition, (the "***VNA Building Sale Proceeds***") (A) first to the Holder of the Allowed VNA Hoosac Bank Secured Claim in full discharge and satisfaction of such Claim, and (B) to the extent of any excess over the Allowed amount of the VNA Hoosac Bank Secured Claim, thereafter to the VNA Post-Effective Trust Account.

Section 4.16.  *Insurance Mitigation.*

ACA has proposed a payment to MDFA Bondholders of a portion of the MDFA Bonds in full satisfaction of ACA's obligations under the ACA Insurance Policy.  The terms of this proposal are as follows:

(a)    The Ballots issued to the Holders of Claims in Classes 1A, 2A, and 3A will contain a box that may be checked by MDFA Bondholders that do not wish to participate in the ACA Insurance Commutation and become a Non-Commuting Bondholder.  Any Holder of an MDFA Bond that wishes to opt out of the ACA Insurance Commutation must so indicate on its Ballot.

42

(b)      Subject only to the option to opt-out discussed above, each Holder of a Claim in Classes 1A, 2A, and 3A will be presumed to have elected to participate in the ACA Insurance Commutation, pursuant to which, in exchange for the right to receive a *pro rata* share of the Commutation Consideration, ACA may elect to deem the Commuting Bondholders to have released, waived, quitclaimed, and otherwise abandoned any and all claims, rights, defenses, and causes of action, whether legal or equitable, known or unknown, that they may have against ACA under, in connection with, or related in any way to the ACA Insurance Policy (the "***ACA Insurance Commutation***").

(c)      Commuting Bondholders and Non-Commuting Bondholders will receive separate series of the New MDFA Bonds.

(d)      The Allowed amount of the MDFA Note Claims and the aggregate amount of New MDFA Bonds issued to Commuting Bondholders shall be reduced by the amount of the Commutation Consideration paid to Commuting Bondholders as set forth in Section 3.2.

(e)      To the extent ACA makes any payments under the ACA Insurance Policy to any Non-Commuting Bondholders and ACA is subrogated to the rights of such Non-Commuting Bondholders under the ACA Insurance Policy, ACA may direct MDFA Trustee to make all distributions otherwise payable to such Non-Commuting Bondholders to ACA to the extent of ACA's subrogated rights to payment.

(f)      Proceeds from the ACA Insurance Commutation shall not be subject to any claims or liens by the Master Trustee or MDFA Trustee, and shall be solely for the benefit of the Commuting Bondholders.

(g)      ACA will waive subrogation rights against the Debtors and the Reorganized Debtors for all amounts commuted.

Section 4.17.   *New Bond Documents; Tax-Exempt Notes; New Note Covenants*

(a)      A form of a new indenture (the "***New Indenture***") and a new loan agreement (the "***New Loan Agreement***") shall be included with the Plan Supplement providing for the issuance, simultaneous with the establishment of the New Indenture and New Loan Agreement, of one or more new series of bonds (the "***New Bonds***") in replacement of the MDFA Bonds and the MHEFA Bonds, forms of which shall also be included in the Plan Supplement.  The New Secured Notes will be distributed to the trustee under the New Indenture (the "***New Trustee***"). The New Bonds will represent and reflect the Bondholders' respective beneficial interests in the New MDFA Note, New MHEFA Note, and any ECF Note or Affiliation Note held by the New Trustee and payments received by the New Trustee thereunder.  For the avoidance of doubt, no New Bonds will be issued with respect to the New MDFA 1111(b) Note or New MHEFA 1111(b) Note.

(b)      The Obligated Group will use their best efforts to establish a tax-exempt bond structure for the New Bonds under the New Indenture and New Loan Agreement, which will contain covenants substantially similar to the covenants under the Master Indenture (except that the Financial and Reporting Covenants will replace all financial or reporting covenants under the Master Indenture), and the Obligated Group will covenant in the New MDFA Note and New

43

MHEFA Note to use best efforts to maintain the tax-exemption of the New Bonds, if achieved; provided, however, that the Obligated Group shall have no obligation to grant, incur, or assume any liability, covenant, or obligation except as provided for in this Plan or to incur any expense, including any obligation to pay for any legal or other fees and expenses associated with establishing such tax-exempt bond structure or any issuances thereunder, other than reasonable fees and expenses of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. as bond counsel not to exceed $100,000; and provided, further, that New Bonds with respect to the New MDFA Note, New MHEFA Note, and any Affiliation Notes or Fixed ECF Note Payments shall have the same structure as if such New Bonds were tax-exempt (including monthly funding of payments or remittance) regardless of whether such New Bonds are ultimately determined to be tax-exempt.

Section 4.18.   *Affiliation.*

(a)     *Restriction on Affiliation.*  The ECF Notes and the New MDFA Note and the New MHEFA Note will contain covenants that the Obligated Group shall not enter into any Affiliation (including an Affiliation with Berkshire Medical Center or an affiliate thereof) unless all of the following conditions are satisfied:

(i)     The members of the Obligated Group, or any transferee of all or substantially all assets of the Obligated Group, or any successor to the Obligated Group if NARH or NBH (so long as NBH is the managing member of NARH) is not the surviving entity, shall issue the Affiliation Notes to the New Trustee.

