**THIS DISCLOSURE STATEMENT IS SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT AND IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## WESTERN DIVISION

```
-----------------------------------------------------------------x
                                       :
In re                                  :
                                       :        Chapter 11
NORTHERN BERKSHIRE                      :
HEALTHCARE, INC., et al.,¹             :        Case No. 11 – 31114 (HJB)
                                       :
                   Debtors.            :        (Jointly Administered)
                                       :
-----------------------------------------------------------------x
```

**MODIFIED SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO MODIFIED SECOND AMENDED PLAN OF REORGANIZATION OF NORTHERN BERKSHIRE HEALTHCARE, INC., NORTH ADAMS REGIONAL HOSPITAL, INC., VISITING NURSE ASSOCIATION & HOSPICE OF NORTHERN BERKSHIRE, INC., AND NORTHERN BERKSHIRE HEALTHCARE PHYSICIANS GROUP, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Attn: Steven T. Hoort
Attn: James A. Wright III
Attn: Jonathan B. Lackow
Attn: Matthew F. Burrows

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

Dated:   January 5, 2012

---

[1] The Debtors in these cases are Northern Berkshire Healthcare, Inc., North Adams Regional Hospital, Inc., Visiting Nurse Association & Hospice of Northern Berkshire, Inc., Northern Berkshire Realty, Inc., and Northern Berkshire Healthcare Physicians Group, Inc.

# TABLE OF CONTENTS

GENERAL BACKGROUND .................................................................................................. 1

SUMMARY OF THE PLAN ................................................................................................ 5

I.   VOTING PROCEDURES AND REQUIREMENTS .................................................... 12

    A.   *Ballots* .................................................................................................................... 12

    B.   *Procedures for Casting Votes and Deadlines for Voting on the Plan* .................... 12

    C.   *Parties Entitled to Vote on the Plan* ...................................................................... 13

    D.   *Counting of Ballots for Determining Acceptance of the Plan* ............................... 13

II.   RISK FACTORS ........................................................................................................ 13

    A.   *Risks Relating to the Chapter 11 Cases* ................................................................ 13

        1.   *General* ....................................................................................................... 13

        2.   *Classification and Treatment of Claims* .................................................... 13

        3.   *Certain Risks of Nonconfirmation or Delay of Confirmation* ................... 14

        4.   *Alternatives to Confirmation and Consummation of the Plan* ................... 14

        5.   *Risk of Nonoccurrence of the Effective Date* ............................................ 15

        6.   *Inability to Assume Certain Contracts* ...................................................... 15

    B.   *Factors Affecting the Value of the Consideration  to Be Issued Under the Plan of Reorganization* 15

        1.   *Capital Requirements* ................................................................................. 15

        2.   *Variances From Expected Performance* ..................................................... 15

        3.   *Recovery Percentages May Differ From Estimates* .................................... 15

        4.   *Uncertainty of Tax Exemption* ................................................................... 15

        5.   *Payments to Trustees* .................................................................................. 16

    C.   *Risks Relating to our Operations* .......................................................................... 16

        1.   *Leverage and Debt Service* ........................................................................ 16

        2.   *Treatment of Trade Vendors and Other Unsecured Claims in the Chapter 11 Cases* ........... 17

        3.   *Competition* ................................................................................................ 17

        4.   *Disruption of Operations and Retention of Patients and Employees* ......... 17

        5.   *Defined Benefit Pension Plan* .................................................................... 17

        6.   *Berkshire Health Systems* .......................................................................... 18

        7.   *Dependence on Individuals, Third-Party Payers, and Other Health Care Organizations* .... 19

        8.   *Healthcare Reform* ..................................................................................... 19

        9.   *Litigation* .................................................................................................... 19

        10.   *Medical Malpractice Liability* .................................................................... 19

        11.   *Acquisitions, Sales, and Other Major Transactions* .................................. 19

        12.   *Facilities* ..................................................................................................... 20

        13.   *Environmental and Health and Safety Liabilities and Requirements* ......... 20

| III. | | BACKGROUND AND EVENTS LEADING UP TO THE CHAPTER 11 CASES | 20 |
|---|---|---|---|
| | A. | Background | 20 |
| | B. | Events Leading to Financial Distress | 21 |
| | C. | Outstanding Indebtedness | 22 |
| IV. | | OPERATIONS | 22 |
| | A. | General | 22 |
| | B. | Employees | 23 |
| | C. | Corporate History | 23 |
| | D. | Services | 23 |
| | E. | Facilities | 24 |
| | F. | Recent and Future Strategy | 24 |
| | G. | Environmental, Health, and Safety Matters | 24 |
| | H. | Pension Plan | 24 |
| | I. | Executive Officers | 25 |
| V. | | THE PLAN – OVERVIEW OF PROPOSED CREDITOR TREATMENT | 25 |
| | A. | MDFA and MHEFA Bondholders | 25 |
| | B. | General Unsecured Creditors | 28 |
| | C. | Pension Benefit Guaranty Corporation | 29 |
| VI. | | THE PLAN – CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION | 29 |
| | A. | Overview of Chapter 11 | 29 |
| | B. | Administrative Claims, Priority Tax Claims, and Other Unclassified Claims | 30 |
| | | 1. Administrative Claims | 30 |
| | | 2. Priority Tax Claims | 30 |
| | | 3. Professional Fees | 30 |
| | C. | Classification of Claims | 31 |
| | D. | Treatment and Voting Rights of Claims | 33 |
| | | 1. Treatment of Claims | 33 |
| | | 2. Voting Rights of Claims | 37 |
| | | 3. No Effect on Claims Against Northern Berkshire Realty, Inc. | 37 |
| | | 4. Confirmation Pursuant to 1129(b) of the Bankruptcy Code | 37 |
| | E. | Means of Implementation of Plan | 37 |
| | | 1. Compromise of Controversies; Waiver of Intercompany Claims. | 37 |
| | | 2. Vesting and Distribution of Assets | 38 |
| | | 3. Continued Corporate Existence | 38 |
| | | 4. Cancellation of Notes and Instruments | 39 |
| | | 5. Cancellation of Liens | 40 |

6. *New Constituent Documents* ........................................................ 40

7. *New Officers* ........................................................................... 40

8. *Trustees of the Reorganized Debtors* ......................................... 41

9. *Corporate Action* ..................................................................... 41

10. *Post-Effective Trust* ................................................................. 41

11. *ECF Notes* ............................................................................... 43

12. *1111(b) Elections* .................................................................... 44

13. *Establishment of Administrative Bar Date* ................................ 46

14. *Disposition of VNA Real Estate* ................................................ 46

15. *Insurance Mitigation* ............................................................... 46

16. *New Bond Documents; Tax-Exempt Notes; New Note Covenants* ....... 47

17. *Restriction on Affiliation* .......................................................... 47

18. *Treatment of Claims of PBGC* ................................................... 49

19. *Search Committee* .................................................................... 49

VII. DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS, AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN ........................................... 50

A. *Description of the New Notes and New Articles of Organization* .......... 50

    1. *Description of the New Notes* ................................................. 50

    2. *Description of the New Articles of Organization* ....................... 50

B. *Description of Post-Effective Trust Agreement* ............................... 50

VIII. VALUATION ANALYSIS ......................................................................... 50

A. *Valuation* ................................................................................ 50

B. *Financial Projections* ............................................................... 52

IX. LIQUIDATION ANALYSIS ....................................................................... 52

X. THE PLAN – OTHER PROVISIONS ........................................................... 54

A. *Treatment of Executory Contracts and Unexpired Leases* ................. 54

    1. *Assumption of Executory Contracts and Unexpired Leases* ............. 54

    2. *Claims Based on Rejection of Executory Contracts or Unexpired Leases* ....... 55

    3. *Insurance Policies* ................................................................ 55

    4. *Modifications, Amendments, Supplements, Restatements, or Other Agreements* ....... 55

B. *Provisions Governing Distributions* .............................................. 55

    1. *Date of Distributions; Distribution Record Date* ........................ 55

    2. *Disbursing Agent* .................................................................. 56

    3. *Delivery of Distributions and Undeliverable or Unclaimed Distributions* ....... 56

    4. *Setoff* .................................................................................. 56

    5. *Surrender of Cancelled Notes, Instruments, or Securities* ................ 57

6.    *Lost, Stolen, Mutilated, or Destroyed Documentation* ........................................ 57

7.    *Fractional and Minimum Distributions* ............................................................. 57

8.    *Manner of Payment Under Plan of Reorganization* ........................................... 57

9.    *Withholding and Reporting Requirements.* ........................................................ 57

10.   *ACA Commutation Distributions* ...................................................................... 57

C.    *Procedures for Resolving Disputed Claims* ................................................................. 58

1.    *Prosecution of Objections to Claims.* ................................................................ 58

2.    *Estimation of Claims.* ........................................................................................ 58

3.    *Payments and Distributions on Disputed Claims.* .............................................. 58

4.    *Debtors' Rights and Defenses Preserved* ........................................................... 58

5.    *Disputed Claims Reserves* ................................................................................. 59

D.    *Conditions Precedent to Confirmation and Effective Date* ........................................... 59

1.    *Conditions Precedent to Confirmation* ............................................................. 59

2.    *Conditions Precedent to the Effective Date* ...................................................... 59

3.    *Waiver of Conditions* ........................................................................................ 60

4.    *Modification of Plan* ......................................................................................... 60

5.    *Effect of Withdrawal or Revocation* .................................................................. 60

6.    *Reservation of Rights* ........................................................................................ 60

7.    *Substantial Consummation of Plan* ................................................................... 61

E.    *Effect of Plan Confirmation* ....................................................................................... 61

1.    *Binding Effect* ................................................................................................... 61

2.    *Discharge of Claims* .......................................................................................... 61

3.    ***Releases*** ......................................................................................................... 61

4.    ***Exculpation and Limitation of Liability*** ...................................................... 62

5.    ***Injunction*** ...................................................................................................... 62

6.    *Term of Bankruptcy Injunction or Stays* ........................................................... 63

7.    *Termination of Subordination Rights and Settlement of Related Claims* ............ 63

8.    *Preservation of Rights of Action.* ...................................................................... 63

F.    *Retention of Jurisdiction* ............................................................................................ 63

G.    *Miscellaneous Provisions* ........................................................................................... 65

1.    *Payment of Statutory Fees* ................................................................................ 65

2.    *Governing Law* ................................................................................................. 65

3.    *Severability of Terms or Provisions* .................................................................. 65

4.    *Severability of Debtors* ..................................................................................... 65

5.    *Inconsistency* .................................................................................................... 66

6.    *Filing of Additional Documents* ........................................................................ 66

7.    *Service of Documents* ....................................................................................... 66

iv

|  | 8. | *Section 1125(e) of the Bankruptcy Code* ............................................................ 66 |
|  | 9. | *Exemption from Certain Transfer Taxes* ........................................................... 66 |
|  | 10. | *Tax Reporting and Compliance* ....................................................................... 67 |
|  | 11. | *Schedules and Exhibits* ..................................................................................... 67 |
|  | 12. | *No Prejudice* ...................................................................................................... 67 |
|  | 13. | *Allocation of Payments* ..................................................................................... 67 |
|  | 14. | *Dissolution of Statutory Committees.* ............................................................... 67 |

XI. RESOLUTION OF DISPUTES ............................................................................................... 67

    A. *Employee Claims, Including Claims Under MNA and SEIU Collective Bargaining Agreements* .... 67

    B. *Payments to Capital Lessors* ....................................................................................... 68

XII. EVENTS DURING BANKRUPTCY ...................................................................................... 69

    A. *Early Relief* ................................................................................................................... 69

    B. *Protection of Patient Information* ................................................................................ 69

    C. *Retention of Professionals* ........................................................................................... 69

    D. *Bar Date* ....................................................................................................................... 69

    E. *Berkshire Health Systems Contract* ............................................................................ 69

    F. *Pension Plan Termination Approved* ........................................................................... 70

XIII. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS ................................................ 70

    A. *Federal Income Tax Consequences to Bondholders Receiving New Bonds in Exchange for MDFA Bonds and MHEFA Bonds* ..................................................................................... 71

    B. *Federal Income Tax Consequences to Holders Receiving Post-Effective Trust Interests* ............... 72

    C. *Taxable or Tax-Exempt Interest* .................................................................................. 72

    D. *Withholding and Reporting* ......................................................................................... 72

XIV. CONFIRMATION .................................................................................................................. 73

    A. *Confirmation Hearing* ................................................................................................. 73

    B. *Requirements for Confirmation* ................................................................................... 73

    C. *Class Acceptance of the Plan* ...................................................................................... 73

    D. *Cram Down* .................................................................................................................. 74

    E. *Plan Meets Requirements for Confirmation* ............................................................... 74

        1. *Best Interests of Creditors—Liquidation Analysis* ......................................... 74

        2. *Feasibility of the Plan* ..................................................................................... 75

    F. *Alternatives to Confirmation and Consummation of the Plan* ..................................... 75

        1. *Alternative Plans of Reorganization* ............................................................... 75

        2. *Dismissal of the Debtors' Chapter 11 Cases* ................................................... 75

        3. *Liquidation Under Chapter 7 or Chapter 11* ................................................... 75

v

RECOMMENDATION AND CONCLUSION.................................................................................................. 76

ANNEXES

      I.      Definitions

EXHIBITS

      A.      Plan of Reorganization
      B.      Projections
      C.      CMAG Liquidation Analysis
      D.      Commutation Discussion

## GENERAL BACKGROUND

This Disclosure Statement provides information regarding the Plan that the Debtors seek to have confirmed by the Bankruptcy Court. The confirmation of the Plan is subject to, among other things, judicial approval of this Disclosure Statement and the Plan. If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all the Debtors' creditors will be bound by the Plan and the transactions contemplated thereby.

We believe that confirmation of the Plan is in the best interests of creditors and other parties in interest, and, therefore, that the Plan should be confirmed**. The Debtors recommend that all eligible parties vote to accept the Plan.**

This Disclosure Statement and the Plan (and all exhibits, schedules, and appendices hereto and thereto) and the related materials delivered together herewith are being furnished to Holders of Impaired Claims pursuant to section 1145 of the Bankruptcy Code. Our trustees, officers, and employees may solicit votes from the Holders of Impaired Claims, but will not receive any additional compensation for such solicitations.

**The Voting Agent for the Plan is:**

**GCG, Inc.**
**5151 Blazer Parkway, Suite A**
**Dublin, OH 43017**

Our legal advisor is Ropes & Gray LLP. Ropes & Gray LLP can be contacted at:

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Attn: Steven T. Hoort
Attn: James A. Wright III

**THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE NEW NOTES TO BE ISSUED ON THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SEC OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**AS A RESULT OF THESE FACTORS AND THE TRANSFER RESTRICTIONS DESCRIBED HEREIN, THERE LIKELY WILL NOT BE ANY LIQUID MARKET FOR THE NEW NOTES AND THE POST-EFFECTIVE TRUST INTERESTS TO BE ISSUED UNDER THE PLAN, AND THERE CAN BE NO ASSURANCE THAT ANY MARKET WILL EVER DEVELOP. THE REORGANIZED DEBTORS WILL NOT BE OBLIGATED TO COMPLETE ANY PUBLIC OFFERING FOLLOWING THE EFFECTIVE DATE OF THE PLAN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY PARTY DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.**

**EACH HOLDER OF AN IMPAIRED CLAIM SHOULD REVIEW THIS DISCLOSURE STATEMENT AND THE PLAN AND ALL EXHIBITS HERETO AND THERETO BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. WE**

29105905_1

**BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED; HOWEVER, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THOSE DOCUMENTS AND AS OTHERWISE PROVIDED HEREIN.**

**THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE COMPANY AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS.  SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING THOSE SUMMARIZED HEREIN.**

**ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN, OR CONTEMPLATED BY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.  SUCH PROJECTIONS AND STATEMENTS ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE COMPANY AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE COMPANY, OUR ADVISORS, OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED.  THERE CAN BE NO ASSURANCE THAT OUR ACTUAL ABILITY TO COVER OUR FUTURE PRINCIPAL AND CASH INTEREST PAYMENT OBLIGATIONS WILL NOT DIFFER FROM THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

**NEITHER OUR INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION, OR THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY, NOR DO THEY ASSUME ANY RESPONSIBILITY FOR OR CLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION, OR THE LIQUIDATION ANALYSIS.**

**SEE THE SECTION ENTITLED "RISK FACTORS" OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN RISK FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.**

---

All exhibits to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if fully set forth herein.

No person has been authorized to give any information or make any representation on our behalf not contained, or incorporated by reference, in this Disclosure Statement or the Plan and, if given or made, such information or representation must not be relied upon as having been authorized.

The delivery of this Disclosure Statement will not, under any circumstances, create any implication that the information it contains (or incorporates by reference from other documents or reports) is correct as of any time subsequent to the date hereof (or the date of a document or report incorporated by reference), or that there has been no change in the information set forth herein (or in a document or report incorporated by reference) or in our affairs since the date hereof (or thereof).  All statements contained in this Disclosure Statement are made as of the date hereof unless otherwise specified.

29105905_1

**CORPORATE INFORMATION**

Our corporate headquarters are located at 71 Hospital Avenue, North Adams, Massachusetts 01247.  Our web site is www.nbhealth.org.  Information on our web site is not a part of this Disclosure Statement, except to the extent that any such information expressly is incorporated herein.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Disclosure Statement contains statements relating to future results of our operations that are "forward-looking statements" as defined by the SEC in its rules, regulations, and releases. Any statements set forth in this Disclosure Statement with regard to our expectations as to financial results and other aspects of our business may constitute forward-looking statements. These statements relate to our future plans, objectives, expectations, and intentions and may be identified by words like "believe," "expect," "may," "will," "should," "seek," or "anticipate," and similar expressions. We caution readers that any such forward-looking statements are based on assumptions that we believe are reasonable, but are subject to a wide range of risks including, but not limited to, risks associated with, (i) future financial results and liquidity, including our continued ability to operate profitably in the normal course, (ii) various factors that may affect the value of the New Notes, ECF Notes, and the Post-Effective Trust Interests to be issued under the Plan, (iii) our relationship with and payment terms provided by our trade creditors, (iv) additional financing requirements post-restructuring, (v) the results of renegotiating certain key commercial agreements, (vi) future dispositions and acquisitions, (vii) our restructuring and the costs associated therewith, (viii) litigation uncertainties, (ix) the effects of conditions in the healthcare industry on us and our operations, (x) the confirmation and consummation of the Plan, and (xi) each of the other risks identified in Article II. "RISK FACTORS." Due to these uncertainties, we cannot assure you that any forward-looking statements will prove to be correct. We are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, or otherwise; *provided*, *however*, that we may be required to update or otherwise modify the information contained herein to comply with certain provisions of the Bankruptcy Code governing the solicitation of votes for acceptance of the Plan.

There may be events in the future that we are not able to predict accurately or over which we have no control. The risk factors listed in this Disclosure Statement under "Risk Factors," as well as any cautionary language contained in this Disclosure Statement, provide examples of risks, uncertainties, and events that may cause actual results to differ materially from the expectations we describe in our forward-looking statements. Holders of Impaired Claims should be aware that the occurrence of the events described in these risk factors and elsewhere in this Disclosure Statement could have a material adverse effect on our business, operating results, and financial condition.

## SUMMARY OF THE PLAN

This summary does not contain all the information that is important to you and is qualified in its entirety by the more detailed information included elsewhere in this Disclosure Statement and in the accompanying Plan.

| | |
|---|---|
| **Voting Record Date:** | Only Holders of Impaired Claims that are beneficial owners (or their legal representatives or nominees) as of the Voting Record Date, which has been set as [    ], 2012, will be entitled to vote on the Plan. We reserve the right to establish a later Voting Record Date if we decide to extend the Voting Deadline. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS—Procedures for Casting Votes and Deadlines for Voting on the Plan." |
| **Voting Deadline; Extension:** | The Voting Deadline is [        p.m.], Eastern Time, on [        ], 2012. If we extend the Voting Deadline, the term Voting Deadline will mean the latest time and date as to which the Solicitation is extended. Any extension of the Voting Deadline will be followed as promptly as practicable by notice of the extension. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS—Procedures for Casting Votes and Deadlines for Voting on the Plan." |
| **Voting Procedures:** | Ballots will be distributed by mail to the Holders of Impaired Claims entitled to vote on the Plan. Ballots must be completed and returned to the Voting Agent by the Voting Deadline. See Article I. "VOTING PROCEDURES AND REQUIREMENTS." |
| **Revocation or Withdrawal of Ballots:** | Holders of Impaired Claims may not revoke or withdraw their Ballots after the Voting Deadline. Prior to the Voting Deadline, however, Holders of Impaired Claims may withdraw any votes cast even if such votes have been delivered to the Voting Agent. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS—Procedures for Casting Votes and Deadlines for Voting on the Plan." |
| **Voting Agent:** | We have retained GCG, Inc. as our Voting Agent in connection with this Disclosure Statement. Ballots of registered Holders should be directed to GCG, Inc. at the address set forth on page 12 of this Disclosure Statement. See Article I. "VOTING PROCEDURES AND REQUIREMENTS." |
| **The Plan:** | As a general matter, in order for the Plan to become effective and for any distributions to be made thereunder, the Plan must, among other things, be confirmed by the Bankruptcy Court. For the Plan to be confirmed by consent of an Impaired Class, votes to approve the Plan must be received prior to the Voting Deadline from Holders of Impaired Claims that constitute (i) at least two-thirds in amount of the Claims of the Holders in such Impaired Class of Claims who actually cast votes in respect of the Plan and (ii) more than one-half in number of the Holders of such Impaired Class of Claims who actually cast votes with respect to the Plan. See Article XIV.C. "CONFIRMATION—Class Acceptance of the Plan." The Bankruptcy Court may confirm the Plan so long as one Impaired Class of Claims votes to accept the Plan with respect to each Debtor and the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code (as further described under Article XIV.D. "CONFIRMATION—Cram Down"). Except for Class 5 – Other Priority Claims – all Classes of Claims are Impaired under the Plan. Class 5 is Unimpaired, and therefore Holders of Claims in Class 5 are deemed to have accepted and are not entitled to vote on the Plan. See Article I.C. "VOTING PROCEDURES AND REQUIREMENTS—Parties Entitled to Vote on the Plan."<br><br>If the Plan is confirmed by the Bankruptcy Court, the Holders of Allowed Claims related to the MDFA and MHEFA Notes will respectively receive, in full satisfaction and discharge of their Claims, new bonds secured by beneficial interests in the New MDFA Note, New MHEFA Note, and the ECF Notes (and, if NARH or NBH affiliates with another healthcare institution under certain conditions, the Affiliation Notes); the Holder of the Allowed VNA Hoosac Bank Secured Claim will receive proceeds of the sale of the VNA Building up to the Allowed amount of its Secured Claim; the Holders of Allowed Other Secured Claims unrelated to the MDFA and MHEFA Notes or the VNA Building will each receive, in full |

- 5 -

satisfaction and discharge of their Claims, a New Note secured by the same collateral or other collateral of like value except as otherwise provided in the Plan; and the Holders of Allowed PBGC Prepetition Claims, Allowed General Unsecured Claims, and the Allowed VNA Hoosac Bank Deficiency Claim will receive, in full satisfaction and discharge of their Claims, their Pro-Rata Share of the Post-Effective Trust Interests conditioned on the appropriate Classes voting to accept the Plan. All distributions under the Plan will be made on or as soon as practicable after the Effective Date, except as otherwise provided in the Plan. See Article VI.D.1. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION—Treatment of Voting Rights of Claims—Treatment of Claims."

| | |
|---|---|
| **Effectiveness of the Plan:** | The Effective Date will not occur and distributions will not be made under the Plan unless the requisite votes to accept the Plan under the Bankruptcy Code have been received, the Plan has been confirmed by the Bankruptcy Court as satisfying the requirements set forth in section 1129 of the Bankruptcy Code, and the other conditions to effectiveness set forth in Article VIII of the Plan have been satisfied. We cannot assure you that the requisite votes to accept the Plan under the Bankruptcy Code will be received, that the Plan will be confirmed by the Bankruptcy Court, or that the other conditions to effectiveness of the Plan will be satisfied. See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases."

If the Plan is confirmed by the Bankruptcy Court and becomes effective, every Holder of a Claim against the Debtors will be bound by the terms of the Plan, whether or not such Holder voted to accept the Plan. See Article X.E. "THE PLAN—OTHER PROVISIONS—Effect of Plan Confirmation." |
| **ACA Insurance Commutation:** | The Plan provides the MDFA Bondholders the opportunity to participate in a commutation proposed by ACA of the ACA insurance policy that insures the MDFA Bonds. Accordingly, in addition to the distributions described above, MDFA Bondholders that do not opt out of the ACA Insurance Commutation will receive their *pro rata* share of the Commutation Consideration. ACA estimates that such bondholders would recover up to $5 million under the ACA Insurance Commutation, in addition to the other recoveries provided in the Plan. See Article VI.D.1. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION—Means of Implementation of Plan—Insurance Commutation." |
| **ECF and Affiliation Notes:** | Bondholders will receive new bonds secured by beneficial interests in new secured non-interest-bearing ECF Notes with a 30 year term on account of Allowed Claims related to the MDFA and MHEFA Notes. The ECF Notes are payable out of the Obligated Group's Excess Cash Flow (subject to certain minimums for the first seven years). The Debtors estimate the ECF Notes' aggregate principal amount will be between approximately $23.25 million and $28.25 million, depending on the results of the ACA Insurance Commutation. If the Obligated Group enters into an Affiliation with another healthcare entity, holders of ECF Notes will cease to receive payments on account of Excess Cash Flow in excess of minimum amounts, and will instead be issued new secured interest-bearing Affiliation Notes with a 30 year term from the Effective Date and a principal amount of at least $3.25 million in aggregate. |
| **Treatment of Claims:** | The table below summarizes each Class of Claims in the Plan, the projected aggregate amount of Claims comprising each Class, the treatment of each Class, and the projected recoveries of each Class. The projected recoveries (if the Plan is approved) are based upon certain assumptions contained in the valuation analysis of CMAG. See Article VI.D. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION—Treatment and Voting Rights of Claims." |

| Class/Type of Claims | Projected Claims[1] | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan[2] |
|---|---|---|---|---|
| Unclassified – Administrative Claims | The Debtors are unable to estimate the amount of Administrative Claims at this time. | Paid in full in Cash. | N/A | 100% |
| Unclassified – Priority Tax Claims | The Debtors estimate that the amount of Priority Tax Claims is zero or de minimis. | Paid in full in Cash, or treated in accordance with Bankruptcy Code section 1129(a)(9)(C). | N/A | 100% |
| Unclassified – Professional Fee Claims | The Debtors are unable to estimate the amount of Professional Fee Claims at this time. | Paid in full in Cash, subject to allowance by the Bankruptcy Court | N/A | 100% |
| Class 1A – NBH MDFA Note Claims | Pursuant to the Plan, the Allowed amount of Claims in this Class is $13,190,000.00. | Will receive, on the Effective Date, interests in (x) the New MDFA Note and MDFA ECF Note or, (y) if an 1111(b) Election is made for this Class, the New MDFA 1111(b) Note.[3] | Impaired/ Entitled to Vote. | 35% |
| Class 1B – NBH MHEFA Note Claims | Pursuant to the Plan, the Allowed amount of Claims in this Class is $30,532,048.73. | Will receive, on the Effective Date, interests in (x) the New MHEFA Note and MHEFA ECF Note or, (y) if an 1111(b) Election is made for this Class, the New MHEFA 1111(b) Note. | Impaired/ Entitled to Vote. | 35% |
| Class 1C – NBH PBGC Prepetition Claim | Pursuant to the Plan, the Allowed amount of Claims in this Class is $27,251,912. | Will receive, on the Effective Date, a Pro-Rata Share of the relevant Post-Effective Trust Interests.[4] | Impaired/ Entitled to Vote. | 0.04% |
| Class 1D – NBH General Unsecured | The Debtors currently estimate the amount of | Will receive, on the Effective Date, a Pro-Rata Share of the | Impaired/ Entitled to Vote. | 0.04% |

---

[1] Estimated amounts of General Unsecured Claims are based on amounts set forth in the Debtors' schedules, and exclude intercompany claims and certain incorrectly-scheduled claims. The process of reconciling filed claims with our schedules is ongoing.

[2] These projected recoveries assume that no secured creditor makes an election pursuant to section 1111(b) of the Bankruptcy Code. Projected recoveries for Classes 1A, 2A, and 3A are shown in aggregate, as are projected recoveries for Classes 1B, 2B, and 3B.

[3] The MDFA Bondholders also have the opportunity to participate in the ACA Insurance Commutation and to receive their *pro rata* share of the Commutation Consideration. See Article V.D.16 "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION—Means of Implementation of Plan—Insurance Commutation."