(ii)     Any successor to the Obligated Group or transferee of all or substantially all assets of the Obligated Group shall assume all of the Obligated Group's obligations under the New MDFA Note, the New MHEFA Note, and the ECF Notes (if any) as modified pursuant to this Section 4.18, subject to any liens and security interests under the New Secured Notes.

(iii)     Any Affiliation must be an arm's length transaction with an entity that (A) is not an insider of any member of the Obligated Group and (B) will have a net worth following the Affiliation equal to or greater than the net worth of the Obligated Group immediately preceding the Affiliation, as evidenced by a certificate of a Certified Public Accountant.  An Affiliation by Berkshire Health Systems, Inc. becoming the managing member of NBH and/or NARH shall conclusively be deemed to satisfy the criteria of this clause (iii).

(b)     The original principal amount of the Affiliation Notes (the "***Affiliation Notes Original Principal Amount***") shall equal, in total, either:

(i)     subject to clause (ii) below, an amount such that the sum of the amounts of (A) scheduled amortization and interest payments under the Affiliation Notes, (B) amortization and interest payments made, and scheduled amortization and interest payments to be made, under the New MDFA Note and the New MHEFA Note, (C) Fixed ECF Note Payments made

44

under the ECF Notes, and scheduled Fixed ECF Note Payments to be made under the ECF Notes, and (D) the ECF Credits for payments previously made to the Holders of the ECF Notes would equal the sum of the Allowed amounts of the MDFA Note Claim and the MHEFA Note Claim; or

(ii)  if the original principal amount set forth in clause (i) above would be less than $3.25 million, the lesser of (A) such original principal amount calculated without giving effect to ECF Credits, if any, and (B) $3.25 million.

(c)  Payments under the ECF Notes made before the Affiliation Notes are issued shall be credited on a dollar-for-dollar basis towards the calculation of the Affiliation Notes Original Principal Amount as provided in Section 4.18(b), and shall be further credited (such further crediting, the "***ECF Credits***") in the following amounts towards the calculation of the Affiliation Notes Original Principal Amount:

(i)  25% of the amount of all Fixed ECF Note Payments made on or before the first ECF Note Payment Date after the Obligated Group's 2015 fiscal year ends;

(ii)  150% of the amount of all payments of Excess Cash Flow (if any) made in excess of the amount of the Fixed ECF Note Payment on or before the first ECF Note Payment Date after the Obligated Group's 2015 fiscal year ends; and

(iii)  200% of the amount of all payments made under an ECF Note after the first ECF Note Payment Date after the Obligated Group's 2015 fiscal year ends through the first ECF Note Payment Date after the Obligated Group's 2018 fiscal year ends.

(d)  *Effect on ECF Notes*.  If an Affiliation is consummated on or after the end of the Obligated Group's 2018 fiscal year, the ECF Notes shall automatically terminate and all obligations of the Obligated Group thereunder shall automatically be deemed fully satisfied and discharged.  If an Affiliation is consummated before the Obligated Group's 2018 fiscal year ends:

(i)  the principal amount of each ECF Note will be reduced to the outstanding amount of Fixed ECF Note Payments remaining under such ECF Note;

(ii)  the maturity date of the ECF Notes shall be the last day of the Obligated Group's 2018 fiscal year;

(iii)  the obligation to make Fixed ECF Note Payments provided in Section 4.11(b) shall survive Affiliation, but no obligation to make any payment of Excess Cash Flow in excess of the Fixed ECF Note Payments shall survive Affiliation;

45

(iv)      for each dollar of payments under an ECF Note the Obligated Group pays a Holder of an Affiliation Note after the Affiliation Notes are issued, such Holder shall forgive an additional amount of principal of its Affiliation Note equal to (A) 25 cents, if paid on or before the first ECF Note Payment Date after the Obligated Group's 2015 fiscal year ends, and (B) two dollars, if paid thereafter; and

(v)       except as provided in this subsection (d), each ECF Note shall automatically terminate and all obligations of the Obligated Group thereunder shall automatically be deemed fully satisfied and discharged.

(e)      If a payment default (other than a payment default due to an acceleration that was not itself based on a payment default) occurs and is continuing under an ECF Note or Affiliation Note or the New MDFA Note or New MHEFA Note, a Holder of an Affiliation Note may, by written notice to the Obligated Group, elect to recalculate the principal amount of its Affiliation Note to give no effect to the reductions in the principal amount of its Affiliation Note, if any, made pursuant to the ECF Credits or as provided in Section 4.18(d)(iv), which shall then be null and void.

(f)      *Effect on New PET Unsecured Note.*  If the Obligated Group enters into any Affiliation, including an Affiliation with Berkshire Medical Center or an affiliate thereof, the principal amount of the New PET Unsecured Note shall automatically become due and payable immediately.

Section 4.19.   *Treatment of Claims of PBGC.*

The Debtors have proposed a settlement in the Plan with PBGC, which PBGC may accept by voting to accept the Plan.  As provided in Section 4.1, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the settlement described in this Section 4.18(a) under Bankruptcy Rule 9019.  The following treatment is conditioned upon PBGC voting to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code with respect to each Debtor.  Unless PBGC votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code with respect to each Debtor, notwithstanding any other provision of the Plan:

(i)       Only the VNA Post-Effective Trust Account will be established, and no Holder of General Unsecured Claims or PBGC Prepetition Claims against NBH, NARH, or NBHPG will receive any distribution of Post-Effective Trust Interests or any other recovery, from the Post-Effective Trust or otherwise;

(ii)      each Debtor shall retain all Avoidance Actions in its Estate and all right to file, settle, compromise, withdraw, or litigate to judgment objections to any PET Claim; and

(iii)     the Reorganized Debtors shall not issue the New PET Unsecured Note and shall have no obligation with respect thereto.