[4] Recovery is conditioned upon the PBGC voting to accept the Plan.

| Class/Type of Claims | Projected Claims[1] | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan[2] |
|---|---|---|---|---|
| Claims | Claims in this Class to be $259,607.72. | relevant Post-Effective Trust Interests.[5] | | |
| Class 2A – NARH MDFA Note Claims | Pursuant to the Plan, the Allowed amount of Claims in this Class is $13,190,000.00. | Will receive, on the Effective Date, interests in (x) the New MDFA Note and MDFA ECF Note or, (y) if an 1111(b) Election is made for this Class, the New MDFA 1111(b) Note.[6] | Impaired/ Entitled to Vote. | 35% |
| Class 2B – NARH MHEFA Note Claims | Pursuant to the Plan, the Allowed amount of Claims in this Class is $30,532,048.73. | Will receive, on the Effective Date, interests in (x) the New MHEFA Note and MHEFA ECF Note or, (y) if an 1111(b) Election is made for this Class, the New MHEFA 1111(b) Note. | Impaired/ Entitled to Vote. | 35% |
| Class 2C – CalFirst Capital Lease 1 Claim | The Debtors currently estimate the amount of Claims in this Class to be $149,949.02. | Will receive, on the Effective Date, the CalFirst Capital Lease 1 Secured Note. | Impaired/ Entitled to Vote. | 100% |
| Class 2D – CalFirst Capital Lease 2 Claim | The Debtors currently estimate the amount of Claims in this Class to be $122,500.73. | Will receive, on the Effective Date, the CalFirst Capital Lease 2 Secured Note. | Impaired/ Entitled to Vote. | 100% |
| Class 2E – Other Capital Lease Claims | The Debtors currently estimate the amount of Claims in this Class to be $74,252.27. | Will receive, on the Effective Date, the Other Capital Lease Secured Notes. | Impaired/ Entitled to Vote. | 100% |
| Class 2F – NARH PBGC Prepetition Claim | Pursuant to the Plan, the Allowed amount of Claims in this Class is $27,251,912. | Will receive, on the Effective Date, a Pro-Rata Share of the relevant Post-Effective Trust Interests.[7] | Impaired/ Entitled to Vote. | 1% |
| Class 2G – NARH General Unsecured Claims | The Debtors currently estimate the amount of Claims in this Class to be $7,333,215.28. | Will receive, on the Effective Date, a Pro-Rata Share of the relevant Post-Effective Trust Interests.[8] | Impaired/ Entitled to Vote. | 1% |
| Class 3A – VNA MDFA Note Claims | Pursuant to the Plan, the Allowed amount of Claims in this Class is $13,190,000.00. | Will receive, on the Effective Date, interests in (x) the New MDFA Note and MDFA ECF Note or, (y) if an 1111(b) Election is made for | Impaired/ Entitled to Vote. | 35.5% |

---

[5] Recovery is conditioned upon this Class and the PBGC voting to accept the Plan.

[6] See footnote 3.

[7] Recovery is conditioned upon the PBGC voting to accept the Plan.

[8] Recovery is conditioned upon this Class and the PBGC voting to accept the Plan.

| Class/Type of Claims | Projected Claims[1] | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan[2] |
|---|---|---|---|---|
| | | this Class, the New MDFA 1111(b) Note.[9] | | |
| Class 3B – VNA MHEFA Note Claims | Pursuant to the Plan, the Allowed amount of Claims in this Class is $30,532,048.73. | Will receive, on the Effective Date, interests in (x) the New MHEFA Note and MHEFA ECF Note or, (y) if an 1111(b) Election is made for this Class, the New MHEFA 1111(b) Note. | Impaired/ Entitled to Vote. | 35.5% |
| Class 3C – VNA Hoosac Bank Secured Claim | Pursuant to the Plan, the Allowed amount of Claims in this Class is the lesser of $599,261.41 and the VNA Building Sale Proceeds. | Will receive, on the Effective Date, the VNA Building Sale Proceeds up to the Allowed amount of the VNA Hoosac Bank Secured Claim. | Impaired/ Entitled to Vote. | 93.6% |
| Class 3D – VNA PBGC Prepetition Claim | The Debtors currently estimate the amount of Claims in this Class to be $27,251,912. | Will receive, on the Effective Date, a Pro-Rata Share of the relevant Post-Effective Trust Interests. | Impaired/ Entitled to Vote. | 0.5% |
| Class 3E – VNA General Unsecured Claims | The Debtors currently estimate the amount of Claims in this Class to be $699,811.44. | Will receive, on the Effective Date, a Pro-Rata Share of the relevant Post-Effective Trust Interests. | Impaired/ Entitled to Vote. | 0.5% |
| Class 3F – VNA Hoosac Bank Deficiency Claim | The Debtors currently estimate the amount of Claims in this Class to be $59,261.41.[10] | Will receive, on the Effective Date, a Pro-Rata Share (if any) of the relevant Post-Effective Trust Interests.[11] | Impaired/ Entitled to Vote. | 0.5% |
| Class 4A – NBHPG PBGC Prepetition Claim | The Debtors currently estimate the amount of Claims in this Class to be $27,251,912. | Will receive, on the Effective Date, a Pro-Rata Share of the relevant Post-Effective Trust Interests.[12] | Impaired/ Entitled to Vote. | 0.07% |
| Class 4B – NBHPG General Unsecured Claims | The Debtors currently estimate the amount of Claims in this Class to be $393,921.07. | Will receive, on the Effective Date, a Pro-Rata Share of the relevant Post-Effective Trust Interests.[13] | Impaired/ Entitled to Vote. | 0.07% |
| Class 5 – Other Priority Claims | The Debtors estimate that the amount of | Paid in full in Cash. | Unimpaired/ Deemed to | 100% |

[9] See footnote 3.

[10] There will be no VNA Hoosac Bank Deficiency Claim unless the amount of the VNA Building Sale Proceeds is less than $599,261.41. See Article VI.E.14 "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION—Means of Implementation of Plan—Disposition of VNA Real Estate." The appraised liquidation value of the VNA Building Real Property is $540,000.

[11] Recovery is conditioned upon this Class and the PBGC voting to accept the Plan.

[12] Recovery is conditioned upon the PBGC voting to accept the Plan.

[13] Recovery is conditioned upon this Class and the PBGC voting to accept the Plan.

- 9 -

| Class/Type of Claims | Projected Claims[1] | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan[2] |
|---|---|---|---|---|
| | Other Priority Claims is zero or de minimis. | | Accept. | |
| Class 6 – Other Secured Claims | The Debtors estimate that the amount of Other Secured Claims is zero or de minimis. | Reinstated or entitled to return of collateral. | Unimpaired/ Deemed to Accept. | 100% |

**Distribution Date:** Distributions to be made under the Plan generally will be made as of the Effective Date, the date the Claim is Allowed, or as soon as practicable thereafter.  See Article X.B.1. "THE PLAN—OTHER PROVISIONS—Provisions Governing Distributions—Date of Distributions."

**Plan Supplement:** We will file the Plan Supplement not later than ten days prior to the Voting Deadline.  It is anticipated that the Plan Supplement will include, among other things, forms of: (i) the New Constituent Documents, (ii) the New Notes, (iii) the Post-Effective Trust Agreement, (iv) the Term Sheet, (v) the New Indenture, (vi) the New Mortgage, (vii) the New Security Agreement, and (viii) the 1111(b) Notes amortization schedule.  The Plan Supplement will disclose the identity and affiliations of each proposed member of each of the New Boards of Trustees, who will be selected in accordance with section 4.8 of the Plan.  See Article VI.E.8. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION— Means of Implementation of Plan—Trustees of the Reorganized Debtors."  The Plan Supplement will also identify executory contracts or unexpired leases to be assumed pursuant to the Plan or that the Debtors reserve the right to seek to assume.

**Boards of Trustees:** Section 4.8 of the Plan provides each member of each of the initial New Boards of Trustees shall assume the position of trustee on the day immediately following the Effective Date.  Any subsequent New Board of Trustees shall be elected, classified, and composed in a manner consistent with the applicable New Constituent Documents and applicable nonbankruptcy law.  See Article VI.E.8. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION—Means of Implementation of Plan— Trustees of the Reorganized Debtors."

**Releases:** In consideration for the contributions of certain parties to the Chapter 11 Cases and as part of a settlement with Nuveen and ACA, the Plan provides for certain waivers, exculpations, releases, and injunctions.  See Article X.E.3. "THE PLAN—OTHER PROVISIONS—Effect of Plan Confirmation—Releases."

**Certain U.S. Federal Income Tax Consequences:** For a summary of certain U.S. federal income tax consequences of the Plan to Holders, see Article XI. "CERTAIN FEDERAL INCOME TAX CONSIDERATIONS."

**Risk Factors:** Prior to deciding whether and how to vote on the Plan, each Holder of an Impaired Claim should consider carefully all the information in this Disclosure Statement, especially the "Risk Factors" described in Article II hereof.  See Article II. "RISK FACTORS."

**The foregoing is only a brief summary of certain provisions of the Plan. You should read the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Disclosure Statement.**

- 10 -

## SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA

The following selected consolidated historical financial data sets forth, for the periods and dates indicated, certain summary consolidated financial information of our operations. All financial data for the year ended September 30, 2011 are preliminary and subject to further revision. We derived the summary consolidated statements of operations information from our unaudited consolidated financial statements as of and for the years ended September 30, 2011 and September 30, 2010, and from our unaudited consolidated financial statements as of and for the year ended September 30, 2009.

|  | Years ended September 30, | | |
| **CONSOLIDATED STATEMENTS OF OPERATIONS** | 2011 | 2010 | 2009 |
|---|---|---|---|
| **Unrestricted Revenues, Gains and Other Support** | | | |
| Net patient service revenue | $65,725,881 | $65,411,990 | $64,509,829 |
| Other | 1,862,506 | 2,164,594 | 3,543,779 |
| Net assets released from restrictions used for operations | 141,264 | 936,952 | 9,370 |
| Total unrestricted revenues, gains and other support | 67,729,651 | 68,513,536 | 68,062,978 |
| **Expenses and Losses** | | | |
| Salaries and wages | 29,865,406 | 31,246,235 | 31,613,321 |
| Employee Benefits | 10,036,423 | 10,997,241 | 9,297,280 |
| Purchased services and professional fees | 4,345,848 | 4,903,315 | 4,576,061 |
| Supplies and other | 23,717,764 | 20,774,350 | 17,132,249 |
| Depreciation and amortization | 3,093,247 | 3,061,370 | 2,923,338 |
| Interest | 3,312,508 | 2,540,522 | 3,539,731 |
| Provision for uncollectable accounts: | 1,788,944 | 1,284,828 | 1,626,292 |
| Total expenses and losses | 76,160,140 | 74,807,861 | 70,708,272 |
| **Operating Income (Loss)** | (8,430,489) | (6,294,326) | (2,645,294) |
| **Other Income (Expense)** | | | |
| Distributions from trusts | | | 51,023 |
| Investment return | | | (3,520,421) |
| Change in fair value of interest rate swap agreement | | | 57,459 |
| Total other income (expense) | 251,732 | 570,613 | (3,411,939) |
| **Excess (Deficiency) of Revenues Over Expenses From Continuing Operations** | (8,178,757) | (5,723,713) | (6,057,233) |
| **Discontinued Operations** | | | |
| Loss from discontinued operations | 0 | (8,499,806) | (9,051,527) |
| **Excess (Deficiency) of Revenues Over Expenses** | (8,178,757) | (14,233,519) | (15,108,760) |
| Contributions of or for acquisition of property and equipment | | | -- |
| Investment return – change in unrealized gains and losses on other than trading securities | | | 1,867,938 |
| Net assets released from restriction used for purchase of property and equipment | | | 510,600 |
| Defined benefit pension costs | | | |
| Net loss arising during year | | | (11,383,298) |
| Amortization of net loss included in net periodic pension cost | | | 301,819 |
| **Increase (Decrease) in Unrestricted Net Assets** | | | $(23,811,701) |

- 11 -

## I.     VOTING PROCEDURES AND REQUIREMENTS

The following instructions for voting to accept or reject the Plan, together with the instructions contained in the Ballots, constitute the Voting Instructions.  To vote on the Plan, as of the Voting Record Date, you must be a beneficial Holder of an Impaired Claim.  To vote, you must fill out and sign a Ballot.

### A.     *Ballots*

After carefully reviewing this Disclosure Statement and its exhibits, including the Plan, please indicate your acceptance or rejection of the Plan by completing the Ballots received.

If you do not receive a Ballot for a Claim that you believe you hold and that is in a Class that is entitled to vote on the Plan, or if a Ballot is damaged or lost or if you have any questions regarding the procedures for voting on the Plan, you should contact the Voting Agent by e-mail at NBHealthinfo@gcginc.com or by telephone at (631) 470-5000.

### B.     *Procedures for Casting Votes and Deadlines for Voting on the Plan*

Any Ballot received after the Voting Deadline may not be included in any calculation to determine whether the parties entitled to vote on the Plan have voted to accept or reject the Plan.  When a Ballot is returned indicating acceptance or rejection of the Plan, but is unsigned, illegible, or incomplete, the unsigned, illegible, or incomplete Ballot may not be included in any calculation to determine whether the requisite parties entitled to vote on the Plan have voted to accept the Plan.

Please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot, and return the Ballot in the enclosed return envelope, by first class mail, courier, or hand delivery, to the Voting Agent at the following address:

| **By Regular Mail:** | **By Hand Delivery or Overnight Courier:** |
|---|---|
| Northern Berkshire Healthcare, Inc. | Northern Berkshire Healthcare, Inc. |
| c/o GCG, Inc., Solicitation Agent | c/o GCG, Inc., Solicitation Agent |
| P.O. Box 9669 | 5151 Blazer Parkway, Suite A |
| Dublin, Ohio 43017-4969 | Dublin, Ohio 43017 |

**BALLOTS MAY NOT BE COUNTED IF THEY ARE RECEIVED BY THE VOTING AGENT AFTER THE VOTING DEADLINE OR ARE ILLEGIBLE, INCOMPLETE, OR UNSIGNED.**

**If you are an MDFA Bondholder and you do not wish to participate in the ACA Insurance Commutation contemplated by Section 4.16 of the Plan, you must affirmatively elect out of the ACA Insurance Commutation in your Ballot.  If you fail to return your Ballot or do not opt out in your Ballot, you will be deemed to have opted to participate in the ACA Insurance Commutation and will be a Commuting Bondholder.  Please refer to Section 4.16 of the Plan and to Exhibit D hereto (which remains subject to ACA's final approval) for details regarding the relevant provisions.**

**If you are an MDFA Bondholder or a MHEFA Bondholder, you will receive an 1111(b) Form with your Ballot in which you may vote for or against making an 1111(b) Election on behalf of all of the MDFA Bonds or MHEFA Bonds, respectively.  If you wish to vote in favor of making an 1111(b) Election, you must affirmatively vote in favor of making on your 1111(b) Form and return the form in accordance with the voting procedures.  If you return your Ballot but fail to return your 1111(b) Form, you will be deemed to vote against making an 1111(b) Election against any member of the Obligated Group.  Please refer to Section 4.12 of the Plan and to Article V.A hereof for details regarding the 1111(b) Election.**

- 12 -

We reserve the right to extend the Voting Deadline. Any such extension will be followed as promptly as practicable by notice thereof by press release or other public announcement. If we extend the Voting Deadline, we reserve the right to establish a later Voting Record Date.

Upon the expiration or termination of the Solicitation, Ballots may not be revoked or withdrawn. Prior to the expiration or termination of the Solicitation, however, Ballots may be revoked or withdrawn even if such votes have been delivered to the Voting Agent.

At this time, neither we nor the Voting Agent is requesting or will accept delivery of certificates representing any Claims.

C.      *Parties Entitled to Vote on the Plan*

Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims that is not deemed to accept or reject the Plan is entitled to vote to accept or reject the Plan. A class is "impaired" unless the legal, equitable, and contractual rights of the holders of claims in that class are left unaltered by a plan of reorganization or the plan reinstates the claims held by members of such class by (i) curing any defaults that exist, (ii) reinstating the maturity of such claims, (iii) compensating the holders of such claims for damages that result from the reasonable reliance on any contractual provision or law that allows acceleration of such claims, (iv) compensating the holders (other than the debtor or an insider) of any claims arising from failure to perform a non-monetary obligation for any actual pecuniary loss incurred by such holder as a result of such failure and (v) otherwise leaving unaltered any legal, equitable, or contractual rights to which the claims entitle the holders of such claims or interests.

Classes that are not impaired under a plan are conclusively presumed to accept such plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, votes are not solicited from the Holders of Claims in Classes that are not Impaired.

Votes to accept the Plan are being solicited only from Impaired Classes that are not deemed to accept or reject the Plan. Except for Class 5 – Other Priority Claims and Class 6 – Other Secured Claims, all Classes of Claims are Impaired under the Plan and are therefore entitled to vote to accept or reject the Plan.

D.      *Counting of Ballots for Determining Acceptance of the Plan*

Only those Ballots (other than any Ballot that is illegible, incomplete, or unsigned) that are received prior to the Voting Deadline will be counted for purposes of determining whether each Impaired Class that is entitled to vote has voted to accept or reject the Plan.

Under Section 1126(c) of the Bankruptcy Code, a voting class of claims is deemed to have accepted a plan if it is accepted by holders holding at least two-thirds in amount and more than one-half in number of the allowed claims in such class that vote on the plan.

## II.      RISK FACTORS

A.      *Risks Relating to the Chapter 11 Cases*

1.      *General*

A protracted bankruptcy case in which the Plan is not timely confirmed and consummated as expected may have adverse effects on our operations.

2.      *Classification and Treatment of Claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim in a particular Class only if such Claim is substantially similar to the other Claims of such Class. Further, the Plan must provide the same treatment for each

- 13 -

Claim of a particular Class unless the Holder of a particular Claim agrees to a less favorable treatment of its Claim. We believe that all Claims have been appropriately classified in the Plan and that we have complied with the requirement of equal treatment. If the Bankruptcy Court finds that the Plan does not satisfy these requirements, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

### 3.   *Certain Risks of Nonconfirmation or Delay of Confirmation*

Whether or not all Classes of Claims accept or are presumed to accept the Plan, the Plan still may not be confirmed by the Bankruptcy Court, which sits as a court of equity and may exercise substantial discretion. A nonaccepting creditor might challenge the solicitation results or the terms of the Plan as not being in compliance with the Bankruptcy Code. In such event, we may seek to resolicit acceptances. Nonetheless, confirmation of the Plan could be delayed and possibly jeopardized. Additionally, we cannot assure you that the Plan will not require significant modifications for confirmation, or that such modifications would not require a resolicitation of acceptances.

Even if the Bankruptcy Court were to determine that the voting results were accurate and appropriate, the Bankruptcy Court could nevertheless decline to confirm the Plan if it were to find that any statutory conditions to confirmation had not been met, including that the terms of the Plan are fair and equitable to nonaccepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any nonaccepting Classes, that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization, and that the value of distributions to nonaccepting Holders of Impaired Claims will not be less than the value of distributions such Holders would receive if our operations were liquidated under chapter 7 of the Bankruptcy Code. See Article XIV.E.1. "CONFIRMATION—Plan Meets Requirements for Confirmation—Best Interests of Creditors—Liquidation Analysis." Although we believe that the Plan meets these tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion. See Article XIV.E. "CONFIRMATION—Plan Meets Requirements for Confirmation."

The confirmation and consummation of the Plan also are subject to certain other conditions. See Article X.D. "THE PLAN—OTHER PROVISIONS—Conditions Precedent to Confirmation and Effective Date of the Plan." No assurance can be given that these conditions will be satisfied or, if not satisfied, that we could or would waive such conditions, or that any required consent to such waiver would be obtained.

If the Plan is not confirmed, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims would ultimately receive in respect of their Claims. If an alternative plan of reorganization could not be agreed to, it is possible that we would have to liquidate our assets, in which case it is highly likely that Holders of Claims would receive significantly less than they would have received pursuant to the Plan. See Article XIV.F.3. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan—Liquidation Under Chapter 7 or Chapter 11." Moreover, failure to confirm the Plan could extend our stay in chapter 11, during which time we could experience significant deterioration in our going concern value.

### 4.   *Alternatives to Confirmation and Consummation of the Plan*

There can be no assurance that the Plan will be confirmed or consummated. If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives include (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (ii) dismissal of the Chapter 11 Cases, and (iii) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. We believe the Plan is significantly more attractive than these alternatives because, among other things, it will minimize disputes concerning our reorganization, expedite our exit from chapter 11, reduce the expenses of a case under chapter 11 of the Bankruptcy Code, minimize the disruption to our operations that would result from a protracted and contested bankruptcy case, and ultimately result in a larger distribution to creditors than would other types of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 of the Bankruptcy Code.

5. *Risk of Nonoccurrence of the Effective Date*

Although we believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. The effectiveness of the Plan is subject to a number of conditions precedent, as outlined in section 8.2 of the Plan, and there can be no assurance that all such conditions will occur (or be waived in accordance with the terms of the Plan).

6. *Inability to Assume Certain Contracts*

The Plan provides for the assumption and rejection of various executory contracts and unexpired leases. Our intention is to preserve as much of the benefit of our existing contracts as possible and to reject those contracts that are burdensome to our operations. Certain limited classes of executory contracts, however, may not be assumed without the consent of the counterparty. In these cases, we would need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent would be forthcoming or that material conditions would not be attached to any such consent that would make assuming such contracts unreasonable. We would then be required to either forego the benefits offered by such contracts or find alternative arrangements to replace them.

B.    *Factors Affecting the Value of the Consideration to Be Issued Under the Plan of Reorganization*

1. *Capital Requirements*

The Reorganized Debtors' business is expected to have significant capital expenditure needs, which we anticipate satisfying from future revenues. It is possible, however, that we will need additional capital in the future to meet our capital expenditure needs, and because we will remain leveraged, our ability to gain access to such capital cannot be assured, particularly in view of general economic and industry conditions.

2. *Variances From Expected Performance*

A fundamental premise of the Plan is that it restructures our indebtedness to reasonable levels consistent with our business plan. Our business plan reflects numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not occur. Such assumptions include, among others, assumptions concerning the general economy and its recovery, Medicare and Medicaid reimbursement rates, government involvement in and regulation of the healthcare industry, our ability to make necessary capital expenditures, our ability to manage costs and achieve cost reductions, our ability to increase our labor productivity, our ability to reduce the level of our observation status patients, and other risk factors described below. We believe that the assumptions underlying our business plan are reasonable. Unanticipated events and circumstances, however, may affect our actual financial results. In particular, we assume no new recessionary economic decline will occur in the next several years and that the recent federal laws enacted regarding healthcare will take effect over the next few years without significant revision. The actual results we achieve, therefore, necessarily will vary from the projected results, and such variations may be material and adverse.

3. *Recovery Percentages May Differ From Estimates*

The estimated percentage recovery by Holders of Claims receiving New Notes and/or Post-Effective Trust Interests is based on estimated values of the New Notes and Post-Effective Trust Interests and assumptions regarding agreements with PBGC. Given that the market and economic conditions upon which such values are based are beyond our control, the actual results achieved necessarily will vary from the estimate. Such variations may be material and adverse. See "SUMMARY OF THE PLAN."

4. *Uncertainty of Tax Exemption*

We are required to use commercially reasonably efforts to establish a tax-exempt structure for the New Bonds. This may not, however, be possible for some or all of the New Bonds, because there are substantial obstacles to securing tax-exemption for all of the New Bonds. Certain features of the New Secured Notes, such as

- 15 -

the length of the term and payments from Excess Cash Flow, may make it difficult to secure tax-exemption for the New Bonds.  A tax-exempt structure would also require the cooperation of a government authority such as MDFA to issue any new tax-exempt bonds, and we can make no assurances that we can secure such cooperation.  We therefore cannot assure you that any payments in connection with any New Bonds will be exempt from federal income taxation.

     5.   *Payments to Trustees*

Under the Plan, the bond reserve funds held by MHEFA Trustee and MDFA Trustee as trustees will be distributed to the Bondholders, subject to MHEFA Trustee and MDFA Trustee's rights to exercise "charging liens" on these funds to pay their expenses.  Likewise, the New Secured Notes will be held by the Master Trustee for the benefit of the New Trustee, subject to the Master Trustee's rights to exercise charging liens on these assets to pay its expenses.

As part of a settlement with Nuveen and ACA, the Plan provides for the Debtors to pay up to $900,000 in connection with fees and expenses of MHEFA Trustee, MDFA Trustee, and the Master Trustee on or before September 30, 2012.

We expect MHEFA Trustee, MDFA Trustee, and the Master Trustee will exercise their Charging Lien rights to pay their expenses, including legal expenses, associated with these chapter 11 cases, thereby reducing recoveries to the Bondholders to the extent that such fees and expenses exceed the amount paid by the Debtors.  Under the Plan, the Debtors will pay up to $900,000 to the trustees or the Bondholders in reimbursement for these expenses, the principal amount of the ECF Notes will be increased to reflect fees and expenses above $900,000, and the Bondholders will be treated as if they had received the amounts and assets taken by MHEFA Trustee, MDFA Trustee, and the Master Trustee by exercise of their Charging Liens for purposes of determining the Debtors' remaining obligations.

    C.    *Risks Relating to our Operations*

     1.   *Leverage and Debt Service*

We are highly leveraged and will retain some leverage even if the Plan is confirmed and the transactions contemplated thereunder are consummated.  Our levels of indebtedness could have important consequences, including:

    (a)    requiring us to dedicate a substantial portion of our cash flow from operations to payments on indebtedness, thereby reducing the availability of cash flow to fund working capital, capital expenditures, and other general corporate purposes;

    (b)    increasing our vulnerability to adverse general economic or industry conditions;

    (c)    limiting our flexibility in planning for, or reacting to, changes in our business or the industry in which we operate;

    (d)    impairing our ability to obtain additional financing in the future for working capital, capital expenditures, debt service requirements, acquisitions, general corporate purposes, or other purposes; or

    (e)    placing us at a competitive disadvantage to our competitors who may not be as highly leveraged.

To adequately service our indebtedness, we will require liquidity.  While we project that future cash flow will be sufficient to meet our obligations and commitments, as noted above, actual results will necessarily vary from our projections, and such variances could be material and adverse.  If we are unable to generate sufficient cash flow from operations in the future to service our indebtedness and to meet our other commitments, we will be required to

adopt one or more alternatives, such as a further refinancing or restructuring of our indebtedness, selling material assets or operations, or seeking to raise additional debt. These actions may not be implemented on a timely basis or on satisfactory terms or at all, and they may not enable us to continue to satisfy our capital requirements. Restrictive covenants in our indebtedness may prohibit us from adopting any of these alternatives (with the failure to comply with these covenants resulting in an event of default, which, if not cured or waived, could result in the acceleration of certain of our indebtedness). We cannot assure you that our assets or cash flow would be sufficient to fully repay borrowings under our outstanding debt instruments, if accelerated upon an event of default, or that we would be able to repay, refinance, or restructure the payments of those debt instruments.

### 2. *Treatment of Trade Vendors and Other Unsecured Claims in the Chapter 11 Cases*

Holders of General Unsecured Claims are Impaired under the Plan and will not be paid in full, including a number of our vendors and other trading partners. Failure to pay these claims in full may lead vendors to refuse to engage in further business with us. Alternatively, our trading partners may only engage in business with us after we exit bankruptcy on onerous terms. We cannot assure you that we will maintain the same network and base of vendors, suppliers, and other trading partners after we emerge from bankruptcy, which could adversely impact our operations.

### 3. *Competition*

There is significant competition among acute care hospitals and in some instances among their affiliated health systems. Moreover, we compete with other proprietary and nonprofit competitors that may in certain instances have significantly greater financial resources. In addition, we face increased competition (i) with other hospitals for physician and nurse recruitment, (ii) between physicians who generally use hospitals and non-physician practitioners who may not generally use hospitals, and (iii) from home health agencies, ambulatory care facilities, rehabilitation and therapy centers, physician group practices, and other non-hospital providers of many services for which patients generally and currently rely on us.

### 4. *Disruption of Operations and Retention of Patients and Employees*

The pendency of the Chapter 11 Cases could adversely affect patients' demand for our services; our ability to provide the services required by patients and other users of our services and facilities; our relationships with physicians and nurses; and management capabilities. In such event, weakened operating results may occur that could give rise to variances from our business plan.

Our ability to maintain our operations and implement our strategies effectively depends, in part, on the efforts of our executive officers and other key employees. In particular, our future success will depend on our ability to attract and retain skilled clinical staff. Because of the traditional stigma associated with any bankruptcy, regardless of whether it may improve our financial condition, the Chapter 11 Cases may adversely affect our ability to attract and retain the requisite highly skilled personnel and key employees.

### 5. *Defined Benefit Pension Plan*

As discussed in further detail in Article IV.H. "OPERATIONS—Pension Plan," the Bankruptcy Court has authorized a distress termination of our Pension Plan. If this termination is effected, ERISA would require us to make an aggregate of $2,565,000 in premium payments to the PBGC in the 25 months following our emergence from bankruptcy (the "Premium Payments"). We have undertaken extensive negotiations with the PBGC to modify the Premium Payments to allow for their payment on terms more favorable to us, but as of the date hereof we have not reached a formal agreement and there can be no assurances that an agreement will be reached. If we do not reach an agreement with the PBGC regarding the Premium Payments, we will be required to make the Premium Payments in full on the normal time-table, which will substantially reduce the amount of free cash flow available for debt service and payments to unsecured creditors in the first three years following our reorganization.

- 17 -

6.   *Berkshire Health Systems*

We work in concert with Berkshire Health Systems ("<u>BHS</u>") to provide urology and cardiology services to our patients, services that generate substantial revenue for our operations.  To compensate BHS for the costs and difficulties of offering these services at a distance from BHS's main care centers, NARH agreed to pay the shortfall associated with these costs at a later date.  This liability (the "<u>Prepetition Liability</u>") accrued over the years.  By December 31, 2010, the Prepetition Liability exceeded $1.8 million.

In early 2011, BHS announced that it would cease providing cardiology and urology services unless we entered into a new arrangement under which we would both pay for cardiology and urology services on a current basis and make payments towards reducing the Prepetition Liability.  After negotiations between BHS and us, we entered into an agreement with BHS on May 19, 2011 (the "<u>BHS Contract</u>").

In the BHS Contract, BHS agreed to continue to provide cardiology and urology services until the earlier of (a) April 15, 2015 or (b) 15 days following any change in ownership or control of the Hospital.  In exchange, we agreed to pay BHS, on or before the 15th day of each month commencing on May 15, 2011, a total monthly payment of $81,375.22, consisting of: (a) $27,900.00 for monthly cardiology services; (b) $10,750.00 for monthly urology services; and (c) $42,725.22 toward reducing the Prepetition Liability (collectively, the "<u>Monthly Payments</u>").

Since the Petition Date, we have made monthly payments to BHS only in the amount of $38,650.00, comprised of $27,900.00 for cardiology services and $10,750.00 for urology services.  We have not paid the $42,725.22 towards reducing the Prepetition Liability.