46

If PBGC does vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code with respect to each Debtor, then, upon the occurrence of, and as of, the Effective Date:

(b)      the PBGC Prepetition Claims against NBH, NARH, VNA, and NBHPG shall be Allowed in the amount of $27,251,912, and all other PBGC Prepetition Claims shall be deemed waived;

(c)      as provided in Section 3.2, PBGC, as the Holder of the Allowed PBGC Prepetition Claims, shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the Post-Effective Trust Interests;

(d)      for the aggregate post-Effective Date claims of PBGC against the Reorganized Debtors under 29 U.S.C. § 1306(a)(7) (the "***PBGC Post-Effective Claim***"), the PBGC will receive, in full satisfaction of the PBGC Post-Effective Claim, the PBGC Post-Effective Note.

Section 4.20.   *Search Committee.*

(a)      The Debtors shall form a committee (the "***Search Committee***") prior to the Effective Date to identify and interview all candidates for Chief Executive Officer of Reorganized NBH and NARH and make recommendations to the Boards of Trustees of Reorganized NBH and NARH to fill those positions.  The Search Committee shall have been formed prior to the Confirmation Date and shall consist of ten uncompensated members.  At least eight of the members shall be members of the Boards of Trustees of Reorganized NBH and NARH.  No more than two of the members shall be members of the Creditors' Committee (as selected by the Creditors' Committee), and such members shall be dismissed on the Effective Date unless Holders of Claims in Classes 1D and 2G have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.

(b)      The Search Committee shall be authorized to retain an executive search firm at the Reorganized Debtors' expense and to take any other action necessary to identify and interview candidates for Chief Executive Officer of Reorganized NBH and NARH.

(c)      The identity of the members of the Search Committee shall be disclosed in the Plan Supplement.

(d)      The Boards of Trustees of Reorganized NBH and NARH shall retain sole discretion and authority to select the respective Chief Executive Officers of Reorganized NBH and NARH.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 5.1.   *Assumption of Executory Contracts and Unexpired Leases.*

(a)      All executory contracts and unexpired leases of the Debtors that are not (i) assumed by the Debtors prior to the Effective Date, (ii) subject to a motion seeking such

assumption as of the Effective Date, or (iii) identified in the Plan or the Plan Supplement as executory contracts or unexpired leases to be assumed pursuant to the Plan or for which the Debtors expressly reserve the right to seek to assume, shall be deemed to have been rejected by the Debtors on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code without further notice or order of the Bankruptcy Court.  The Debtors reserve the right after the Confirmation Date to withdraw any pending motions seeking to assume any executory contracts or unexpired leases that have not been approved by Final Order, in which case such executory contracts or unexpired leases shall be deemed rejected pursuant to the Plan as of the date of such withdrawal.  Notwithstanding the foregoing, on the Effective Date, the Debtors will assume their collective bargaining agreements with the MNA and with SEIU.

(b)       Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, in accordance with section 365(b)(1) of the Bankruptcy Code, by payment of such amount in Cash, as and when provided in the Confirmation Order, or upon such other terms as the parties to such executory contract or unexpired lease may otherwise agree, or, with respect to the collective bargaining agreement with the MNA or with SEIU, by paying such amounts (which shall include all paid time off due to the Debtors' employees that are members of the MNA) in the ordinary course of business pursuant to the respective agreement.  If a dispute arises regarding (i) the amount of any cure payments required under section 365(b)(1) of the Bankruptcy Code, (ii) the ability of any Reorganized Debtor or any assignee thereof to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption under section 365 of the Bankruptcy Code, the cure payments required under section 365(b)(1) of the Bankruptcy Code, if any, shall be made following the entry of a Final Order resolving such dispute.  Notwithstanding anything to the contrary herein, the Debtors reserve their rights under applicable non-bankruptcy law, including with respect to amounts due, under the collective bargaining agreements with the MNA and with SEIU.

Section 5.2.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*.

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be Filed by the later of (a) the General Bar Date or (b) within 45 days after the date of any deemed rejection or entry of an order of the Bankruptcy Court approving such rejection.  Any Claim arising from the rejection of an executory contract or unexpired lease for which a proof of such Claim is not Filed within such time period shall forever be barred from assertion against the Debtors or the Reorganized Debtors, the Estates, and their property, unless otherwise ordered by the Bankruptcy Court.  The Allowed amount of any Claim arising from the rejection of executory contracts or unexpired leases for which proof of such Claim timely has been Filed shall be, and shall be treated as, an Allowed General Unsecured Claim under the terms hereof (subject to any limitation under section 502(b) of the Bankruptcy Code or other applicable law).

Section 5.3.      *Insurance Policies*.

Notwithstanding Section 5.1 hereof, unless otherwise rejected by the Debtors prior to the Effective Date or subject to a motion seeking such rejection as of the Effective Date, all the

Debtors' insurance policies and any agreements, documents, or instruments relating thereto shall be deemed to be, and treated, as executory contracts and shall be assumed on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.  Nothing contained in this section shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any Entity under any of the Debtors' insurance policies, including, without limitation, the insurer.