On July 20, 2011, BHS filed a motion to compel us to assume or reject the BHS Contract.  In the motion, BHS asserted, among other things, that the entire Monthly Payment amount of $81,375.22 is due on a going-forward basis.  We objected to BHS's motion, asserting that the only postpetition monthly amounts due under the BHS Contract prior to the agreement's assumption or rejection is the $27,900 for ongoing cardiology services and $10,750 for ongoing urology services.  We also requested that the Court not compel us to assume or reject the BHS Contract prior to confirmation of a plan of reorganization.  The Court ultimately ruled in our favor, denying BHS's motion.

Pursuant to section 365 of the Bankruptcy Code, we may seek to assume or reject the BHS Contract.  If we assume the BHS Contract, BHS asserts that we would be required to "cure" the unpaid portion of the Monthly Payments since the Petition Date (which totals approximately $255,000 as of December 1, 2011).  Thus, it is BHS's position that we must choose between (a) assuming the BHS Contract, curing the unpaid Monthly Payments, and making all future Monthly Payments in full for the term of the BHS Contract or (b) rejecting the BHS contract and losing the urology and cardiology services BHS provides thereunder.

We have reached an agreement in principle with BHS regarding ongoing Monthly Payments, curing the unpaid Monthly Payments, and payment of the Prepetition Liability.  Under this agreement, BHS would continue to provide urology and cardiology services. NARH would continue to pay for these services on a monthly basis, and NARH would pay the Prepetition Liability and unpaid Monthly Payments under a note with a 10 year term and 4% interest rate.  NARH would pay approximately $120,000 a year towards the Prepetition Liability, with the remainder due at the end of the note term.  NARH would not be required to pay any cure to BHS on or before the Effective Date.

If we cannot reach final agreement with BHS, we may reject the BHS Contract.  If we reject the BHS Contract, we would likely need to partner with other providers for urology and cardiology services in the short term. These services may come at a higher cost than we currently pay under the BHS Contract.  It is also possible that, depending on the circumstances, we could operate without cardiology and/or urology services for a period of time, which could lead to a loss of revenue and impact our profitability.

- 18 -

7. *Dependence on Individuals, Third-Party Payers, and Other Health Care Organizations*

Our operations are dependent on individuals, employers, insurers, and governmental agencies for substantially all our revenues, and there is no guarantee that payments made from such sources will remain at levels comparable to present levels or that they will be sufficient to cover all operating and fixed costs. For instance, increased unemployment or other adverse economic conditions in our service areas might increase the proportion of patients without health insurance benefits or who otherwise are unable to pay fully for the costs of their care. Further, efforts by employers to reduce the costs of health insurance by having employees bear a greater portion of their health care costs may cause employees to be more selective and cost conscious in choosing health care services. Finally, insurers and governmental agencies may increase efforts to reduce the utilization of our facilities and limit payments for the services provided by such facilities.

8. *Healthcare Reform*

We expect the national healthcare reform law to put increasing pressure on us and similarly sized nonprofit hospitals. Over the next ten years, healthcare reform is expected to reduce Medicare reimbursements to hospitals by approximately $155 billion. For hospitals like ours that have a disproportionately high number of patients covered by Medicare, this means a steady and significant reduction in Medicare reimbursements commencing in the next few years. In addition, national healthcare reform imposes on hospitals the obligation to make significant capital expenditures, including the obligation to have electronic medical records by 2014, and penalizes hospitals that take Medicare reimbursements but fail to meet the applicable deadline. According to a report of the Massachusetts Hospital Association, national healthcare reform will likely reduce NARH's revenues by nearly $15 million over a ten-year period.

Healthcare reform also creates certain incentives and efficiencies that only benefit larger healthcare institutions. We are too small to benefit from these programs and policies and will likely need to merge or form a partnership with another healthcare institution in the next few years to access them and remain viable. Accordingly, it is not sufficient for us to reorganize our operations to a break-even level on a current basis. Instead, we must put ourselves in a strong position to weather the roll-out of healthcare reform and become an attractive partner for a business combination.

9. *Litigation*

From time to time, we are subject to claims or litigation incidental to our business. As of the date of this Disclosure Statement, we are not currently involved in any legal proceedings that, individually or in the aggregate, are expected to have a material effect on our business, financial condition, results of operations, or cash flows.

10. *Medical Malpractice Liability*

We face a business risk of exposure to medical malpractice liability claims if the use of our services is alleged to have resulted in injury or other adverse effects to our patients. We currently maintain, and intend to continue to maintain, medical malpractice liability insurance coverage, but there can be no assurance that we will be able to obtain such insurance on acceptable terms in the future, if at all, or that any such insurance will provide adequate coverage against potential claims. Medical malpractice liability claims can be expensive to defend and can divert the attention of management and other personnel for long periods of time, regardless of the ultimate outcome. An unsuccessful medical malpractice liability defense could have a material adverse effect on our operations, financial condition, results of operations or prospects, or our ability to meet our debt service obligations. In addition, our business depends on the strong reputation we have developed in the northern Berkshire County community and beyond. If this reputation is damaged, we may face difficulty in maintaining demand for our services, which would reduce our revenue.

11. *Acquisitions, Sales, and Other Major Transactions*

In the past, we have completed acquisitions, and we may consider acquisitions, business combinations, and joint ventures in the future. Acquisitions and joint ventures involve a number of special risks and challenges,

- 19 -

including those relating to conforming the standards, processes, procedures, and controls of the acquired business with those of our existing operations, coordinating new and existing services, the assumption of unknown liabilities, integrating medical technologies, increasing indebtedness, and increasing the scope, geographic diversity, and complexity of our operations. Our failure to successfully integrate acquired healthcare institutions into our existing operations or be successfully integrated into an acquiring healthcare institution's operations could result in our incurring unanticipated expenses and losses.

We also may consider, on a case-by-case basis, certain asset sales or other divestitures of non-core assets in the future or pursuant to the Plan. There can be no assurances that material liabilities will not arise in connection with such future sales and divestitures or of the consideration that we would receive in connection with any such sale or other disposition.

12. *Facilities*

We continue to review our lease for the Ambulatory Care Center (the "ACC"), a medical office building, and options related thereto. If we choose to reject the lease, we would have limited rights to remain in the ACC and could be required to exit the facility quickly. A rapid relocation in the limited time available could result in material relocation costs.

We have deferred a substantial amount of spending on maintenance obligations and capital expenditures due to our overleveraged balance sheet, recent and ongoing recessionary pressures in the United States, and a lack of available credit because of the domestic financial crisis and its after-effects. Because of this deferral, we will devote considerable spending to maintenance obligations and capital obligations in the near term. We may need to make repairs and upgrades to, or perform deferred maintenance on, our hospital facilities. See Article IV.E. OPERATIONS—Facilities." Making these capital expenditures will reduce our available capital. On the other hand, failure to make these expenditures in the near term could have a significant adverse impact on the quality of our services and, more generally, our operating performance.

13. *Environmental and Health and Safety Liabilities and Requirements*

As a health care provider, we are subject to a wide variety of federal, state, and local environmental and occupational health and safety laws and regulations. Among the types of regulatory requirements we face are air and water quality control requirements applicable to asbestos, polychlorinated biphenyls, and radioactive substances; requirements for providing notice to employees and members of the public about hazardous materials handled by or located at our healthcare facilities; and requirements for training our employees in the proper handling and management of hazardous materials and wastes.

As owners and operators of properties or facilities, we may be subject to liability for investigating and remedying any hazardous substances located on our property, including any such substances that migrate off the property. Our operations include, without limitation, the handling, use, storage, transportation, disposal, and/or discharge of medical and/or other hazardous materials, wastes, pollutants, or contaminants. As a result, our operations are particularly susceptible to the risks associated with compliance with such laws and regulations. Failure to comply may result in damage to individuals, property, or the environment; interrupt operations and/or increase their cost; result in legal liability, damages, injunctions, or fines; and result in investigations, administrative proceedings, penalties, or other government agency actions. At the present time, we are not aware of any pending or threatened environmental claim, investigation, or enforcement action which, if determined adversely, would have material adverse consequences.

## III.    BACKGROUND AND EVENTS LEADING UP TO THE CHAPTER 11 CASES

A.    *Background*

NBH was founded in 1984 as the parent corporation of an expanding local healthcare system with the mission of providing healthcare to the local community. With an employee base of approximately 563 people, NBH and its Debtor affiliates are the second-largest employers in northern Berkshire County, Massachusetts, and the

largest employers in the city of North Adams.  The largest affiliate of NBH is North Adams Regional Hospital, Inc. ("NARH"), which operates North Adams Regional Hospital (the "Hospital"), a full-service community hospital in the Berkshire Hills.  NARH medical staff includes internists, family care practitioners, and a broad range of specialists.  Ninety-six percent of the medical staff is board certified or board eligible.  NARH serves the areas of western Massachusetts, eastern New York, and southern Vermont.

For a more detailed description of the NBH's operations, see Article IV.  "OPERATIONS."

B.      *Events Leading to Financial Distress*

Over the last 15 years, we have become highly leveraged through secured bond debt issued by two agencies of the Commonwealth of Massachusetts: the Massachusetts Health and Educational Facilities Authority ("MHEFA") and the Massachusetts Development Finance Agency ("MDFA").[14]  In 1996, we financed certain equipment purchases and additions, renovations, and expansions to the Hospital, including maternity, medical, surgical, and pediatric units, with proceeds from the issuance of MHEFA revenue bonds (the "1996 Bonds").  In 2004, we refinanced a portion of the 1996 Bonds and financed additional equipment purchases, additions, renovations, and expansions to the Hospital with proceeds from additional MHEFA revenue bond issuances: the 2004 Series A Bonds (the "2004A Bonds") and the 2004 Series B Bonds (the "2004B Bonds," and, together with the 2004A Bonds and the 1996 Bonds, the "MHEFA Bonds").  Nuveen Investments and certain of its affiliates (collectively, "Nuveen") hold the vast majority of the MHEFA Bonds.

In 1999, we financed the acquisition by Northern Berkshire Community Services, Inc. ("NBCS"), one of our non-profit corporate affiliates, of Sweet Brook Transitional Care & Living Centers ("Sweet Brook"), a 184-bed skilled nursing facility, and Sweetwood Continuing Care Retirement Community ("Sweetwood," and together with Sweet Brook, the "Sweets"), a 70-unit continuing care retirement community, with the proceeds from the issuance of MDFA revenue bonds (the "MDFA Bonds").  The MDFA Bonds are insured by ACA Financial Guaranty Corporation ("ACA").

The 2004A Bonds and 2004B Bonds immediately went into default in the first reporting period for violations of certain financial covenants.  In addition, the Sweets did not generate earnings and cash flows sufficient to support the debt that was incurred in connection with their acquisition.  In ensuing years, we made significant operational changes to service our increased long-term debt obligations, and in fiscal years 2007 and 2008, we turned a profit.

However, the abrupt downturn in the domestic economy in 2007 had a significant negative impact on our operations.  Specifically, the collapse of the residential housing market had a significantly negative impact on Sweetwood, as potential customers for continued care retirement centers typically fund the large up-front payments required to join through the sale of their home.  As a result, Sweetwood's occupancy rate remained well below the level necessary to break even on its operations.  Sweet Brook's business was similarly depressed by the recession, which affected customers' ability to afford staying at a skilled nursing facility.

Additionally, in 2008, as a result of the economic recession, the value of our board-designated investment portfolio decreased by 43% to $7.2 million, and we saw a dramatic decline in the value of our defined benefit pension plan assets.  We responded by discontinuing enrollment of new employees into the defined benefit pension plan with new employees participating instead in a 403(b) plan for which we match a portion of employee contributions.

Beginning in December 2008, the Hospital undertook aggressive steps to address the impending financial crisis.  We cut approximately $2.5 million from operating expenses and instituted staffing reductions.  From 2008 to 2010, we froze the accrual of benefits under the Pension Plan for all union and nonunion employees and created a defined contribution pension plan for such employees.  As a result of the Sweets' continuing shortfall in earnings and cash flows relative to the debt service requirements of the existing indebtedness, we were forced to lend money

---

[14] In August 2010, Governor Deval Patrick signed into law Chapter 240 of the Economic Development Reorganization Act of 2010, which merged MHEFA into the MDFA, effective as of October 1, 2010.

to the Sweets in order to fund their operations in fiscal years 2008 and 2009.  The Sweets continued to be a drain on our cash flow, and in June 2009 we began a process to sell the Sweets.  Although the sale process was originally intended to take only a few months, it took over a year to find a buyer and close the sale.  On August 15, 2010, in consultation with Nuveen and ACA, we sold the Sweets to DES Senior Care Holdings, LLC for a gross purchase price of approximately $7 million plus the assumption of certain liabilities.  The sale left NBCS with few remaining assets.

Following the sale of the Sweets, discussions with Nuveen and ACA turned to a global restructuring of our operations and bond debt.  In September 2010, we retained Navigant Capital Advisors, LLC ("Navigant") as a consultant to review our operations to determine steps to be taken to improve our cash flow and operational profitability and proposals for restructuring our long-term debt.  In November 2010, Navigant provided us with a comprehensive report reviewing our operations and financial situation.  That report concluded that we could not support the full $44 million of bond debt and that a significant reduction would be necessary for us to reorganize successfully.

In late 2010, we began a process to have our hospital certified as a Critical Access Hospital ("CAH").  CAH certification is determined by the Centers for Medicare & Medicaid Services ("CMS"), a unit of the United States Department of Housing & Human Services, which regulates Medicare and Medicaid.  Hospitals that have been designated CAH receive cost-plus based reimbursement from Medicare, which is intended to make such hospitals more profitable and thereby prevent their closure.  CAH designation is only available, however, to hospitals in remote areas that satisfy a number of criteria, as determined by CMS.  While we believe our hospital satisfied the required criteria, CMS disagreed and despite significant efforts on our part denied our CAH application in mid-2011.

Our financial condition remained cash-flow negative through February 2011; critical vendors began pushing back more forcefully against stretched accounts payable, further pressuring our limited cash resources; and we began experiencing serious operational problems due to our prolonged financial distress, most notably in increasing difficulty in retaining critical physicians and other staff and in filling vacant positions.

After months of negotiations with Nuveen and ACA, we were unable to reach an agreement on a consensual chapter 11 restructuring.  Consequently, on June 13, 2011, we commenced these chapter 11 cases to seek relief from the Court under the Bankruptcy Code.  Contemporaneously with our commencement of these chapter 11 cases, NBCS commenced a separate case under chapter 7 of the Bankruptcy Code to liquidate its remaining assets.

      *C.*       *Outstanding Indebtedness*

As of the Petition Date, the outstanding amount due in respect of the MHEFA Bonds and the MDFA Bonds was $43.7 million.  The MDFA Bonds bear interest at a fixed rate of 5¾% and 6¼% *per annum*.  The 1996 Bonds bear interest at rates that range from 6¼% to 6⅜% *per annum*; the 2004A Bonds bear interest at a fixed rate of 6⅜% *per annum*; and the 2004B Bonds bear interest at a fixed rate of 6¼% *per annum*.  Our obligations under the MHEFA Bonds and the MDFA Bonds are secured by the master notes issued by the Debtors under the Master Indenture, the mortgages on the primary facilities of the Hospital, and a pledge of gross revenues from our operations.

In addition to our bond debt, as of the date hereof, the outstanding amount due in respect of our estimated underfunded pension liability is approximately $27,251,912, the outstanding amount due in respect of our capital lease obligations is approximately $348,702.02, the outstanding amount due in respect of the secured portion of our outstanding mortgages is approximately $1 million, and the outstanding amount due in respect of our general unsecured claims (excluding our unfunded pension liability) is approximately $8.65 million.

## IV.     OPERATIONS

      *A.*       *General*

The Debtors' executive offices are located at 71 Hospital Avenue, North Adams, Massachusetts 01247.

We are a non-profit healthcare corporation in northern Berkshire County, Massachusetts. Our mission is to provide regional healthcare services in our local and surrounding communities. We serve a population of approximately 43,000 and operate through our non-profit corporate affiliates: NARH, NBCS, Visiting Nurse Association & Hospice of Northern Berkshire, Inc. ("VNA"), Northern Berkshire Realty, Inc. ("NBR"), and Northern Berkshire Healthcare Physicians Group, Inc. ("NBHPG"). Through these affiliates, NBH offers a comprehensive array of acute and subacute healthcare services.

NARH operates the Hospital, a full-service community hospital with 109 beds and 12 bassinets located in North Adams, Massachusetts. NBCS formerly owned and operated a skilled nursing facility and a continuing care facility known collectively as the Sweets, but, as described in Article III.B. "BACKGROUND AND EVENTS LEADING UP TO THE CHAPTER 11 CASES—Events Leading to Financial Distress", the Sweets were sold in August 2010. The VNA provides nursing and hospice care services in the homes of patients, allowing them to recuperate from illness, injury, or childbirth or manage a medical condition while staying in their own homes. NBR owns and manages certain of our real property on which our other affiliates operate. NBHPG owns and operates our employed physician ambulatory practices, including Northern Berkshire OBGYN, Northern Berkshire Family Medicine, Northern Berkshire ENT, and Northern Berkshire General Surgery.

B. *Employees*

As of November 2011, we had a total of approximately 563 employees.

C. *Corporate History*

The Hospital was incorporated as North Adams Hospital on December 29, 1884, and accepted its first patient in March 1885. In November 1975, the Hospital changed its name to North Adams Regional Hospital to reflect the Hospital's expanding service area and the important role of the Hospital in providing health care services in northern Berkshire County, Massachusetts and the surrounding communities. Originally named Northern Berkshire Health System Inc., NBH was organized as a non-profit corporation in 1984 and established as the sole corporate member of NARH and the VNA. Also in 1984, we established NBR. In 1998, we established REACH Community Health Foundation, Inc. ("REACH") as the Hospital's community health education department, which was later dissolved in 2008. In 1999, we acquired NBCS, which itself acquired and incorporated the Sweets. However, as described elsewhere in this Disclosure Statement, we sold the Sweets in August 2010. In March 2008, we established NBHPG.

D. *Services*

Through its affiliates, NBH offers the following healthcare services:

- obstetrics and gynecology;
- birthing;
- cancer care;
- community education;
- critical care;
- emergency care;
- hospice care;
- laboratory services;
- general surgery;
- medical imaging/x-ray services;
- medical-surgical services;
- neurology and stroke services;
- nutrition services;
- pediatrics;
- physical therapy;
- psychiatric services;

- 23 -

- respiratory therapy;
- family medicine;
- wound healing; and
- ear, nose, and throat services.

### E.    Facilities

The Hospital campus is located on a 28.73 acre parcel located in the City of North Adams.  The campus is composed of four buildings.  The main Hospital building was constructed in 1956 and a north wing was added in 1970.  Four additional buildings are adjacent to the main Hospital building: the Clark House, a 15,236 square-foot building, in which the Hospital's administrative offices, conference rooms and information technology center are located; the Doctors Office Building, a 25,350 square-foot building built in 1970, in which the bio-med and project-management departments are located; the Doctors Annex, a 4,950 square-foot building which houses a medical clinic; and the ACC, a 48,000 square-foot medical office building.

The Hospital campus also includes a helicopter landing pad with easy access to the emergency department for emergency life-flight operations and a three-level parking structure completed in 2001 that accommodates approximately 180 vehicles.  The ACC was built in 2002 and houses physicians' offices.  The ACC is owned by a private development company not affiliated with NBH.  The land on which the ACC is situated is owned by the Hospital and leased to the owners of the ACC pursuant to a fifty-one-year lease.  The Hospital leases a portion of the ACC.  In addition, the Hospital guarantees the payment of rent on space in the ACC that it does not lease in event that space remains vacant for a period of six consecutive months or longer.

### F.    Recent and Future Strategy

We filed the Plan and this Disclosure Statement to reorganize our operations.  The Plan provides a framework for us to continue our charitable mission after bankruptcy without any significant changes in our operations.  The Plan also provides for a substantial reduction and deferral of our bond payment obligations, proposing to replace our annual $3.5 million prepetition bond payments with annual minimum payments of $1.25 million or less, with any additional amounts only payable before 2043 out of excess cash flow or following an Affiliation.  See Article V.A. "THE PLAN—OVERVIEW OF PROPOSED CREDITOR TREATMENT—MDFA and MHEFA Bondholders."  The Plan also provides for a recovery for unsecured creditors in the form of trust interests, as more fully described below.  See Article VII.B.  "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS, AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Post-Effective Trust Agreement," Article VIII.  "VALUATION ANALYSIS," and the projections attached as Exhibit B.

### G.    Environmental, Health, and Safety Matters

For a discussion of our current and future liabilities under federal, state, and local environmental law and occupational health and safety laws and regulations, see Article II.C.13.  "RISK FACTORS—Risks Relating to the Company—Environmental and Health and Safety Liabilities and Requirements."

### H.    Pension Plan

NARH sponsors a defined benefit pension plan, the North Adams Regional Hospital Retirement Income Plan (the "Pension Plan").  As of September 30, 2010, the Pension Plan was underfunded by approximately $27 million.  From 2008 to 2010, we froze the accrual of benefits under the Pension Plan for all union and nonunion employees and increased our contributions to a defined contribution pension plan for such employees.  To preserve our liquidity, we did not make the minimum required funding contributions to the Pension Plan of $309,892 in January 2011, $364,022 in April 2011, and $364,022 in July 2011.  Even if we were to take advantage of certain deferral elections, based on the current funding deficit, we would owe contributions of approximately $1.8 million to the Pension Plan in fiscal year 2011 and approximately $1.7 million in fiscal year 2012 if the Pension Plan were not terminated.

We determined that a distress termination of our Pension Plan would be necessary to reorganize successfully.  When we filed our petitions in chapter 11, we also provided the required notices to the Pension Benefit Guaranty Corporation ("PBGC") and the Pension Plan participants to begin the process of terminating our Pension Plan.  PBGC is a United States government corporation and an agency of the United States created by the Employee Retirement Income Security Act of 1974 (as amended, "ERISA") to administer the pension plan termination insurance program established under Title IV of ERISA, 29 U.S.C. §§ 1301-1461.  PBGC guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV.  Each of the Debtors is a "contributing sponsor" of the Pension Plan or a member of the contributing sponsor's "controlled group," within the meaning of 29 U.S.C. § 1301(a)(13)-(14).  The Pension Plan is covered by Title IV of ERISA.  PBGC has filed claims for the Pension Plan's unfunded benefit liabilities under 29 U.S.C. § 1362(b), for minimum funding contributions to the Pension Plan and shortfall and waiver amortization charges under 29 U.S.C. § 1362(c), and for insurance premiums due (if any) under 29 U.S.C. §§ 1306 and 1307.

On September 6, 2011, we filed a motion to terminate the Pension Plan (the "Pension Plan Motion").  The Pension Plan Motion sought an order from the Bankruptcy Court determining that we satisfy the financial requirements for a distress termination of the Pension Plan under 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).  To satisfy these requirements, we were required to demonstrate an inability to pay all our debts pursuant to a plan of reorganization and continue in business outside the chapter 11 reorganization process absent termination of the Pension Plan.  On October 6, 2011, the Bankruptcy Court found that we satisfied these requirements and approved termination of the Pension Plan.  However, this order did not result in the termination of the Pension Plan, as only PBGC can effect a distress termination of the Pension Plan after determining that we satisfy the other requirements under 29 U.S.C. § 1341(c)(2)(B)(ii).

We have been in discussions with PBGC since before the Petition Date and have reached a tentative agreement with PBGC with respect to PBGC's prepetition claims and post-bankruptcy premiums relating to the Pension Plan, described further in Article VI.E.18. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION—Means of Implementation of Plan—Treatment of Claims of PBGC."

If the Pension Plan is formally terminated by PBGC, we would no longer be required to make contributions to the Pension Plan, including any contributions that would otherwise be necessary to meet the minimum funding standards prescribed by 29 U.S.C. § 1082 and 26 U.S.C. § 412 or to pay PBGC premiums prescribed by 29 U.S.C. §§ 1306 and 1307.  Termination of the Pension Plan is a condition to the occurrence of the Effective Date of the Plan.

    *I.*    *Executive Officers*

Our executive officers are as follows:

| Name | Position(s) held |
| --- | --- |
| William F. Frado, Jr. | President, Chief Executive Officer |
| Christopher L. Hickey | Chief Financial Officer |

## V.    THE PLAN – OVERVIEW OF PROPOSED CREDITOR TREATMENT

    *A.*    *MDFA and MHEFA Bondholders*

The Plan reflects heavily-negotiated terms among the Debtors, Nuveen (as the controlling holder of the MHEFA Bonds), and ACA (as insurer of the MDFA Bonds).  The Debtors believe that the Plan provides the highest and most expeditious possible recovery for holders of MHEFA Bonds and MDFA Bonds and eliminates the expense, delay, and uncertainty of litigating the bondholders' claims and rights, which would likely diminish (not enhance) the return to creditors.

Under the proposed terms of this resolution, no 1111(b) Election will be made with respect to the MDFA Note or the MHEFA Note.  In exchange, the Obligated Group will release all reserve funds held by the bond trustees and will issue new bonds backed by new secured notes to replace the MDFA Note and the MHEFA Note.

The overall structure is an innovative hybrid with an 1111(b) election and has the following components:

First, the MDFA Note Claims will be Allowed in the amount of $13,190,000 and the MHEFA Note Claims will be Allowed in the amount of $30,532,049.

There will be paid to MDFA Trustee and MHEFA Trustee and applied against the respective allowed Amounts of their Claims the MDFA Note Reserve Fund Amount and the MHEFA Note Reserve Fund Amount (the amounts of the debt service reserve fund and other funds held by MDFA Trustee and MHEFA Trustee), reducing the unpaid portion of the Allowed amount of the MDFA Note to $12,901,745 and the unpaid portion of the Allowed amount of the MHEFA Note to $27,301,056.

These remaining Allowed amounts will be satisfied by issuance to the New Trustee of two new secured notes for the MDFA Bonds (in up to two series) and two new secured notes for the MHEFA Bonds.  One secured note bears interest at a 6% rate and has a 30-year amortization.  The amount of this new note in respect of the MDFA Note will be $3,850,998.93.  The amount of this new note in respect of the MHEFA Note will be $8,149,001.07.  The balance of the Allowed amount of the claims will be represented by ECF Notes.  The ECF Notes contain a fixed component payable over 7 years.  The balance of the ECF Note is a proxy for an 1111(b) election.  The balance of the obligations under the ECF Notes are payable pursuant to a formula out of Excess Cash Flow, with the unpaid balance due at the end of the 30-year term.  The ECF Notes bear no interest, and principal owed at maturity is reduced by the amount of all interest payments made, respectively, under the new MDFA Note and new MHEFA Note.  New bonds will be issued to the MDFA Bondholders and MHEFA Bondholders, respectively, backed by these new notes.

In addition, ACA has proposed the ACA Insurance Commutation, under which Commuting Bondholders under the MDFA Note may receive up to $5 million from ACA, over and above any recoveries to which Commuting Bondholders would be entitled from the Reorganized Debtors, which reduces the Allowed amount of the MDFA Note Claim and the amount of New MDFA Bonds the Commuting Bondholders will receive.

The following is a summary of the treatment of the MDFA Note and the MHEFA Note.

<u>MDFA Note without ACA Insurance Commutation</u>

| | |
|---|---|
| Distribution of MDFA Note Reserve Funds: | $288,255 |
| New MDFA Note: | $3,850,998.84 |
| Fixed component of ECF Note: | $617,764.40 |
| Balance of ECF Note: | $8,432,981.76 |
| Total Recovery: | $13,190,000 |

<u>MDFA Note with Maximum ACA Insurance Commutation</u>

| | |
|---|---|
| Distribution of MDFA Note Reserve Funds: | $288,255 |
| New MDFA Note: | $2,693,562.37 |
| Fixed component of ECF Note: | $432,092.30 |
| Maximum amount of ACA Insurance Commutation: | $5,000,000 |
| Balance of ECF Note: | $4,776,090 |
| Total Recovery: | $13,190,000 |

<u>MHEFA Note</u>

| | |
|---|---|
| Distribution of MHEFA Note Reserve Funds: | $3,230,993 |
| New MHEFA Note: | $8,149,001.16[15] |
| Fixed Component of ECF Note: | $1,307,235.60[16] |
| Balance of ECF Note: | $17,844,819.24[17] |
| Total Recovery: | $30,532,049 |

The proposed treatment also makes provision for what will occur on an Affiliation by the Debtors.  In recognition that an Excess Cash Flow note would be a major disincentive for any healthcare institution to affiliate with the Debtors, on Affiliation the Excess Cash Flow component of each ECF Note converts to a fixed payment obligation, an Affiliation Note, with a present value equal to approximately the balance of the ECF Note otherwise due at maturity.  This fixed payment obligation bears interest at 6% and amortizes over the remaining balance of the term of the new MDFA Note and the New MHEFA Note.  Under certain circumstances the Obligated Group may reduce the principal amount owing on Affiliation by more than the amount of Excess Cash Flow and other payments under the ECF Notes. These credits, however, will not reduce the amount of the MDFA Affiliation Note below $956,803.06, or the MHEFA Affiliation Note to less than $2,293,196.93.[18]

In the new notes to be issued under the Plan, the Debtors covenant to use best efforts to obtain and maintain tax exempt status for the New Bonds.

---

[15] Since the ACA Insurance Commutation reduces the Allowed MDFA Note Claim, it also changes the allocation of $12 million aggregate amount of the New MDFA Note, as well as the allocation of the fixed $1.925 million component of the ECF Note.  This amount assumes no Commutation Consideration has been elected.  If MDFA Bondholders elect the full Commutation Consideration, the amount of the New MHEFA Note would be $9,306,437.63, the fixed component of the MHEFA ECF Note would be approximately $1.5 million, and the balance of the MHEFA ECF Note would be approximately $16.5 million.

[16] See footnote 15.

[17] See footnote 15.