Section 5.4.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*.

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed or rejected shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease and all executory contracts or unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.  Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that the Debtors executed during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of such executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

# ARTICLE VI

# PROVISIONS GOVERNING DISTRIBUTIONS

Section 6.1.    *Date of Distributions; Distribution Record Date*.

(a)    Any distribution to be made hereunder shall be made on or as soon as practicable after the Effective Date, except as otherwise provided in the Plan.  Any payment or act required to be made or done hereunder on a day that is not a Business Day shall be made or done on the next succeeding Business Day.

(b)    As of the Distribution Record Date, the transfer registers for the MDFA Bonds and the MHEFA Bonds shall be closed and the transfer of such MDFA Bonds, such MHEFA Bonds or any interest therein, shall be prohibited.  The Disbursing Agent, MDFA Trustee, MHEFA Trustee, the Master Trustee, and the New Trustee (i) shall not have any obligation to recognize the transfer or sale of, or any participation in, any Allowed Claims relating to the MDFA Bonds or the MHEFA Bonds that occurs after the Distribution Record Date and (ii) shall be entitled for purposes of the Plan to recognize and make distributions only to Holders of such Claims as of the Distribution Record Date.

Section 6.2.    *Disbursing Agent*.

(a)    *General*.  All distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as the Disbursing Agent, except as otherwise provided in the Plan.

(b)      *Rights and Powers of Disbursing Agent.*  The Disbursing Agent shall be empowered, without further order of the Bankruptcy Court, to (i) make all distributions contemplated by the Plan, (ii) employ or contract with any Entities to assist in or make the distributions required by the Plan, (iii) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

Section 6.3.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

(a)      *Delivery in General.*

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided*, *further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by that Holder or, if no Proof of Claim was filed, in the Schedules.

(b)      *Delivery to Holders of Allowed Secured Claims.*  All distributions of New Secured Notes on account of the Secured Claims shall be made to the Holder of the respective Allowed Secured Claim following compliance with the requirements set forth in Section 6.5.

(c)      *Undeliverable Distributions.*

If any distribution or notice provided in connection with the Chapter 11 Cases to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or otherwise is unclaimed, the Disbursing Agent shall make no further distribution to such Holder unless and until the Disbursing Agent is notified in writing of the Holder's then current address.  On or as soon as practicable after the date on which a previously undeliverable or unclaimed distribution becomes deliverable and claimed, the Disbursing Agent shall make such distribution without interest thereon.  Any Holder of an Allowed Claim that fails to assert a Claim hereunder for an undeliverable or unclaimed distribution within one year after the Effective Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall forever be barred and enjoined from asserting such Claim against any of the Debtors, the Estates, the Reorganized Debtors, or their property.  After the first anniversary of the Effective Date, all property or interests in property not distributed pursuant to this Section 6.3 shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code.  Such property or interests in property shall be returned by the Disbursing Agent to the Reorganized Debtors, and the Claim of any other Holder to such property or interests in property shall be discharged and forever be barred.  Nothing contained herein shall require or be construed to require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

Section 6.4.     *Setoff.*

The Reorganized Debtors shall be permitted, but not required, to set off any claims of any nature whatsoever the Debtors have against the Holder of a Claim (other than any Claim of

50

MDFA Trustee or the MDFA Bondholders, MHEFA Trustee or the MHEFA Bondholders, or PBGC) against such Claim or the distributions to be made hereunder on account of such Claim; *provided*, *however*, that neither the failure to exercise such setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim the Reorganized Debtors may have against such Holder.

Section 6.5.    *Surrender of Cancelled Notes, Instruments, or Securities*.

(a)    Any Holder of any Claim evidenced by the instruments, securities, or other documentation cancelled under Section 4.4 shall surrender such applicable instruments, securities, or other documentation to the Reorganized Debtors in accordance with written instructions, which may be waived in writing by the Debtors or the Reorganized Debtors, to be provided to such Holder by the Reorganized Debtors.

(b)    In the Reorganized Debtors' discretion, any distribution required to be made hereunder on account of any Claim shall be treated as an undeliverable distribution under Section 6.3(c) pending the satisfaction of the terms of this Section 6.5.

(c)    Subject to Section 6.6, any Holder of any Claim evidenced by the instruments, securities, or other documentation cancelled under Section 4.4 that fails to surrender such applicable instruments, securities, or other documentation in accordance with Section 6.5(a) within one year after the Effective Date shall have such Claim, and the distribution on account of such Claim, discharged and shall forever be barred from asserting such Claim against any of the Reorganized Debtors or their respective property.  Such distributions shall be treated as unclaimed property as provided in Section 6.3(c).

Section 6.6.    *Lost, Stolen, Mutilated, or Destroyed Documentation*.

In addition to any requirements under any applicable agreement, any Holder of a Claim evidenced by instruments, securities, or other documentation cancelled under Section 4.4 and required to be surrendered under Section 6.5(a) that have been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such instruments, securities, or other documentation, (a) deliver evidence of such loss, theft, mutilation, or destruction that is reasonably satisfactory to the Reorganized Debtors and (b) deliver to the Reorganized Debtors such security or indemnity as may be required by the Reorganized Debtors to hold the Reorganized Debtors harmless from any damages, liabilities, or costs incurred in treating such Entity as the Holder of such Allowed Claim.  Such Holder shall, upon compliance with this ARTICLE VI, be deemed to have surrendered such instruments, securities, or other documentation for all purposes hereunder.