[18] This allocation is based on the respective Allowed Claims under the MDFA Note and the MHEFA Note and does not take into account any ACA Insurance Commutation, but in no event shall the credits reduce the aggregate face value of the Affiliation Notes below $3.25 million.

- 27 -

If the Plan is not approved, a court could confirm a plan of reorganization without bondholders' consent that the Debtors believe offers bondholders treatment that is inferior to the treatment that is proposed under the Plan.

First, the Plan could offer bondholders secured notes with a value equal to the Allowed amount of the secured portion of their Claims, plus the same treatment under the Plan as General Unsecured Creditors for the remainder of their Allowed Claims. The Debtors estimate that the secured notes would be the same new notes with a $12 million total principal amount offered under the Plan, and the treatment as General Unsecured Creditors would provide only a one percent recovery on the remaining $31 million. The Plan's guaranteed recovery alone exceeds these amounts and secures the entire obligation, and also offers bondholders a share of any excess cash flow.

Second, the bondholders could make an 1111(b) Election, in which case the Debtors believe bondholders would receive different treatment and materially worse economic value. Under an 1111(b) Election, the bondholders would receive new secured notes with a value equal only to the Allowed amount of the secured portion of their Claims, which the Debtors estimate to be $12 million, but which, over time, provide a stream of payments equal to the total Allowed amounts of their Claims. Thus, the Plan provides that, if the bondholders make the 1111(b) Election, they will receive only new secured notes with the present value of $12 million, and no ECF or Affiliation Notes.

The Debtors estimate that the $12 million new secured notes the bondholders will receive if no 1111(b) Election is made have the same $12 million present value as the notes they would receive if the 1111(b) Election were made. Thus, the Debtors believe that the ECF and Affiliation Notes the bondholders will also receive if no 1111(b) Election is made provide significant additional value the bondholders would lose if an 1111(b) Election is made. Accordingly, the Debtors believe that an 1111(b) Election is not in the bondholders' best interests because it would substantially reduce the bondholders' recoveries under the Plan.

Nuveen and ACA have informed the Debtors that they do not agree with Debtors' analysis of what bondholders would receive if an 1111(b) Election were made, but that regardless Nuveen and ACA both consider the proposed treatment of Bondholder Claims under the settlement to provide the best possible recovery for Bondholders. Nuveen and ACA therefore recommend that all Bondholders vote to accept the Plan and that Bondholders do not make an 1111(b) Election.

B.      General Unsecured Creditors

The Plan offers General Unsecured Creditors interests in a trust that will receive notes or other assets from the Debtors or the Reorganized Debtors, along with Avoidance Actions in each Debtor's Estate. The trust will distribute trust interests pro rata to Holders of Claims in accordance with their Allowed Claims against each Debtor, with subaccounts for Holders of Claims against NARH, NBH, NBHPG, and VNA. General Unsecured Creditors of NBH, NARH, or NBHPG will not receive this treatment unless both their Class and PBGC votes to accept the Plan.

The trust subaccounts for Holders of Claims against NARH, NBH, and NBHPG will receive shares in a new $375,000 note jointly issued by NARH, NBH, and NBHPG. The shares of this note will be distributed approximately 92% to the NARH trust subaccount, 3% to the NBH trust subaccount, and 5% to the NBHPG trust subaccount, in accordance with General Unsecured Claims against each Debtor as set forth on the schedules to the Debtors' bankruptcy petitions. In calculating these distributions, the Debtors excluded any MDFA Note Claims and MHEFA Note Claims and any intercompany claims (which will be released). The Debtors estimate that Holders of General Unsecured Claims against NARH, the Debtor owing the vast majority of General Unsecured Claims, will receive a 1% recovery, payable in equal monthly installments over four years, plus the pro rata amount of any recoveries on Avoidance Actions.

The trust subaccount for Holders of Claims against VNA will receive the Women's Exchange Real Property and the VNA Building Real Property (subject to the VNA Hoosac Bank Secured Claim). Based on real estate appraisals, the Debtors estimate that the VNA trust subaccount will receive approximately $260,000 from the liquidation of these properties after satisfaction of the VNA Hoosac Bank Secured Claim.

- 28 -

The holders of beneficial interests in the NBH, NARH, and NBHPG trust subaccounts will be the Holders of Allowed General Unsecured Claims and Allowed PBGC Prepetition Claims against each such Debtor. The holders of interests in the VNA trust subaccount will be Holders of Allowed General Unsecured Claims, the Allowed Prepetition PBGC Claim, the Allowed MDFA Note Claim, the Allowed MHEFA Note Claim, and the Allowed VNA Hoosac Bank Deficiency Claim (if any).

Representatives of the General Unsecured Creditors will also participate on a Search Committee to select the new Chief Executive Officer of NBH and NARH, unless the Classes of General Unsecured Creditors of NBH and NARH do not vote to accept the Plan. The Debtors believe that many of the General Unsecured Claims are held by Holders with a substantial interest in the Debtors' ongoing operations, and therefore attribute significant value to General Unsecured Creditors' ability to participate in the Search Committee. Moreover, since the Debtors believe that General Unsecured Creditors would likely be entitled to no recovery after payment of Secured Claims and Administrative Claims, and absent a waiver of intercompany Claims, the Debtors believe that the Plan offers General Unsecured Creditors a substantially better recovery than any alternative treatment to which they would otherwise be entitled.

C.    *Pension Benefit Guaranty Corporation*

The Plan reflects negotiated terms among the Debtors and PBGC, as the insurer of and successor to the Pension Plan. The Debtors' agreement with PBGC is subject to PBGC's final approval. The Debtors' desire to resolve their significantly underfunded Pension Plan was a key motivation for these Chapter 11 Cases. The settlement the Debtors have proposed to the PBGC replaces the Debtors' significant plan termination penalties and $27,251,912 underfunding liability with payments that the Reorganized Debtors can afford, and grants PBGC the same treatment as General Unsecured Creditors for its prepetition claims for termination of the Pension Plan.

Without PBGC's consent, the Debtors would be required to pay PBGC a premium after emerging from bankruptcy equal to approximately $2.9 million in three equal annual payments, the first to be paid within a month after emergence. The Debtors and PBGC have an agreement, subject to final approval by the PBGC, for the Reorganized Debtors to instead pay two-thirds of this amount in 10 years, with straight-line amortization of one third of the principal amount, interest accruing at 2%, and credits for early repayment of principal of up to two dollars for each dollar prepaid. The agreement with the PBGC removes the bulk of the $2.9 million premium from the early years of the Debtors' cash flow, enabling the Debtors to propose the Plan and to provide for a distribution to unsecured creditors.

Unless PBGC votes all of its PBGC Prepetition Claims to accept the Plan, none of the terms of this settlement will apply, and the Debtors will provide no recovery to PBGC for its PBGC Prepetition Claims or to any General Unsecured Creditors for their General Unsecured Claims.

## VI.    THE PLAN – CLASSIFICATIONS, DISTRIBUTIONS, AND IMPLEMENTATION

A.    *Overview of Chapter 11*

Chapter 11 is the business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its financial affairs for the benefit of itself and its creditors. The principal goals of chapter 11 are to permit the rehabilitation of the debtor and provide for equality of treatment of similarly situated creditors.

The Plan provides, among other things, for a restructuring of our financial indebtedness. The goal of the Plan is to de-lever our balance sheet in order to provide us with a capital structure that will best enable us to continue to provide high quality healthcare for residents of the northern Berkshire County region.

The following summary is a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Disclosure Statement. Capitalized terms used in this Article V but not otherwise defined in Annex I shall have the meanings assigned such terms in the Plan.

- 29 -

B.        *Administrative Claims, Priority Tax Claims, and Other Unclassified Claims*

1.    *Administrative Claims*

Pursuant to Section 2.1 of the Plan, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Administrative Claim (except to the extent that such Holder agrees to less favorable treatment thereof) on or as soon as practicable after the latest of (a) the Effective Date, (b) the date on which such Administrative Claim becomes Allowed, (c) the date on which such Administrative Claim becomes due and payable, and (d) such other date as mutually may be agreed to by such Holder and the Debtors.  Notwithstanding the foregoing, any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto.  Allowed Administrative Claims shall be paid in Cash from the Reorganized Debtors' cash on hand or generated by the Reorganized Debtors' ordinary business operations.

2.    *Priority Tax Claims*

Pursuant to Section 2.2 of the Plan, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) on or as soon as practicable after the latest of (a) the Effective Date, (b) the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable, and (d) such other date as mutually may be agreed to by and among such Holder and the Debtors; *provided, however,* that the Debtors may, at their option and in lieu of payment in full in Cash of an Allowed Priority Tax Claim as provided in clauses (a) through (d) hereof, make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.  Allowed Priority Tax Claims shall be paid in Cash from the Reorganized Debtors' cash on hand or generated by the Reorganized Debtors' ordinary business operations.

3.    *Professional Fees*

Pursuant to Section 2.3 of the Plan:

(a)    *Final Fee Applications*

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court and served on the Reorganized Debtors no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims and the apportionment of such Professional Fee Claims among the Debtors after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases.  The Disbursing Agent shall make all distributions on account of Allowed Claims for Professional compensation and reimbursement of expenses as soon as reasonably practicable after such Claims become Allowed.  Such distributions shall be paid in Cash from the Reorganized Debtors' cash on hand or generated by the Reorganized Debtors' ordinary business operations.

(b)    *Payment of Interim Amounts*

Professionals shall be paid pursuant to the "Monthly Statement" process set forth in the Professional Fee Order with respect to all calendar months ending prior to the Effective Date.

(c)    *Post-Effective Date Fees and Expenses*

On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date shall terminate and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

- 30 -

(d)    *Fee Applications for Substantial Contribution Claims*

All Persons seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred during the Chapter 11 Cases under section 503(b)(3)(D) shall File their respective applications and serve them on the Reorganized Debtors no later than 45 days after the Effective Date. Each such application shall be in the form of an application for payment of Professional Fee Claims under section 330 of the Bankruptcy Code and shall comply with all provisions of the Bankruptcy Code, the Bankruptcy Rules, and the MLBR applicable thereto and guidelines promulgated by the U.S. Trustee.

4.    *Certain Master Trustee and Bond Trustee Fees and Expenses*

Pursuant to Section 2.4 of the Plan:

- As part of the settlement described in Section 4.1 of the Plan, on the condition that each of Classes 1A, 1B, 2A, 2B, 3A, and 3C has voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and has not made any 1111(b) Election, the Obligated Group has agreed as follows with respect to the fees and expenses incurred by the Master Trustee, MDFA Trustee, and MHEFA Trustee prior to the Effective Date, including the fees and expenses incurred by such trustee's professionals, required to be reimbursed under the Master Indenture or the respective Loan and Trust Agreement (collectively, "Trustee Fees and Expenses"):

  o  On the Effective Date, the Obligated Group shall pay $500,000 into escrow for distribution on account of Trustee Fees and Expenses to the Master Trustee, MDFA Trustee, and MHEFA Trustee.

  o  The principal amount of the MDFA ECF Note shall be deemed increased by (x) the sum of the amounts of (i) the Trustee Fees and Expenses owing with respect to the MDFA Loan and Trust Agreement and (ii) the Trustee Fees and Expenses owing with respect to the Master Indenture times the MDFA Note Share, less (y) $900,000 times the MDFA Note Share.

  o  The principal amount of the MHEFA ECF Note shall be deemed increased by (x) the sum of the amounts of (i) the Trustee Fees and Expenses owing with respect to the MHEFA Loan and Trust Agreement and (ii) the Trustee Fees and Expenses owing with respect to the Master Indenture times the MHEFA Note Share, less (y) $900,000 times the MHEFA Note Share.

  o  On or before September 15, 2012, the Obligated Group shall pay to the New Trustee for allocation among the Bondholders an amount not to exceed the lesser of (x) $400,000 in aggregate or (y) the amount of the Trustee Fees and Expenses less $500,000.

Within 10 days after the Effective Date, invoices for all Trustee Fees and Expenses through the Effective Date, including fees and expenses of professionals setting forth full time and expense records (redacted as necessary to preserve client confidentiality), shall be served upon counsel to the Obligated Group, the U.S. Trustee, and the Creditors' Committee.  For the avoidance of doubt, no payments related to Trustee Fees and Expenses shall be subject to ECF Credits.

For avoidance of doubt, nothing contained in this Plan shall prohibit, prevent, restrict or limit in any way the rights of the Master Trustee, MDFA Trustee, or MHEFA Trustee to exercise their respective Charging Liens in order to pay any and all unpaid Trustee Fees and Expenses that may be due and owing to the Master Trustee, MDFA Trustee, and/or MHEFA Trustee.

C.    *Classification of Claims*

Section 1123(a)(1) of the Bankruptcy Code requires a plan of reorganization to designate classes of claims. The Plan segregates the various Claims against the Debtors into various classes.  Based on both the enterprise value and liquidation value of the Debtors as set forth herein, the Debtors have insufficient value to pay their creditors in full.

29105905_1

The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim in a particular Class only if such Claim is substantially similar to the other Claims of such Class. We believe that all Claims have been appropriately classified in the Plan. To the extent that the Bankruptcy Court determines that such classification is incorrect, however, the Bankruptcy Court could deny confirmation of the Plan.

If the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, we would seek (with the consent of any required parties) to (i) modify the Plan to provide for whatever reasonable classification might be required for confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this Disclosure Statement for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which the Holder of such Claim was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan adversely affects the treatment of a Holder of Claims in a manner that requires resolicitation, we likely will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this Disclosure Statement will constitute a consent to the Plan's treatment of such Holder regardless of the Class to which such Holder is ultimately deemed to be a member. See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases."

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class unless the Holder of a particular Claim agrees to a less favorable treatment of its Claim. We believe we have complied with the requirement of equal treatment for each Claim of a particular Class.

Only Classes that are "impaired" (pursuant to section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan, unless the Class is deemed to have rejected the Plan. As a general matter, a class of claims is considered to be "unimpaired" under a plan of reorganization if the plan does not alter the legal, equitable, and contractual rights of the holders of such claims. Under the Bankruptcy Code, holders of unimpaired claims are conclusively presumed to have accepted a proposed plan of reorganization. Holders of Claims that do not receive or retain anything under a proposed plan of reorganization are deemed to have rejected such plan.

The categories of Claims outlined in the Plan and listed below classify Claims for all purposes, including for purposes of voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. Pursuant to section 3.1 of the Plan, a Claim shall be deemed classified in a particular Class only to the extent that such Claim qualifies within the description of such Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such different Class. A Claim is in a particular Class only to the extent that such Claim has not been paid or otherwise settled prior to the Effective Date.

The classification of Claims (except for Administrative Claims, Professional Fee Claims, and Priority Tax Claims, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) pursuant to the Plan is as follows:

> Class 1A—NBH MDFA Note Claims
> Class 1B—NBH MHEFA Note Claims
> Class 1C—NBH PBGC Prepetition Claim
> Class 1D—NBH General Unsecured Claims
>
> Class 2A—NARH MDFA Note Claims
> Class 2B—NARH MHEFA Note Claims
> Class 2C—CalFirst Capital Lease 1 Claim
> Class 2D—CalFirst Capital Lease 2 Claim
> Class 2E—Other Capital Lease Claims

- 32 -

Class 2F—NARH PBGC Prepetition Claim
Class 2G—NARH General Unsecured Claims

Class 3A—VNA MDFA Note Claims
Class 3B—VNA MHEFA Note Claims
Class 3C—VNA Hoosac Bank Secured Claim
Class 3D—VNA PBGC Prepetition Claim
Class 3E—VNA General Unsecured Claims
Class 3F— VNA Hoosac Bank Deficiency Claim

Class 4A— NBHPG PBGC Prepetition Claim
Class 4B— NBHPG General Unsecured Claims

Class 5—Other Priority Claims

Class 6—Other Secured Claims

D.      *Treatment and Voting Rights of Claims*

The treatment and voting rights of Claims pursuant to Article III of the Plan are as follows:

1.  *Treatment of Claims*

(a)   Class 1A— NBH MDFA Note Claims.

(i)   *Treatment*: On behalf of the Holders of the MDFA Notes, in full satisfaction
and discharge of the Allowed MDFA Note Claims, the New Trustee shall
receive, under the settlement described in Section 4.1 of the Plan, (x) the New
MDFA Note and the MDFA ECF Note or (y) such other treatment as the
Holders elect pursuant to Section 4.12 of the Plan.

(ii)  *Allowance*: The MDFA Note Claims against NBH (together with the MDFA
Note Claims against NARH and VNA) shall be deemed Allowed in an aggregate
amount equal to the outstanding principal amount of the MDFA Note minus the
sum of (A) the MDFA Note Reserve Fund Amount and (B) the Commutation
Consideration.

(b)   Class 1B— NBH MHEFA Note Claims.

(i)   *Treatment*: On behalf of the Holders of the MHEFA Notes, in full satisfaction
and discharge of the Allowed MHEFA Note Claims, the New Trustee shall
receive, under the settlement described in Section 4.1 of the Plan, (x) the New
MHEFA Note and the MHEFA ECF Note or (y) such other treatment as the
Holders elect pursuant to Section 4.12 of the Plan.

(ii)  *Allowance*: The MHEFA Note Claims against NBH (together with the MHEFA
Note Claims against NARH and VNA) shall be deemed Allowed in an aggregate
amount equal to the outstanding principal amount of the MHEFA Note minus
the MHEFA Note Reserve Fund Amount.

(c)   Class 1C— NBH PBGC Prepetition Claim.

(i)   *Treatment*: If Class 1C votes to accept the Plan in accordance with section
1126(c) of the Bankruptcy Code, the Holder of the Allowed PBGC Prepetition

- 33 -

Claim against NBH shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NBH Post-Effective Trust Account Interests.

(ii)   *Allowance*:  The PBGC Prepetition Claim against NBH shall be deemed Allowed in an aggregate amount equal to $27,251,912.

(d)   Class 1D—NBH General Unsecured Claims.  If PBGC and Class 1D vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim against NBH shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NBH Post-Effective Trust Account Interests.

(e)   Class 2A— NARH MDFA Note Claims.

(i)   *Treatment*:  On behalf of the Holders of the MDFA Notes, in full satisfaction and discharge of the Allowed MDFA Note Claims, the New Trustee shall receive, under the settlement described in Section 4.1 of the Plan, (x) the New MDFA Note and the MDFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12 of the Plan.

(ii)   *Allowance*:  The MDFA Note Claims against NARH (together with the MDFA Note Claims against NBH and VNA) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MDFA Note minus the sum of (A) the MDFA Note Reserve Fund Amount and (B) the Commutation Consideration.

(f)   Class 2B— NARH MHEFA Note Claims.

(i)   *Treatment*:  On behalf of the Holders of the MHEFA Notes, in full satisfaction and discharge of the Allowed MHEFA Note Claims, the New Trustee shall receive, under the settlement described in Section 4.1 of the Plan, (x) the New MHEFA Note and the MHEFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12 of the Plan.

(ii)   *Allowance*:  The MHEFA Note Claims against NARH (together with the MHEFA Note Claims against NBH and VNA) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MHEFA Note minus the MHEFA Note Reserve Fund Amount.

(g)   Class 2C— CalFirst Capital Lease 1 Claim.

(i)   *Treatment*:  The Holder of the Allowed CalFirst Capital Lease 1 Claim shall receive, in full satisfaction and discharge thereof, the CalFirst Capital Lease 1 Secured Note.

(ii)   *Allowance*:  For purposes of the Plan, the entire Allowed outstanding amount of the CalFirst Capital Lease 1 Claim as of the Effective Date shall be treated as an Allowed Secured Claim.

(h)   Class 2D— CalFirst Capital Lease 2 Claim.

(i)   *Treatment*:  The Holder of the Allowed CalFirst Capital Lease 2 Claim shall receive, in full satisfaction and discharge thereof, the CalFirst Capital Lease 2 Secured Note.

- 34 -

(ii)    *Allowance*: For purposes of the Plan, the entire Allowed outstanding amount of the CalFirst Capital Lease 2 Claim as of the Effective Date shall be treated as an Allowed Secured Claim.

(i)    Class 2E— Other Capital Lease Claims.

(i)    *Treatment*: Each Holder of an Allowed Other Capital Lease Claim shall receive, in full satisfaction and discharge thereof, its respective Other Capital Lease Secured Note.

(ii)    *Allowance*: For purposes of the Plan, the entire Allowed outstanding amount of each Other Capital Lease Claim as of the Effective Date shall be treated as an Allowed Secured Claim.

(j)    Class 2F— NARH PBGC Prepetition Claim.

(i)    *Treatment*: If Class 2F votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, the Holder of the Allowed PBGC Prepetition Claim against NARH shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NARH Post-Effective Trust Account Interests.

(ii)    *Allowance*: The PBGC Prepetition Claim against NARH shall be deemed Allowed in an aggregate amount equal to $27,251,912.

(k)    Class 2G—NARH General Unsecured Claims.  If PBGC and Class 2G vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim against NARH shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NARH Post-Effective Trust Account Interests.

(l)    Class 3A— VNA MDFA Note Claims.

(i)    *Treatment*: On behalf of the Holders of the MDFA Notes, in full satisfaction and discharge of the Allowed MDFA Note Claims, the New Trustee shall receive, under the settlement described in Section 4.1 of the Plan, (x) the New MDFA Note and the MDFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12 of the Plan.

(ii)    *Allowance*: The MDFA Note Claims against VNA (together with the MDFA Note Claims against NARH and NBH) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MDFA Note minus the sum of (A) the MDFA Note Reserve Fund Amount and (B) the Commutation Consideration.

(m)    Class 3B— VNA MHEFA Note Claims.

(i)    *Treatment*: On behalf of the Holders of the MHEFA Notes, in full satisfaction and discharge of the Allowed MHEFA Note Claims, the New Trustee shall receive, under the settlement described in Section 4.1 of the Plan, (x) the New MHEFA Note and the MHEFA ECF Note or (y) such other treatment as the Holders elect pursuant to Section 4.12 of the Plan.

(ii)    *Allowance*: The MHEFA Note Claims against VNA (together with the MHEFA Note Claims against NARH and NBH) shall be deemed Allowed in an aggregate amount equal to the outstanding principal amount of the MHEFA Note minus the MHEFA Note Reserve Fund Amount.

- 35 -

(n)    Class 3C— VNA Hoosac Bank Secured Claim.

    (i)    *Treatment*:  The Holder of the Allowed VNA Hoosac Bank Secured Claim shall receive, in full satisfaction and discharge thereof, the VNA Building Sale Proceeds (up to the Allowed amount of such Secured Claim) as set forth in Section 4.15 of the Plan.

    (ii)    *Allowance*:  Upon consummation of the sale of the VNA Building Real Property, the VNA Hoosac Bank Secured Claim shall be deemed Allowed in an amount equal to the lesser of (A) $599,261.41 and (B) the amount of the VNA Building Sale Proceeds.

(o)    Class 3D— VNA PBGC Prepetition Claim.

    (i)    *Treatment*:  The Holder of the Allowed PBGC Prepetition Claim against VNA shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the VNA Post-Effective Trust Account Interests.

    (ii)    *Allowance*:  The PBGC Prepetition Claim against VNA shall be deemed Allowed in an aggregate amount equal to $27,251,912.

(p)    Class 3E— VNA General Unsecured Claims.  Each Holder of an Allowed General Unsecured Claim against VNA shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the VNA Post-Effective Trust Account Interests.

(q)    Class 3F— VNA Hoosac Bank Deficiency Claim.

    (i)    *Treatment*:  The Holder of the Allowed VNA Hoosac Bank Deficiency Claim, if any, shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the VNA Post-Effective Trust Account Interests.

    (ii)    *Allowance*:  The VNA Hoosac Bank Deficiency Claim, if any, shall be deemed Allowed in an amount equal to the excess, if any, of (A) $599,261.41 over (B) the amount of the VNA Building Sale Proceeds.

(r)    Class 4A— NBHPG PBGC Prepetition Claim.

    (i)    *Treatment*:  If Class 4A votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, the Holder of the Allowed PBGC Prepetition Claim against NBHPG shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NBHPG Post-Effective Trust Account Interests.

    (ii)    *Allowance*:  The PBGC Prepetition Claim against NBHPG shall be deemed Allowed in an aggregate amount equal to $27,251,912.

(s)    Class 4B—NBHPG General Unsecured Claims. If Class 4B votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim against NBHPG shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the NBHPG Post-Effective Trust Account Interests.

(t)    Class 5—Other Priority Claims.  Each Holder of an Allowed Other Priority Claim shall receive from the Disbursing Agent, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Other Priority Claim (except to the extent such Holder agrees to less favorable treatment thereof) on or as soon as practicable after the latest of (x) the Effective Date, (y) the date on

which such Other Priority Claim becomes Allowed, and (z) such other date as mutually may be agreed to by and among such Holder and the Debtors.

(u)   Class 6—Other Secured Claims. Each Holder of an Allowed Other Secured Claim shall have its agreement with the respective Debtor reinstated under section 1124(2) of the Bankruptcy Code or shall receive from the Disbursing Agent, in full satisfaction and discharge thereof, the collateral securing its Other Secured Claim.

2.   *Voting Rights of Claims*

(a)   Impaired Classes:

(i)   The following Classes are Impaired: Class 1A, Class 1B, Class 1C, Class 1D, Class 2A, Class 2B, Class 2C, Class 2D, Class 2E, Class 2F, Class 2G, Class 3A, Class 3B, Class 3C, Class 3D, Class 3E, Class 3F, Class 4A, and Class 4B.

(ii)   The following Holders are entitled to vote the following Claims to accept or reject the Plan: each Holder of an NBH MDFA Note Claim, NBH MHEFA Note Claim, NBH PBGC Prepetition Claim, NBH General Unsecured Claim, NARH MDFA Note Claim, NARH MHEFA Note Claim, CalFirst Capital Lease 1 Claim, CalFirst Capital Lease 2 Claim, Other Capital Lease Claim, NARH PBGC Prepetition Claim, NARH General Unsecured Claim, VNA MDFA Note Claim, VNA MHEFA Note Claim, VNA Hoosac Bank Secured Claim, VNA PBGC Prepetition Claim, VNA General Unsecured Claim, VNA Hoosac Bank Deficiency Claim, NBHPG PBGC Prepetition Claim, and NBHPG General Unsecured Claim.

(b)   Unimpaired Classes:

(i)   Class 5 and Class 6 are Unimpaired.

(ii)   Holders of Allowed Other Priority Claims and Allowed Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.   *No Effect on Claims Against Northern Berkshire Realty, Inc.*

Pursuant to Section 3.4 of the Plan, for the avoidance of doubt, the Plan is not, and shall not be deemed to be, a plan of reorganization for NBR. The Plan has no effect of any Claims against NBR, including any Claims of PBGC, MDFA Trustee, MHEFA Trustee, the MDFA Bondholders, or the MHEFA Bondholders against NBR, all of whose rights against NBR shall be reserved. For the avoidance of doubt, the Plan will discharge all Claims of NBR against any of the Debtors, which shall be Allowed solely as a $207,628.97 General Unsecured Claim against NBHPG.

4.   *Confirmation Pursuant to 1129(b) of the Bankruptcy Code*

With respect to any Class of Claims that is deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

E.   *Means of Implementation of Plan*

1.   *Compromise of Controversies; Waiver of Intercompany Claims.*

- 37 -

Pursuant to Section 4.1 of the Plan, in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

The provisions of the Plan, and in particular Sections 2.4, 3.2, 4.2, 4.10, 4.11, 4.12, 4.16, 4.17, 4.18. 8.2, 9.3, and 9.4 of the Plan, represent a settlement between the Debtors, Nuveen, and ACA following extensive arm's-length and good faith negotiations and, pursuant to Section 4.1(a) of the Plan, the Bankruptcy Court's entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such settlement under Bankruptcy Rule 9019. An MDFA Bondholder may accept this settlement by voting all of his, her, or its Claims in Classes 1A, 2A, and 3A to accept the Plan, and a MHEFA Bondholder may accept this settlement by voting all of his, her, or its Claims in Classes 1B, 2B, and 3B to accept the Plan. Any split vote by a Bondholder, or any vote by a Bondholder to accept the Plan with respect to Claims against one Debtor but not another Debtor, shall be deemed a vote to reject the Plan with respect to all Debtors.

The provisions of the Plan, and in particular Sections 3.2 and 4.19 of the Plan, represent a settlement between the Debtors and PBGC following extensive arm's-length and good faith negotiations and, pursuant to Section 4.1(a) of the Plan, the Bankruptcy Court's entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such settlement under Bankruptcy Rule 9019.

The entry of the Confirmation Order shall further constitute the Bankruptcy Court's approval of each Debtor's agreement to waive any and all intercompany claims against each and every one of the other Debtors.

2.      *Vesting and Distribution of Assets*

Pursuant to Section 4.2 of the Plan, on the Effective Date, except as provided in Section 4.10 or Section 4.19 of the Plan, (a) the Reorganized Debtors shall issue the PBGC Post-Effective Note to the Holder of the PBGC Post-Effective Claims and the New PET Unsecured Note to the Post-Effective Trust Accounts of NBH, NARH, and NBHPG, (b) VNA shall transfer the VNA Building Real Property (subject to the VNA Hoosac Bank Secured Claim) and the Women's Exchange Real Property to the VNA Post-Effective Trust Account, (c) the Debtors will release the MDFA Note Reserve Fund Amount to MDFA Trustee (to the extent not previously released) to be applied to reduce the principal amount of the MDFA Note Claim, subject to the rights of the Master Trustee and MDFA Trustee, if any, to assert their respective Charging Liens against such funds to pay any Trustee Fees and Expenses which may be due and owing to the Master Trustee and MDFA Trustee; provided, however, that all amounts so released to MDFA Trustee shall be deemed applied to reduce the principal amount of the MDFA Note Claim, (d) the Debtors will release the MHEFA Note Reserve Fund Amount to MHEFA Trustee (to the extent not previously released) to be applied to reduce the principal amount of the MHEFA Note Claim, subject to the rights of the Master Trustee and MHEFA Trustee, if any, to assert its Charging Lien against such funds under the MHEFA Loan and Trust Agreement to pay any Trustee Fees and Expenses which may be due and owing to the Master Trustee and MHEFA Trustee; provided, however, that all amounts so released to MHEFA Trustee shall be deemed applied to reduce the principal amount of the MHEFA Note Claim, (e) with respect to each Debtor, the Avoidance Actions in each Debtor's Estate, and each Debtor's right to file, settle, compromise, withdraw, or litigate to judgment objections to any PET Claim, shall vest exclusively in the Post-Effective Trust Account of such Debtor, (f) the Reorganized Debtors shall transfer $25,000 to the Post-Effective Trust, and (g) title to all other Assets of any Debtor shall vest in the respective Reorganized Debtor, free and clear of all Claims, liens, encumbrances, and other interests.