Section 6.7.    *Fractional and Minimum Distributions*.

Notwithstanding anything contained herein to the contrary, no fractional dollars of Cash shall be distributed.  For purposes of distribution hereunder, fractional dollars shall be rounded to the nearest whole unit (with any amount less than one-half dollar to be rounded down).

Notwithstanding any other provision of this Plan, the Disbursing Agent shall have no obligation to make any distribution under this Plan with a value of less than $50.

51

Section 6.8.    *Manner of Payment Under Plan of Reorganization.*

The Disbursing Agent shall be authorized, in its discretion, to make any Cash payment required to be made hereunder by check or wire transfer.

Section 6.9.    *Withholding and Reporting Requirements.*

The Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority in connection with the Plan and all instruments issued in connection therewith and distributions thereon. All distributions under the Plan shall be subject to any such withholding or reporting requirements.

Section 6.10.   *ACA Commutation Distributions.*

All checks issued with respect to the Commutation Consideration shall be issued by ACA and not by the Obligated Group and shall bear a notice indicating that endorsement or deposit of such check shall constitute a voluntary release, quitclaim, and waiver of any and all claims that such bondholder may have against ACA under, pursuant to, or in connection with, the ACA Insurance Policy.

## ARTICLE VII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

Section 7.1.    *Prosecution of Objections to Claims.*

(a)    *Reorganized Debtors.*

Except as provided in Section 7.1(b), on and after the Confirmation Date, each Reorganized Debtor may, without approval of the Bankruptcy Court, (a) file, settle, compromise, withdraw, or litigate to judgment objections to Claims (other than Claims previously Allowed, including Claims Allowed herein) with respect to its Estate and (b) settle or compromise any Disputed Claim with respect to its Estate.  Any objections to Claims must be filed by the Claims Objection Deadline.

(b)    *Post-Effective Trust.*

As provided in (a) and Section 4.10 (and except as otherwise provided in Section 4.10 or Section 4.19), on and after the Confirmation Date, the Post-Effective Trustee, on behalf of each Post-Effective Trust Account, (a) shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment objections to PET Claims against the respective Estate (other than such Claims previously Allowed, including PET Claims Allowed herein) and, with respect to the VNA Post-Effective Trust Account, the VNA Hoosac Bank Secured Claim, and (b) may settle or compromise any such Disputed Claim without approval of the Bankruptcy Court.  All Claim objections of the Post-Effective Trustee must be filed by the Claims Objection Deadline.

Section 7.2.    *Estimation of Claims*.

The Reorganized Debtors or the Post-Effective Trustee, as the case may be, shall be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors (or the Reorganized Debtors, as the case may be) previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors (or the Reorganized Debtors or the Post-Effective Trustee, as the case may be) may pursue any supplemental proceedings to object to the allowance of such Claim.  All the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

Section 7.3.    *Payments and Distributions on Disputed Claims*.

Notwithstanding any other provision to the contrary herein, no payments or distributions shall be made hereunder with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, or determined by Final Order and such Disputed Claim has become an Allowed Claim.  Moreover, except as otherwise provided in the Plan, no interest shall accrue or be Allowed on any Claim during the period after the Petition Date.

Section 7.4.    *Debtors' Rights and Defenses Preserved*.

Except as expressly provided in any order entered in the Chapter 11 Cases, nothing, including, but not limited to, the failure of the Debtors, the Reorganized Debtors, or the Post-Effective Trustee to object to a Claim for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors, the Reorganized Debtors, or the Post-Effective Trustee with respect to any Claim, including, but not limited to, all rights of the Debtors, the Reorganized Debtors, or the Post-Effective Trustee to contest or defend themselves against such Claims in any lawful manner or forum when and if such Claim is sought to be enforced by the Holder thereof.

Section 7.5.    *Disputed Claims Reserves.*

(a)      *Deposit of Post-Effective Trust Interests on the Effective Date.*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Post-Effective Trustee shall deposit (which deposit shall be reflected solely through book entries) from each Post-Effective Trust Account into the respective Disputed Claims Reserve for such Post-Effective Trust Account the Post-Effective Trust Interests that would have been distributed to the Holders of the respective Disputed PET Claims if such Claims had been Allowed PET Claims on the Effective Date, to ensure that the Holders of Allowed PET Claims receive the same percentage recovery from the Post-Effective Trust on account of their individual Claims at all times.  The amount of Post-Effective Trust Interests to be deposited into each Disputed Claims Reserve for each Disputed PET Claim will be determined based on the least of (a) the asserted amount of the Disputed PET Claim filed with the Bankruptcy Court or (if no proof of such Claim was filed) scheduled by the Debtors, (b) the amount, if any, of the Disputed PET Claim estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, and (c) the amount otherwise agreed to by the Debtors and the Holder of such Disputed PET Claim.