3.      *Continued Corporate Existence*

Pursuant to Section 4.3 of the Plan, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal entity, with all the powers available to such legal entity under applicable law and pursuant to the applicable New Constituent Documents, and without prejudice to any right to alter or terminate such existence (whether by merger, sale, or otherwise) in accordance with such applicable law. On and after the Effective Date, the Reorganized Debtors may operate their respective businesses and use, acquire, lease, sell or dispose of their assets without supervision or approval by the Bankruptcy Court and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

4.        *Cancellation of Notes and Instruments*

Cancellation of Secured Notes

Pursuant to Section 4.4 of the Plan, on the Effective Date, the Loan and Trust Agreements, the Master Indenture, the MDFA Bonds, the MHEFA Bonds, and the Secured Notes and any other notes, bonds, certificates, or other instruments or documents evidencing or creating the Secured Notes shall be cancelled and deemed terminated, satisfied, and discharged, and MDFA Trustee, MHEFA Trustee, the MDFA Bondholders, the MHEFA Bondholders, the Holder of the VNA Hoosac Bank Secured Claim, and the Master Trustee shall have no further rights or entitlements in respect thereof against the Debtors; provided, however, notwithstanding any provision contained herein to the contrary:

(i)        the MHEFA Loan and Trust Agreement and the MHEFA Bonds shall continue in effect solely for the purposes of permitting MHEFA Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to MHEFA Trustee;

(ii)        the MDFA Loan and Trust Agreement and the MDFA Bonds shall continue in effect solely for the purposes of permitting MDFA Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to MDFA Trustee; and

(iii)        the Master Trust Agreement and the Secured Notes shall continue in effect solely for the purposes of permitting Master Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to the Master Trustee.

- 39 -

Cancellation of Other Instruments

On the Effective Date, and except as otherwise provided in the following three paragraphs, any notes, bonds, certificates, or other instruments or documents evidencing or creating any Claims that are Impaired by the Plan shall be automatically cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and deemed terminated, satisfied, and discharged. Any Holder of an Impaired Claim shall have no further rights or entitlements in respect thereof against the Debtors except the right to receive the distributions, if any, to which the Holder is entitled under the Plan.

Upon the Effective Date, MDFA Trustee (solely in its capacity as trustee under the MDFA Loan and Trust Agreement), shall be discharged from its duties and obligations arising the MDFA Loan and Trust Agreement, the MDFA Bonds and any agreements, instruments and documents related thereto; provided, however, notwithstanding any provision contained herein to the contrary, the MDFA Loan and Trust Agreement and the MDFA Bonds shall continue in effect solely for the purposes of permitting MDFA Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to MDFA Trustee.

Upon the Effective Date, MHEFA Trustee shall be discharged from its duties and obligations arising under the MHEFA Loan and Trust Agreement, the MHEFA Bonds and any agreements, instruments and documents related thereto, provided, however, notwithstanding any provision contained herein to the contrary, the MHEFA Loan and Trust Agreement and the MHEFA Bonds shall continue in effect solely for the purposes of permitting MHEFA Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to MHEFA Trustee.

Upon the Effective Date, the Master Trustee shall be discharged from its duties and obligations arising the Master Trust Agreement, the Secured Notes and any agreements, instruments and documents related thereto; provided, however, notwithstanding any provision contained herein to the contrary, the Master Trust Agreement and the Secured Notes shall continue in effect solely for the purposes of permitting the Master Trustee to maintain the Charging Lien which it has with respect to any Trustee Fees and Expenses that may be due and owing to the Master Trustee.

5.      *Cancellation of Liens*

Pursuant to Section 4.5 of the Plan, on the Effective Date, any Lien securing any Secured Claim shall be deemed released and the Holder of such Secured Claim shall release any collateral (including any cash collateral) or other property of any Debtor held by such Holder and shall take such actions the Debtors or the Reorganized Debtors may request to evidence the release of such Lien, including, as the Debtors or the Reorganized Debtors may request, to execute, deliver, file, or record such releases, and the Debtors or the Reorganized Debtors may take such actions on behalf of such Holders; provided, however, that notwithstanding any provision contained herein to the contrary: (i) any Charging Lien that MHEFA Trustee has shall continue to remain in full force and effect; (ii) any Charging Lien that MDFA Trustee has shall continue to remain in full force and effect; and (iii) any Charging Lien that the Master Trustee has shall continue to remain in full force and effect.

6.      *New Constituent Documents*

Pursuant to Section 4.6 of the Plan, on or as soon as practicable after the Effective Date, the Reorganized Debtors shall (a) make any and all filings that may be required in connection with the New Constituent Documents with the appropriate governmental offices or agencies and (b) take any and all other actions that may be required to render the New Constituent Documents effective.

7.      *New Officers*

Pursuant to Section 4.7 of the Plan and section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each of the New Officers (and, if such Person is an insider, the nature of any compensation for such Person) will be provided in the Plan Supplement.

29105905_1

8.      *Trustees of the Reorganized Debtors*

Pursuant to Section 4.8 of the Plan, the New Board of Trustees for each Reorganized Debtor will be the same as the current board of trustees for the respective Debtor, except to the extent otherwise provided in the Plan Supplement.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of each of the initial New Boards of Trustees (and, if such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement.  Each member of each of the initial New Boards of Trustees shall assume the position of trustee on the day immediately following the Effective Date.  Any subsequent New Board of Trustees shall be elected, classified, and composed in a manner consistent with the applicable New Constituent Documents and applicable nonbankruptcy law.

9.      *Corporate Action*

Pursuant to Section 4.9 of the Plan, on the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) adopting the New Constituent Documents, (b) selecting the Reorganized Debtors' trustees and officers, (c) issuing the New Notes, and (d) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All such actions shall be deemed to have occurred and shall be in effect, without any requirement of further action by the trustees or officers of the Debtors or the Reorganized Debtors.  On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the boards of trustees of the Reorganized Debtors shall issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated in Section 4.9 of the Plan shall be effective notwithstanding any requirements under any applicable nonbankruptcy law.

10.     *Post-Effective Trust*

Pursuant to Section 4.10 of the Plan, we will establish the Post-Effective Trust as the mechanism for distributing our remaining assets and pursuing and resolving any Claims relating to the Post-Effective Trust and Avoidance Actions (other than the Released Avoidance Actions).

(a)    *Conditions to Treatment.*  The following treatment (solely with respect to Holders of General Unsecured Claims against NBH, NARH, and NBHPG) is conditioned upon the PBGC and the Holders of General Unsecured Claims against NBH, NARH, and/or NBHPG voting to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.  Unless the PBGC and the Holders of a Class of General Unsecured Claims against NBH, NARH, and/or NBHPG vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, notwithstanding any other provision of the Plan:

(i)     no Post-Effective Trust Account will be established with respect to such Debtor, and no Holder of General Unsecured Claims against such Debtor will receive any distribution of Post-Effective Trust Interests or any other recovery, from the Post-Effective Trust or otherwise;

(ii)    such Debtor shall retain all Avoidance Actions in such Debtor's Estate and all right to file, settle, compromise, withdraw, or litigate to judgment objections to any PET Claim; and

(iii)   all payments under the New PET Unsecured Note or from the respective Post-Effective Trust Account that would otherwise be made to or for the benefit of such Holders will instead be made to the Holders of the MDFA ECF Note and the MHEFA ECF Note (in accordance with the MDFA Note Share and the

- 41 -

MHEFA Note Share) to permanently reduce the principal amounts of such ECF Notes.

(b)   *In General*.

(i)    The Post-Effective Trust will distribute to the holders of the Post-Effective Trust Interests in such trust the net proceeds of the Post-Effective Trust's assets as provided in the Post-Effective Trust Agreement.

(ii)   *Holders*.

(1)    the holders of Post-Effective Trust Interests in the Post-Effective Trust Accounts of NARH, NBH, and NBHPG shall be the Holders of Allowed PBGC Prepetition Claims and Allowed General Unsecured Claims against the respective Debtor; and

(2)    the holders of VNA Post-Effective Trust Account Interests shall be the Holders of the following Claims against VNA: the Allowed MDFA Note Claims, the Allowed MHEFA Note Claims, the Allowed VNA Hoosac Bank Deficiency Claim, the Allowed PBGC Prepetition Claim against VNA, and Allowed General Unsecured Claims against VNA.

(iii)  *Assets*.

(1)    the Post-Effective Trust Accounts of NARH, NBH, and NBHPG shall receive shares of the New PET Unsecured Note in the following proportions: 92% to the NARH Post-Effective Trust Account, 3% to the NBH Post-Effective Trust Account, and 5% to the NBHPG Post-Effective Trust Account;

(2)    the VNA Post-Effective Trust Account shall receive the Women's Exchange Real Property and the VNA Building Real Property (subject to the VNA Hoosac Bank Secured Claim); and

(3)    each Post-Effective Trust Account shall receive the Avoidance Actions in such Debtor's Estate.

(iv)   *Litigation, Objection, and Settlement Power*. The Post-Effective Trust, on behalf of each Post-Effective Trust Account, may pursue Avoidance Actions vested in such Post-Effective Trust Account; file, withdraw, or litigate to judgment objections to PET Claims against its respective Debtor and settle or compromise such Disputed PET Claims without approval of the Bankruptcy Court; and resolve such Disputed PET Claims outside the Bankruptcy Court and under applicable governing law.

(v)    The Post-Effective Trust will be formed on the Effective Date and is expected to be formed as a Massachusetts trust.

(vi)   The Post-Effective Trust will continue in existence until the fourth anniversary of the Effective Date or until the distribution of all its property, whichever occurs first, except that if the Trust Supervisors determine that it is necessary to extend the duration of the Post-Effective Trust to accomplish the Post-Effective

- 42 -

Trust's purposes, the Trust Supervisors may, prior to the fourth anniversary of the Effective Date, apply to the Bankruptcy Court to extend the duration of the trust.

    (c)   *Management of the Post-Effective Trust*

The Post-Effective Trust will be managed by a managing trustee (the "Post-Effective Trustee") and three supervisors (the "Post-Effective Trust Supervisors"), each of which shall be selected by the Creditors' Committee. The Post-Effective Trustee will have the authority to manage and dispose of the assets of the Post-Effective Trust, but will be required to obtain the consent of the Post-Effective Trust Supervisors to take certain actions, as provided in the Post-Effective Trust Agreement.

    (d)   *Ownership of the Post-Effective Trust*

Post-Effective Trust Interests will be evidenced solely by book entries. The Post-Effective Trust Interests will be non-voting and will not confer any rights as shareholders. The Post-Effective Trust Interests will not be transferable by a holder except: (i) to any relative, spouse, or relative of the spouse of such holder, (ii) to any trust or estate in which such holder has more than a 50% interest of the beneficial interest (excluding contingent interests), (iii) to any corporation, partnership, or other organization in which such holder is the beneficial owner of more than 50% of the equity securities (excluding directors' qualifying shares) so long as the transferor and transferee certify that there is no current intention of changing the direct and indirect ownership of the transferee, (iv) to any person or entity that holds, directly or indirectly, more than 50% of the voting securities of such holder, or (v) upon the death of such holder in accordance with the operation of law. Each Post-Effective Trustee will take reasonable actions to prohibit the formation of an active trading market in the Post-Effective Trust Interests.

11.    *ECF Notes*

Section 4.11 of the Plan provides:

    (a)   As provided in Section 3.2 of the Plan, unless an 1111(b) Election is made with respect to the MDFA Note Claims, Holders of Claims in Class 1A, Class 2A, and Class 3A shall receive the MDFA ECF Note and, unless an 1111(b) Election is made with respect to the MHEFA Note Claims, Holders of Claims in Class 1B, Class 2B, and Class 3B shall receive the MHEFA ECF Note.

    (b)   The Obligated Group will pay to the Holders of the ECF Notes (x) through and until the first ECF Note Payment Date after the Obligated Group's 2017 fiscal year end, (1) the applicable Fixed ECF Note Payment, payable on or before September 15 of the applicable fiscal year, and (2) (A) the amount of the portion of Excess Cash Flow, if any, calculated as set forth below as of the respective ECF Calculation Date, less (B) the applicable Fixed ECF Note Payment, with such excess payable on or before the ECF Note Payment Date, and, (y) thereafter, a portion of Excess Cash Flow, if any, calculated as set forth below as of the respective ECF Calculation Date, payable on or before the ECF Note Payment Date:

    (i)   if the Obligated Group's Days' Cash on Hand on the respective ECF Calculation Date is less than 25.0 days, the product of 35% of the Obligated Group's Excess Cash Flow times the MDFA Note Share to the New Trustee on behalf of Holders of the New MDFA Bonds and the product of 35% of the Obligated Group's Excess Cash Flow times the MHEFA Note Share to the New Trustee on behalf of Holders of the New MHEFA Bonds;

    (ii)   if Obligated Group's Days' Cash on Hand on the respective ECF Calculation Date is greater than or equal to 25.0 days but less than 30.0 days, the product of 50% of the Obligated Group's Excess Cash Flow times the MDFA Note Share

- 43 -

to the New Trustee on behalf of Holders of the New MDFA Bonds and the product of 50% of the Obligated Group's Excess Cash Flow times the MHEFA Note Share to the New Trustee on behalf of Holders of the New MHEFA Bonds; and

(iii)   if Obligated Group's Days' Cash on Hand on the respective ECF Calculation Date is greater than or equal to 30.0 days, the product of 75% of the Obligated Group's Excess Cash Flow times the MDFA Note Share to the New Trustee on behalf of Holders of the New MDFA Bonds and the product of 75% of the Obligated Group's Excess Cash Flow times the MHEFA Note Share to the New Trustee on behalf of Holders of the New MDFA Bonds.

(c)   *Application of Payments.*

(i)   All interest payments on the New MDFA Note will be applied to permanently reduce the outstanding principal amount of the MDFA ECF Note, and all interest payments on the New MHEFA Note will be applied to permanently reduce the outstanding principal amount of the MHEFA ECF Note.

(ii)   All Fixed ECF Note Payments and all payments of Excess Cash Flow referenced in clause (b) above will be applied to permanently reduce the outstanding principal amount of the respective ECF Note.

(iii)   Any distributions received by the New Trustee or the MDFA Bondholders from the New PET Unsecured Note, the VNA Post-Effective Trust Account, or NBR will be applied to permanently reduce the outstanding principal amount of the MDFA ECF Note.

(iv)   Any distributions received by the New Trustee or the MHEFA Bondholders from the New PET Unsecured Note, the VNA Post-Effective Trust Account, or NBR will be applied to permanently reduce the outstanding principal amount of the MHEFA ECF Note.

(d)   If NARH or NBH (so long as NBH is the managing member of NARH) enters into an Affiliation, the ECF Notes will be modified as provided in Section 4.18 of the Plan.

(e)   Unless the ECF Notes are modified in the event of an Affiliation as provided in Section 4.18 of the Plan, any remaining principal amounts under the ECF Notes shall be due at maturity.

12.   *1111(b) Elections*

Section 4.12 of the Plan provides:

(a)   *Procedure for Making 1111(b) Election*

(i)   The only Holders of Claims eligible to make the 1111(b) Election are the MDFA Bondholders, as the Holders of the MDFA Note Claims, and the MHEFA Bondholders, as the Holders of the MHEFA Note Claims.

(ii)   To make an 1111(b) Election with respect to any member of the Obligated Group, the Holders of the respective Claims must mark a box on their 1111(b) Forms indicating that such Holders intend to make an 1111(b) Election with respect to all members of the Obligated Group.  The Balloting and Noticing

- 44 -

Agent will file an 1111(b) balloting report on the docket within three Business Days of the 1111(b) Election Date.

(iii) If the 1111(b) Forms returned to the Balloting and Noticing Agent on or before the 1111(b) Election Date indicate that each Class of Holders of MDFA Note Claims has made an 1111(b) Election against all of the members of the Obligated Group by at least two-thirds in principal amount of the MDFA Bonds and more than half in number of the MDFA Bondholders, an 1111(b) Election shall be deemed to have been made as of the 1111(b) Election Date with respect to the MDFA Note Claims against all the members of the Obligated Group.

(iv) If the 1111(b) Forms returned to the Balloting and Noticing Agent on or before the 1111(b) Election Date indicate that each Class of Holders of MHEFA Note Claims has made an 1111(b) Election against all of the members of the Obligated Group by at least two-thirds in principal amount of the MHEFA Bonds and more than half in number of the MHEFA Bondholders, an 1111(b) Election shall be deemed to have been made as of the 1111(b) Election Date with respect to the MHEFA Note Claims against all the members of the Obligated Group.

(v) Unless an 1111(b) Election is made in accordance with Section 4.12 of the Plan, the right to make the 1111(b) Election for a Class of Holders of MDFA Note Claims or MHEFA Note Claims shall be deemed waived with respect to the Plan, including any amendments or modifications to the Plan that do not result in a material adverse change to the treatment of the respective Claim.

(vi) Once an 1111(b) Election has been made, it may not be revoked without the consent of the Debtors in their sole discretion.

(vii) An 1111(b) Election cannot be made with respect to one member of the Obligated Group but not another member, and any 1111(b) Election with respect to less than all members of the Obligated Group will be deemed ineffective against all members of the Obligated Group.

(viii) An 1111(b) Election with respect to a Debtor constitutes a waiver of any unsecured claim against such Debtor, and a Class of Holders that has made an 1111(b) Election shall not be entitled to the New MDFA Note, the New MHEFA Note, any ECF Note, or any Affiliation Note.

(b) *1111(b) Elections by the MDFA Bondholders.*

If MDFA Trustee or the MDFA Bondholders make an 1111(b) Election with respect to each member of the Obligated Group, the MDFA Bondholders shall receive, in lieu of beneficial interests in the New MDFA Note and the MDFA ECF Note provided for in Section 3.2 of the Plan, beneficial interests in the New 1111(b) MDFA Note, and shall not receive beneficial interests in any Affiliation Note.

(c) *1111(b) Elections by the MHEFA Bondholders.*

If MHEFA Trustee or the MHEFA Bondholders make an 1111(b) Election with respect to each member of the Obligated Group, the MHEFA Bondholders shall receive, in lieu of beneficial interests in the New MHEFA Note and the MDFA ECF Note provided for in Section 3.2 of the Plan, beneficial interests in the New 1111(b) MHEFA Note, and shall not receive beneficial interests in any Affiliation Note.

13.     *Establishment of Administrative Bar Date*

Pursuant to Section 4.14 of the Plan, except as otherwise provided in Section 2.3 of the Plan with respect to Professional Fee Claims, each Holder of an Administrative Claim (other than an Administrative 503(b)(9) Claim) shall file with the Bankruptcy Court and serve on counsel to the Debtors, at the addresses set forth in Section 11.7 of the Plan, a request to pay such Administrative Claim ("Administrative Claim Request"), so as to be actually received on or before 5:00 p.m. (prevailing Eastern time) on the Administrative Bar Date. Any Holder of an Administrative Claim (other than an Administrative 503(b)(9) Claim) that fails to timely file and serve an Administrative Claim Request by the applicable deadline set forth in Section 4.14 of the Plan shall be forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtors, the Estates, or any Entity formed pursuant to the Plan, including the Post-Effective Trust, and such Administrative Claim will be deemed discharged as of the Effective Date in accordance with Section 9.2 of the Plan. Notwithstanding anything in Section 4.14 of the Plan to the contrary, the Bar Date for Administrative 503(b)(9) Claims shall be the Bar Date established by the Bar Date Order and not by Section 4.14 of the Plan.

14.     *Disposition of VNA Real Estate*

Pursuant to Section 4.15 of the Plan, the Post-Effective Trustee shall endeavor to sell the Women's Exchange Real Property and distribute the proceeds of such sale, net of carrying costs and costs of disposition, to the VNA Post-Effective Trust Account. The Post-Effective Trustee shall lease the VNA Building Real Property to VNA for a term ending no later than four months after the Effective Date, in exchange for lease payments equal to the regular monthly payments under the VNA Hoosac Bank Mortgage. VNA may terminate this lease earlier by giving the Post-Effective Trustee 30 days prior written notice. Upon the termination of the lease with VNA, the Post-Effective Trustee shall endeavor to sell the VNA Building Real Property. The Post-Effective Trustee shall distribute the proceeds of such sale, net of carrying costs and costs of disposition, (the "VNA Building Sale Proceeds") (A) first to the Holder of the Allowed VNA Hoosac Bank Secured Claim in full discharge and satisfaction of such Claim, and (B) to the extent of any excess over the Allowed amount of the VNA Hoosac Bank Secured Claim, thereafter to the VNA Post-Effective Trust Account.

15.     *Insurance Mitigation*

Pursuant to Section 4.16 of the Plan, the Ballots issued to the Holders of Claims in Classes 1A, 2A, and 3A will contain a box that may be checked by MDFA Bondholders that do not wish to participate in the ACA Insurance Commutation and become a Non-Commuting Bondholder. Any Holder of an MDFA Bond that wishes to opt out of the ACA Insurance Commutation must so indicate on its Ballot.

Subject only to the option to opt-out discussed above, each Holder of a Claim in Classes 1A, 2A, and 3A will be presumed to have elected to participate in the ACA Insurance Commutation, pursuant to which, in exchange for the right to receive a pro rata share of the Commutation Consideration, ACA may elect to deem the Commuting Bondholders to have released, waived, quitclaimed, and otherwise abandoned any and all claims, rights, defenses, and causes of action, whether legal or equitable, known or unknown, that they may have against ACA under, in connection with, or related in any way to the ACA Insurance Policy (the "ACA Insurance Commutation").

Commuting Bondholders and Non-Commuting Bondholders will receive separate series of the New MDFA Bonds.

The Allowed amount of the MDFA Note Claims and the aggregate amount of New MDFA Bonds issued to Commuting Bondholders shall be reduced by the amount of the Commutation Consideration paid to Commuting Bondholders as set forth in Section 3.2 of the Plan.

To the extent ACA makes any payments under the ACA Insurance Policy to any Non-Commuting Bondholders and ACA is subrogated to the rights of such Non-Commuting Bondholders under the ACA Insurance Policy, ACA may direct MDFA Trustee to make all distributions otherwise payable to such Non-Commuting Bondholders to ACA to the extent of ACA's subrogated rights to payment.

- 46 -

Proceeds from the ACA Insurance Commutation shall not be subject to any claims or liens by the Master Trustee or MDFA Trustee, and shall be solely for the benefit of the Commuting Bondholders.

ACA will waive subrogation rights against the Debtors and the Reorganized Debtors for all amounts commuted.

ACA has prepared a further discussion of the ACA Insurance Commutation, which is attached as Exhibit D.

16.    *New Bond Documents; Tax-Exempt Notes; New Note Covenants*

Pursuant to Section 4.17 of the Plan, a form of a new indenture (the "New Indenture") and a new loan agreement (the "New Loan Agreement") shall be included with the Plan Supplement providing for the issuance, simultaneous with the establishment of the New Indenture and New Loan Agreement, of one or more new series of bonds (the "New Bonds") in replacement of the MDFA Bonds and the MHEFA Bonds, forms of which shall also be included in the Plan Supplement.  The New Secured Notes will be distributed to the trustee under the New Indenture (the "New Trustee").  The New Bonds will represent and reflect the Bondholders' respective beneficial interests in the New MDFA Note, New MHEFA Note, and any ECF Note or Affiliation Note held by the New Trustee and payments received by the New Trustee thereunder.  For the avoidance of doubt, no New Bonds will be issued with respect to the New MDFA 1111(b) Note or New MHEFA 1111(b) Note.

T The Obligated Group will use their best efforts to establish a tax-exempt bond structure for the New Bonds under the New Indenture and New Loan Agreement, which will contain covenants substantially similar to the covenants under the Master Indenture (except that the Financial and Reporting Covenants will replace all financial or reporting covenants under the Master Indenture), and the Obligated Group will covenant in the New MDFA Note and New MHEFA Note to use best efforts to maintain the tax-exemption of the New Bonds, if achieved; provided, however, that the Obligated Group shall have no obligation to grant, incur, or assume any liability, covenant, or obligation except as provided for in this Plan or to incur any expense, including any obligation to pay for any legal or other fees and expenses associated with establishing such tax-exempt bond structure or any issuances thereunder, other than reasonable fees and expenses of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. as bond counsel not to exceed $100,000; and provided, further, that New Bonds with respect to the New MDFA Note, New MHEFA Note, and any Affiliation Notes or Fixed ECF Note Payments shall have the same structure as if such New Bonds were tax-exempt (including monthly funding of payments or remittance) regardless of whether such New Bonds are tax-exempt (including monthly funding of payments or remittance) regardless of whether such New Bonds are ultimately determined to be tax-exempt.

17.    *Restriction on Affiliation*

Pursuant to Section 4.18 of the Plan:

• The ECF Notes and the New MDFA Note and the New MHEFA Note will contain covenants that the Obligated Group shall not enter into any Affiliation (including an Affiliation with Berkshire Medical Center or an affiliate thereof) unless all of the following conditions are satisfied:

    ° The members of the Obligated Group, or any transferee of all or substantially all assets of the Obligated Group, or any successor to the Obligated Group if NARH or NBH (so long as NBH is the managing member of NARH) is not the surviving entity, shall issue the Affiliation Notes to the New Trustee.

    ° Any successor to the Obligated Group or transferee of all or substantially all assets of the Obligated Group shall assume all of the Obligated Group's obligations under the New MDFA Note, the New MHEFA Note, and the ECF Notes (if any) as modified pursuant to Section 4.18 of the Plan, subject to any liens and security interests under the New Secured Notes.

    ° Any Affiliation must be an arm's length transaction with an entity that (A) is not an insider of any member of the Obligated Group and (B) will have a net worth following the Affiliation equal to or greater than the net worth of the Obligated Group immediately preceding the Affiliation, as evidenced

by a certificate of a Certified Public Accountant.  An Affiliation by Berkshire Health Systems, Inc. becoming the managing member of NBH and/or NARH shall conclusively be deemed to satisfy the criteria of this clause.

- The original principal amount of the Affiliation Notes (the "Affiliation Notes Original Principal Amount") shall equal, in total, either:

  ° subject to the clause below, an amount such that the sum of the amounts of (A) scheduled amortization and interest payments under the Affiliation Notes, (B) amortization and interest payments made, and scheduled amortization and interest payments to be made, under the New MDFA Note and the New MHEFA Note, (C) Fixed ECF Note Payments made under the ECF Notes and scheduled Fixed ECF Note Payments to be made under the ECF Notes, and (D) the ECF Credits for payments previously made to the Holders of the ECF Notes would equal the sum of the Allowed amounts of the MDFA Note Claim and the MHEFA Note Claim; or

  ° if the original principal amount set forth in the clause above would be less than $3.25 million, the lesser of (A) such original principal amount calculated without giving effect to ECF Credits, if any, and (B) $3.25 million.

- Payments under the ECF Notes made before the Affiliation Notes are issued shall be credited on a dollar-for-dollar basis towards the calculation of the Affiliation Notes Original Principal Amount as provided in Section 4.18(b), and shall be further credited (such further crediting, the "ECF Credits") in the following amounts towards the calculation of the Affiliation Notes Original Principal Amount:

  ° 25% of the amount of all Fixed ECF Note Payments made on or before the first ECF Note Payment Date after the Obligated Group's 2015 fiscal year ends;

  ° 150% of the amount of all payments of Excess Cash Flow (if any) made in excess of the amount of the Fixed ECF Note Payment on or before the first ECF Note Payment Date after the Obligated Group's 2015 fiscal year ends; and

  ° 200% of the amount of all payments made under an ECF Note after the first ECF Note Payment Date after the Obligated Group's 2015 fiscal year ends through the first ECF Note Payment Date after the Obligated Group's 2018 fiscal year ends.

- If an Affiliation is consummated on or after the end of the Obligated Group's 2018 fiscal year, the ECF Notes shall automatically terminate and all obligations of the Obligated Group thereunder shall automatically be deemed fully satisfied and discharged.  If an Affiliation is consummated before the Obligated Group's 2018 fiscal year ends:

  ° the principal amount of each ECF Note will be reduced to the outstanding amount of Fixed ECF Note Payments remaining under such ECF Note;

  ° the maturity date of the ECF Notes shall be the last day of the Obligated Group's 2018 fiscal year;

  ° the obligation to make Fixed ECF Note Payments provided in Section 4.11(b) of the Plan shall survive Affiliation, but no obligation to make any payment of Excess Cash Flow in excess of the Fixed ECF Note Payments shall survive Affiliation;

  ° for each dollar of payments under an ECF Note the Obligated Group pays a Holder of an Affiliation Note after the Affiliation Notes are issued, such Holder shall forgive an additional amount of principal of its Affiliation Note equal to (A) 25 cents, if paid on or before the first ECF Note Payment Date after the Obligated Group's 2015 fiscal year ends, and (B) two dollars, if paid thereafter; and

  ° except as provided in Section 4.18(d) of the Plan, each ECF Note shall automatically terminate and all obligations of the Obligated Group thereunder shall automatically be deemed fully satisfied and discharged.