(b)      *Distributions of Post-Effective Trust Interests after Allowance.*

When a Disputed PET Claim becomes an Allowed PET Claim, the Post-Effective Trustee shall distribute (solely through book entries) to the Holder the amount of Post-Effective Trust Interests from the respective Disputed Claims Reserve that the Holder would have received on account of such Claim if the Claim had been an Allowed PET Claim on the Effective Date, no later than the fifth Business Day after the end of the calendar month in which such Disputed PET Claim becomes an Allowed PET Claim.

(c)      *Distributions of Post-Effective Trust Interests after Disallowance.*

If a Disputed PET Claim is Disallowed, in whole or in part, the Post-Effective Trustee shall distribute the Post-Effective Trust Interests (solely through book entries) reserved in respect of the Disallowed amount of the Disputed PET Claim from the respective Disputed Claims Reserve to the holders of the other Post-Effective Trust Interests (including the Disputed Claims Reserve, as applicable) in such Post-Effective Trust Account on a quarterly basis (and in no event later than the fifth Business Day after the end of each calendar quarter) and in a manner designed to ensure that the Holders of Allowed PET Claims receive the same Pro-Rata Share of beneficial interests in the Post-Effective Trust Account.  Notwithstanding anything to the contrary in this Section 7.5(c), to the extent that Post-Effective Trust Interests have been transferred in compliance with the Post-Effective Trust Agreement and this Plan, distributions to be made pursuant to this Section 7.5(c) shall be made to the current holder of such Post-Effective Trust Interests.

29105896_1

## ARTICLE VIII

## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

Section 8.1.    *Conditions Precedent to Confirmation.*

The Confirmation Order shall not be entered unless and until such Confirmation Order is in form and substance satisfactory to the Debtors.

Section 8.2.    *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless and until each of the following conditions has occurred or has been waived by the Debtors in accordance with the terms herein:

(a)    the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate;

(b)    the Confirmation Order shall have been entered on the docket for the Chapter 11 Cases and no stay of the Confirmation Order shall be in effect;

(c)    the New Notes and all other documents and agreements necessary to implement the terms of the Plan as determined by the Debtors shall have been executed;

(d)    PBGC shall have terminated the North Adams Regional Hospital Retirement Income Plan pursuant to 29 U.S.C. § 1341;

(e)    NBR shall have consummated a sale of the Doctors Building to NARH;

(f)    all authorizations, consents, and approvals determined by the Debtors to be necessary to implement the terms of the Plan shall have been obtained;

(g)    the Creditors' Committee shall have appointed the Post-Effective Trustee, and the Post-Effective Trust Agreement shall have been executed;

(h)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full;

(i)    the New Indenture, New Loan Agreement, New Mortgage, and New Security Agreement shall have been executed and the New Bonds shall have been issued; and

(j)    all other actions necessary to implement the terms of the Plan shall have been taken.

Section 8.3.    *Waiver of Conditions.*

Any condition set forth in this ARTICLE VIII (other than the condition set forth in Section 8.2(a) and Section 8.2(b)(i)) may be waived, in whole or in part, at any time by the Debtors without notice and without leave or order of the Bankruptcy Court.

Section 8.4.    *Modification of Plan*.

The Debtors may amend, supplement, or modify the Plan at any time, subject to the restrictions and requirements of section 1127 of the Bankruptcy Code, and except to the extent such amendment, supplement, or modification affects a party's right of consent hereunder and such consent has not been previously obtained.  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

Section 8.5.    *Effect of Withdrawal or Revocation*.

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.  If the Plan is so revoked or withdrawn, or if the Effective Date fails to occur, (a) the Confirmation Order, automatically and without further order of the Bankruptcy Court, shall be, and shall be deemed, vacated, null and void, with no force or legal effect whatsoever; (b) no distributions under the Plan shall be made; (c) all Assets shall remain vested in the Debtors' Estates; (d) the Debtors and all Holders of Claims shall be restored to the status quo ante as of the Day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (e) the Debtors' obligations with respect to the Claims shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other Person or Entity or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

Section 8.6.    *Reservation of Rights*.

The Plan shall have no force or effect unless and until the Confirmation Order is entered.  Prior to the Effective Date, none of the Filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or any other matter.

Section 8.7.    *Substantial Consummation of Plan*.

Substantial consummation of the Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

## ARTICLE IX

## EFFECT OF PLAN CONFIRMATION

Section 9.1.    *Binding Effect*.

The provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, the Post-Effective Trustee, the Post-Effective Trust, the Disbursing Agent, any Holder of any Claim treated herein or any Person named or referred to in the Plan, and each of their respective heirs, executors, administrators, representatives, predecessors, successors,

56

assigns, agents, officers, trustees, and directors, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

Section 9.2.   *Discharge of Claims.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims and causes of action of any nature whatsoever arising on or before the Effective Date, including any interest accrued on such Claims from and after the Petition Date, whether known or unknown, against the Debtors and liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties arising before the Effective Date, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, in each case whether or not:  (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim has accepted the Plan.  Any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims arising before the Effective Date, subject to the Effective Date occurring.