- If a payment default (other than a payment default due to an acceleration that was not itself based on a payment default) occurs and is continuing under an ECF Note or Affiliation Note or the New MDFA Note

- 48 -

or New MHEFA Note, a Holder of an Affiliation Note may, by written notice to the Obligated Group, elect to recalculate the principal amount of its Affiliation Note to give no effect to the reductions in the principal amount of its Affiliation Note, if any, made pursuant to the ECF Credits or as provided in Section 4.18(d)(iv) of the Plan, which shall then be null and void.

- If the Obligated Group enters into any Affiliation, including an Affiliation with Berkshire Medical Center or an affiliate thereof, the principal amount of the New PET Unsecured Note shall automatically become due and payable immediately.

18.    *Treatment of Claims of PBGC*

Pursuant to Section 4.19 of the Plan, the Debtors have proposed a settlement in the Plan with PBGC, which PBGC may accept by voting to accept the Plan.  As provided in Section 4.1 of the Plan, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the settlement described in Section 4.18(a) of the Plan under Bankruptcy Rule 9019.  The following treatment is conditioned upon PBGC voting to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code with respect to each Debtor.  Unless PBGC votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code with respect to each Debtor, notwithstanding any other provision of the Plan:

- Only the VNA Post-Effective Trust Account will be established, and no Holder of General Unsecured Claims or PBGC Prepetition Claims against NBH, NARH, or NBHPG will receive any distribution of Post-Effective Trust Interests or any other recovery, from the Post-Effective Trust or otherwise;

- each Debtor shall retain all Avoidance Actions in its Estate and all right to file, settle, compromise, withdraw, or litigate to judgment objections to any PET Claim; and

- the Reorganized Debtors shall not issue the New PET Unsecured Note and shall have no obligation with respect thereto.

If PBGC does vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code with respect to each Debtor, then, upon the occurrence of, and as of, the Effective Date:

- the PBGC Prepetition Claims against NBH, NARH, VNA, and NBHPG shall be Allowed in the amount of $27,251,912 , and all other PBGC Prepetition Claims shall be deemed waived;

- as provided in Section 3.2 of the Plan, PBGC, as the Holder of the Allowed PBGC Prepetition Claims shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of the Post-Effective Trust Interests; and

- for the aggregate post-Effective Date claims of PBGC against the Reorganized Debtors under 29 U.S.C. § 1306(a)(7) (the "PBGC Post-Effective Claim"), the PBGC will receive, in full satisfaction of the PBGC Post-Effective Claim, the PBGC Post-Effective Note.

19.    *Search Committee*

Pursuant to Section 4.20 of the Plan:

- (a)    The Debtors shall form a committee (the "Search Committee") prior to the Effective Date to identify and interview all candidates for Chief Executive Officer of Reorganized NBH and NARH and make recommendations to the Boards of Trustees of Reorganized NBH and NARH to fill those positions. The Search Committee shall have been formed prior to the Confirmation Date and shall consist of ten uncompensated members.  At least eight of the members shall be members of the Boards of Trustees of Reorganized NBH and NARH.  No more than two of the members shall be members of the Creditors' Committee (as selected by the Creditors' Committee), and such members shall be dismissed on the

- 49 -

Effective Date unless Holders of Claims in Classes 1D and 2G have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.

- The Search Committee shall be authorized to retain an executive search firm at the Reorganized Debtors' expense and to take any other action necessary to identify and interview candidates for Chief Executive Officer of Reorganized NBH and NARH.

- The identity of the members of the Search Committee shall be disclosed in the Plan Supplement.

- The Boards of Trustees of Reorganized NBH and NARH shall retain sole discretion and authority to select the respective Chief Executive Officers of Reorganized NBH and NARH.

## VII.   DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS, AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN

### A.    *Description of the New Notes and New Articles of Organization*

#### 1.    *Description of the New Notes*

The Plan provides for the issuance of the New Notes to the Debtors' secured creditors and to the Post-Effective Trust.  The New Notes comprise the New Secured Notes and the New Unsecured Notes.  The New Secured Notes will be issued to the Debtors' secured creditors, including MDFA Trustee, US Bank, and the Debtors' capital lessors and mortgagees, on account of their respective Secured Claims.  The New Unsecured Notes will be issued to the respective Post-Effective Trust on behalf of the Debtors' general unsecured creditors, including the Debtors' secured creditors that hold Deficiency Claims.  The New Notes will be substantially in the form included in the Plan Supplement.

#### 2.    *Description of the New Articles of Organization*

Section 8.2 of the Plan provides, among other things, that it is a condition precedent to the effectiveness of the Plan that the New Articles of Organization be duly filed with the Massachusetts Secretary of the Commonwealth, unless such condition is waived pursuant to the terms of the Plan.  The New Articles of Organization will be included in the Plan Supplement.

### B.    *Description of Post-Effective Trust Agreement*

The Plan contemplates the formation on the Effective Date of a Post-Effective Trust with subaccounts for each Reorganized Debtor.  The Post-Effective Trust will be governed by a Post-Effective Trust Agreement and will (i) make distributions under the Plan to Holders of Allowed PBGC Prepetition Claims and Allowed Unsecured Claims, and in certain circumstances Allowed Deficiency Claims, (ii) pursue and resolve objections to such Claims, and (iii) pursue and resolve any Avoidance Actions (other than the Released Avoidance Actions) vested in the Post-Effective Trust pursuant to the Plan.  The Post-Effective Trust will be managed by a Post-Effective Trustee and supervised by three Post-Effective Supervisors, each of which will be selected by the Creditors' Committee. Section 8.2 of the Plan provides, among other things, that it is a condition precedent to the effectiveness of the Plan that the Post-Effective Trust Agreement be executed and that the Creditors' Committee appoint the Post-Effective Trustee of the Post-Effective Trust, unless such conditions are waived pursuant to the terms of the Plan.  The Post-Effective Trust Agreement will be included in the Plan Supplement.

## VIII.   VALUATION ANALYSIS

### A.    *Valuation*

As part of the confirmation requirements of the Bankruptcy Code for the Plan, our board of trustees requested that CMAG perform an analysis of the estimated reorganization value of the Reorganized Debtors on a going-concern basis.

THE ESTIMATED RANGE OF THE REORGANIZATION VALUE OF THE REORGANIZED DEBTORS, AS OF AN ASSUMED EFFECTIVE DATE OF JANUARY 2012, REFLECTS WORK PERFORMED BY CMAG ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE REORGANIZED DEBTORS AVAILABLE TO CMAG AS OF SEPTEMBER 30, 2011.

THE VALUE OF AN OPERATING ENTERPRISE IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH AN ENTERPRISE. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN.  SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN.

FURTHER, CMAG'S VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND CMAG.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE ESTIMATED VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

CMAG has advised us that for purposes of its analysis, CMAG assumed that (i) market, business, and general economic conditions will be similar to conditions assumed in our business plan; (ii) the financial and other information we and our professionals furnished to CMAG is accurate and complete; and (iii) the Plan will be confirmed without material changes from those detailed herein.

Based upon the analyses detailed below, the assumptions made, matters considered and limits of review also set forth below, CMAG estimated the total reorganization enterprise value range of the Reorganized Debtors to be between $10.4 million and $14.7 million with a midpoint of approximately $12.1 million.  This estimate is limited to an estimate of the Reorganized Debtors' enterprise value.  The foregoing estimated reorganization enterprise value reflects, among other factors described herein, current financial market conditions as of the date of this Disclosure Statement and the inherent uncertainty as to the achievement of the results described in our management's projections.   Outstanding principal and accrued interest on the MDFA Note and the MHEFA Note totaled approximately $43,722,049 as of June 13, 2011.  Based on CMAG's estimated reorganization enterprise value of the Reorganized Debtors on a going-concern basis, even at the upper end of the range of estimated reorganization values, Holders of the MDFA Note and the MHEFA Note will receive value that is less than 100% of the indebtedness under such notes, and Holders of General Unsecured Claims will receive value that is less than 100% of the amount of their General Unsecured Claims.

It should be understood that, although subsequent developments may affect CMAG's conclusions, before or after the Confirmation Hearing, CMAG does not have any obligation to update, revise, or reaffirm the estimate set forth herein.

With respect to the business analysis prepared by our management, CMAG assumed that the analysis has been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of our management as to our future operating and financial performance.  In addition, CMAG has assisted our management in updating our analysis and testing various key elements of the projections to ensure they reflect a measured and achievable forecast that takes into account the major changes the Debtors have undergone since our financial model was first developed.  CMAG's estimate of a range of reorganization values assumes we will achieve our management's projections in all material respects, including revenue growth and improvements in operating margins, earnings, and cash flow.  If we perform at levels below those expected, such performance may have a material negative impact on the estimated range of values for the Reorganized Debtors.

CMAG has employed generally accepted valuation techniques in estimating the reorganization enterprise value of the Reorganized Debtors.  CMAG relied primarily on three valuation methodologies: (i) comparable public company analysis, (ii) comparable transaction analysis, and (iii) DCF analysis.  These valuation methodologies

- 51 -

reflect both (a) the market's current view of the Debtors' business plan and operations and (b) a longer term focus on the intrinsic value of the projected cash flows in our business plan. CMAG weighted these analyses based on CMAG's judgment as to the significance of each analysis in determining the Reorganized Debtors' indicated enterprise value range.

     *B.*     *Financial Projections*

     The Bankruptcy Code requires as one of the conditions to confirmation of a plan of reorganization that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. 11 U.S.C. § 1129(a)(11). This standard is commonly referred to as "feasibility." For the purposes of determining whether the Plan meets the feasibility standard, and to assist the Holders of Claims in Impaired Classes in evaluating whether to vote to accept or reject the Plan and exchange their Claims against the Debtors for the distributions described herein, our management has analyzed our ability to meet our obligations under the Plan and retain sufficient liquidity and capital resources to conduct our operations following emergence from the Chapter 11 Cases. Our management has also prepared certain estimates of operating profit, EBITDA, and certain other items with respect thereto. CMAG has reviewed our projections and helped our management test certain key assumptions, but has not performed a full review of all details of our projections. A copy of our management's projections for fiscal years 2012, 2013, 2014, 2015, and 2016 as of the date hereof is attached hereto as Exhibit B.

     Our management prepared this analysis in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice.

     Based on this analysis and review, subject to the risk factors described herein and otherwise, our management projects that we will be able to meet our obligations after exiting Chapter 11.

## IX.     LIQUIDATION ANALYSIS

     Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim that has not voted to accept the Plan must receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code (sometimes called the "Best Interests Test," which is described in greater detail in Article XIV.E.1 hereof). If all members of an impaired class of claims have accepted the Plan, the "best interests test" does not apply with respect to that class.

     A determination of the value that Holders will receive or retain if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code begins with an estimation of the gross proceeds that would be generated from the hypothetical liquidation of our assets and properties in the context of a chapter 7 liquidation case, including the cash and cash equivalents we would hold at the time of the commencement of the hypothetical chapter 7 case. The gross liquidation proceeds then are reduced by the costs and expenses of the liquidation – including such additional administrative expenses and priority claims that may result from the termination of Debtors' business and the use of chapter 7 for the purposes of a hypothetical liquidation – to determine the net liquidation proceeds available for distribution to creditors. Such net liquidation proceeds (*i.e.*, cash available for distribution) are then applied on a hypothetical basis to creditors in strict priority in accordance with section 726 of the Bankruptcy Code.

     In performing a liquidation analysis of the Debtors, CMAG considered the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including:

- the increased cost and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee;

- the increased cost and expenses of complying with government oversight and patient safety practices required to wind down a hospital;

- 52 -

- the erosion in value of assets in a chapter 7 case in the context of the liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; and

- substantial increase in claims treated as priority and general unsecured claims than we anticipate in a chapter 11 case.

In addition to these factors, we believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be less than the value of distributions under the Plan because the distributions in chapter 7 may not occur for a substantial period of time. In the liquidation analysis, for example, CMAG estimated that a liquidation of the Debtors would take nine to fifteen months. Further, it is possible that distribution of the proceeds of the liquidation could be delayed for a substantial time after the completion of such liquidation to resolve all objections to claims and prepare for distributions.

CMAG prepared a liquidation analysis at our request and with the assistance of our management and other advisors. CMAG's liquidation analysis estimates the values that may be obtained by Claim Holders upon a disposition of assets pursuant to a liquidation in a bankruptcy case under chapter 7 of the Bankruptcy Code, as an alternative to continued operations of our businesses under the Plan. The analysis is based on a number of assumptions discussed below. **Because of the numerous risks, uncertainties, and contingencies beyond our control, there can be no assurances whatsoever that the recoveries set forth in the liquidation analysis could be realized in an actual liquidation.** Moreover, because the liquidation analysis was prepared for purposes of evaluating the Plan in respect of section 1129(a)(7) of the Bankruptcy Code, the amounts disclosed are not likely to be meaningful for us as a going concern or indicative of actual returns that may eventually be realized in a non-liquidation context.

Underlying the liquidation analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the Debtors or a chapter 7 trustee. Additionally, various liquidation decisions upon which certain assumptions are based are subject to change. The actual amount of claims could vary significantly from our estimate, depending on the claims asserted during the chapter 7 case. Accordingly, the actual liquidation value of the Debtors could vary materially from the estimates provided in the liquidation analysis.

The liquidation analysis concludes that, after a nine to fifteen month liquidation of all of the Debtors' assets, the range of proceeds available for distribution to creditors after paying administrative claims required to wind down the Debtors' operations would be between approximately $5.2 million and $10.3 million on a consolidated basis. For NARH and NBH on a consolidated basis, the midpoint of this range is $6.43 million; for NBHPG, $0; for VNA, $1.275 million. Since substantially all of the consolidated assets of NARH and NBH are encumbered by the Master Trustee's liens for a $43.7 million secured claim, liquidation proceeds would be insufficient to repay the MDFA Note Claims or the MHEFA Note Claims. There are also significant Administrative Claims and Other Priority Claims against NARH and NBH, which we estimate would exceed the liquidation value of NARH's and NBH's few unencumbered assets by a large margin. We estimate that, after paying winddown claims, no liquidation proceeds would be available for unsecured creditors of NBHPG. With respect to VNA, since all of VNA's cash and accounts receivable are encumbered by the Master Trustee's liens, only $77,000 of liquidation proceeds of unencumbered assets would be available to any unsecured creditors of VNA, including holders of Administrative Claims, Priority Tax Claims, and Other Priority Claims. We estimate that VNA's unpaid Administrative Claims, including winddown costs, amounts advanced by NARH, and VNA's share of amounts owed to professionals, well exceed $77,000. We therefore estimate that, in a hypothetical chapter 7 liquidation, no distribution would be available to Holders of any General Unsecured Claims or priority claims of any of the Debtors.

The liquidation analysis also concludes that, in connection with a consensual liquidation, the range of proceeds from liquidating bondholder collateral would be between $10.7 million and $15.2 million, with a midpoint of $12.6 million after paying costs of liquidation (but not winddown costs). This liquidation analysis in the Disclosure Statement is a hypothetical construct only to show what the results of liquidation could be under certain circumstances.

It is not the Debtor's intention to liquidate and the Debtors intend to continue operations indefinitely. The Debtors note in that regard that as non-profit entities their chapter 11 cases are not subject to involuntary conversion to cases under chapter 7 of the Bankruptcy Code. They also note that under Section 601 of the Master Indenture the Debtors are entitled to use revenues to pay for, among other things, the cost of continuing operations.

Under the Plan, Holders of the MDFA Note Claims and MHEFA Note Claims will receive a significant distribution, Holders of other Secured Claims will receive notes or property equal to the value of their collateral, all priority claims will be paid in full, and Holders of General Unsecured Claims will receive some distribution, with the vast majority of General Unsecured Creditors receiving an estimated 1% distribution.  Based on the liquidation analysis, we believe that all Holders of Claims will receive under the Plan not less than what they would receive under a chapter 7 liquidation.

A further analysis of these results is set forth as Exhibit C.

## X.     THE PLAN – OTHER PROVISIONS

Capitalized terms used in this Article VIII.B but not otherwise defined in Annex I shall have the meanings assigned such terms in the Plan.

### A.     *Treatment of Executory Contracts and Unexpired Leases*

#### 1.   *Assumption of Executory Contracts and Unexpired Leases*

Section 365 of the Bankruptcy Code permits debtors to assume or reject executory contracts and unexpired leases with the authorization of the Bankruptcy Court.  Section 365 of the Bankruptcy Code further provides that an executory contract or unexpired lease can be assumed only if (i) certain defaults with respect to such contract or lease are cured (or adequate assurance of a prompt cure is provided), (ii) compensation for any pecuniary losses arising from such default are provided, and (iii) "adequate assurance" of future performance is provided. Section 1123(b)(2) of the Bankruptcy Code allows for the assumption of unrejected contracts and leases pursuant to the terms of a plan of reorganization.  Pursuant to Section 5.1 of the Plan:

(a)     All executory contracts and unexpired leases of the Debtors that are not (i) assumed by the Debtors prior to the Effective Date, (ii) subject to a motion seeking such assumption as of the Effective Date, or (iii) identified in the Plan or the Plan Supplement as executory contracts or unexpired leases to be assumed pursuant to the Plan or for which the Debtors expressly reserve the right to seek to assume, shall be deemed to have been rejected by the Debtors on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code without further notice or order of the Bankruptcy Court.  The Debtors reserve the right after the Confirmation Date to withdraw any pending motions seeking to assume any executory contracts or unexpired leases that have not been approved by Final Order, in which case such executory contracts or unexpired leases shall be deemed rejected pursuant to the Plan as of the date of such withdrawal. Notwithstanding the foregoing, on the Effective Date, the Debtors will assume their collective bargaining agreements with the MNA and with SEIU.

(b)     Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, in accordance with section 365(b)(1) of the Bankruptcy Code, by payment of such amount in Cash, as and when provided in the Confirmation Order, or upon such other terms as the parties to such executory contract or unexpired lease may otherwise agree, or, with respect to the collective bargaining agreement with the MNA or with SEIU, by paying such amounts (which shall include all paid time off due to the Debtors' employees that are members of the MNA) in the ordinary course of business pursuant to the respective agreement.  If a dispute arises regarding (i) the amount of any cure payments required under section 365(b)(1) of the Bankruptcy Code, (ii) the ability of any Reorganized Debtor or

- 54 -

any assignee thereof to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption under section 365 of the Bankruptcy Code, the cure payments required under section 365(b)(1) of the Bankruptcy Code, if any, shall be made following the entry of a Final Order resolving such dispute.  Notwithstanding anything to the contrary herein, the Debtors reserve their rights under applicable non-bankruptcy law, including with respect to amounts due, under the collective bargaining agreements with the MNA and with SEIU.

2.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Section 5.2 of the Plan provides that all proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be Filed by the later of (a) the General Bar Date or (b) within 45 days after the date of any deemed rejection or entry of an order of the Bankruptcy Court approving such rejection.  Any Claim arising from the rejection of an executory contract or unexpired lease for which a proof of such Claim is not Filed within such time period shall forever be barred from assertion against the Debtors or the Reorganized Debtors, the Estates, and their property, unless otherwise ordered by the Bankruptcy Court.  The Allowed amount of any Claim arising from the rejection of executory contracts or unexpired leases for which proof of such Claim timely has been Filed shall be, and shall be treated as, an Allowed General Unsecured Claim under the terms hereof (subject to any limitation under section 502(b) of the Bankruptcy Code or other applicable law)..

3.    *Insurance Policies*

Pursuant to Section 5.3 of the Plan, notwithstanding Section 5.1 of the Plan, unless otherwise rejected by the Debtors prior to the Effective Date or subject to a motion seeking such rejection as of the Effective Date, all the Debtors' insurance policies and any agreements, documents, or instruments relating thereto shall be deemed to be, and treated, as executory contracts and shall be assumed on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.  Nothing contained in Section 5.3 of the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any Entity under any of the Debtors' insurance policies, including, without limitation, the insurer.

4.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Section 5.4 of the Plan provides that, unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed or rejected shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease and all executory contracts or unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.  Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that the Debtors executed during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of such executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.    *Provisions Governing Distributions*

1.    *Date of Distributions; Distribution Record Date*

Pursuant to Section 6.1 of the Plan, any distribution to be made hereunder shall be made on or as soon as practicable after the Effective Date, except as otherwise provided in the Plan.  Any payment or act required to be made or done hereunder on a day that is not a Business Day shall be made or done on the next succeeding Business Day.   In addition, as of the Distribution Record Date, the transfer registers for the MDFA Bonds and the MHEFA Bonds shall be closed and the transfer of such MDFA Bonds, such MHEFA Bonds, or any interest therein, shall be prohibited.  The Disbursing Agent, MDFA Trustee, MHEFA Trustee, the Master Trustee, and the New Trustee, (a) shall not have any obligation to recognize the transfer or sale of, or any participation in, any Allowed Claims relating to the MDFA Bonds or the MHEFA Bonds that occurs after the Distribution Record Date, and (b) shall be

- 55 -

entitled for purposes of the Plan to recognize and make distributions only to Holders of such Claims as of the Distribution Record Date.

### 2.   *Disbursing Agent*

Section 6.2 of the Plan provides:

(a) *General.*  Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as the Disbursing Agent.

(b) *Rights and Powers of Disbursing Agent.*  The Disbursing Agent shall be empowered, without further order of the Bankruptcy Court, to (i) make all distributions contemplated by the Plan, (ii) employ or contract with any Entities to assist in or make the distributions required by the Plan, (iii) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 3.   *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

Section 6.3 of the Plan provides:

(a) *Deliver in General.*  Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided, however,* that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided, further,* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by that Holder or, if no Proof of Claim was filed, in the Schedules.

(b) *Delivery to Holders of Allowed Secured Claims.*  All distributions of New Secured Notes on account of the Secured Claims shall be made to the Holder of the respective Allowed Secured Claim following compliance with the requirements set forth in Section 6.5 of the Plan.

(c) *Undeliverable Distributions.*  If any distribution or notice provided in connection with the Chapter 11 Cases to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or otherwise is unclaimed, the Disbursing Agent shall make no further distribution to such Holder unless and until the Disbursing Agent is notified in writing of the Holder's then current address.  On or as soon as practicable after the date on which a previously undeliverable or unclaimed distribution becomes deliverable and claimed, the Disbursing Agent shall make such distribution without interest thereon.  Any Holder of an Allowed Claim that fails to assert a Claim hereunder for an undeliverable or unclaimed distribution within one year after the Effective Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall forever be barred and enjoined from asserting such Claim against any of the Debtors, the Estates, the Reorganized Debtors, or their property.  After the first anniversary of the Effective Date, all property or interests in property not distributed pursuant to Section 6.3 of the Plan shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code.  Such property or interests in property shall be returned by the Disbursing Agent to the Reorganized Debtors, and the Claim of any other Holder to such property or interests in property shall be discharged and forever be barred.  Nothing contained in the Plan shall require or be construed to require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 4.   *Setoff*

Pursuant to Section 6.4 of the Plan, the Reorganized Debtors shall be permitted, but not required, to set off any claims of any nature whatsoever the Debtors have against the Holder of a Claim (other than any Claim of MDFA Trustee or the MDFA Bondholders, MHEFA Trustee or the MHEFA Bondholders, or PBGC) against such Claim or the distributions to be made hereunder on account of such Claim; *provided, however,* that neither the

failure to exercise such setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim the Reorganized Debtors may have against such Holder.

### 5. *Surrender of Cancelled Notes, Instruments, or Securities*

Pursuant to Section 6.5 of the Plan, any Holder of any Claim evidenced by the instruments, securities, or other documentation cancelled under Section 4.4 of the Plan shall surrender such applicable instruments, securities, or other documentation to the Reorganized Debtors in accordance with written instructions, which may be waived in writing by the Debtors or the Reorganized Debtors, to be provided to such Holder by the Reorganized Debtors.  In the Reorganized Debtors' discretion, any distribution required to be made hereunder on account of any Claim shall be treated as an undeliverable distribution under Section 6.3(c) of the Plan pending the satisfaction of the terms of Section 6.5 of the Plan.  Subject to Section 6.6 of the Plan, any Holder of any Claim evidenced by the instruments, securities, or other documentation cancelled under Section 4.4 of the Plan that fails to surrender such applicable instruments, securities, or other documentation in accordance with Section 6.5(a) of the Plan within one year after the Effective Date shall have such Claim, and the distribution on account of such Claim, discharged and shall forever be barred from asserting such Claim against any of the Reorganized Debtors or their respective property. Such distributions shall be treated as unclaimed property as provided in Section 6.3(c) of the Plan.

### 6. *Lost, Stolen, Mutilated, or Destroyed Documentation*

Pursuant to Section 6.6 of the Plan, in addition to any requirements under any applicable agreement, any Holder of a Claim evidenced by instruments, securities, or other documentation cancelled under Section 4.4 of the Plan and required to be surrendered under Section 6.5(a) that have been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such instruments, securities, or other documentation, (a) deliver evidence of such loss, theft, mutilation, or destruction that is reasonably satisfactory to the Reorganized Debtors and (b) deliver to the Reorganized Debtors such security or indemnity as may be required by the Reorganized Debtors to hold the Reorganized Debtors harmless from any damages, liabilities, or costs incurred in treating such Entity as the Holder of such Allowed Claim.  Such Holder shall, upon compliance with Article VI of the Plan, be deemed to have surrendered such instruments, securities, or other documentation for all purposes hereunder.

### 7. *Fractional and Minimum Distributions*

Pursuant to Section 6.7 of the Plan, notwithstanding anything contained in the Plan to the contrary, no fractional dollars of Cash shall be distributed.  For purposes of distribution hereunder, fractional dollars shall be rounded to the nearest whole unit (with any amount less than one-half dollar to be rounded down).  Notwithstanding any other provision of the Plan, the Disbursing Agent shall have no obligation to make any distribution under the Plan with a value of less than $50.

### 8. *Manner of Payment Under Plan of Reorganization*

Pursuant to Section 6.8 of the Plan, the Disbursing Agent shall be authorized, in its discretion, to make any Cash payment required to be made hereunder by check or wire transfer.

### 9. *Withholding and Reporting Requirements.*

Pursuant to Section 6.9 of the Plan, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority in connection with the Plan and all instruments issued in connection therewith and distributions thereon.  All distributions under the Plan shall be subject to any such withholding or reporting requirements.

### 10. *ACA Commutation Distributions*

Pursuant to Section 6.10 of the Plan, all checks issued with respect to the Commutation Consideration shall be issued by ACA and not by the Obligated Group and shall bear a notice indicating that endorsement or deposit of

such check shall constitute a voluntary release, quitclaim, and waiver of any and all claims that such bondholder may have against ACA under, pursuant to, or in connection with, the ACA Insurance Policy.

C.    *Procedures for Resolving Disputed Claims*

1.    *Prosecution of Objections to Claims.*

Pursuant to Section 7.1 of the Plan, except as provided in Section 7.1(b) of the Plan, on and after the Confirmation Date, each Reorganized Debtor may, without approval of the Bankruptcy Court, (a) file, settle, compromise, withdraw, or litigate to judgment objections to Claims (other than Claims previously Allowed, including Claims Allowed under the Plan) with respect to its Estate and (b) settle or compromise any Disputed Claim with respect to its Estate. Any objections to Claims must be filed by the Claims Objection Deadline. As provided in Section 4.2 and Section 4.10 of the Plan (and except as otherwise provided in Section 4.10 or Section 4.19), on and after the Confirmation Date, the Post-Effective Trustee, on behalf of each Post-Effective Trust Account, (a) shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment objections to PET Claims against the respective Estate (other than such Claims previously Allowed, including PET Claims Allowed under the Plan), and, with respect to the VNA Post-Effective Trust Account, the VNA Hoosac Bank Secured Claim, and (b) may settle or compromise any such Disputed Claim without approval of the Bankruptcy Court. All Claim objections of the Post-Effective Trustee must be filed by the Claims Objection Deadline.

2.    *Estimation of Claims.*

Pursuant to Section 7.2 of the Plan, the Reorganized Debtors or the Post-Effective Trustee, as the case may be, shall be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors (or the Reorganized Debtors, as the case may be) previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors (or the Reorganized Debtors or the Post-Effective Trustee, as the case may be) may pursue any supplemental proceedings to object to the allowance of such Claim. All the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

3.    *Payments and Distributions on Disputed Claims.*

Pursuant to Section 7.3 of the Plan, notwithstanding any other provision to the contrary in the Plan, no payments or distributions shall be made hereunder with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, or determined by Final Order and such Disputed Claim has become an Allowed Claim. Moreover, except as otherwise provided in the Plan, no interest shall accrue or be Allowed on any Claim during the period after the Petition Date.

4.    *Debtors' Rights and Defenses Preserved*

Pursuant to Section 7.4 of the Plan, except as expressly provided in any order entered in the Chapter 11 Cases, nothing, including, but not limited to, the failure of the Debtors, the Reorganized Debtors, or the Post-Effective Trustee to object to a Claim for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors, the Reorganized Debtors, or the Post-Effective Trustee with respect to any Claim, including, but not limited to, all rights of the Debtors, the Reorganized Debtors, or the Post-Effective Trustee to contest or defend themselves against such Claims in any lawful manner or forum when and if such Claim is sought to be enforced by the Holder thereof.

- 58 -

5.   *Disputed Claims Reserves*

Section 7.5 of the Plan provides:

(a)  *Deposit of Post-Effective Trust Interests on the Effective Date.*  On the Effective Date (or as soon thereafter as is reasonably practicable), the Post-Effective Trustee shall deposit (which deposit shall be reflected solely through book entries) from each Post-Effective Trust Account into the respective Disputed Claims Reserve for such Post-Effective Trust Account the Post-Effective Trust Interests that would have been distributed to the Holders of the respective Disputed PET Claims if such Claims had been Allowed PET Claims on the Effective Date, to ensure that the Holders of Allowed PET Claims receive the same percentage recovery from the Post-Effective Trust on account of their individual Claims at all times.  The amount of Post-Effective Trust Interests to be deposited into each Disputed Claims Reserve for each Disputed PET Claim will be determined based on the least of (a) the asserted amount of the Disputed PET Claim filed with the Bankruptcy Court or (if no proof of such Claim was filed) scheduled by the Debtors, (b) the amount, if any, of the Disputed PET Claim estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, and (c) the amount otherwise agreed to by the Debtors and the Holder of such Disputed PET Claim.