Section 9.3.   **_Releases._**

(a)   **_Releases by the Debtors_**.  **For good and valuable consideration, the adequacy of which is hereby confirmed, upon the Effective Date, the Debtors shall be deemed forever to release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities (other than any rights to enforce the terms of the Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act, omission, transaction, event, cause, matter, or thing taking place on or before the Effective Date against (i) the ACA Parties, if the MDFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, (ii) the Nuveen Parties, if the MHEFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, (iii) MDFA Trustee, if the MDFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, unless MDFA Trustee has filed an objection to the Plan, (iv) MHEFA Trustee, if the MHEFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, unless MHEFA Trustee has filed an objection to the Plan, and (v) the Master Trustee, if both the MDFA Bondholders and the MHEFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, unless the Master Trustee has filed an objection to the Plan.**

57

(b)      **_Releases by ACA, Nuveen, MDFA Trustee, MHEFA Trustee, and the Master Trustee_**. **For good and valuable consideration, the adequacy of which is hereby confirmed, upon the Effective Date, ACA, Nuveen, MDFA Trustee, MHEFA Trustee, and the Master Trustee (each respectively only if it is eligible to receive a release pursuant to Section 9.3(a)) shall be deemed forever to release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities (other than any rights to enforce the terms of the Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act, omission, transaction, event, cause, matter, or thing taking place on or before the Effective Date against the Debtor Parties.**

Section 9.4.      **_Exculpation and Limitation of Liability_**.

**None of the Debtor Parties, the ACA Parties, the Nuveen Parties, or the Reorganized Debtors shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim, or any other party in interest in the Chapter 11 Cases, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the administration of the Plan, or the property to be distributed under the Plan, except for their gross negligence, willful misconduct, or bad faith as determined by a Final Order entered by a court of competent jurisdiction.**

Section 9.5.      **_Injunction_**.

(a)      **_General_**. **All Entities who have held, hold, or may hold Claims arising on or before the Effective Date and all other parties in interest in the Chapter 11 Cases, along with their respective current and former employees, agents, officers, trustees, principals, and affiliates, permanently are enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, or (iv) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, on account of such Claims; _provided, however_, that nothing contained herein shall preclude such Entities from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan.**

(b)         ***Injunction Against Interference with Plan*.  Upon entry of the Confirmation Order, all Holders of Claims and their respective current and former employees, agents, officers, trustees, principals, and affiliates shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan.  Each Holder of an Allowed Claim, by accepting distributions pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Section 9.5.**

Section 9.6.      *Term of Bankruptcy Injunction or Stays*.

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence as of the Confirmation Date, shall remain in full force and effect until the Effective Date, except for any injunction or stay of the Holder of the VNA Hoosac Bank Secured Claim, which shall remain in full force and effect until the sale of the VNA Building Real Property pursuant to Section 4.15 is consummated.

Section 9.7.      *Termination of Subordination Rights and Settlement of Related Claims*.

The classification and manner of satisfying all Claims under the Plan take into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, sections 510(b) or 510(c) of the Bankruptcy Code, or otherwise.  All subordination rights that a Holder of a Claim may have with respect to any distribution to be made under the Plan shall be discharged and terminated and all actions related to the enforcement of such subordination rights shall be permanently enjoined.  Accordingly, distributions under the Plan to Holders of Allowed Claims will not be subject to payment of a beneficiary of such terminated subordination rights or to levy, garnishment, attachment, or other legal process by a beneficiary of such terminated subordination rights.

Section 9.8.      *Preservation of Rights of Action*.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and have the exclusive right to enforce, after the Effective Date, any claims, rights, and Causes of Action that the Debtors or the Estates may hold against any Entity (except as otherwise provided in Section 9.3 or, with respect to certain Avoidance Actions, (a)), including all Causes of Action against any Entity on account of indebtedness and any other Causes of Action in favor of the Reorganized Debtors or their Estates.  The Reorganized Debtors shall be permitted to pursue such retained claims, rights, or Causes of Action in accordance with the best interests of the Reorganized Debtors.

# ARTICLE X

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order, and the Chapter 11 Cases to the fullest extent permitted by law, including jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of (i) any request for payment of any Administrative Claim, (ii) any and all objections to the allowance or priority of Claims, including, without limitation, any objections to claims brought by the Debtors, the Reorganized Debtors, or the Post-Effective Trustee, and (iii) any other actions taken by the Reorganized Debtors or the Post-Effective Trustee in accordance with their authority under the Plan;

(b)     grant or deny any application for allowance of compensation or reimbursement of expenses authorized pursuant to the Plan or the Bankruptcy Code under sections 330, 331, 503(b), 1103, and 1129(a)(9) of the Bankruptcy Code and resolve any dispute under Section 2.4;

(c)     resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which any Debtor or Reorganized Debtor may be liable, and hear, determine, and, if necessary, liquidate, any Claims arising therefrom;

(d)     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)     decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date, including any motions, adversary proceedings, contested or litigated matters, and any other matters brought by the Reorganized Debtors in accordance with their authority under the Plan;

(f)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Confirmation Order;

(g)     resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)     modify the Confirmation Order, the Plan (before or after the Effective Date under section 1127 of the Bankruptcy Code), or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect

29105896_1

or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, the Confirmation Order, any Bankruptcy Court order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(i)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan or the Confirmation Order;

(j)      hear and determine any rights, claims, or Causes of Action held or reserved by, or accruing to, the Debtors, the Reorganized Debtors, or the Post-Effective Trustee pursuant to the Bankruptcy Code, the Plan, the Confirmation Order, or, in the case of the Debtors, any other applicable law;

(k)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases, including all such orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings set forth in the Plan or the Confirmation Order;

(l)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(m)      determine any other matters that may arise in connection with or that relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Confirmation Order;

(n)      enter the Final Decree;

(o)      hear and resolve all matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(p)      hear and resolve all matters involving the nature, existence, or scope of the Debtors' discharge;

(q)      hear and resolve all matters related to the property of the Estates from and after the Confirmation Date;

(r)      hear and resolve all matters related to the Post-Effective Trust's operations; and

(s)      hear and resolve such other matters as may be provided in the Confirmation Order or as may be authorized by the Bankruptcy Code.

# ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1.   *Payment of Statutory Fees.*

All fees payable under section 1930 of title 28 of the United States Code shall be paid on or before the Effective Date.

Section 11.2.   *Governing Law.*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, or any other federal law, rule, or regulation is applicable, or to the extent that an exhibit or supplement to the Plan provides otherwise, the Plan shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.

Section 11.3.   *Severability of Terms or Provisions.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to render the term or provision valid or enforceable, to the maximum extent practicable and consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable.  Such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Section 11.4.   *Severability of Debtors.*

Prior to the entry of the Confirmation Order, the Debtors, in their sole discretion, may elect to proceed with confirmation of the Plan solely with respect to certain Debtors and to exclude the application of this Plan to any other Debtor or Debtors.  In such event, the Plan shall automatically be altered, and the Bankruptcy Court shall interpret all terms and provisions of the Plan, so as to exclude the application of the Plan to such excluded Debtor or Debtors. Notwithstanding any such alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect with respect to the remaining Debtors and shall in no way be affected, impaired, or invalidated by such alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms with respect to the remaining Debtors.

62

Section 11.5.   *Inconsistency*.

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, any exhibit or schedule to the Plan, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

Section 11.6.   *Filing of Additional Documents*.

The Debtors (or the Reorganized Debtors, as the case may be) shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Section 11.7.   *Service of Documents*.

All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> Northern Berkshire Healthcare, Inc.
> 71 Hospital Avenue
> North Adams, Massachusetts 01247
> Attn: Christopher L. Hickey
>
> with copies to:
>
> Ropes & Gray LLP
> Prudential Tower
> 800 Boylston Street
> Boston, Massachusetts 02199-3600
> Attn: Steven T. Hoort
> Attn: James A. Wright III

Section 11.8.   *Section 1125(e) of the Bankruptcy Code*.

As of the Confirmation Date, (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective affiliates, agents, trustees, officers, employees, advisors, and attorneys that have participated in the offer and issuance of any securities under the Plan shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and therefore are not, and shall not be, liable on account of such offer, issuance, or solicitation at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of any securities under the Plan.  The Debtors and each of their respective affiliates, agents, trustees, officers, employees, advisors, and attorneys shall bear

63

no obligation or liability with respect to the ACA Insurance Commutation or any solicitation thereunder.

Section 11.9.  *Exemption from Certain Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, no stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax, or other similar tax shall result from, or be levied on account of, (a) issuing, transferring, or exchanging notes, (b) creating any mortgage, deed of trust, lien, pledge, or other security interest, (c) making or assigning any lease or sublease, or (d) making or delivering any deed or other instrument of transfer, under, in furtherance of, or in connection with, the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or transfers of tangible property.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned or leased property that close on or after the Confirmation Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

Section 11.10. *Tax Reporting and Compliance*.

The Reorganized Debtors may request expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for or on behalf of the Debtors for any and all taxable periods ending after the Petition Date through and including the Effective Date.  All distributions pursuant to the Plan shall be subject to all tax withholding and reporting requirements imposed on the Debtors by applicable law.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent may take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, or other spousal awards, liens, and encumbrances.

Section 11.11. *Schedules and Exhibits*.

Other than for purposes of Section 11.5, all exhibits and schedules to the Plan, including the Plan Supplement, but excluding any materials related to the ACA Insurance Commutation, are incorporated into and are a part of the Plan as if fully set forth herein.

Section 11.12. *No Prejudice*.

If the Confirmation Order is vacated, then (a) the Plan shall be null and void in all respects, (b) no distributions under the Plan shall be made, (c) the Debtors and all Holders of Claims shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date, and (d) nothing contained in the Plan or the Disclosure Statement shall (i) be deemed to constitute a waiver or release of (x) any Claims by any creditor or (y) any Claims against the Debtors, (ii) prejudice in any manner the rights of the Debtors, or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors in any respect.

29105896_1

Section 11.13. *Allocation of Payments*.

To the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of such Claim first and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest.

Section 11.14. *Dissolution of Statutory Committees.*

All Statutory Committees appointed in the Chapter 11 Cases, if any, shall be dissolved on the Confirmation Date.

29105896_1

Dated: January 5, 2012

Respectfully Submitted,

NORTHERN BERKSHIRE HEALTHCARE, INC.

_____

Christopher L. Hickey
Chief Financial Officer

NORTH ADAMS REGIONAL HOSPITAL, INC.

_____

Christopher L. Hickey
Chief Financial Officer

VISITING NURSE ASSOCIATION & HOSPICE
OF NORTHERN BERKSHIRE, INC.

_____

Christopher L. Hickey
Chief Financial Officer

NORTHERN BERKSHIRE HEALTHCARE
PHYSICIANS GROUP, INC.

_____

Christopher L. Hickey
Chief Financial Officer

29105896_1