(b)  *Distributions of Post-Effective Trust Interests after Allowance.*  When a Disputed PET Claim becomes an Allowed PET Claim, the Post-Effective Trustee shall distribute (solely through book entries) to the Holder the amount of Post-Effective Trust Interests from the respective Disputed Claims Reserve that the Holder would have received on account of such Claim if the Claim had been an Allowed PET Claim on the Effective Date, no later than the fifth Business Day after the end of the calendar month in which such Disputed PET Claim becomes an Allowed PET Claim.

(c)  *Distributions of Post-Effective Trust Interests after Disallowance.*  If a Disputed PET Claim is Disallowed, in whole or in part, the Post-Effective Trustee shall distribute the Post-Effective Trust Interests (solely through book entries) reserved in respect of the Disallowed amount of the Disputed PET Claim from the respective Disputed Claims Reserve to the holders of the other Post-Effective Trust Interests (including the Disputed Claims Reserve, as applicable) in such Post-Effective Trust Account on a quarterly basis (and in no event later than the fifth Business Day after the end of each calendar quarter) and in a manner designed to ensure that the Holders of Allowed PET Claims receive the same Pro-Rata Share of beneficial interests in the Post-Effective Trust Account. Notwithstanding anything to the contrary in Section 7.5(c) of the Plan, to the extent that Post-Effective Trust Interests have been transferred in compliance with the Post-Effective Trust Agreement and the Plan, distributions to be made pursuant to Section 7.5(c) of the Plan shall be made to the current holder of such Post-Effective Trust Interests.

D.      *Conditions Precedent to Confirmation and Effective Date*

1.   *Conditions Precedent to Confirmation*

Pursuant to Section 8.1 of the Plan, the Confirmation Order shall not be entered unless and until such Confirmation Order is in form and substance satisfactory to the Debtors.

2.   *Conditions Precedent to the Effective Date*

Pursuant to Section 8.2 of the Plan, the Effective Date shall not occur unless and until each of the following conditions has occurred or has been waived by the Debtors in accordance with the terms of the Plan:

(a)   the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate;

(b)   the Confirmation Order shall have been entered on the docket for the Chapter 11 Cases and no stay of the Confirmation Order shall be in effect;

- 59 -

(c)     the New Notes and all other documents and agreements necessary to implement the terms of the Plan as determined by the Debtors shall have been executed;

(d)     PBGC shall have terminated the North Adams Regional Hospital Retirement Income Plan pursuant to 29 U.S.C. § 1341;

(e)     NBR shall have consummated a sale of the Doctors Building to NARH;

(f)     all authorizations, consents, and approvals determined by the Debtors to be necessary to implement the terms of the Plan shall have been obtained;

(g)     the Creditors' Committee shall have appointed the Post-Effective Trustee, and the Post-Effective Trust Agreement shall have been executed;

(h)     all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full;

(i)     the New Indenture, New Loan Agreement, New Mortgage, and New Security Agreement shall have been executed and the New Bonds shall have been issued; and

(j)     all other actions necessary to implement the terms of the Plan shall have been taken.

3.   *Waiver of Conditions*

Pursuant to Section 8.3 of the Plan, any condition set forth in Article VIII of the Plan (other than the condition set forth in Section 8.2(a) and Section 8.2(b)(i) of the Plan) may be waived, in whole or in part, at any time by the Debtors without notice and without leave or order of the Bankruptcy Court.

4.   *Modification of Plan*

Pursuant to Section 8.4 of the Plan, the Debtors may amend, supplement, or modify the Plan at any time, subject to the restrictions and requirements of section 1127 of the Bankruptcy Code, and except to the extent such amendment, supplement, or modification affects a party's right of consent hereunder and such consent has not been previously obtained. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

5.   *Effect of Withdrawal or Revocation*

Pursuant to Section 8.5 of the Plan, the Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is so revoked or withdrawn, or if the Effective Date fails to occur, (a) the Confirmation Order, automatically and without further order of the Bankruptcy Court, shall be, and shall be deemed, vacated, null and void, with no force or legal effect whatsoever; (b) no distributions under the Plan shall be made; (c) all Assets shall remain vested in the Debtors' Estates; (d) the Debtors and all Holders of Claims shall be restored to the *status quo ante* as of the Day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (e) the Debtors' obligations with respect to the Claims shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other Person or Entity or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

6.   *Reservation of Rights*

Pursuant to Section 8.6 of the Plan, the Plan shall have no force or effect unless and until the Confirmation Order is entered. Prior to the Effective Date, none of the Filing of the Plan, any statement or provision contained in

- 60 -

the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or any other matter.

### 7.   *Substantial Consummation of Plan*

Pursuant to Section 8.7 of the Plan, substantial consummation of the Plan under Bankruptcy Code section 1101(2) will be deemed to occur on the Effective Date.

### E.   *Effect of Plan Confirmation*

#### 1.   *Binding Effect*

Pursuant to Section 9.1 of the Plan, the provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, the Post-Effective Trustee, the Post-Effective Trust, the Disbursing Agent, any Holder of any Claim treated under the Plan or any Person named or referred to in the Plan, and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers, trustees, and directors, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

#### 2.   *Discharge of Claims*

Pursuant to Section 9.2 of the Plan and section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims and causes of action of any nature whatsoever arising on or before the Effective Date, including any interest accrued on such Claims from and after the Petition Date, whether known or unknown, against the Debtors and liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties arising before the Effective Date, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, in each case whether or not:  (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim has accepted the Plan.  Any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims arising before the Effective Date, subject to the Effective Date occurring.

#### 3.   ***Releases***

**Pursuant to Section 9.3 of the Plan:**

**(a)  *Releases by the Debtors*.  For good and valuable consideration, the adequacy of which is hereby confirmed, upon the Effective Date, the Debtors shall be deemed forever to release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities (other than any rights to enforce the terms of the Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act, omission, transaction, event, cause, matter, or thing taking place on or before the Effective Date against (i) the ACA Parties, if the MDFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, (ii) the Nuveen Parties, if the MHEFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, (iii) MDFA Trustee, if the MDFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, unless MDFA Trustee has filed an objection to the Plan, (iv) MHEFA Trustee, if the MHEFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, unless MHEFA Trustee has filed an objection to the Plan, and (v) the Master**

- 61 -

**Trustee, if both the MDFA Bondholders and the MHEFA Bondholders have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and have not elected to make an 1111(b) Election, unless the Master Trustee has filed an objection to the Plan..**

**(b)  _Releases by ACA, Nuveen, MDFA Trustee, MHEFA Trustee, and the Master Trustee_.  For good and valuable consideration, the adequacy of which is hereby confirmed, upon the Effective Date, ACA, Nuveen, MDFA Trustee, MHEFA Trustee, and the Master Trustee (each respectively only if it is eligible to receive a release pursuant to Section 9.3(a)) shall be deemed forever to release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities (other than any rights to enforce the terms of the Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act, omission, transaction, event, cause, matter, or thing taking place on or before the Effective Date against the Debtor Parties.**

4.  _Exculpation and Limitation of Liability_

**Pursuant to Section 9.4 of the Plan, none of the Debtor Parties, the ACA Parties, the Nuveen Parties, or the Reorganized Debtors shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim, or any other party in interest in the Chapter 11 Cases, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the administration of the Plan, or the property to be distributed under the Plan, except for their gross negligence, willful misconduct, or bad faith as determined by a Final Order entered by a court of competent jurisdiction.**

5.  _Injunction_

**Pursuant to Section 9.5 of the Plan:**

**(a) _General_.  All Entities who have held, hold, or may hold Claims arising on or before the Effective Date and all other parties in interest in the Chapter 11 Cases, along with their respective current and former employees, agents, officers, trustees, principals, and affiliates, permanently are enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, or (iv) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, on account of such Claims; provided, however, that nothing contained in the Plan shall preclude such Entities from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan.**

**(b) _Injunction Against Interference with Plan_.  Upon entry of the Confirmation Order, all Holders of Claims and their respective current and former employees, agents, officers, trustees, principals, and affiliates shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan. Each Holder of an Allowed Claim, by accepting distributions pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Section 9.5 of the Plan.**

- 62 -

6. *Term of Bankruptcy Injunction or Stays*

Pursuant to Section 9.6 of the Plan, all injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence as of the Confirmation Date, shall remain in full force and effect until the Effective Date, except for any injunction or stay of the Holder of the VNA Hoosac Bank Secured Claim, which shall remain in full force and effect until the sale of the VNA Building Real Property pursuant to Section 4.15 of the Plan is consummated.

7. *Termination of Subordination Rights and Settlement of Related Claims*

Pursuant to Section 9.7 of the Plan, the classification and manner of satisfying all Claims under the Plan take into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, sections 510(b) or 510(c) of the Bankruptcy Code, or otherwise. All subordination rights that a Holder of a Claim may have with respect to any distribution to be made under the Plan shall be discharged and terminated and all actions related to the enforcement of such subordination rights shall be permanently enjoined. Accordingly, distributions under the Plan to Holders of Allowed Claims will not be subject to payment of a beneficiary of such terminated subordination rights or to levy, garnishment, attachment, or other legal process by a beneficiary of such terminated subordination rights.

8. *Preservation of Rights of Action*

Pursuant to Section 9.8 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and have the exclusive right to enforce, after the Effective Date, any claims, rights, and Causes of Action that the Debtors or the Estates may hold against any Entity (except as otherwise provided in Section 9.3 of the Plan or, with respect to certain Avoidance Actions, Section 4.2 of the Plan), including all Causes of Action against any Entity on account of indebtedness and any other Causes of Action in favor of the Reorganized Debtors or their Estates. The Reorganized Debtors shall be permitted to pursue such retained claims, rights, or Causes of Action in accordance with the best interests of the Reorganized Debtors.

F. *Retention of Jurisdiction*

Article X of the Plan provides that, pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order, and the Chapter 11 Cases to the fullest extent permitted by law, including jurisdiction to:

(a) allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of (i) any request for payment of any Administrative Claim, (ii) any and all objections to the allowance or priority of Claims, including, without limitation, any objections to claims brought by the Debtors ,the Reorganized Debtors, or the Post-Effective Trustee, and (iii) any other actions taken by the Reorganized Debtors or the Post-Effective Trustee in accordance with their authority under the Plan;

(b) grant or deny any application for allowance of compensation or reimbursement of expenses authorized pursuant to the Plan or the Bankruptcy Code under sections 330, 331, 503(b), 1103, and 1129(a)(9) of the Bankruptcy Code and resolve any dispute under Section 2.4 of the Plan;

(c) resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which any Debtor or Reorganized Debtor may be liable, and hear, determine, and, if necessary, liquidate, any Claims arising therefrom;

(d)   ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)   decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date, including any motions, adversary proceedings, contested or litigated matters, and any other matters brought by the Reorganized Debtors in accordance with their authority under the Plan;

(f)   enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Confirmation Order;

(g)   resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such other documents;

(h)   modify the Confirmation Order, the Plan (before or after the Effective Date under section 1127 of the Bankruptcy Code), or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, the Confirmation Order, any Bankruptcy Court order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(i)   issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan or the Confirmation Order;

(j)   hear and determine any rights, claims, or Causes of Action held or reserved by, or accruing to, the Debtors, the Reorganized Debtors, or the Post-Effective Trustee pursuant to the Bankruptcy Code, the Plan, the Confirmation Order, or, in the case of the Debtors, any other applicable law;

(k)   enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases, including all such orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings set forth in the Plan or the Confirmation Order;

(l)   enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(m)   determine any other matters that may arise in connection with or that relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Confirmation Order;

(n)   enter the Final Decree;

(o)   hear and resolve all matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- 64 -

(p)    hear and resolve all matters involving the nature, existence, or scope of the Debtors' discharge;

(q)    hear and resolve all matters related to the property of the Estates from and after the Confirmation Date;

(r)    hear and resolve all matters related to the Post-Effective Trust's operations; and

(s)    hear and resolve such other matters as may be provided in the Confirmation Order or as may be authorized by the Bankruptcy Code.

G.    *Miscellaneous Provisions*

1.    *Payment of Statutory Fees*

Pursuant to Section 11.1 of the Plan, all fees payable under section 1930 of title 28 of the United States Code shall be paid on or before the Effective Date.

2.    *Governing Law*

Pursuant to Section 11.2 of the Plan, except to the extent that the Bankruptcy Code, the Bankruptcy Rules, or any other federal law, rule, or regulation is applicable, or to the extent that an exhibit or supplement to the Plan provides otherwise, the Plan shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.

3.    *Severability of Terms or Provisions*

Pursuant to Section 11.3 of the Plan, if, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to render the term or provision valid or enforceable, to the maximum extent practicable and consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable.  Such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

4.    *Severability of Debtors*

Pursuant to Section 11.4 of the Plan, prior to the entry of the Confirmation Order, the Debtors, in their sole discretion, may elect to proceed with confirmation of the Plan solely with respect to certain Debtors and to exclude the application of the Plan to any other Debtor or Debtors.  In such event, the Plan shall automatically be altered, and the Bankruptcy Court shall interpret all terms and provisions of the Plan, so as to exclude the application of the Plan to such excluded Debtor or Debtors.  Notwithstanding any such alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect with respect to the remaining Debtors and shall in no way be affected, impaired, or invalidated by such alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms with respect to the remaining Debtors.

- 65 -

5. *Inconsistency*

Pursuant to Section 11.5 of the Plan, in the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, any exhibit or schedule to the Plan, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

6. *Filing of Additional Documents*

Pursuant to Section 11.6 of the Plan, the Debtors (or the Reorganized Debtors, as the case may be) shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

7. *Service of Documents*

Pursuant to Section 11.7 of the Plan, all notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> Northern Berkshire Healthcare, Inc.
> 71 Hospital Avenue
> North Adams, Massachusetts 01247
> Attn: Christopher L. Hickey
>
> with copies to:
>
> Ropes & Gray LLP
> Prudential Tower
> 800 Boylston Street
> Boston, Massachusetts 02199-3600
> Attn: Steven T. Hoort
> Attn: James A. Wright III

8. *Section 1125(e) of the Bankruptcy Code*

Section 11.8 of the Plan provides that, as of the Confirmation Date, (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective affiliates, agents, trustees, officers, employees, advisors, and attorneys that have participated in the offer and issuance of any securities under the Plan shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and therefore are not, and shall not be, liable on account of such offer, issuance, or solicitation at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of any securities under the Plan.   The Debtors and each of their respective affiliates, agents, trustees, officers, employees, advisors, and attorneys shall bear no obligation or liability with respect to the ACA Insurance Commutation or any solicitation thereunder.

9. *Exemption from Certain Transfer Taxes*

Section 11.9 of the Plan provides that, Pursuant to section 1146(a) of the Bankruptcy Code, no stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax, or other similar tax shall result from, or be levied on account of, (a) issuing, transferring, or exchanging notes, (b) creating any mortgage, deed of trust, lien, pledge, or other security interest, (c) making or assigning any lease or sublease, or (d) making or delivering any deed or other instrument of transfer, under, in furtherance of, or in connection with, the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or

- 66 -

transfers of tangible property.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned or leased property that close on or after the Confirmation Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

### 10. *Tax Reporting and Compliance*

Pursuant to Section 11.10 of the Plan, the Reorganized Debtors may request expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for or on behalf of the Debtors for any and all taxable periods ending after the Petition Date through and including the Effective Date.  All distributions pursuant to the Plan shall be subject to all tax withholding and reporting requirements imposed on the Debtors by applicable law. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent may take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, or other spousal awards, liens, and encumbrances.

### 11. *Schedules and Exhibits*

Pursuant to Section 11.11 of the Plan, other than for purposes of Section 11.5 of the Plan, all exhibits and schedules to the Plan, including the Plan Supplement, but excluding any materials related to the ACA Insurance Commutation, are incorporated into and are a part of the Plan as if fully set forth in the Plan.

### 12. *No Prejudice*

Pursuant to Section 11.12 of the Plan, if the Confirmation Order is vacated, then (a) the Plan shall be null and void in all respects, (b) no distributions under the Plan shall be made, (c) the Debtors and all Holders of Claims shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date, and (d) nothing contained in the Plan or the Disclosure Statement shall (i) be deemed to constitute a waiver or release of (x) any Claims by any creditor or (y) any Claims against the Debtors, (ii) prejudice in any manner the rights of the Debtors, or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors in any respect.

### 13. *Allocation of Payments*

Pursuant to Section 11.13 of the Plan, to the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of such Claim first and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest.

### 14. *Dissolution of Statutory Committees.*

Pursuant to Section 11.14 of the Plan, all Statutory Committees appointed in the Chapter 11 Cases, if any, shall be dissolved on the Confirmation Date.

## XI.    RESOLUTION OF DISPUTES

### A.    *Employee Claims, Including Claims Under MNA and SEIU Collective Bargaining Agreements*

Pursuant to the Plan, NARH will assume its collective bargaining agreements with the MNA and SEIU.  As a result, Reorganized NARH will be obligated to pay all amounts owing under the agreements in the ordinary course, in accordance with the terms of the respective agreement, regardless of whether the amounts accrued prepetition or postpetition.

NARH recently concluded an arbitration with the MNA regarding the calculation of overtime owed to union members.  As part of its decision, the arbitrator determined that the Debtors owed unpaid overtime to certain union members.  The arbitration decision did not fix the amount the Debtors owe, and the Debtors calculate that they owe approximately $28,000 on account of this issue, although the Debtors have not reached agreement with the MNA on this amount and a further determination may be required to fix the amount.

Although these amounts accrued prepetition, the MNA asserts that this overtime must be paid in full, arguing that these amounts arise under the collective bargaining agreement and are required to be paid under the Bankruptcy Code if the collective bargaining agreement is assumed.  Courts in this District have published decisions that support the MNA's view.  See In re Arlene's Sportswear, Inc., 140 B.R. 25, 28 (Bankr. D. Mass. 1992); Eagle, Inc. v. Local no. 537, 198 B.R. 637, 639 (D. Mass. 1996).  Many other courts, including federal courts of appeal, take a contrary view and hold that the priority (if any) of employee claims is governed by sections 507(a)(4) and (a)(5) of the Bankruptcy Code, even if a collective bargaining agreement also covers those employees.  See, e.g., Air Line Pilots Ass'n, Int'l v. Shugrue (In re Ionosphere Clubs, Inc.), 22 F.3d 403, 408 (2d Cir. 1994); In re Roth American, Inc., 975 F.2d 949, 957 (3d Cir. 1992).

The Debtors have determined not to challenge the MNA's arguments, to assume the collective bargaining agreement with the MNA, and, accordingly, to pay the overtime – and all other amounts owing under the collective bargaining agreement, including all paid time off due to MNA members – in full, subject to the Debtors' rights to dispute the amounts the MNA and affected employees contend are due.  In the Debtors' business judgment, it is in the Debtors' best interests to assume the collective bargaining agreements and not to challenge the MNA's position.  The Debtors' employees are essential to the Debtors' success and the success of the reorganization the Plan contemplates.  The Debtors intend to assume the collective bargaining agreement and would likely be required to pay these costs as part of cure costs in connection with assumption.  Further, the Debtors believe that the costs and risks of litigating this dispute outweigh the potential gains.  Since precedent of the Bankruptcy Court and District Court of this District supports the MNA's view, the Debtors would likely be required to litigate this issue on appeal to the U.S. Court of Appeals for the First Circuit to reach a favorable outcome, regardless of the outcome in the Bankruptcy Court, and, while the Debtors believe they have the stronger legal position, a favorable outcome cannot be assured.  In addition, the costs of litigating this matter through appeal would easily outweigh the Debtors' estimates of unpaid overtime.

Any Claims of employees against the Debtors that do not arise under the collective bargaining agreement with the MNA or with SEIU will not be paid in full under the Plan unless they qualify as priority Claims under section 507 of the Bankruptcy Code.  Employees that filed Proofs of Claim will be treated as Holders of Other Priority Claims or General Unsecured Claims, as applicable, unless their Claims are paid in full in connection with assumption of a collective bargaining agreement.  As stated above, the Debtors have agreed with MNA that the Debtors will pay MNA members all paid time off due to MNA members in connection with curing defaults under the MNA collective bargaining agreement.

B.     Payments to Capital Lessors

The Plan treats certain equipment agreements denominated as "leases" in the agreement – the CalFirst Capital Lease 1, CalFirst Capital Lease 2, and the Other Capital Leases – as financings arrangements.  Accordingly, Holders of capital lease Claims will receive new Secured Notes in satisfaction of their Claims.

It is the Debtor's position that these capital equipment "leases" are not true leases but are instead financing agreements. The determination of whether an agreement is a true lease or a financing agreement, however, involves a weighing of several factors and is therefore subject to dispute. While it is the Debtor's position that these capital leases are in fact financing agreements, the issue is not free from doubt and contrary arguments could be made.

If the capital leases are financing agreements, the Debtors are not required to make current payments during bankruptcy.  If they are true leases, however, the Debtors are required by section 365 of the Bankruptcy Code to make current payments under the agreements prior to rejection.  Accordingly, to avoid inadvertently breaching their leases and risking the loss of critical equipment, the Debtors have made current payments on the capital leases and intend to continue to do so. The Plan treats these payments as adequate protection payments of postpetition interest

- 68 -

and amortization of principal, in accordance with the terms of the respective capital leases, and adjusts the claims accordingly.

## XII.    EVENTS DURING BANKRUPTCY

### A.    *Early Relief*

On the first day of the Chapter 11 Cases, we requested and later received relief that enabled us to enter bankruptcy with minimal impact on our day-to-day operations.  With this relief, we transitioned into operating in bankruptcy with no change to patient care and virtually no loss of suppliers, employees, or access to our day-to-day cash (including cash collateral).

Principally, with this relief, we were authorized to: (a) use prepetition bank accounts, checks, and other business forms; (b) honor prepetition compensation and benefits obligations to employees; and (c) continue use of our utility services without fear of discontinuation of service.

The Bankruptcy Court also entered an interim order authorizing us to use cash collateral in accordance with a budget agreed to with the Master Trustee, which has thus far been extended through January 17, 2012.

After receiving this initial relief, we also established procedures for easily retaining key professionals whose services are provided in the ordinary course of business, but who might otherwise discontinue services if made to comply with certain bankruptcy procedures, and procedures governing compensation of professionals that are key to providing services connected to the Chapter 11 Cases.

### B.    *Protection of Patient Information*

On June 20, 2011, the Bankruptcy Court authorized procedures governing the disclosure of patient information.  The Debtors are obligated to, and have throughout their operations taken great efforts to, preserve confidential information of patients.  The Debtors, together with the Voting Agent as the Debtors' claims and noticing agent, proposed procedures to satisfy both the Debtors' disclosure obligations in the Chapter 11 Cases and their confidentiality requirements to patients, including encoding, redacting, and encrypting certain information, which the Bankruptcy Court later approved.

### C.    *Retention of Professionals*

On July 15, 2011, the Bankruptcy Court authorized the retention of Ropes & Gray LLP as bankruptcy counsel to assist the Debtors with their obligations and strategic opportunities while operating in bankruptcy.  The Bankruptcy Court also authorized the retention of (a) Carl Marks Advisory Group LLC as the Debtors' financial adviser during restructuring and (b) Schwartz Hannum PC to assist with the Debtors' ongoing labor disputes and negotiations.

### D.    *Bar Date*

On August 4, 2011, the Bankruptcy Court entered an order establishing September 15, 2011 as the date by which claimants must file claims against the Debtors in the Chapter 11 Cases.  The Debtors believe that setting this bar date three months after the filing of the Chapter 11 Cases will assist, and has already assisted, the speedy resolution of claims and of the Chapter 11 Cases themselves.

### E.    *Berkshire Health Systems Contract*

As described in Article II.C.6, "RISK FACTORS—Risks Relating to our Operations—Berkshire Health Systems," on August 5, 2011, the Bankruptcy Court entered an order denying the motion of BHS to compel the Debtors to assume or reject the BHS contract.  We thus secured substantial additional time to negotiate a resolution of our contract with BHS.

F.      *Pension Plan Termination Approved*

As described in Article IV.H "OPERATIONS—Pension Plan," on September 6, 2011, we filed a motion to terminate the Pension Plan.  The Pension Plan Motion sought an order from the Bankruptcy Court determining that we satisfy the financial requirements for a distress termination of the Pension Plan under 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).  To satisfy these requirements, we were required to demonstrate an inability to pay all our debts pursuant to a plan of reorganization and continue in business outside the chapter 11 reorganization process absent termination of the Pension Plan.  On October 6, 2011, the Bankruptcy Court found that we satisfied these requirements and approved termination of the Pension Plan.

## XIII.   CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, BONDHOLDERS AND HOLDERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT, AND (C) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to certain Holders of Claims.  The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the Internal Revenue Service may adopt.  In addition, this summary addresses only U.S. federal income tax consequences and not foreign, state, or local tax consequences, or any estate or gift tax consequences, of the Plan.  Also, this summary does not address the federal income tax consequences of the Plan to taxpayers subject to special treatment under the Tax Code (including, but not limited to, Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, S corporations, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, partnerships and other pass- through entities (and their beneficial holders), Bondholders who are themselves in bankruptcy, and agents).  Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Bondholder or Holder.  Furthermore, this discussion assumes that Bondholders do not separately hold Claims, and that Holders only hold Claims in a single class.  Bondholders that separately own Claims and Holders of Claims in more than one class should consult their own tax advisors as to the effect that separately owning Claims or owning Claims in more than one class, respectively, may have on the U.S. federal income tax consequences described below.

Due to the possibility of changes in law, differences in the circumstances applicable to Bondholders and Holders, differences in individual Bondholders' and Holders' methods of accounting (including with respect to contingent payment debt instruments), and the potential for disputes as to legal and factual matters, the federal income tax consequences described below are subject to significant uncertainties.  There can be no assurance that the Internal Revenue Service will not challenge any or all of the tax consequences described below, or that such a challenge, if asserted, would not be sustained.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION.  IT IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A BONDHOLDER OR HOLDER.  ALL BONDHOLDERS AND HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE TO THE BONDHOLDER OR HOLDER UNDER THE PLAN.

A.      *Federal Income Tax Consequences to Bondholders Receiving New Bonds in Exchange for MDFA Bonds and MHEFA Bonds*

In accordance with the Plan, and as described in more detail in Article V.A of this Disclosure Statement, Bondholders will receive, in exchange for their MDFA Bonds and MHEFA Bonds, the New Bonds, which will represent and reflect the Bondholders' respective beneficial interests in the New Secured Notes held by the New Trustee and payments received by the New Trustee thereunder.  Such transaction is expected to be treated as an exchange or "significant modification" of the MDFA Bonds and MHEFA Bonds and accordingly a realization event for federal income tax purposes.  Each Bondholder generally should realize gain or loss based on the difference between the "amount realized" by such Bondholder and the Bondholder's adjusted tax basis with respect to his, her or its MDFA Bonds or MHEFA Bonds.  The determination of the amount realized by a given Bondholder in connection with such exchange will depend on the terms, structure and composition of the New Bonds received by the Bondholder, and should generally take into account, without limitation, the stated principal amount, imputed principal amount, and/or fair market value of each series of New Bonds received by the Bondholder, and potentially the amount of the ACA Commutation, if any, received by the Bondholder.  The value of one or more series of New Bonds may be attributable, in whole or in part, to contingent payments (for example, payments derived from the ECF Note, VNA Post-Effective Trust Account Interests, or Affiliation Note, if any), and Bondholders should consult their tax advisors as to the effect of such contingent payments on the "amount realized" in connection with the exchange.  Any gain or loss realized by a Bondholder in connection with the exchange of MDFA Bonds or MHEFA Bonds for New Bonds should constitute ordinary income or loss to such Bondholder unless the MDFA Bonds or MHEFA Bonds are a capital asset in the hands of such Bondholder.  If the MDFA Bonds or MHEFA Bonds are a capital asset that has been held by the Bondholder for more than one year, the Bondholder should generally realize long-term capital gain or loss in connection with the exchange.

The federal income tax consequences to a Bondholder of holding the New Bonds will depend on the terms, structure and composition of the New Bonds held by the Bondholder.  Bondholders should generally recognize ordinary income in connection with the receipt of payments on the New Bonds treated as interest for federal income tax purposes, except to the extent such interest qualifies as tax-exempt interest for federal income tax purposes.  See Section C below.  Certain payments on one or more series of New Bonds may consist of contingent payments (for example, payments derived from the ECF Note, VNA Post-Effective Trust Account Interests or Affiliation Note, if any), and Bondholders should consult their tax advisors as to the tax consequences associated with such contingent payments.  In addition, because one or more of the New Secured Notes or series of New Bonds may be treated as issued with "original issue discount," Bondholders may be deemed to receive imputed interest, generally taxable as ordinary income, in connection with holding the New Bonds which may result in phantom income to such Bondholders (that is, taxable income without a corresponding cash receipt).  The circumstances in which phantom income may arise for a Bondholder include, but are not limited to, the holding of beneficial interests (through the New Bonds) in 1111(b) Notes as a result of an 1111(b) Election.  ALL BONDHOLDERS SHOULD CONSULT THEIR TAX ADVISORS AS TO THE POTENTIAL FOR RECEIVING IMPUTED INTEREST/PHANTOM INCOME WITH RESPECT TO THE NEW BONDS.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH BONDHOLDER.  FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN.  THEREFORE, IT IS IMPORTANT THAT EACH BONDHOLDER OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH BONDHOLDER OF THE PLAN.

B.       *Federal Income Tax Consequences to Holders Receiving Post-Effective Trust Interests*

In accordance with the Plan, and as described in more detail in Article V.B of this Disclosure Statement, certain Holders of Claims will receive, in full satisfaction and discharge thereof, his, her, or its Pro-Rata Share of Post-Effective Trust Interests in the Post-Effective Trust.  Each such Holder should generally realize gain or loss upon receipt of such Post-Effective Trust Interests based on the difference between the "amount realized" by such Holder and such Holder's adjusted tax basis in his, her, or its Claim.  The amount realized should generally be equal to the value of such Holder's Pro-Rata Share of the relevant Post-Effective Trust Interests.

As certain proceeds to be received by the Post-Effective Trust may consist of contingent payments, such Holders should consult their tax advisors as the effects of such contingent payments on any gain or loss realized and the proper federal income tax treatment of such contingent payments (including with respect to potential imputed interest, i.e., phantom income).  Any gain or loss realized by such Holder on disposition of a Claim generally should constitute ordinary income or loss to such Holder unless such Claim is a capital asset in the hands of such Holder.  If a Claim is a capital asset that has been held by such Holder for more than one year, such Holder should generally realize long-term capital gain or loss on disposition thereof.  Subject to the discussion below regarding the Disputed Claims Reserves, for federal income tax purposes, it is intended that each such Holder be treated as an owner of the Post-Effective Trust and, thus, should be subject to tax on such Holder's share of any taxable income or gain (as ordinary income or capital gain, depending on the circumstances) resulting from operations of the Post-Effective Trust, regardless of whether the corresponding cash proceeds are distributed to such Holder.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction, the Post-Effective Trustee is expected to file returns for the Post-Effective Trust Interests attributable to the Disputed Claims Reserve as a disputed ownership fund under Treasury Regulation Section 1.468B-9, of which the Post-Effective Trustee is the "administrator" as defined in such regulations, and the Post-Effective Trustee shall be responsible for payments, out of amounts otherwise payable with respect to such Post-Effective Trust Interests, of any taxes imposed thereon.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH SUCH HOLDER.  FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN.  THEREFORE, IT IS IMPORTANT THAT EACH SUCH HOLDER OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF THE PLAN.

C.       *Taxable or Tax-Exempt Interest*

The Obligated Group makes no representation and takes no position as to whether interest on any series of New Bonds will be excludable from federal gross income under section 103 of the Tax Code (or under any similar state or local taxation regime).  Section 4.17 of the Plan sets forth certain limited undertakings of the Obligated Group to cooperate in the possible establishment and maintenance of a tax-exempt bond structure to the extent practicable for the New Bonds.  BONDHOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO WHETHER INTEREST ON ANY SERIES OF NEW BONDS MAY BE EXCLUDABLE FROM GROSS INCOME, AND IF NOT, THE POTENTIAL CONSEQUENCES TO THE BONDHOLDER GIVEN HIS, HER OR ITS PARTICULAR CIRCUMSTANCES.  FOR EXAMPLE, A BONDHOLDER THAT IS A "REGULATED INVESTMENT COMPANY" SHOULD CONSULT WITH ITS TAX ADVISOR CONCERNING THE CONSEQUENCES OF THE RECEIPT OF TAXABLE INTEREST OR OTHER TAXABLE INCOME ON THE BONDHOLDER'S ABILITY TO PAY "EXEMPT INTEREST DIVIDENDS" TO ITS OWN SHAREHOLDERS, AND ON THE BONDHOLDER'S OBLIGATIONS WITH RESPECT TO FORM 1099 REPORTING TO ITS SHAREHOLDERS AND TO THE INTERNAL REVENUE SERVICE.

D.       *Withholding and Reporting*

Payments of interest, dividends, and certain other payments to non-exempt recipients are generally subject to backup withholding (currently at the rate of 28%) unless the payee of such payment furnishes such payee's correct taxpayer identification number (social security number or employer identification number) to the payor in the proper manner and certain other conditions are met.  The payor may be required to withhold the applicable percentage of any payments made to a payee who does not provide his, her, or its taxpayer identification number.  Backup withholding is not an additional tax, but an advance payment that may be refunded to the taxpayer by the

Internal Revenue Service to the extent that the backup withholding results in an overpayment of tax by such taxpayer for the taxable year.

THE FOREGOING IS INTENDED TO BE A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO CERTAIN BONDHOLDERS AND CERTAIN HOLDERS AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN.  SUCH CONSEQUENCES WILL DEPEND ON THE INDIVIDUAL CIRCUMSTANCES OF EACH BONDHOLDER AND HOLDER.  ACCORDINGLY, EACH BONDHOLDER AND HOLDER IS URGED TO CONSULT WITH HIS, HER, OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## XIV.   CONFIRMATION

### A.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing to consider confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.

The Bankruptcy Court has scheduled a Confirmation Hearing to consider whether the Plan satisfies the various requirements of the Bankruptcy Code for [              ], 2012 at [        ] (ET).  At that time, the Debtors will submit a report to the Bankruptcy Court concerning the vote for acceptance or rejection of the Plan by the parties entitled to vote thereon.  Confirmation hearing notices are being provided to all Holders of Claims as required by the Bankruptcy Rules.  Objections to confirmation must be filed with the Bankruptcy Court by [         ], 2012 at [        ] (ET) and are governed by Bankruptcy Rules 3020(b) and 9014 and the local rules of the Bankruptcy Court.  UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THE CONFIRMATION HEARING NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.     Requirements for Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the provisions of section 1129 of the Bankruptcy Code have been satisfied by the Plan.  If all the provisions of section 1129 of the Bankruptcy Code are met, the Bankruptcy Court may enter an order confirming the Plan.  We believe that all the requirements of section 1129 of the Bankruptcy Code will be satisfied.

### C.     Class Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each impaired class of claims or interests accept a plan, subject to the exceptions described in the section entitled "cram down" below.  For each debtor, at least one impaired class of claims must accept a plan in order for the plan to be confirmed.

For a class of claims to accept a plan, section 1126 of the Bankruptcy Code requires acceptance by creditors that hold at least two-thirds in dollar amount and a majority in number of the allowed claims of such class, in both cases counting only those claims actually voting to accept or reject the plan.  The holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

For a class of interests to accept a plan, section 1126 of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests actually voting to accept or reject the plan.  The holders of interests who fail to vote are not counted as either accepting or rejecting a plan.

29105905_1

If the Plan is confirmed, the Plan will be binding on all Holders of Claims of each Class, including Classes and members of such Classes that did not vote or that voted to reject the Plan.

We believe that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that we have complied or will have complied with all the requirements of chapter 11 and that the Plan has been proposed and made in good faith.

### D.     Cram Down

A court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cram down" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires the court to find that the plan is "fair and equitable" and does not "discriminate unfairly" against any nonaccepting impaired class of claims or interests.  With respect to a dissenting class of claims, the "fair and equitable" standard requires, among other things, that, pursuant to the Plan, either (i) each holder of a claim in such dissenting class will receive or retain property having a value, as of the effective date of a plan, equal to the allowed amount of its claim, or (ii) no holder of allowed claims or interests in any junior class will receive or retain any property on account of such claims or interests.  With respect to a dissenting class of interests, the "fair and equitable" standard requires that pursuant to the Plan, either (i) each holder of an interest in the dissenting class will receive or retain property having a value, as of the effective date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests or (ii) no holder of an interest in any junior class will receive or retain any property on account of such interests.  The strict requirement of the allocation of full value to dissenting classes before junior classes can receive a distribution is known as the "absolute priority rule."

### E.     Plan Meets Requirements for Confirmation

#### 1.   Best Interests of Creditors—Liquidation Analysis

To confirm the Plan, the Bankruptcy Court must determine that the Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code, that is, that the Plan is in the best interests of each Holder of a Claim in an Impaired Class that has not voted to accept the Plan.  To satisfy this "best interests" test, the Bankruptcy Court must find that the Plan provides each non-consenting Holder in such Impaired Class with a recovery, on account of such Holder's Claim, that has a value at least equal to the value of the distribution that each such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

We believe that confirmation of the Plan is in the best interests of the Holders of Claims because it provides distributions to such Holders having a present value, as of the Effective Date, of not less than the value such Holders likely would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  See Article VIII. "VALUATION ANALYSIS" and Article VIII.B.  "LIQUIDATION ANALYSIS."

To estimate what members of each Impaired Class of Claims would receive if the Debtors were liquidated pursuant to chapter 7 of the Bankruptcy Code, we must first determine the aggregate dollar amount that would be available to such members for distribution if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the Debtors' assets were liquidated by a chapter 7 trustee.  The resulting liquidation value of the Debtors would consist of the net proceeds from the disposition of assets of the Debtors, augmented by any cash held by the Debtors.

We believe that chapter 7 liquidation would result in a diminution in the value to be realized by Holders of Claims due to, among other factors, (i) the failure to realize the maximum going-concern value of the Debtors' assets, (ii) additional costs and expenses involved in the appointment of a chapter 7 trustee and attorneys, accountants, and other professionals to assist such trustee in the chapter 7 case, (iii) additional expenses and Claims, some of which would be entitled to priority in payment, which would arise by reason of the liquidation, including Claims resulting from the rejection of unexpired leases and executory contracts in connection with a cessation of the Debtors' operations, and (iv) the substantial time that would elapse before creditors would receive any distribution

- 74 -

in respect of their Claims. Consequently, we believe that the Plan, which provides for the continuation of our business, will provide a greater ultimate return to Holders of Claims than would a chapter 7 liquidation.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Holders of Claims in Impaired Classes will receive distributions under the Plan that are at least as great as the distributions that such Holders would receive upon a liquidation of the Debtors pursuant to chapter 7 of the Bankruptcy Code.

### 2. *Feasibility of the Plan*

We believe that confirmation of the Plan is not likely to be followed by a liquidation of the Reorganized Debtors or a need for a further financial reorganization of the Reorganized Debtors. Upon confirmation of the Plan, the Reorganized Debtors will have sufficient cash to fund distributions under the Plan and to support and meet their ongoing financial needs. We believe the Plan as proposed is feasible and that the Reorganized Debtors will be financially viable after confirmation of the Plan.

### F. *Alternatives to Confirmation and Consummation of the Plan*

If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives available to the Debtor would include (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code or (ii) liquidation under chapter 11 or chapter 7 of the Bankruptcy Code. If the Plan is not confirmed, we will decide which alternative to pursue by weighing each of the available options and choosing the alternative or alternatives that are in the best interests of the Debtors, their stakeholders, and other parties in interest.

### 1. *Alternative Plans of Reorganization*

If the Plan is not confirmed, the Debtors (or, if the exclusive period in which to file a plan of reorganization has expired or is terminated by the Bankruptcy Court, any other party in interest) could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization or continuation of our operations or an orderly liquidation of our assets.

We believe that the Plan is a significantly more attractive alternative than those alternatives, because it will result in a larger distribution to creditors than would other types of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 or chapter 11 of the Bankruptcy Code and will avoid the disruption of our business that would result from a protracted and contested bankruptcy case.

### 2. *Dismissal of the Debtors' Chapter 11 Cases*

Dismissal of our Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo* as of the commencement of the Chapter 11 Cases on June 13, 2011. Upon dismissal of our Chapter 11 Cases, we would lose the protections afforded by the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with our creditors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of our Chapter 11 Cases would permit secured prepetition lenders that have not been paid in full to foreclose upon the assets that are subject to their liens. Dismissal also would permit unpaid unsecured creditors to obtain and enforce judgments against us. We believe that these actions would seriously undermine our ability to obtain financing and would quickly lead to the liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Therefore, we believe that dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

### 3. *Liquidation Under Chapter 7 or Chapter 11*

If no plan of reorganization is confirmed (and in certain other circumstances), the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. A discussion of the potential effects that a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth under Article VIII.B. "LIQUIDATION ANALYSIS." In a

liquidation, the assets of the Debtors would be sold in exchange for cash, securities, or other property, which would then be distributed to creditors.  In contrast to the Plan (or an alternative reorganization under chapter 11 of the Bankruptcy Code), in which certain creditors would receive debt of the Reorganized Debtors and would be subject to the risks associated with holding such securities, in a liquidation creditors might receive cash or other assets that are not subject to those risks.  See Article II.A.  "RISK FACTORS—Risks Relating to the Chapter 11 Cases."  We believe, however, that liquidation under chapter 7 would result in either smaller or no distributions to Holders of Claims as compared to those provided for in the Plan because of, among other things, (i) failure to realize the greater going-concern value of the Debtors' assets and the erosion in value of assets in a chapter 7 case due to the expeditious liquidation required and the "forced sale" atmosphere that would prevail, (ii) administrative expenses involved in the appointment of a trustee and professional advisors to such trustee, and (iii) expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations of the Debtors.  In addition, a chapter 7 liquidation is likely to result in substantial litigation and delays in ultimate distributions to creditors.  If a chapter 7 liquidation occurs, we believe that there would not be sufficient assets to make any distribution to unsecured creditors, or priority claimants, and that the Holders of the MDFA Note and MHEFA Note would not be paid in full.

In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, potentially resulting in somewhat greater (but indeterminate) recoveries.  Although preferable to a chapter 7 liquidation, we believe that a liquidation under chapter 11 still would not realize the full going-concern value of the Debtors' assets.  The going-concern value is predicated upon the Debtors continuing in operation.  In contrast, liquidation value assumes that the Debtors would be unable to continue functioning as a going concern and their assets would be sold separately.  Consequently, the Debtors believe that a liquidation under chapter 11 is a less attractive alternative to creditors than the Plan because of the likelihood of a greater recovery provided for by the Plan.  See Article V.  "THE PLAN— CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION" and Article VIII.B.  "LIQUIDATION ANALYSIS.

### RECOMMENDATION AND CONCLUSION

We believe that confirmation of the Plan is in the best interests of creditors and that the Plan should be confirmed.  We recommend that all Holders of Claims that are entitled to vote on the Plan vote to accept the Plan.

Dated: January 5, 2012

Respectfully Submitted,

NORTHERN BERKSHIRE HEALTHCARE, INC.

*/s/ [DRAFT]*
_____
Christopher L. Hickey
Chief Financial Officer

NORTH ADAMS REGIONAL HOSPITAL, INC.

*/s/ [DRAFT]*
_____
Christopher L. Hickey
Chief Financial Officer

VISITING NURSE ASSOCIATION & HOSPICE OF
NORTHERN BERKSHIRE, INC.

*/s/ [DRAFT]*
_____
Christopher L. Hickey
Chief Financial Officer

NORTHERN BERKSHIRE HEALTHCARE PHYSICIANS
GROUP, INC.

*/s/ [DRAFT]*
_____
Christopher L. Hickey
Chief Financial Officer

Signature Page – Disclosure Statement

## ANNEX I

### Terms

"1111(b) Election" shall have the meaning ascribed in the Plan.

"1111(b) Election Date" shall have the meaning ascribed in the Plan.

"1111(b) Form" shall have the meaning ascribed in the Plan.

"1111(b) Notes" shall have the meaning ascribed in the Plan.

"1996 Bonds" is defined in Article III.B.

"2004A Bonds" is defined in Article III.B.

"2004B Bonds" is defined in Article III.B.

"ACA" means ACA Financial Guaranty Corporation.

"ACA Insurance Commutation" shall have the meaning ascribed in the Plan.

"ACA Parties" shall have the meaning ascribed in the Plan.

"ACC" is defined in Article II.C.12.

"Administrative 503(b)(9) Claims" shall have the meaning ascribed in the Plan.

"Administrative Bar Date" shall have the meaning ascribed in the Plan.

"Administrative Claims" shall have the meaning ascribed in the Plan.

"Administrative Claim Request" shall have the meaning ascribed in the Plan.

"Affiliation" shall have the meaning ascribed in the Plan.

"Affiliation Notes" shall have the meaning ascribed in the Plan.

"Affiliation Notes Original Principal Amount" shall have the meaning ascribed in the Plan.

"Allowed" shall have the meaning ascribed in the Plan.

"Assets" shall have the meaning ascribed in the Plan.

"Avoidance Actions" shall have the meaning ascribed in the Plan.

"Ballot" shall have the meaning ascribed in the Plan.

"Balloting and Noticing Agent" shall have the meaning ascribed in the Plan.

"Bankruptcy Code" shall have the meaning ascribed in the Plan.

"Bankruptcy Court" shall have the meaning ascribed in the Plan.

"Bankruptcy Rules" shall have the meaning ascribed in the Plan.

"Bar Date" shall have the meaning ascribed in the Plan.

"Bar Date Order" shall have the meaning ascribed in the Plan.

"Baseline Budget" shall have the meaning ascribed in the Plan.

"BHS" is defined in Article II.C.5.

"Bondholder" shall have the meaning ascribed in the Plan.

"Business Day" shall have the meaning ascribed in the Plan.

"CAH" is defined in Article III.B.

"CalFirst" shall have the meaning ascribed in the Plan.

"CalFirst Capital Lease 1" shall have the meaning ascribed in the Plan.

"CalFirst Capital Lease 1 Claim" shall have the meaning ascribed in the Plan.

"CalFirst Capital Lease 1 Secured Note" shall have the meaning ascribed in the Plan.

"CalFirst Capital Lease 2" shall have the meaning ascribed in the Plan.

"CalFirst Capital Lease 2 Claim" shall have the meaning ascribed in the Plan.

"CalFirst Capital Lease 2 Secured Note" shall have the meaning ascribed in the Plan.

"Capital Lease" shall have the meaning ascribed in the Plan.

"Capital Lease Claims List" shall have the meaning ascribed in the Plan.

"Cash" shall have the meaning ascribed in the Plan.

"Causes of Action" shall have the meaning ascribed in the Plan.

"Chapter 11 Cases" shall have the meaning ascribed in the Plan.

"Chapter 11 Parties" shall have the meaning ascribed in the Plan.

"Charging Lien" shall have the meaning ascribed in the Plan.

"Claim" shall have the meaning ascribed in the Plan.

"Claims Objection Deadline" shall have the meaning ascribed in the Plan.

"Class" shall have the meaning ascribed in the Plan.

"CMAG" means Carl Marks Advisory Group, LLC.

"CMS" is defined in Article III.B.

"Commutation Consideration" shall have the meaning ascribed in the Plan.

"Commutation Percentage" shall have the meaning ascribed in the Plan.

"Commuted Insurance Policy" shall have the meaning ascribed in the Plan.

"Commuting Bondholders" shall have the meaning ascribed in the Plan.

"Confirmation Date" shall have the meaning ascribed in the Plan.

"Confirmation Hearing" shall have the meaning ascribed in the Plan.

"Confirmation Hearing Notice" means [                    ].

"Confirmation Order" shall have the meaning ascribed in the Plan.

"Creditors' Committee" shall have the meaning ascribed in the Plan.

"Days' Cash on Hand" shall have the meaning ascribed in the Plan.

"Debtor Parties" shall have the meaning ascribed in the Plan.

"Debtors" shall have the meaning ascribed in the Plan.

"Disallowed" shall have the meaning ascribed in the Plan.

"Disbursing Agent" shall have the meaning ascribed in the Plan.

"Disclosure Statement" shall have the meaning ascribed in the Plan.

"Disputed" shall have the meaning ascribed in the Plan.

"Disputed Claims Reserves" shall have the meaning ascribed in the Plan.

"Distribution Record Date" shall have the meaning ascribed in the Plan.

"Doctors Building" shall have the meaning ascribed in the Plan.

"DTC" means The Depository Trust Corporation.

"ECF Calculation Date" shall have the meaning ascribed in the Plan.

"ECF Credits" shall have the meaning ascribed in the Plan.

"ECF Notes" shall have the meaning ascribed in the Plan.

"ECF Note Payment Date" shall have the meaning ascribed in the Plan.

"Effective Date" shall have the meaning ascribed in the Plan.

"Entity" shall have the meaning ascribed in the Plan.

"ERISA" is defined in Article IV.H.

"Estates" shall have the meaning ascribed in the Plan.

"Excess Cash Flow" shall have the meaning ascribed in the Plan.

"File," "Filed," or "Filing" shall have the meaning ascribed in the Plan.

- 3 -

"Final Decree" shall have the meaning ascribed in the Plan.

"Final Order" shall have the meaning ascribed in the Plan.

"Financial and Reporting Covenants" shall have the meaning ascribed in the Plan.

"Fixed ECF Note Payment" shall have the meaning ascribed in the Plan.

"GAAP" shall have the meaning ascribed in the Plan.

"General Bar Date" shall have the meaning ascribed in the Plan.

"General Unsecured Claims" shall have the meaning ascribed in the Plan.

"General Unsecured Creditors" means Holders of General Unsecured Claims.

"Holder" shall have the meaning ascribed in the Plan.

"Hospital" is defined in Article III.A.

"Impaired" shall have the meaning ascribed in the Plan.

"Lien" shall have the meaning ascribed in the Plan.

"Loan and Trust Agreements" shall have the meaning ascribed in the Plan.

"Master Indenture" shall have the meaning ascribed in the Plan.

"Master Trustee" shall have the meaning ascribed in the Plan.

"MBL" shall have the meaning ascribed in the Plan.

 "MDFA" shall have the meaning ascribed in the Plan.

"MDFA Affiliation Note" shall have the meaning ascribed in the Plan.

"MDFA Bonds" shall have the meaning ascribed in the Plan.

"MDFA Bondholders" shall have the meaning ascribed in the Plan.

"MDFA ECF Note" shall have the meaning ascribed in the Plan.

"MDFA Loan and Trust Agreement" shall have the meaning ascribed in the Plan.

"MDFA Note" shall have the meaning ascribed in the Plan.

"MDFA Note Claim" shall have the meaning ascribed in the Plan.

"MDFA Note Reserve Fund Amount" shall have the meaning ascribed in the Plan.

"MDFA Note Share" shall have the meaning ascribed in the Plan.

"MDFA Trustee" shall have the meaning ascribed in the Plan.

"MHEFA" shall have the meaning ascribed in the Plan.

"MHEFA Affiliation Note" shall have the meaning ascribed in the Plan.

"MHEFA Bonds" shall have the meaning ascribed in the Plan.

"MHEFA Bondholders" shall have the meaning ascribed in the Plan.

"MHEFA ECF Note" shall have the meaning ascribed in the Plan.

"MHEFA Loan and Trust Agreement" shall have the meaning ascribed in the Plan.

"MHEFA Note" shall have the meaning ascribed in the Plan.

"MHEFA Note Claim" shall have the meaning ascribed in the Plan.

"MHEFA Note Reserve Fund Amount" shall have the meaning ascribed in the Plan.

"MHEFA Note Share" shall have the meaning ascribed in the Plan.

"MHEFA Trustee" shall have the meaning ascribed in the Plan.

"MNA" shall have the meaning ascribed in the Plan.

"NARH" shall have the meaning ascribed in the Plan.

 "NARH General Unsecured Claims" shall have the meaning ascribed in the Plan.

"NARH PET Claim" shall have the meaning ascribed in the Plan.

"NARH Post-Effective Trust Account" shall have the meaning ascribed in the Plan.

"NARH Post-Effective Trust Account Interests" shall have the meaning ascribed in the Plan.

"Navigant" is defined in Article III.B.

"NBCS" shall have the meaning ascribed in the Plan.

"NBH" shall have the meaning ascribed in the Plan.

"NBH General Unsecured Claims" shall have the meaning ascribed in the Plan.

"NBH PET Claim" shall have the meaning ascribed in the Plan.

"NBH Post-Effective Trust Account" shall have the meaning ascribed in the Plan.

"NBH Post-Effective Trust Account Interests" shall have the meaning ascribed in the Plan.

"NBHPG" is defined in Article IV.A.

"NBHPG PET Claim"

"NBHPG Post-Effective Trust Account"

"NBHPG Post-Effective Trust Account Interests"

"NBR" shall have the meaning ascribed in the Plan.

"New Articles of Organization" shall have the meaning ascribed in the Plan.

"New Boards of Trustees" shall have the meaning ascribed in the Plan.

"New Bonds" shall have the meaning ascribed in the Plan.

"New By-Laws" shall have the meaning ascribed in the Plan.

"New Collateral" shall have the meaning ascribed in the Plan.

"New Constituent Documents" shall have the meaning ascribed in the Plan.

"New Indenture" shall have the meaning ascribed in the Plan.

"New Loan Agreement" shall have the meaning ascribed in the Plan.

"New MDFA 1111(b) Note" shall have the meaning ascribed in the Plan.

"New MDFA Bonds" shall have the meaning ascribed in the Plan.

"New MDFA Note" shall have the meaning ascribed in the Plan.

"New MHEFA 1111(b) Note" shall have the meaning ascribed in the Plan.

"New MHEFA Bonds" shall have the meaning ascribed in the Plan.

"New MHEFA Note" shall have the meaning ascribed in the Plan.

"New Mortgage" shall have the meaning ascribed in the Plan.

"New Notes" shall have the meaning ascribed in the Plan.

"New Note Terms" shall have the meaning ascribed in the Plan.

"New Officers" shall have the meaning ascribed in the Plan.

"New PET Unsecured Note" shall have the meaning ascribed in the Plan.

"New Secured Notes" shall have the meaning ascribed in the Plan.

"New Security Agreement" shall have the meaning ascribed in the Plan.

"New Trustee" shall have the meaning ascribed in the Plan.

"New Unsecured Notes" shall have the meaning ascribed in the Plan.

"Non-Commuting Bondholders" shall have the meaning ascribed in the Plan.

"Nuveen" shall have the meaning ascribed in the Plan.

"Nuveen Parties" shall have the meaning ascribed in the Plan.

"Obligated Group" shall have the meaning ascribed in the Plan.

"Operating Budget" shall have the meaning ascribed in the Plan.

- 6 -

"Operating Expenses" shall have the meaning ascribed in the Plan.

"Other Capital Leases" shall have the meaning ascribed in the Plan.

"Other Capital Lease Claims" shall have the meaning ascribed in the Plan.

"Other Capital Lease Secured Notes" shall have the meaning ascribed in the Plan.

"Other Capital Lessors" shall have the meaning ascribed in the Plan.

"Other Priority Claims" shall have the meaning ascribed in the Plan.

"Other Secured Claims" shall have the meaning ascribed in the Plan.

"PBGC" shall have the meaning ascribed in the Plan.

"PBGC Notes" shall have the meaning ascribed in the Plan.

"PBGC Post-Effective Claim" shall have the meaning ascribed in the Plan.

"PBGC Post-Effective Note" shall have the meaning ascribed in the Plan.

"PBGC Prepetition Claim" shall have the meaning ascribed in the Plan.

"Person" shall have the meaning ascribed in the Plan.

"Pension Plan" is defined in Article IV.H.

"PET Claim" shall have the meaning ascribed in the Plan.

"Petition Date" shall have the meaning ascribed in the Plan.

"Plan" shall have the meaning ascribed in the Plan.

"Plan Documents" shall have the meaning ascribed in the Plan.

"Plan Supplement" shall have the meaning ascribed in the Plan.

"Post-Effective Trust" shall have the meaning ascribed in the Plan.

"Post-Effective Trust Accounts" shall have the meaning ascribed in the Plan.

"Post-Effective Trust Agreement" shall have the meaning ascribed in the Plan.

"Post-Effective Trustee" shall have the meaning ascribed in the Plan.

"Post-Effective Trust Interests" shall have the meaning ascribed in the Plan.

"Post-Effective Trust Supervisors" shall have the meaning ascribed in the Plan.

"Postpetition Interest" shall have the meaning ascribed in the Plan.

"Priority Tax Claims" shall have the meaning ascribed in the Plan.

"Pro-Rata Share" shall have the meaning ascribed in the Plan.

"Professionals" shall have the meaning ascribed in the Plan.

"Professional Fee Claims" shall have the meaning ascribed in the Plan.

"Professional Fee Order" shall have the meaning ascribed in the Plan.

"Proof of Claim" means a proof of claim filed in the bankruptcy cases.

"REACH" is defined in Article IV.C.

"Reorganized Debtor" shall have the meaning ascribed in the Plan.

"Restricted Pension Payments" shall have the meaning ascribed in the Plan.

"Schedules" shall have the meaning ascribed in the Plan.

"Search Committee" has the meaning ascribed in the Plan.

"SEC" means the Securities and Exchange Commission.

"Secured Claim" shall have the meaning ascribed in the Plan.

"Secured Notes" shall have the meaning ascribed in the Plan.

"SEIU" shall have the meaning ascribed in the Plan.

"Solicitation" means this solicitation.

"Statutory Committees" shall have the meaning ascribed in the Plan.

"Sweet Brook" is defined in Article III.B.

"Sweets" is defined in Article III.B.

"Sweetwood" is defined in Article III.B.

"Tax Code" means Title 26 of the United States Code.

"Term Sheet" shall have the meaning ascribed in the Plan.

"Trust Supervisors" shall have the meaning ascribed in the Plan.

"Trustee Fees and Expenses" shall have the meaning ascribed in the Plan.

"Unimpaired" shall have the meaning ascribed in the Plan.

"Unrestricted Cash" shall have the meaning ascribed in the Plan.

"U.S. Trustee" shall have the meaning ascribed in the Plan.

"VNA" shall have the meaning ascribed in the Plan.

"VNA Building Real Property" shall have the meaning ascribed in the Plan.

"VNA Building Sale Proceeds" shall have the meaning ascribed in the Plan.

- 8 -

"VNA General Unsecured Claims" shall have the meaning ascribed in the Plan.

"VNA Hoosac Bank Deficiency Claim" shall have the meaning ascribed in the Plan.

"VNA Hoosac Bank Mortgage" shall have the meaning ascribed in the Plan.

"VNA Hoosac Bank Secured Claim" shall have the meaning ascribed in the Plan.

"VNA PET Claim" shall have the meaning ascribed in the Plan.

"VNA Post-Effective Trust Account" shall have the meaning ascribed in the Plan.

"VNA Post-Effective Trust Account Interests" shall have the meaning ascribed in the Plan.

"VNA Post-Effective Trustee" shall have the meaning ascribed in the Plan.

"Voting Agent" means GCG, Inc.

"Voting Deadline" means [                    ]

 "Voting Record Date" means [                    ].

"Voting Provisions" shall have the meaning ascribed in the Plan.

"Women's Exchange Real Property" shall have the meaning ascribed in the Plan.

- 9 -